**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| **TEXAS ADVANCED** | § | |
| **OPTOELECTRONIC** | § | |
| **SOLUTIONS, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | **CIVIL ACTION NO. 4:08-cv-451** |
| | § | |
| **vs.** | § | |
| | § | |
| **INTERSIL CORPORATION,** | § | **Jury Trial Requested** |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Texas Advanced Optoelectronic Solutions, Inc. ("TAOS" or "Plaintiff") files this Original Complaint against Intersil Corporation ("Intersil" or "Defendant") and would respectfully show the Court as follows:

## I.

## INTRODUCTION

1.      This is a lawsuit by TAOS to enjoin Intersil's taking and misuse of TAOS's confidential information and patented technology, and to recover damages from Intersil for the unlawful conduct in which it has engaged.

2.      Through expenditure of tremendous resources, TAOS invented, designed, developed, and patented state-of-the-art technology to produce the first digital ambient light sensors that are used, among other applications, to automatically adjust the "brightness" of flat panel display screens.    TAOS achieved remarkable success with its device, selling it to customers for use in high-profile products such as the Apple iPhone.

3.      Under the auspices of evaluating the purchase of TAOS, and constrained by obligations of confidentiality, Intersil undertook a complete detailed analysis of TAOS and its products.  Prior to this analysis, Intersil did not have a product that competed directly against TAOS's light sensor.  Now, Intersil markets a family of competitive light sensors.  Indeed, of all the TAOS competitors that develop and sell ambient light sensors, it appears that Intersil's products are the only ones that use the same patented technology and method as that utilized in the TAOS light sensors.

4.      Intersil "developed" its competing product, and brought it to market, in an astonishingly short period of time.  It did so not through its own independent research and development, but by unlawfully using and copying TAOS's confidential information and trade secrets and infringing on TAOS's patented technology.  Intersil also exploited its knowledge of TAOS's proprietary pricing information to unfairly and unlawfully compete against TAOS, thereby virtually guaranteeing its award of contracts for ambient light sensors.  As a result of Intersil's unlawful conduct and predatory pricing, TAOS has lost prospective supply contracts with at least Apple and Dell to Intersil.  TAOS now brings this lawsuit to enjoin Intersil's illegal conduct and recover its damages.

## II.

## PARTIES

5.      TAOS is a corporation organized under the laws of Nevada with its principal place of business in Plano, Collin County, Texas.  TAOS's corporate headquarters are located at 1001 Klein Road, Suite 300, Plano, Texas 75074.

6.      Intersil is a corporation organized under the laws of Delaware with its principal place of business in Milpitas, Santa Clara County, California.  Intersil's corporate headquarters are located at 1001 Murphy Ranch Road, Milpitas, California, 95035.  Intersil may be served

with citation by services its registered agent, CT Corporation System, 350 N. St. Paul Street, Dallas, Texas 75201.

## III.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action and TAOS's claims for patent infringement pursuant to 28 U.S.C. § 1331 and § 1338.  This Court has supplemental jurisdiction over the related contract and state law claims asserted herein pursuant to 28 U.S.C. § 1367.  The Court further has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between Intersil and TAOS and the amount in controversy exceeds $75,000.

8.      Venue is proper in this District under 28 U.S.C. § 1391 and § 1400 because a substantial part of the events or omissions giving rise to TAOS's claims occurred in this judicial district.

9.      Intersil is subject to personal jurisdiction by virtue of its contact with the State of Texas and Eastern District of Texas in particular.  Representatives of Intersil travelled to Texas for the stated purpose of evaluating the purchase of TAOS by Intersil.  Furthermore, Intersil directly and through subsidiaries or intermediaries (including distributors, retailers and others), ship, distribute, sell, offer for sale, and advertise its products in the United States, the State of Texas and the Eastern District of Texas.  Intersil, directly and through subsidiaries or intermediaries (including distributors, retailers, and others), has purposefully and voluntarily placed one or more of its infringing products, as described below, into the stream of commerce with the expectation that said products will be purchased and used by consumers in the Eastern District of Texas.  These infringing products have been and continue to be purchased and used by consumers in the Eastern District of Texas.  Finally, Intersil maintains offices in Richardson,

El Paso, Houston and Austin, Texas, and conducts business in the Eastern District of Texas over its website at www.intersil.com.

## IV.

## FACTS APPLICABLE TO ALL COUNTS

**A.      TAOS is an Industry Leader in Optoelectronic Devices.**

10.      Established in 1998, TAOS is a privately held company that develops, manufacturers, and markets numerous optoelectronic products, including photodiode sensors. TAOS employs approximately 65 people at its corporate headquarters in Plano, Texas; a satellite office in Seoul, South Korea; and sales locations throughout the world.  A recognized industry leader, TAOS's products are purchased by a broad range of technology-based companies.

11.      Optoelectronic sensors (also referred to as "light sensors"), such as photodiodes, detect light that is visible to the human eye, as well as invisible light, including ultraviolet light and infrared light.  TAOS's light sensors are incorporated into numerous products, including colorimeters to calibrate color displays and determine paint colors, hand dryers to detect the presence of a person to signal the blower fan to engage, and flat panel display screens (used in computer systems, laptop computers, cell phones, and PDA's) to provide optimum viewing in diverse lighting conditions, and extend battery life in mobile appliances.

12.      TAOS has received numerous awards for its work in the field of optoelectronics. Over the past ten years, numerous industry periodicals and expositions have awarded "Product of the Year" and similar recognitions to TAOS for its products and designs.

**B.      Intersil Now is a Direct Competitor with TAOS.**

13.      Prior to 2004-2005, Intersil did not compete in any meaningful way with TAOS. By its unlawful conduct discussed below, however, Intersil is now a direct competitor.

14.    Intersil designs and manufactures optoelectronic sensors, as well as analog and wireless networking solutions, integrated circuits for optical storage (CD and DVD recordable), and power management products.  Like TAOS, Intersil participates in some of the industry's fastest growing markets, including flat panel displays, cell phones, handheld systems, and notebook computers.  However, Intersil competes in many more markets than TAOS.

**C.     TAOS Developed an Optoelectronic Sensor that Approximates the Human Eye's Perception of Light.**

15.    The makers of electronic devices constantly seek to extend a product's battery life.  Display screens, like those on mobile phones and laptop computers, are one of the greatest drains on a battery's life.  Display panel backlighting can account for 30% to 40% of total power used in devices such as phones or computers.  Unnecessary display panel backlighting, such as in a dim room or on an airplane, contributes significantly to battery drain.

16.    Ambient light (*i.e.*, illumination) sensors ("ALS") allow for the accurate control of backlight devices by adjusting display brightness in relation to the ambient light conditions, thereby increasing a battery's life.  Conventional light sensors, however, respond strongly to infrared light, which the human eye does not recognize.  This can lead to significant error when the infrared content of ambient light is high, such as with incandescent lighting, due to the difference between the sensor's response and the light perceived by the human eye.  In other words, a conventional sensor may perceive the ambient light to be much brighter than the ambient light perceived by the human eye.  Consequently, the sensor will "overcompensate" for infrared light that is invisible to the human eye. TAOS solved this problem by designing and creating a light sensor that more closely tracks the spectral response of the human eye.

17.    In 2002, TAOS introduced the first light-to-digital sensor developed specifically for ambient light sensor applications.  The TSL2560 sensor and its successors (collectively

"TSL256x") substantially duplicate the spectral response of the human eye using two photodiodes. One photodiode is sensitive to both visible and infrared light, while the other is sensitive primarily to infrared light. Similar to all photodiodes, TSL256x's photodiodes produce currents in response to the detected light. An analog-to-digital converter ("ADC") then converts the photodiode currents to digital outputs. The ADC digital output from the two channels is then processed to obtain a value that approximates the human eye response to light. The resulting value can then be used to adjust any desired application or device, including display panels.

18. While useful for almost all light sensing applications, the TSL256x are particularly designed for display panels on computer screens, mobile phones, flat panel screens, and similar display panels. The purpose of TAOS's design is two-fold. First, it extends the battery life of electronic devices by automatically reducing unnecessary illumination on display screens in relation to ambient light conditions. Second, it provides optimum viewing of display screens in diverse lighting conditions.

19. On January 14, 2002, TAOS filed a patent application for methods and apparatus used in a light sensor developed specifically for ambient light sensor applications, which was duly and legally issued on July 22, 2003. (US Patent No. 6,596,981) ("the '981 Patent"). A true and correct copy of the '981 Patent is attached as Exhibit "A."

**D. Intersil Falsely Represents that It Wants to Make a Deal with TAOS for Use of the TSL256x Sensors and the Parties Enter into a Confidentiality Agreement.**

20. In the Spring of 2004, Intersil, in conjunction with its investment bankers, Broadview International ("Broadview), approached TAOS's management for the purpose of structuring a potential business deal between TAOS and Intersil. TAOS already was the market leader in ALS, having introduced the first light-to-digital sensor approximately two years earlier.

Furthermore, TAOS products were well known within the industry; hence their use by top computer and flat panel display manufactures.

21.     Intersil, conversely, did not competitively participate in the ALS market, though it was trying to make inroads.  Approximately two years earlier, Intersil had purchased Elantec Semiconductor, a manufacturer of high performance analog devices.   In the press release announcing the acquisition, Intersil claimed that it was seeking to "expand[] into additional high growth analog markets".  However, two years after the Elantec acquisition, Intersil still had not made any measurable impact in the ALS market in which TAOS had gained significant traction as a result of its research and development efforts.  TAOS knew that in the future, Intersil could potentially be a viable competitor in the ALS market and, therefore, proceeded with caution in responding to Intersil.

22.     On May 6, 2004, Mohan Maheswaran ("Maheswaran"), the Vice President and General Manager of Intersil's ALS business unit, contacted Carlo Strippoli ("Strippoli"), TAOS's Vice President of Sales and Marketing, "to see if a meeting between [TAOS and Intersil] would be of benefit."

23.     On May 14, 2004, Maheswaran and Kirk Laney ("Laney"), TAOS's President and Chief Executive Officer, conducted a conference call to discuss their respective businesses. Maheswaran represented that Intersil did not have a product competitive with the TSL256x sensors and that it wanted to explore a path with TAOS to quickly enter the market by one of three methods: i) a licensing agreement between the parties; ii) an equity investment by Intersil to enable TAOS's immediate growth in the marketplace; or iii) a merger between the two companies whereby Intersil would purchase TAOS.

24.     On June 3, 2004, TAOS and Intersil entered into a Confidentiality Agreement ("Agreement").  The Agreement, in part, states:

In connection with a possible business relationship ("Possible Business Relationship") between Intersil Corporation ("Intersil") and TAOS, Inc. ("TAOS") and in order to allow both parties to evaluate the Possible Business Relationship, the parties will disclose to each other and their Agents, upon the execution and delivery of this letter agreement by both parties, certain information about their respective properties, employees, finances, businesses and operations. In the course of our discussions relating to the Possible Business Relationship, it is expected that each of us will disclose to the other, orally, electronically, and in documents, information relating to our respective businesses and operations ("Confidential Information").  This letter sets forth our agreement to preserve the confidential nature of the Confidential Information.

Each of us agrees that any and all Confidential Information which either of us (or our respective Agents (as defined below) obtains from the other, whether obtained before, on or after the date of this letter, will be obtained solely for the limited purpose of enabling the recipient of such information (the "Recipient") to investigate and evaluate the business and financial condition of the other (the "Provider") in connection with such discussions and negotiations (the "Permitted Use") and that the Recipient will hold the Confidential Information in strict confidence and shall not communicate the Confidential Information to any other person or entity; *provided, however*, that any of such Confidential Information may be disclosed to any of the Recipient's representatives, employees, consultants and affiliates (including major stockholders) (collectively, "Agents") to the extent such persons or entities need to know of such Confidential Information for the sole purpose of the Permitted Use if, prior to such access, such Agent (i) is advised by the Recipient of the terms of this Agreement and (ii) agrees to be bound by the provisions hereof.

* * * * *

Each of us further represents, warrants and agrees as follows:

1.      Each of us has sought to obtain access to the Confidential Information solely for the Permitted Use and will not use the Confidential Information for any other purpose.

2.      Each of us shall be liable for any damages, liability or other losses which arise from any disclosure of the Confidential Information by anyone to whom it discloses the Confidential Information, including without, limitation its Agents.

* * * * *

6.      Our agreement expressed in this letter shall expressly survive until the third anniversary of the date of this letter agreement.  Upon termination of such

discussions and negotiations, each of us (and our respective Agents), at the request of the other, will promptly return every document or other tangible source of Confidential Information which has been received from the other or its Agents and will not retain any copies thereof or extracts or notations therefrom.

* * * * *

8.       Each of us agrees that the damages suffered by the party harmed by a breach of this agreement would be immediate and irreparable and that monetary damages would not provide an adequate remedy for such breach.  Accordingly, in the event of any such breach, the harmed party shall, in addition to any other rights and remedies it may have, be entitled to preliminary and permanent injunctive relief.

**E.       TAOS Provides Intersil with Confidential Information, Including the Method and Design Detail of the TAOS TSL256x, Which was Not Public Knowledge.**

25.       Upon execution of, and reliance on, the Agreement, TAOS began to provide confidential and proprietary business and technical information, which included its trade secrets, to Intersil solely for the purpose of evaluating a business deal between the companies.  As set forth below, the confidential information and trade secrets provided by TAOS to Intersil included proprietary and secret financial, technical and business information that was developed by TAOS through expenditure of tremendous time, money and resources.  The confidential information and trade secrets that were provided to Intersil are used by TAOS to develop, manufacture, and market its optoelectronic products, thereby giving TAOS a competitive advantage over those who do not know or have the information.

26.       In the absence of the Agreement, TAOS would never have provided its confidential information or trade secrets to Intersil.  Indeed, TAOS takes numerous steps to protect its confidential information and trade secrets from disclosure, whether inadvertent or purposeful.  For example, not all employees have access to its confidential information and trade secrets.  Instead, the company's confidential information is disseminated on a "need to know basis."  TAOS's computer systems are password protected, further limiting access to confidential

information.  Additionally, employees are regularly instructed to maintain TAOS's confidential information and trade secrets in strict confidence.  TAOS's premises are protected by advanced security systems, and employees regularly secure confidential information.  It is also the Company's practice to require employees to sign confidentiality agreements under which they agree not to disclose TAOS's confidential information.  Finally, TAOS strictly prohibits sharing confidential information with third-parties and does so only after receiving strict assurance, pursuant to non-disclosure agreements, that TAOS's confidential information will not be disseminated to any other third-parties or used for inappropriate purposes.  These safeguards have been consistently maintained since TAOS's founding in 1998, and they remain in place to date.

27.     In reliance on the Agreement, on June 4, 2004, Laney provided the "first wave" of TAOS's confidential financial information to Broadview, including revenue, sales, and customer base data.  Throughout the "negotiations" between TAOS and Intersil, Broadview acted as an intermediary on behalf of Intersil.  Like Intersil, Broadview had access to, and became knowledgeable of, TAOS's confidential information.

28.     On June 8, 2004, Laney and TAOS's Chief Financial Officer, David Craig ("Craig"), met at Intersil's headquarters in California with Maheswaran and at least five other members of Intersil's executive team, including: Rajeeva Lahri, Ph.D., ("Lahri") Chief Technology Officer; Duncan Weaver ("Weaver"), Vice President of Corporate Business Development; Michael Jennings ("Jennings"), Director of Marketing for Display Products; and Paul Vanderbilt ("Vanderbilt"), Intersil's Vice President of Engineering.  During the meeting, TAOS made a presentation and disclosed additional confidential information, including financial data, product development and design, market strategy, and TAOS's product roadmap.  At the conclusion of the meeting, Weaver requested a copy of TAOS's confidential PowerPoint

presentation.  Relying on the protections of the Agreement, TAOS provided Weaver a copy of the presentation.

29.     At Intersil's request, on June 10, 2004, Cecil Aswell ("Aswell"), TAOS's Vice President of Engineering, conducted a conference call with Intersil's management for the stated purpose of discussing TAOS's product roadmap and "product wish list (those products that you might develop without your current financial constraints)". On the same day, Laney provided a copy of its "New Product Definition/Development Process" that prioritized programs to meet growth and strategy objectives.  All of the information provided by Aswell and Laney to Intersil was TAOS's confidential information pursuant to the terms of the Agreement.

30.     After the meeting in California, Intersil requested a meeting with TAOS in Plano, Texas, for the stated purpose of conducting a "Due Diligence Meeting."  On June 14, 2004, Maheswaran wrote to Laney:

> Kirk, thanks for coming to Milpitas last week.  It certainly was a pleasure meeting with you.  I would like to take our relationship to the next level and have asked our Business Development VP, Duncan Weaver to setup a meeting in Plano, TX this Thursday, so we can get some more information into Taos (sic).  I would also like to see if you and I can get together for dinner on Wednesday evening.  My admin will be trying to set this up with you.

31.     Laney and Maheswaran met for dinner in Texas on June 16, 2004.  During dinner, Maheswaran expressed a continued interest, on behalf of Intersil, to enter into a "strategic" relationship with TAOS to develop display management products similar to the TSL256x.

32.     The following day, on June 17, 2004, TAOS's entire management team, including top-level officers from the financial, engineering, marketing, and technology groups, met in Plano, Texas with eight Intersil executives that included:

  a.  Mohan Maheswaren;

  b.  Duncan Weaver;

     c.   Vern Kelley - Vice President, Human Resources;

     d.   Sameer Parab - Manager, Technology Integration / Technology Development;

     e.   Kevin Ellis - Director of Engineering Operations;

     f.   Dennis Foster – Senior Manager, Foundry Assembly Operations;

     g.   Emeka Chukwu – Controller, and;

     h.   Brian B. North – Director of Design.

33.     Based on representations made by Intersil throughout the negotiations, TAOS believed that the purpose of the "Due Diligence Meeting" was to evaluate Intersil's purchase of TAOS.  Relying on these representations, and Intersil's execution of the Agreement, TAOS provided all of the confidential information requested by Intersil for the purpose of evaluating TAOS's business, including information related to TAOS's:

     a.   products, markets and strategy;

     b.   engineering team and research and development;

     c.   operations;

     d.   technology and intellectual property, and;

     e.   financial review.

34.     In total, TAOS presented approximately 80 PowerPoint slides, which contained a wealth of confidential information, to Intersil's management, technology, and design teams during the "Due Diligence Meeting."  Several of the slides provided detailed financial and strategic information regarding TAOS's business strategy.  Furthermore, TAOS patents were highlighted, as well as the method by which TAOS leveraged its intellectual property to create a competitive advantage over its competitors.  Specifically, TAOS explained the infrared cancellation technique unique to TAOS's display management products, including the TSL256x.  None of Intersil's management level employees claimed or disclosed that Intersil had developed

or was developing similar products that leveraged these patented techniques.  To the contrary, Intersil represented that it was interested in TAOS precisely because TAOS's technology and confidential information were not in development by Intersil.

35.     The day after the "Due Diligence Meeting," Broadview contacted Laney and claimed that Intersil "thought that the meeting went well and were impressed with TAOS.  Per my voicemail, they are very keen to move forward quickly on their internal view paperwork.  Some of the Income Statements, Costs of Goods Sold and potential Cost Savings detail will be very helpful for them in their analysis."

36.     Similarly, on June 22, 2004, Maheswaran emailed Laney and stated:

> Kirk, thanks for entertaining us last week.  I enjoyed the dinner and the open discussions we had.  I have instructed Duncan to finalize on the financial modeling so we can take discussions to the next step.  I'd also like our VP of human resources to come visit with you and the team.   Hopefully you are still feeling good about Intersil?

37.     In direct response to these and similar requests, TAOS provided Intersil and Broadview with requested confidential information, including customer and financial data, which included TAOS's pricing cost structure and revenue.  For example, on June 23, 2004, TAOS's CFO provided a detailed analysis of TAOS's operating expenses, margins, and semiconductor wafer expenses.  Craig also included comments at the bottom of each spreadsheet to "walk" Intersil through the analysis. The following day, Craig provided a spreadsheet with additional confidential information, including TAOS's revenue forecasts, forecasted costs of sales and margins, and TAOS operating expense information.   Later that week, Craig updated the information to provide additional P&L information, sales pipeline data, TAOS expense data, the cost of goods sold, the cost to TAOS for semiconductor wafers, revenue data by "product family", and revenue forecasts.   Craig also included information on sales "organized by customers [of TAOS]" and the costs of "new business opportunities."

38.     On June 25, 2004, Laney provided a detailed analysis of TAOS's gross product margins.   Intersil had requested the margin information under the guise of "investigating synergies" between the two companies in anticipation of the forthcoming business deal.  On June 29, 2004, Laney updated the spreadsheet to include additional confidential information about TAOS's finances, wafer costs to TAOS by product, royalties, revenue by product, and additional financial information which provided the complete picture of TAOS's product costs.

39.     Pursuant to Intersil's multiple requests, TAOS also provided confidential information concerning its management-level personnel.  On June 24, 2004, TAOS provided a spreadsheet that included the titles, annual salaries, average benefits, total cost, and stock ownership levels of the TAOS employees.

40.     Continuing the guise of an anticipated acquisition or business partnership, Maheswaran emailed Laney on June 24, 2004, and stated that "it was very clear to me that Cecil [Aswell, TAOS's Vice President of Engineering], Gene [Dierschke, TAOS's Chief Technology Officer], Don [Cornett, TAOS's Vice President of Operations], and Carlo [Strippoli, TAOS's Vice President of Sales and Marketing] are critical people to keep on for the next two years while they mentor some new blood.  Somehow we need to come up with an arrangement that will enable us to achieve this."  The next day, Maheswaran wrote to Laney and claimed that he had instructed Intersil's Vice President of Human Resources to travel to Plano for the purpose of discussing personnel matters in anticipation of a merger.

41.     Throughout these discussions, Intersil repeatedly claimed that (i) Intersil was not developing technology for infrared light reduction similar to that used in the TSL256x sensors; and (ii) Intersil wanted to enter that market as quickly as possible through a business deal with TAOS.

---

**F.      Intersil Sends TAOS an Unreasonable Draft Proposal and Then Breaks Off Communications with TAOS.**

42.      In the days before and after the "Due Diligence Meeting," Laney and Maheswaran had discussed several possible business ventures, including a significant equity investment by Intersil or a merger whereby Intersil would purchase TAOS.  Indeed, as late as June 28, 2004, Maheswaran wrote that Intersil was open to either acquisition or investment, "whichever makes sense to both companies."

43.      On June 29, 2004, only one day after TAOS provided its updated confidential financial information, Intersil forwarded a "Preliminary Term Sheet", which was marked "DRAFT – FOR DISCUSSION PURPOSE ONLY".  Neither the Term Sheet nor its cover letter was printed on Intersil letterhead.

44.      The draft "Preliminary Term Sheet" was not a good faith offer, especially considering the deal points previously discussed by Laney and Maheswaran.  Indeed, there were numerous deficiencies to Intersil's "offer" – which was provided only in hopes of perpetuating the illusion that Intersil was continuing to work in good faith with TAOS.  For example, Intersil offered to buy all of TAOS's outstanding shares for an amount far lower than a reasonable valuation of the company based on the financial information provided by TAOS to Intersil. Furthermore, more than half of the consideration for the acquisition was to be paid-out over two years, and was almost entirely contingent on TAOS increasing its revenue by approximately 300% during that period.  Counter-intuitively, the draft "Preliminary Term Sheet" did not provide for any capital investment by Intersil for product development or technical sales teams, a deal point that TAOS had repeatedly emphasized as critical for a transaction to occur and that would be necessary to achieve the revenue growth demanded by Intersil.

45.     Over the next several weeks, Laney attempted to discuss the "Preliminary Term Sheet" with Intersil.  However, there was nothing to be heard from them.  Indeed, the day after Intersil sent its "Preliminary Term Sheet," Maheswaran left the country for a five-week vacation in Europe, and did not return until the first week of August 2004.  In the interim, no one from Intersil was authorized to speak with Laney about the draft "Preliminary Term Sheet," and during Maheswaran's absence, no one from Intersil spoke to Laney about it.

46.     On August 13, 2004, Maheswaran finally spoke to Laney and stated that the draft "Preliminary Term Sheet" was no longer valid.  Maheswaran made clear that no offer would be forthcoming.  In a subsequent email, Maheswaran claimed that the "original offer has expired" and that there was "no plan to make another formal offer at this stage."

**G.     TAOS Requested and Received Intersil's Commitment to Comply with the Confidentiality Agreement.**

47.     On August 25, 2004, Kirk wrote to Intersil's investment bankers and formally requested that Intersil and Broadview comply with the terms of the Confidentiality Agreement:

> As a final note, in our commitment to provide Broadview and [Intersil] critical information thorough (sic) disclosure of our business in the interest of a possible merger, you understand the numerous documents and financial/technology information that were exchanged under NDA is considered TAOS proprietary. FYI, as highlighted to [Intersil] management, no TAOS customer is aware of historical, current, or forecasted TAOS revenue or financials, so you understand how accidental disclosure of this information may severely hurt TAOS at this point in time if leaked to the market.  Also, as Intersil may actually compete with TAOS in the future, it would be prudent to take the appropriate actions to at least purge hard and soft copies of information provided to Intersil.  I understand certain information cannot be erased from brains, but I trust that any information absorbed by Intersil management during presentations, phone calls, or e-mail has not been passed to others within the company that may release such information to the market.  Having said that, what can Broadview do to close this matter and purge all confidential information from Intersil?

48.     On August 30, 2004, Broadview responded and promised that Intersil's in-house Associate General Counsel, Doug Balog, would provide a letter confirming destruction of

TAOS's confidential information and full compliance with the Confidentiality Agreement.  On September 23, 2004, Balog finally represented in writing that Intersil had destroyed all of TAOS's tangible confidential information and would "treat [its] confidentiality obligations very seriously."

**H.**   **Intersil Introduces a Product that Infringes on the '981 Patent, but Alleges that the Technology was Developed by Intersil Before Conducting its TAOS "Due Diligence."**

49.   On December 21, 2005, Intersil published the Data Sheet for its ISL29001 device. Intersil described the product as an "ambient light sensor…with a spectral sensitivity curve matched to that of the human eye."  The ISL29001 Data Sheet touted the product's "[Infrared] rejection" as one of the key features, and described the product's Principles of Operation in terms that were remarkably similar, if not identical, to TAOS's TSL256x:

**Photodiodes and ADC**

The ISL29001 contains two photodiodes.  One of the photodiodes is sensitive to visible and infrared light (Diode 1) and the other is sensitive primarily to infrared light (Diode 2).  The ISL29001 also contains an on-chip integrating analog-to-digital converter (ADC) to convert photodiode currents into digital data.

50.   The ISL29001's Principles of Operation went on to describe the product's method of calculating "digital output" to achieve the spectral sensitivity curve matched to that of the human eye.  The methodology was virtually identical to the method utilized by TAOS's TSL256x and that had been disclosed to Intersil during the "Due Diligence" process.

51.   Less than two weeks later, on January 3, 2006, Intersil first released the preliminary Data Sheet for its "next generation" ISL29003 product.  Once again, Intersil promoted the product's "IR + UV rejection" and described the product's method of calculating digital output to achieve an "optimal Lux setting" matched to that of the human eye.  As with the

ISL29001, the ISL29003's methodology was virtually identical to the method utilized by TAOS's TSL256x and that had been disclosed to Intersil during the "Due Diligence" process.

52.     After learning of Intersil's introduction of these digital sensors, Laney wrote to Maheswaran on March 7, 2006 and stated:

> It was recently brought to my attention that Intersil has introduced digital sensors that mirror the feature set of the TSL256x products TAOS released last year. While I certainly have respect for the Intersil design team to focus and develop products in a timely manner, I have concern regarding the total new product process timeline at Intersil and how these specific devices were developed. It seemed surprisingly fast for your marketing folks to independently assess a rather complex optoelectronic sensor market space in which you were not previously participating, define a product that happened to align with the TAOS sensors under development at the time Intersil was performing due diligence on our company, and introduce a digital sensor into the market (the only other one in the market beside's TAOS's product). I am, therefore, writing to request that you look into this issue.

53.     In the same e-mail, Laney went on to remind Maheswaran that his greatest concern during the due diligence process was that the information provided by TAOS to a competitor, like Intersil, could be "leveraged by a strong mixed-signal company to compete with TAOS much faster than would normally be expected, and in inappropriate ways." Laney attached a copy of Balog's "Certificate of Destruction" and asked Maheswaran to confirm that TAOS's confidential information was not used to "shortcut the normal customer/market analysis, product definition and product development cycles." Maheswaran responded quickly, and said that he would have Intersil's General Counsel, Tom Tokos ("Tokos"), investigate and respond to Laney's concerns.

54.     Two days later, Intersil revised the Data Sheet for the ISL29001 product. Attempting to disguise the use of TAOS's intellectual property, the revised Data Sheet eliminated "[Infrared] rejection" as one of the product's key features, but still described the product's method of calculating "digital output" to achieve the spectral sensitivity curve matched

to that of the human eye, which clearly leveraged the intellectual property and method utilized by TAOS's TSL256x and that had been disclosed to Intersil during the "Due Diligence" process.

55.     Having heard nothing from Intersil, on March 15, 2006, Laney wrote directly to Tokos and asked for an update on his information request.  Tokos claimed that he had pushed the project off to Intersil's Intellectual Property Counsel, Paul Bernkopf ("Bernkopf"), who would be in touch with Laney.

56.     More than two weeks later, on April 3, 2006, Laney still had heard nothing from Intersil and once again followed-up to ask for a status update.  Later that same afternoon, Tokos wrote to Laney and claimed that Intersil's investigation had determined that none of TAOS's confidential information had been retained by Intersil and the ISL2900x products had been developed "based upon its own efforts and customer input."

57.      However, on the same day that Tokos wrote to Laney, Intersil once again revised the Data Sheet for its ISL29001 product.  In the latest iteration of the Data Sheet, Intersil more accurately described how the two-diode method facilitates infrared light cancellation, a key component of TAOS's TSL256x products.

58.     The very next day, on April 4, 2006, Intersil released the preliminary Data Sheet for yet another new Intersil product – the ISL29002.  Seemingly identical to TAOS's TSL256x products, the description claimed that "[t]he sensor includes another photodiode covered with metal to reduce the effects of dark output reading that may be significant in low lux levels."  The preliminary Data Sheet went on to describe the product's method of calculating "digital output" to achieve the spectral sensitivity curve matched to that of the human eye and, furthermore, the method for achieving "IR Rejection."

59.     The device and methodology described in the ISL29002's preliminary Data Sheet again leveraged those developed by TAOS in the TSL256x products, and that had been disclosed

to Intersil during the "Due Diligence" process.  On April 12, 2006, Intersil revised the Data Sheet to include additional information concerning the ISL29002.

60.     On April 6, 2006, Laney wrote to Tokos and asked for an assessment of the "IR cancellation technique on the Intersil 29001 device and product family, and their source for the concept.  It appears to mirror our technique for our digital sensor that we disclosed under the NDA (and also have covered by a patent)."  On May 1, 2006, without having heard anything from Intersil, Laney again requested information concerning Intersil's "possible misappropriation of IP and technical information acquired during due diligence."

61.     On May 15, 2006, Tokos finally responded:

> [T]he technique was developed by Intersil engineers prior to the communications between our companies that took place in June of 2004.  Therefore, [we have] concluded that the technique was based upon Intersil's own efforts without misappropriation of TAOS confidential information.

62.     Tokos's misrepresentations directly contradicted Intersil's previous representation and admissions that it did not have – and was not developing – any optoelectronic sensors that competed with the TAOS TSL256x sensors.  Indeed, Intersil's stated purpose for acquiring TAOS was to quickly enter a market in which it did not already participate.

63.     Upon information and belief, Intersil "developed" and manufactured its ISL2900x products by using TAOS's confidential information and its patented technology.

I.      **TAOS Begins Selling the TSL256x to Apple for Use in the iPhone and to Other End-Users But Loses Contracts to Intersil Based on Intersil's Improper Conduct.**

64.     In or around November 2006, TAOS entered into a contract with Apple Inc. ("Apple") to sell TAOS TSL256x sensors to Apple for use in the first generation Apple iPhone ("iPhone").

65.     Throughout 2007, Apple bought millions of TSL256x sensors, which were used in manufacturing the iPhone.  TAOS entered into negotiations with Apple to provide light-to-digital optical sensors for use in the next generation (3G) Apple iPhone.

66.     In or around January 2008, TAOS unexpectedly learned that Apple would not utilize the TAOS sensor in the next generation (3G) Apple iPhone.  Instead, TAOS learned that Apple had selected Intersil over TAOS to supply sensors for its next generation (3G) Apple iPhone.  Upon information and belief, Intersil unlawfully used TAOS's confidential information and trade secrets to price its ISL2900x sensors lower than TAOS's TSL256x sensors, and to otherwise unfairly compete with TAOS and unlawfully interfere with TAOS's renewal of the Apple iPhone contract.

67.     In approximately March 2006, TAOS quoted Apple pricing to provide light-to-digital optical sensors for use in Apple's iPod touch.  In or around July 2007, TAOS learned that Apple had selected Intersil over TAOS to supply millions of optical sensors for its iPod touch. Intersil entered into a supply contract with Apple to provide ISL2900x sensors for use in the iPod touch.  Upon information and belief, Intersil unlawfully used TAOS's confidential information and trade secrets to price its ISL2900x sensors lower than TAOS's TSL256x sensors, and to otherwise unfairly compete with TAOS and unlawfully prevent TAOS from winning the iPod touch contract.

68.     In approximately September 2007, TAOS bid on Dell's supply contract to provide light-to-digital optical sensors for use in Dell's Notebook computers.  In or around September 2007, however, TAOS learned that Dell had selected Intersil over TAOS to supply sensors for Dell's Notebook computers.  Intersil entered into a supply contract with Dell to provide ISL2900x sensors for use in Dell's Notebook computers.  Upon information and belief, Intersil unlawfully used TAOS's confidential information and trade secrets to price its ISL2900x sensors

lower than TAOS's TSL256x sensors, and to otherwise unfairly compete with TAOS and unlawfully prevent TAOS from winning the Dell contract.

69.     Upon information and belief, Intersil has unlawfully used TAOS's confidential information and trade secrets to price its ISL2900x sensors lower than TAOS's TSL256x sensors, and to otherwise unfairly compete with TAOS and unlawfully prevent TAOS from winning supply contracts from other businesses, currently unknown to TAOS.

**V.**

**CAUSES OF ACTION**

**COUNT ONE: Patent Infringement**

70.     TAOS repeats and realleges the allegations above.

71.     On July 22, 2003, United States Patent No. 6,596,981 ("the '981 patent") entitled "Method and Apparatus for Optical Detector with Special Discrimination" was duly and legally issued with Cecil Aswell, John H. Berlien, Jr., Eugene G. Dierschke, and Lester L. Hodson as the named inventors.  TAOS is the owner of all rights, title, and interest in and to the '981 patent and possesses all rights of recovery under the '981 patent.

72.     Intersil is infringing the '981 patent under 35 U.S.C. § 271 by performing, without authority, one or more of the following acts: (a) making, using, offering to sell, and selling products that infringe one or more valid claims of the '981 patent; and (b) on information and belief, contributing to the infringement of the '981 patent by others; and/or (c) on information and belief, inducing others to infringe the '981 patent.

73.     Intersil's acts of infringement have caused damages to TAOS.  TAOS is entitled to recover from Intersil the damages sustained by TAOS as a result of Intersil's wrongful acts in an amount subject to proof at trial.  Intersil's infringement of TAOS's rights under the '981

patent will continue to damage TAOS's business, causing irreparable harm, for which there is no adequate remedy at law, unless enjoined by the Court.

74.     Intersil is, and has been, aware of the '981 patent, and therefore, Intersil's infringement of the '981 patent is willful and deliberate, and TAOS is entitled to enhanced damages and attorneys' fees incurred in this action pursuant to 35 U.S.C. § 284 and § 285.

## COUNT TWO: Breach of Contract (California Law)

72.     TAOS repeats and realleges the allegations above.

73.     On June 3, 2004, TAOS and Intersil entered into the Agreement.

74.     TAOS performed all of the conditions precedent that it was required to perform under the Agreement.

75.     As discussed above, Intersil breached the Agreement when it, among other things, (i) revealed and disclosed TAOS's Confidential Information to unauthorized third-parties in violation of the Agreement's terms, (ii) used TAOS's Confidential Information for purposes other than its Permitted Use; and (iii) did not return or destroy its copies and files of TAOS's Confidential Information pursuant to the Agreement and the explicit demands of TAOS.

76.     As a result of Intersil's breach of the Agreement, TAOS has suffered damages for which it seeks recovery.

77.     Pursuant to the Agreement, TAOS is entitled to injunctive relief to prohibit Intersil's further breach of the Agreement.

## COUNT THREE: Trade Secret Misappropriation (Texas Law)

78.     TAOS repeats and realleges the allegations above.

79.     The confidential information discussed above constitutes TAOS's trade secrets.

80.     TAOS owned the confidential trade secrets that it disclosed to Intersil.

81.     TAOS took reasonable efforts to maintain the secrecy of its confidential information and trade secrets.  In the absence of the Agreement and the promises and representations made by Intersil and Broadview, TAOS would never have disclosed its confidential information or its trade secrets to Intersil or Broadview.

82.     Intersil misappropriated TAOS's trade secrets by, among other things, (i) acquiring the trade secrets through improper means; and (ii) disclosing or using the trade secrets without TAOS's consent and in breach of a confidential relationship.

83.     As a result of Intersil's misappropriation, TAOS has suffered damages for which it seeks recovery, including, without limitation, lost profits and unjust enrichment.

84.     Because Intersil acted with fraud and/or malice, TAOS is entitled to exemplary damages.

## COUNT FOUR: Tortious Interference with Prospective Relations (Texas Law)

85.     TAOS repeats and realleges the allegations above.

86.     TAOS engaged in negotiations with Apple and Dell to provide light-to-digital optical sensors for use in the next generation (3G) Apple iPhone, the Apple iPod touch, and Dell's Notebook computers.  There was a reasonable probability that TAOS would have entered into business relationships with Apple and Dell to provide light-to-digital optical sensors for their products.

87.     Upon information and belief, Intersil knew of the existence of TAOS's prospective contracts with Apple and Dell.

88.     Intersil intentionally and unlawfully interfered with these known prospective contracts by misappropriating and using TAOS's confidential information and/or trade secrets to, among other things, price its ISL2900x sensors lower than TAOS's TSL256x sensors, and to

otherwise unfairly compete with TAOS and unlawfully interfere with TAOS's prospective contracts and business relations.

89.     Apple and Dell awarded the prospective contracts to Intersil.

90.     Intersil's interference with the prospective contracts and relations was independently unlawful because Intersil misappropriated and used TAOS's confidential information and/or trade secrets to win the contracts.

91.     As a result of Intersil's tortious interference with prospective contracts and relations, TAOS has suffered damages, including, without limitation, lost profits and unjust enrichment.

92.     Because Intersil acted with fraud and/or malice, TAOS is entitled to exemplary damages.

## VI.

## DEMAND FOR JURY TRIAL

93.     TAOS hereby demands a jury for all issues so triable.

## VII.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Texas Advanced Optoelectronic Solutions, Inc. respectfully requests that the Court:

A.     Enter judgment against Intersil for actual, consequential, and compensatory damages suffered by TAOS;

B.     Enter judgment against Intersil for exemplary damages;

C.     Enter judgment finding infringement by Intersil of the '981 patent;

D.     Enter preliminary and permanent injunctive relief preventing Intersil from using and disclosing TAOS's confidential information, trade secrets, technology, and from infringing the '981 patent;

E.      Award TAOS enhanced damages;

F.      Award TAOS exemplary damages;

G.      Award TAOS its attorneys' fees and costs;

H.      Award TAOS pre-judgment and post-judgment interest at the highest rates allowed by law; and

I.      Grant TAOS such other and further relief to which it may be entitled at law or equity.

Respectfully submitted,

  /s/ Jamil N. Alibhai
Jamil N. Alibhai
Texas State Bar No. 00793248
jalibhai@munckcarter.com
Michael A. McCabe
Texas State Bar No. 24007628
mmccabe@munckcarter.com
Robert D. McCutcheon
Texas State Bar No. 00789480
rmccutcheon@munckcarter.com
William A. Munck
Texas State Bar No. 00786127
wmunck@munckcarter.com
Ryan C. Hudson
Texas State Bar No. 24053274
rhudson@munckcarter.com
**MUNCK CARTER, P.C.**
600 Banner Place
12270 Coit Road
Dallas, Texas 75251
Telephone: 972.628.3600
Telecopier: 972.628.3616

**ATTORNEYS FOR TEXAS
ADVANCED OPTOELECTRONIC
SOLUTIONS, INC. ("TAOS")**