1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF TEXAS
2                    PLANO DIVISION

3                                    )
4    TEXAS ADVANCED                  )
     OPTOELECTRONICS SYSTEMS,        ) DOCKET NO. 4:08CV451
5    INC.,                           )
                                     ) MARCH 4, 2015
6                                    )
     V.                              ) 8:54 A.M.
7                                    )
                                     ) PLANO, TEXAS
8    INTERSIL CORPORATION            )

9

10   *********************************************************

11        REPORTER'S TRANSCRIPT OF FINAL ARGUMENTS

12        BEFORE THE HONORABLE RICHARD SCHELL,

13            UNITED STATES DISTRICT JUDGE

14   *********************************************************
15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                   (JURY NOT PRESENT)

3              LAW CLERK:  HEAR YE, HEAR YE, HEAR YE, THIS

4    UNITED STATES DISTRICT COURT IN AND FOR THE EASTERN

5    DISTRICT OF TEXAS HOLDING A REGULAR SESSION IN THE CITY

6    OF PLANO IS NOW OPEN ACCORDING TO LAW.  GOD SAVE THESE

7    UNITED STATES AND THIS HONORABLE COURT.

8              THE COURT:  THANK YOU.  PLEASE TAKE YOUR

9    SEATS.  OKAY.  WE HAVE PRESENT IN THE COURTROOM COUNSEL

10   FOR BOTH SIDES.  MR. ALIBHAI, MR. MCCABE, MR. WILSON ARE

11   HERE FOR THE PLAINTIFF, ALONG WITH MR. LANEY, THE CEO OF

12   TAOS.

13             AND ALSO FOR THE DEFENDANT, WE HAVE

14   MR. BRAGALONE, MR. KIMBLE, MR. GRAHAM, AND MR. TOKOS,

15   THE GENERAL COUNSEL FOR INTERSIL.  CASE -- WE'RE

16   SCHEDULED THIS MORNING TO BEGIN FINAL ARGUMENTS.  EACH

17   SIDE HAS AGREED TO 90 MINUTES PER SIDE FOR FINAL

18   ARGUMENTS.  PLAINTIFF HAVING THE BURDEN OF PROOF ON FOUR

19   CLAIMS IN THE CASE HAS THE RIGHT TO OPEN AND CLOSE FINAL

20   ARGUMENTS.

21             I THINK YOU SAID, MR. ALIBHAI, THAT YOU AND

22   MR. MCCABE WOULD SHARE YOUR OPENING ARGUMENT ALSO?

23             MR. ALIBHAI:  YES, YOUR HONOR.

24             THE COURT:  NOW, DO YOU WANT ME TO GIVE YOU

25   ANY WARNING AS TO HOW MUCH TIME YOU'VE USED, OR WILL

1   MR. WILSON HELP YOU WITH THAT?

2                  MR. ALIBHAI:  MR. WILSON CAN'T HELP US WITH

3   THAT, BUT MS. CHEN'S GOING TO BE SITTING RIGHT HERE, AND

4   SHE'S GOING TO HELP US WITH THAT.

5                  MR. WILSON:  IT'S TRUE.

6                  THE COURT:  AND I FORGOT MS. CHEN IS HERE

7   TODAY TOO.  SO THAT'S FINE.

8                  ALL RIGHT.  LET'S SEE, MR. BRAGALONE, DO

9   YOU -- ARE YOU GOING TO MAKE THE FULL ARGUMENT FOR

10  INTERSIL?

11                 MR. BRAGALONE:  YES, YOUR HONOR.

12                 THE COURT:  YOU WILL?  OKAY.  ALL RIGHT.

13  DO YOU WANT ME TO GIVE YOU ANY KIND OF WARNING WHEN YOU

14  GET CLOSE TO YOUR 90 MINUTES?

15                 MR. BRAGALONE:  YOUR HONOR, IF I GET DOWN

16  TO TWO, THEN YES.

17                 THE COURT:  OKAY.  SURE WILL.  NOW, YOU

18  WERE GOING TO EXCHANGE DEMONSTRATIVE EXHIBITS NO LATER

19  THAN 7:00 A.M. THIS MORNING.  SO, ARE THERE ANY ISSUES

20  WITH THAT, WITH THOSE EXHIBITS?

21                 MR. ALIBHAI:  YOUR HONOR, WE HAVE ONE ISSUE

22  WITH THE SLIDES.

23                 THE COURT:  OKAY.  WHAT IS IT?

24                 MR. ALIBHAI:  AND I THINK IF THEY PUT IT

25  UP, IT MIGHT BE EASIER FOR YOUR HONOR TO SEE.  IT'S

1   SLIDES 37 AND 38.  WHEN -- WHEN I ARGUED THE MOTIONS FOR

2   JUDGMENT AS A MATTER OF LAW, ONE OF THE ISSUES I RAISED

3   WAS THAT THE LAST TWO SUBPARTS OF THEIR DECLARATORY

4   RELIEF CLAIM WAS ABOUT THE FACT THAT THEY WERE RELYING

5   ON THE BROADVIEW/INTERSIL AGREEMENT, AND I THOUGHT THAT

6   WE HAD AN AGREEMENT ON THE RECORD THAT THEY WOULD NOT BE

7   ABLE TO RELY ON THE BROADVIEW/INTERSIL AGREEMENT.  AND

8   THEY INTEND TO ARGUE THE BROADVIEW/INTERSIL AGREEMENT TO

9   THE JURY AND THE CERTIFICATE OF DESTRUCTION MAKING

10  REFERENCE TO THAT.

11              THE COURT:  ALL RIGHT, NOW, THAT -- THAT

12  WAS IN A DOCUMENT -- WHAT DOCUMENT WAS THAT IN?

13              MR. ALIBHAI:  IT WAS THE CERTIFICATE OF

14  DESTRUCTION, WHICH IS --

15              THE COURT:  WELL, NO, THERE WAS A REFERENCE

16  TO SUBPARTS OF SOME DOCUMENT.

17              MR. ALIBHAI:  SORRY.  THAT WAS THEIR

18  ORIGINAL ANSWER AND COUNTERCLAIMS.

19              THE COURT:  YES.

20              MR. ALIBHAI:  IT WAS THE FIFTH

21  COUNTERCLAIM, YOUR HONOR.

22              THE COURT:  OKAY.  OKAY, THAT'S

23  DOCUMENT 88.  THERE WAS AN AGREEMENT -- I THINK IT WAS

24  ON THE EVENING WE HAD THE RULE 50 MOTION HEARING, SO IT

25  WAS -- IT WAS NIGHT BEFORE LAST, THERE WAS AN AGREEMENT

1  THAT -- THE WAY I UNDERSTOOD IT -- THAT INTERSIL WOULD

2  NOT ARGUE THAT -- LET'S SEE.  LET ME READ IT FIRST.

3              THE WAY I UNDERSTOOD IT WAS INTERSIL AGREED

4  NOT TO ARGUE THAT THE DESTRUCTION OF TAOS'S DOCUMENTS

5  CONSISTENT WITH THE TERMS OF THE LETTER DATED

6  SEPTEMBER 23, 2004, FROM DOUG BALOG TO KIRK LANEY DID

7  NOT CONSTITUTE A MATERIAL BREACH OF INTERSIL'S

8  OBLIGATIONS TO TAOS.  THAT'S PART D OF PARAGRAPH 138 IN

9  DOCUMENT 88.

10             PART E READS, "INTERSIL WAS AND IS ENTITLED

11 TO RETAIN A COPY OF THE MATERIALS IT HAD RECEIVED FROM

12 TAOS," AND THE DEFENDANT AGREED NOT TO ARGUE THAT.  THAT

13 WAS MY UNDERSTANDING.  SO, LET'S SEE.  DO WE HAVE THE

14 SLIDES?  CAN WE PUT THOSE UP?  IS MR. WELCH PUTTING

15 THOSE UP?

16             MR. BRAGALONE:  YOUR HONOR, WE HAVE THE

17 NOTEBOOKS HERE.

18             THE COURT:  CAN MR. WELCH PUT THOSE SLIDES

19 UP?

20             MR. BRAGALONE:  I'LL SEE, YOUR HONOR.

21             THE COURT:  OKAY.  THE SLIDE THAT'S ON THE

22 SCREEN --

23             MR. ALIBHAI:  IT'S THE SLIDE BEFORE THAT AS

24 WELL.

25             THE COURT:  OKAY.

1          MR. ALIBHAI:  THEY'RE ARGUING MISTAKE ON

2    THAT SLIDE.

3          THE COURT:  THE SLIDE THAT'S ON THE SCREEN

4    IS -- READS, "TAOS NEVER COMPLAINS OF CERTIFICATE OF

5    DESTRUCTION."  IT THEN HAS AN E-MAIL FROM A PERSON AT

6    BROADVIEW NAMED TODD COLEMAN -- NO, I'M SORRY, AN E-MAIL

7    FROM KIRK LANEY AT TAOS TO DOUG BALOG AT INTERSIL DATED

8    SEPTEMBER 23, 2004, WHERE MR. LANEY SAYS TO MR. BALOG,

9    "THANK YOU FOR YOUR ATTENTION TO THIS MATTER.  YOUR

10   SCANNED ORIGINAL CERTIFICATE OF DESTRUCTION HAS BEEN

11   RECEIVED AND COVERS OUR CONCERNS."

12         OKAY.  SO WHAT DO YOU WANT TO ARGUE?

13         MR. ALIBHAI:  AND IT'S THE SLIDE BEFORE

14   THAT, YOUR HONOR, THAT DISCUSSES THE MISTAKE.

15         THE COURT:  ALL RIGHT.  LET ME SEE THE

16   SLIDE BEFORE THAT.  AGAIN, THIS SLIDE AT THE TOP

17   SAYS, "CERTIFICATE OF DESTRUCTION REVEALS MISTAKE."  IT

18   IS A LETTER FROM INTERSIL TO MR. LANEY DATED

19   SEPTEMBER 23, 2004, AND IT SAYS THAT THIS LETTER

20   CONSTITUTES INTERSIL CORPORATION'S CERTIFICATE OF

21   DESTRUCTION OF TANGIBLE CONFIDENTIAL INFORMATION

22   PROVIDED TO INTERSIL UNDER THE NONDISCLOSURE AGREEMENT

23   BETWEEN INTERSIL CORPORATION AND BROADVIEW

24   INTERNATIONAL, DATED JULY 1, 2004."

25         OKAY.  WHAT DO YOU WANT TO ARGUE,

1    MR. BRAGALONE?

2              MR. BRAGALONE:  WELL, YOUR HONOR, FIRST OF

3    ALL, I WILL NOT BE ARGUING WHAT WE COMMITTED IN THE

4    PRETRIAL CONFERENCE DURING THE JUDGMENTS AS A MATTER OF

5    LAW.

6              THE COURT:  OKAY.  AND -- AND WHAT DID YOU

7    AGREE NOT TO ARGUE?

8              MR. BRAGALONE:  YES.  SPECIFICALLY, AS THE

9    COURT NOTED, INTERSIL AGREED NOT TO ARGUE THAT THE

10   DESTRUCTION OF TAOS DOCUMENTS CONSISTENT WITH THE TERMS

11   OF THE LETTER DATED SEPTEMBER 23, 2004, FROM DOUG BALOG

12   TO KIRK LANEY DID NOT CONSTITUTE A MATERIAL BREACH.

13   WE'RE NOT CONTENDING THAT THIS ABSOLVES US IN ANY WAY OF

14   THE MATERIAL BREACH.  THAT ISSUE'S ALREADY BEEN DECIDED.

15             THE COURT:  OKAY.

16             MR. BRAGALONE:  WE'RE NOT ARGUING THAT AT

17   ALL.  TO THE CONTRARY, AS TO THE JUXTAPOSITION TO THE

18   SLIDES, WE'RE ALSO NOT ARGUING THAT WE WERE ENTITLED TO

19   RETAIN A COPY OF ANY MATERIALS THAT WERE RECEIVED, NOT

20   AT ALL.

21             THE COURT:  OKAY.

22             MR. BRAGALONE:  IN FACT, THE JUXTAPOSITION

23   OF THE TWO SLIDES IS VERY ILLUSTRATIVE OF THE POINT HERE

24   THAT WE ARE GOING TO ARGUE THAT THE CERTIFICATE OF

25   DESTRUCTION PUT THEM ON NOTICE THAT WE HAD THE WRONG

1    NDA.  VERY DIFFERENT.  AND THEN, THE NEXT SLIDE, 38,

2    THAT THEY DIDN'T COMPLAIN ABOUT THAT AT THE TIME.

3                   THE COURT:  OKAY.

4                   MR. BRAGALONE:  THAT'S ALL.

5                   THE COURT:  WHAT'S THE OBJECTION,

6    MR. ALIBHAI?

7                   MR. ALIBHAI:  I'M NOT SURE WHAT THEM HAVING

8    THE WRONG NDA HAS TO DO WITH ANYTHING.  IT CAN'T BE A

9    BREACH.

10                  THE COURT:  WELL, MR. BRAGALONE CONCEDES

11   THAT THESE COMMUNICATIONS DON'T ABSOLVE THEM OF THEIR

12   RESPONSIBILITY UNDER THE CONFIDENTIALITY AGREEMENT TO

13   DESTROY OR RETURN ALL THE CONFIDENTIAL INFORMATION

14   SUPPLIED TO INTERSIL FROM TAOS.  THESE DOCUMENTS SPEAK

15   FOR THEMSELVES.  THERE WAS -- AND I DON'T KNOW HOW TO

16   FIND THEM IN THE RING BINDER HERE.

17                  MR. BRAGALONE:  IT'S NUMBER 37 AND 38, YOUR

18   HONOR, THOSE PAGES AT THE VERY BOTTOM LEFT-HAND CORNER.

19                  THE COURT:  OKAY.  THESE DOCUMENTS

20   OBVIOUSLY SPEAK FOR THEMSELVES.  THEY WERE EXCHANGED ON

21   THE VERY SAME DAY, SEPTEMBER 23, 2004.  WHO WROTE THE

22   FIRST ONE?  WAS THAT FROM MR. TOKOS?

23                  MR. BRAGALONE:  IT WAS FROM MR. BALOG.

24                  THE COURT:  OH, THAT'S RIGHT.  MR. BALOG.

25   SO, MR. BALOG SAYS -- CERTIFIES THAT TANGIBLE

1  CONFIDENTIAL INFORMATION PROVIDED TO INTERSIL HAS BEEN

2  DESTROYED UNDER THE NDA BETWEEN INTERSIL AND BROADVIEW."

3  OBVIOUSLY, THE WRONG NDA.

4          MR. LANEY RESPONDS, SAYING, THANK YOU FOR

5  YOUR ATTENTION.  WE'VE RECEIVED IT AND THAT COVERS OUR

6  CONCERNS.  I MEAN, THEY'RE DEFINITELY -- THOSE ARE

7  DEFINITELY TWO PIECES OF CORRESPONDENCE THAT CROSSED

8  BETWEEN THE TWO PARTIES.

9          MR. ALIBHAI:  AS LONG AS THAT'S WHAT'S

10 BEING ILLUSTRATED BY THESE SLIDES AND NOTHING MORE THAN

11 THAT REGARDING THE BREACH OF THE CONTRACT OR ANY

12 OBLIGATION BETWEEN TAOS AND INTERSIL AS OPPOSED TO

13 BETWEEN INTERSIL AND BROADVIEW, THEN THAT'S ACCEPTABLE.

14         THE COURT:  OKAY.  WELL, IT DOES REVEAL

15 THAT MR. LANEY SAID TO MR. BALOG, THAT COVERS OUR

16 CONCERNS.

17         MR. ALIBHAI:  THAT'S CORRECT.

18         THE COURT:  OKAY.  OKAY.  MS. REESE HAS

19 COPIES OF THE JURY INSTRUCTIONS FOLLOWING OUR HEARING

20 LAST NIGHT AT THE CHARGE CONFERENCE.  SHE HAS COPIES FOR

21 COUNSEL AND A COPY FOR EACH JUROR.  MY PRACTICE IS TO

22 READ THE INSTRUCTIONS BEFORE YOU ARGUE SO THE JURY HAS

23 THE -- HAS AT LEAST HEARD THE JURY INSTRUCTIONS BEFORE

24 THEY HEAR YOUR ARGUMENTS ON THE LAW AND THE FACTS.  I

25 SHOULD SAY YOUR ARGUMENTS ON THE FACTS AND HOW THE LAW

1   APPLIES TO THOSE FACTS.

2            MR. ALIBHAI:  YOUR HONOR, IS IT YOUR

3   PRACTICE TO READ THE VERDICT FORM AS WELL OR JUST THE

4   CHARGE?

5            THE COURT:  I READ THE VERDICT FORM TOO.

6            MR. ALIBHAI:  OKAY, THANK YOU.

7            THE COURT:  I READ THE WHOLE THING.

8            OKAY, MR. ALIBHAI, ARE YOU READY?

9            MR. BRAGALONE:  OH, YOUR HONOR, I DIDN'T

10  KNOW IF MR. ALIBHAI WAS DONE WITH HIS COMMENTS TO OUR

11  SLIDES, BUT WE HAD A COUPLE OF CONCERNS ABOUT THEIRS

12  THAT WE WANTED TO RAISE.

13           THE COURT:  OH, OKAY.  I DIDN'T KNOW THAT.

14           MR. BRAGALONE:  SO, THE FIRST ONE, YOUR

15  HONOR, ACTUALLY RELATES ALSO TO THE EMERGENCY MOTION

16  THAT WE FILED A COUPLE DAYS AGO, BUT --

17           THE COURT:  I HAVE NOT HAD TIME TO LOOK AT

18  THAT.  I HAVE A COPY RIGHT HERE.  I UNDERSTAND IT HAS TO

19  DO WITH A RULING I MADE ON JUNE 17TH IN THE MIDDLE OF

20  TRIAL ON ONE OF YOUR OBJECTIONS TO SOME TESTIMONY.  I

21  HAVE NOT HAD A CHANCE TO READ THIS.  IT WAS FILED TWO

22  DAYS AGO.  I GOT IT YESTERDAY.  I WAS WORKING ON JURY

23  INSTRUCTIONS, AND WE HAD A HEARING UNTIL PRETTY LATE

24  LAST NIGHT.  I THINK IT WAS ABOUT 9:30.  AND I DON'T

25  HAVE A RESPONSE FROM THE PLAINTIFF, SO --

1              MR. BRAGALONE:  WELL --

2              THE COURT:  I DON'T HAVE AN OPPORTUNITY TO

3    ADDRESS THAT RIGHT NOW.

4              MR. BRAGALONE:  I UNDERSTAND.  OUR

5    OBJECTION, THOUGH, IS TO THEIR SLIDES, WHICH PERPETUATE

6    THE SAME PROBLEM THAT WE ADDRESSED IN THE MOTION.  SO,

7    I -- I'M GOING TO ADDRESS ONLY THE SLIDES AND THE

8    PROBLEM WITH THOSE NOW.

9              THE COURT:  ALL RIGHT.

10             MR. BRAGALONE:  THE ISSUE, YOUR HONOR, IS

11   THAT, FIRST OF ALL, ALLOWING A WITNESS TO DEMONSTRATE

12   WHAT HE OBSERVED ANOTHER WITNESS DO OUT OF COURT IS

13   HEARSAY.  IT'S NONVERBAL HEARSAY.

14             THE COURT:  OKAY.

15             MR. BRAGALONE:  AND WE MADE A TIMELY

16   OBJECTION AT THE TIME.  WE SINCE WERE ABLE TO PROVIDE

17   THE COURT WITH SOME CASE AUTHORITY AND THE RULE ITSELF

18   THAT INDICATES THAT -- THAT THAT IS, IN FACT, HEARSAY.

19   IT'S BEING OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

20   NOT ONLY ARE THEY OFFERING IT AGAIN IN THEIR

21   DEMONSTRATIVES, APPARENTLY FOR THE TRUTH OF THE MATTER

22   ASSERTED, IT'S IN THERE SEVERAL TIMES, AND THEY'RE

23   RELYING ON THIS -- WHAT THEY DREW UP ON THIS WHITEBOARD

24   HERE.  AND WE OBJECT FOR A COUPLE REASONS.

25             FIRST OF ALL, IT IS CLEARLY HEARSAY, AND

1   IT'S NOW BEING OFFERED FOR THE TRUTH OF THE MATTER

2   ASSERTED.  SECOND, THE WHITEBOARD AND WHETHER OR NOT

3   SOMETHING WAS DELIVERED OR DISSEMINATED OR COMMUNICATED

4   BY WHITEBOARD WAS NEVER, NEVER IN THE HISTORY OF THIS

5   LITIGATION, DISCLOSED.  WE DEPOSED MR. LANEY THREE

6   TIMES.  WE DEPOSED MR. ASWELL, MR. DIERSCHKE.  NEVER --

7   AND WE ASKED, TELL US ALL THE TRADE SECRETS.  JUDGE BUSH

8   ORDERED THAT IF THEY WERE TO IDENTIFY ANY ADDITIONAL

9   TRADE SECRETS OTHER THAN WHAT WAS ON THAT LIST, THAT

10  THEY HAD TO STATE THE MANNER IN WHICH IT WAS

11  DISSEMINATED.  AT NO TIME WAS A WHITEBOARD EVER

12  DISCLOSED.

13              THE COURT:  ARE YOU TALKING ABOUT A

14  WHITEBOARD USED AT ONE OF THE MEETINGS WHERE INTERSIL

15  AND TAOS REPRESENTATIVES WERE EXCHANGING INFORMATION?

16              MR. BRAGALONE:  SO --

17              THE COURT:  IS THAT WHAT YOU'RE TALKING

18  ABOUT?

19              MR. BRAGALONE:  I'M TALKING ABOUT THE

20  WHITEBOARD AND THEN WHAT WAS DONE IN THE COURTROOM TO

21  RECOUNT THE HEARSAY OF WHAT THEY ALLEGED A TAOS EMPLOYEE

22  WROTE ON THE WHITEBOARD.

23              THE COURT:  AT WHAT?  AT A MEETING BETWEEN

24  TAOS AND INTERSIL?

25              MR. BRAGALONE:  YES.  YES, IT WAS A

1   MEETING.  AND THE IRONY IS, IS THAT EVEN THOUGH THIS WAS

2   NEVER DISCLOSED AT ANY TIME IN THE HISTORY OF THIS

3   LAWSUIT, NOW, THEY SAY THAT THAT WAS THE CROWN JEWELS,

4   THAT THAT'S APPARENTLY THE CENTERPIECE OF THEIR CASE IS

5   WHAT WAS DISCLOSED ON THIS WHITEBOARD, AND IT'S VERY

6   CONVENIENT, BECAUSE THEY DON'T HAVE ANY DOCUMENTS.

7   THERE'S NOTHING IN THE CASE THAT SHOWS WHAT THEY NOW

8   CLAIM THAT THEY WROTE ON THIS WHITEBOARD.  AND THEY

9   NEVER DISCLOSED THAT AT ANY TIME IN DISCOVERY.  SO, IT

10  ACTUALLY VIOLATES JUDGE BUSH'S ORDER.

11          THEY WEREN'T PERMITTED TO RAISE A NEW TRADE

12  SECRET.  THEY CAN'T COME TO TRIAL AND BOTH DISCLOSE

13  SOMETHING THAT THEY NEVER SHOWED UP -- SHOWED IN

14  DISCOVERY AND THAT'S CLEARLY HEARSAY.  AND TO MAKE

15  MATTERS WORSE NOW, THEY'VE INCORPORATED IT NUMEROUS

16  TIMES THROUGHOUT THEIR SLIDES.

17          FOR EXAMPLE, 8091, 8091.

18          THE COURT:  I DON'T HAVE ANY OF THOSE

19  SLIDES, SO I DON'T KNOW WHAT YOU'RE TALKING ABOUT.

20          MR. BRAGALONE:  WELL, I THINK PERHAPS THEY

21  CAN BE PUT UP BY THE PLAINTIFF JUST AS WE PUT OURS UP.

22          THE COURT:  OKAY.

23          MR. BRAGALONE:  OR PERHAPS THEY HAVE A

24  NOTEBOOK FOR YOUR HONOR.

25          THE COURT:  DO YOU HAVE EITHER A NOTEBOOK,

1    OR CAN YOU PUT THEM UP?

2                MR. ALIBHAI:  WELL, WE -- WE CAN GET OUR

3    TECH PERSON BACK IN.

4                ID 809-02.

5                MR. BRAGALONE:  SO HERE IT IS ON THE

6    SCREEN, YOUR HONOR.

7                THE COURT:  OKAY.

8                MR. BRAGALONE:  AND AS WE NOTED IN OUR

9    MOTION, THE FUNDAMENTAL PROBLEM IS THAT EVEN THOUGH

10   MR. CECIL ASWELL, THE INVENTOR ON THE '981 PATENT WAS

11   APPARENTLY SUPPOSEDLY THE AUTHOR AND MADE THIS OUT OF

12   COURT STATEMENT, THEY DIDN'T BRING HIM TO TRIAL, SO WE

13   WEREN'T ABLE TO EXAMINE HIM.  THEY DIDN'T DISCLOSE IT AT

14   ANY TIME IN DISCOVERY, SO WE WEREN'T ABLE TO DEPOSE HIM

15   ABOUT IT.

16               SO, WE HAD NO NOTICE OF THIS UNTIL WE HEARD

17   ABOUT IT FOR THE FIRST TIME WHEN MR. ALIBHAI STARTS

18   WRITING ON THE BOARD.  AND IT'S HIGHLY PREJUDICIAL

19   BECAUSE WE BELIEVE --

20               THE COURT:  DID MR. ALIBHAI WRITE THIS?

21               MR. ALIBHAI:  NO, I DIDN'T, YOUR HONOR.

22               MR. BRAGALONE:  MR. DIERSCHKE, I THINK,

23   DID.

24               THE COURT:  HE WROTE IT OVER HERE ON THE

25   WHITEBOARD?  BACK OVER HERE?

1          MR. BRAGALONE:  YES, YOUR HONOR.

2          THE COURT:  I JUST DON'T REMEMBER.  OKAY.

3          MR. BRAGALONE:  AND NOW, THEY WANT TO

4  OBVIOUSLY RELY ON THIS WHEN IT -- IT'S HEARSAY, AND --

5          THE COURT:  ALL RIGHT, SO, MR. DIERSCHKE

6  WROTE THIS IN THE COURTROOM ON FEBRUARY 17TH WHEN HE

7  TESTIFIED, AND HE WAS -- ACCORDING TO YOU, HE WAS

8  WRITING WHAT HE SAW MR. ASWELL PUT ON THE WHITEBOARD

9  YEARS AGO WHEN THERE WAS A MEETING BETWEEN TAOS AND

10 INTERSIL?

11         MR. BRAGALONE:  YES, YOUR HONOR, THAT'S --

12         THE COURT:  IS THAT THE FRAMEWORK?

13         MR. BRAGALONE:  THAT IS CORRECT.  THAT'S

14 WHAT THEY CLAIM, AND THAT IS -- THAT'S CLEARLY WHAT'S

15 CALLED NONVERBAL HEARSAY, RECOUNTING WHAT AN

16 OUT-OF-COURT DECLARANT WROTE.  AND WE CITED FOR THE

17 COURT THE AUTHORITY ON THAT.

18         THE COURT:  I KNOW, BUT I DON'T HAVE A

19 CHANCE TO READ IT BECAUSE YOU FILED IT THE DAY BEFORE

20 YESTERDAY.

21         MR. BRAGALONE:  IT'S VERY SHORT, YOUR

22 HONOR.  IT BARELY GOES ON PAST A FIFTH PAGE, BUT IT --

23 WE --

24         THE COURT:  OKAY.  YOU KNOW, THIS WOULD

25 REQUIRE ME TO RECESS, GET OFF THE BENCH, GET WITH THE

1   COURT REPORTER, LOOK BACK AT THAT TESTIMONY, SEE WHAT

2   WAS SAID, SEE WHAT YOUR OBJECTION WAS, SEE WHAT THE NEXT

3   QUESTION WAS, THAT SORT OF THING.

4                MR. BRAGALONE:  WELL, AND YOUR HONOR DID

5   SUSTAIN WHEN -- WHEN MR. DIERSCHKE WAS ASKED WHAT WAS

6   SAID, YOUR HONOR SUSTAINED THE HEARSAY OBJECTION TO

7   THAT.

8                THE COURT:  OKAY.

9                MR. BRAGALONE:  AND THEN HE WAS ASKED,

10  WELL, WHY DON'T YOU JUST COME WRITE WHAT YOU SAW WAS

11  WRITTEN BY MR. ASWELL, AND YOUR HONOR DENIED THAT

12  HEARSAY OBJECTION.

13               THE COURT:  OKAY.

14               MR. BRAGALONE:  YOUR HONOR, WE WOULD NOT

15  HAVE FILED THIS MOTION IN THE MIDDLE OF TRIAL -- IN

16  FACT, I -- I THINK THIS IS THE ONLY MOTION WE FILED IN

17  THE MIDDLE OF TRIAL, EXCEPT THAT IT WAS SO CRITICAL.

18               THE COURT:  OKAY.  MR. ALIBHAI, WHAT WOULD

19  YOU LIKE TO SAY?

20               MR. ALIBHAI:  FIRST OF ALL, I THOUGHT IT

21  WAS AN OBJECTION TO THE SLIDE.

22               THE COURT:  IT IS.

23               MR. ALIBHAI:  THE SLIDE IS A PICTURE OF

24  WHAT DR. DIERSCHKE DREW IN THE COURTROOM.

25               THE COURT:  RIGHT.

1          MR. ALIBHAI:  OVER AN OBJECTION THAT WAS

2   OVERRULED BY YOUR HONOR.  HE WAS ALLOWED TO -- THE COURT

3   SAID, "THAT'S NOT HEARSAY."  MR. KIMBLE SAID, "THANK

4   YOU, YOUR HONOR," AND THE COURT SAID, "GO AHEAD,

5   MR. DIERSCHKE."  AND THEN HE DREW IT.

6          SO, I'M NOT SHOWING SOMETHING THAT YOU

7   SUSTAINED AN OBJECTION TO.  I'M SHOWING WHAT YOU ALLOWED

8   THE WITNESS TO DO.

9          THE COURT:  OKAY.  I UNDERSTAND.

10         MR. ALIBHAI:  AND THEN WITH RESPECT -- AND

11  WITH RESPECT TO THIS ARGUMENT NOW, THAT THIS IS

12  SOMETHING THAT WAS NOT DISCLOSED, THEY NEVER MADE THAT

13  OBJECTION DURING TRIAL.  YOU DON'T GET TO SHOW UP THE

14  DAY OF CLOSING ARGUMENTS AND MAKE NEW OBJECTIONS TO

15  EVIDENCE THAT'S ALREADY BEEN PUT IN AND MAKE THE

16  ARGUMENT AFTER WE'VE RESTED.  IF THEY'D MADE THIS

17  ARGUMENT TIMELY, THEN WE COULD HAVE DONE SOMETHING ABOUT

18  IT.  BUT THIS IS EVIDENCE THE JURY'S HEARD.

19         THE COURT:  OKAY.  MS. CHEN IS APPARENTLY

20  ABLE TO PULL THAT UP.

21         MR. ALIBHAI:  SHE HAS IT RIGHT HERE, YES.

22         THE COURT:  CAN SHE GIVE IT TO OUR COURT

23  REPORTER AND THE COURT REPORTER CAN PULL IT UP OVER HERE

24  FOR ME?

25         CAN YOU DO THAT, MS. MCGEE?

1              LET'S GO OFF THE RECORD.

2              (A BREAK WAS TAKEN FROM 9:20 A.M.

3              THE COURT:  WHAT IS MR. DIERSCHKE'S

4  POSITION?  IS HE WITH TAOS?

5              MR. ALIBHAI:  CHIEF TECHNICAL OFFICER.

6              THE COURT:  OKAY.  WHAT IS HIS TRAINING AND

7  EDUCATION AND SO FORTH?

8              MR. ALIBHAI:  HE'S --

9              THE COURT:  YOU PROBABLY SAID, BUT I DON'T

10 REMEMBER.

11             MR. ALIBHAI:  HE'S THE WITNESS, YOUR HONOR,

12 THAT TESTIFIED HE HAD A BACHELOR'S DEGREE AND A MASTER'S

13 DEGREE AND A PH.D. FROM STANFORD.  HE HAD WORKED

14 30 YEARS IN OPTOELECTRONICS, AND HE'S ONE OF THE

15 INVENTORS OF THE '981 PATENT.

16             THE COURT:  DO YOU REMEMBER WHAT

17 DISCIPLINES HE HAS HIS DEGREES IN?  ARE THEY TECHNICAL?

18             MR. ALIBHAI:  ALL ELECTRICAL ENGINEERING.

19             THE COURT:  OKAY.  MR. SERRATO, WOULD YOU

20 TELL THE JURY THAT WE'RE IN DISCUSSIONS ON SOME MATTERS

21 AND I'LL BE WITH THEM AS SOON AS I CAN.

22             COURT SECURITY OFFICER:  YES, SIR.

23             (BREAK TAKEN FROM 9:28 A.M. TO 9:32 A.M.)

24             THE COURT:  OKAY.  HERE'S THE EXCHANGE THAT

25 OCCURRED ON FEBRUARY 17, 2015, IN THE MIDDLE OF THIS

1   TRIAL.  MR. DIERSCHKE WAS ON THE STAND.  HE HAS A

2   TECHNICAL BACKGROUND.  I'M INFORMED BY MR. LANEY THAT HE

3   WAS THE -- WELL, LET'S SEE.  I WROTE IT DOWN.  HE WAS

4   THE CHIEF TECHNICAL OFFICER OF TAOS.  I DID, IN MY

5   NOTES, NOTE THAT EUGENE DIERSCHKE ATTENDED SAINT EDWARDS

6   UNIVERSITY AND THEN THE UNIVERSITY OF TEXAS.  HE HAS A

7   BACHELOR'S DEGREE IN ELECTRICAL ENGINEERING.  HE HAS A

8   MASTER'S DEGREE IN ELECTRICAL ENGINEERING AND A PH.D. IN

9   ELECTRICAL ENGINEERING FROM STANFORD UNIVERSITY.  HE

10  WORKED FOR T.I. FOR 30 YEARS.  HE WAS ONE OF THE

11  FOUNDERS OF TAOS.  HE'S A NAMED INVENTOR ON THE '981

12  PATENT.

13          SO, WITH THAT BACKGROUND, HE WAS ON THE

14  STAND.  APPARENTLY, THERE WAS AN EXHIBIT THAT WAS --

15  THAT WAS ON THE SCREEN, PERHAPS, BECAUSE THERE WAS A

16  QUESTION, I ASSUME BY MR. ALIBHAI, "SO, THE PART THAT

17  DEALS WITH AMBIENT LIGHT SENSING OF THIS PICTURE, CAN

18  YOU POINT THAT OUT TO US?"

19          ANSWER:  "THE PARTICULAR AREA THAT HAS TO

20  DO WITH THE DUAL-DIODE APPROACH AND THE RECTANGULAR

21  AREA, THE SORT OF DARK AREA WHICH IS SHOWN IN THE MIDDLE

22  OF THE PARAGRAPH."

23          MAYBE THE PATENT WAS ON THE SCREEN.  I

24  DON'T RECALL WHAT DOCUMENT WAS ON THE SCREEN.

25          QUESTION --

1                MR. ALIBHAI:  IT WAS THE PRESENTATION MADE

2    DURING THAT MEETING.

3                THE COURT:  OKAY.

4                MR. ALIBHAI:  THE ENGINEERING SLIDES AT THE

5    MEETING IN PLANO.

6                THE COURT:  OKAY.  VERY WELL.

7                QUESTION:  "DID INTERSIL ASK QUESTIONS

8    ABOUT THE TSL2560 DURING THE MEETING?"

9                ANSWER:  "YES, THERE WERE A NUMBER OF

10   QUESTIONS."

11               QUESTION:  "WHAT TYPE OF QUESTIONS WAS

12   INTERSIL ASKING ABOUT THE 2560 AT THIS MEETING?"

13               ANSWER:  "ONE PARTICULAR SET OF QUESTIONS

14   HAD TO DO WITH THE PHOTODIODE ITSELF."

15               QUESTION:  "AND DURING THE MEETING, DID YOU

16   OR MR. ASWELL RESPOND TO THOSE QUESTIONS?"

17               ANSWER:  "WELL, CECIL ASWELL WOULD HAVE

18   BEEN THE PRIMARY PERSON DISCUSSING IT, AND IT WAS

19   SUFFICIENTLY" -- AND AT THAT POINT, THERE'S AN OBJECTION

20   BY MR. KIMBLE, WHO SAYS HE'S ABOUT TO RECITE WHAT CECIL

21   ASWELL SAID.  WE -- WE OBJECT, HEARSAY.

22               THE COURT SAID, "THE QUESTION WAS, AND

23   DURING THE MEETING, DID YOU OR MR. ASWELL RESPOND TO

24   THOSE QUESTIONS?  ALL RIGHT.  I'LL SUSTAIN THE

25   OBJECTION."

1            BECAUSE I DIDN'T KNOW -- HE WAS ABOUT TO

2    SAY WHAT DIERSCHKE SAID AT THE MEETING OR WHAT ASWELL

3    SAID AT THE MEETING.

4            AND THEN I SAID TO MR. DIERSCHKE,

5    "MR. DIERSCHKE, YOU CAN TELL US WHAT YOU SAID BUT NOT

6    WHAT MR. ASWELL SAID."

7            MR. ALIBHAI, THEN, CONTINUED HIS QUESTIONS

8    AND SAID, "AND I WASN'T ASKING WHAT MR. ASWELL SAID.  I

9    JUST WANTED TO KNOW WHETHER HE RESPONDED TO THOSE

10   QUESTIONS."

11           ANSWER:  "YES."

12           QUESTION:  "AND OTHER THAN VERBALLY

13   RESPONDING TO THOSE QUESTIONS, DID HE PROVIDE ADDITIONAL

14   INFORMATION ABOUT THE PHOTODIODE STRUCTURE DURING THE

15   MEETING?"

16           ANSWER:  "I RECALL THAT HE DEFINITELY WENT

17   UP TO THE BOARD TO DRAW A BASIC DESCRIPTION OF THE

18   PHOTODIODE."

19           QUESTION:  "AND CAN YOU DRAW FOR ME WHAT A

20   BASIC DESCRIPTION OF THE PHOTODIODE OF THE 2560 LOOKS

21   LIKE?"

22           ANSWER:  "YES."

23           QUESTION:  "YOU ARE FAMILIAR WITH IT?"

24           ANSWER:  "YES."

25           QUESTION:  "OKAY."  MR. ALIBHAI SAYS, "YOUR

1    HONOR, CAN THE WITNESS STEP DOWN TO DRAW ON THE

2    WHITEBOARD?"

3              THE COURT SAID, "YES."

4              MR. KIMBLE SAYS, "YOUR HONOR, BEFORE HE

5    GOES A LITTLE FURTHER, WE WOULD OBJECT.  I'M NOT EXACTLY

6    SURE I UNDERSTAND WHAT HE'S DOING.  BUT IF HE'S DRAWING

7    ON THE BOARD WHAT HE REMEMBERS SOMEBODY ELSE DREW ON THE

8    BOARD AT THE TIME, I THINK THE SAME RULING THAT YOU" --

9    LET'S SEE -- "THAT YOU HAD AS TO HEARSAY WOULD APPLY."

10             THE COURT:  "WAIT A MINUTE."

11             MR. KIMBLE:  "AND HE'S STILL DRAWING."

12             THE COURT:  "NO, NO, HE'S NOT REPEATING

13   WHAT SOMEONE ELSE SAID.  EVEN IF HE'S DRAWING WHAT

14   SOMEONE ELSE SAID, IT'S SOMETHING HE SAW."  THE COURT

15   SAID, "THAT'S NOT HEARSAY."

16             AFTER MR. ALIBHAI SAID, "THAT'S CORRECT,

17   YOUR HONOR," THE COURT SAID, "THAT'S NOT HEARSAY.

18   OKAY."  MR. KIMBLE THEN SAYS, "THANK YOU, YOUR HONOR."

19             OKAY.  I HAVEN'T READ YOUR MOTION HERE, BUT

20   I, JUST OFF THE TOP OF MY HEAD, THINK I AGREE WITH YOU,

21   MR. BRAGALONE, THAT IF MR. DIERSCHKE IS RECITING WHAT

22   SOMEONE ELSE DREW ON A BOARD, THEN THAT WOULD BE

23   NONVERBAL HEARSAY.  I THINK YOU'RE RIGHT ON THAT,

24   ALTHOUGH I HAVE NOT HEARD FROM MR. ALIBHAI IN RESPONSE

25   TO YOUR MOTION.

1            SO, WHEN I SAID, ON THE 17TH, "IF HE'S

2    DRAWING ON THE BOARD WHAT HE REMEMBERS SOMEONE ELSE DREW

3    ON THE BOARD" -- WAIT A MINUTE.  LET'S SEE.  WHEN I SAID

4    ON THE 17TH, "EVEN IF HE'S DRAWING WHAT SOMEONE ELSE

5    DREW, IT'S SOMETHING HE SAW."  OKAY.  I DON'T THINK THAT

6    MAKES ANY DIFFERENCE.  I THINK THAT WOULD BE HEARSAY.

7    BUT HERE, WHAT I HEARD -- AND THIS IS WHAT I WAS LOOKING

8    FOR -- IS THAT DIERSCHKE TESTIFIED THAT HE RECALLED

9    ASWELL WENT UP TO THE BOARD TO DRAW A DESCRIPTION OF THE

10   PHOTODIODE, BUT MR. ALIBHAI'S QUESTION WAS, "AND CAN YOU

11   DRAW FOR ME WHAT A BASIC DESCRIPTION OF THE PHOTODIODE

12   OF THE 2560 LOOKS LIKE?"

13           ANSWER:  "YES."

14           QUESTION:  "YOU'RE FAMILIAR WITH IT?"

15   "MR. DIERSCHKE, YOU'RE FAMILIAR WITH IT?"

16           ANSWER:  "YES."

17           HE'S AN ELECTRICAL ENGINEER, HAS

18   THREE DEGREES IN ELECTRICAL ENGINEERING.  HE'S A

19   CO-INVENTOR OF THE '981 PATENT.  IT WAS NOT CLEAR --

20   WELL, IT WAS CLEAR THAT HE HIMSELF, PERSONALLY, WAS

21   FAMILIAR WITH A PHOTODIODE OF THE 2560, AND SO THAT'S --

22   THAT'S PART OF WHAT I HEARD WHEN I OVERRULED

23   MR. KIMBLE'S OBJECTION.

24           MR. BRAGALONE:  AND YES, YOUR HONOR, THEN

25   WHAT PLAINTIFFS THEN PROCEEDED TO DO IS THEY PROCEEDED

1  TO RELY ON THAT AS THEIR EVIDENCE OF WHAT WAS ACTUALLY

2  COMMUNICATED AT THAT MEETING BY MR. ASWELL, WHO DIDN'T

3  COME TO TRIAL.

4                  THE COURT:  NO, NO.

5                  MR. BRAGALONE:  WELL, ACTUALLY, THEY --

6  THEY DID.  IN THE COURSE OF THE REST OF THEIR

7  PRESENTATION, THEY REPEATEDLY REFERRED TO THAT AS

8  EVIDENCE FOR THE TRUTH OF THE MATTER ASSERTED.  IN OTHER

9  WORDS, THAT WAS WHAT WAS DISCLOSED BY CECIL ASWELL.  AND

10 YOUR HONOR, THIS, PERHAPS --

11                 THE COURT:  NO, NO, NO.  NO, I'M NOT GOING

12 TO LET THAT STAND.  I'VE READ TO YOU WHAT WAS SAID HERE,

13 AND WHAT WAS SAID HERE WAS THAT MR. DIERSCHKE HIMSELF

14 WAS FAMILIAR WITH THE -- WITH WHAT A PHOTODIODE OF THE

15 2560 LOOKS LIKE.  THAT IS NOT HEARSAY.

16                 MR. BRAGALONE:  WELL, AND, YOUR HONOR, IF

17 THEY'RE NOT GOING TO SAY IN CLOSING THAT THIS WAS

18 ACTUALLY WHAT WAS DISCLOSED AT THAT MEETING, THEN WE

19 DON'T HAVE A PROBLEM.  IF THIS -- IF THIS IS ONLY

20 DR. DIERSCHKE'S DRAWING OF A PHOTODIODE AND NOT BEING

21 ASSERTED TO THIS JURY AS WHAT WAS DISCLOSED BY CECIL

22 ASWELL AT THAT MEETING TO INTERSIL, THOSE ARE TWO VERY

23 DIFFERENT THINGS, AND I ABSOLUTELY AGREE WITH YOUR

24 HONOR.  SO, REALLY, WHAT IT DEPENDS ON IS HOW THEY'RE

25 GOING TO USE IT IN CLOSING.  JUST LIKE YOU ASKED ME HOW

1   I WAS GOING TO USE THE TWO SLIDES, I THINK WE NEED TO

2   FIND OUT FROM MR. ALIBHAI IF THEY'RE GOING TO ALLEGE

3   THAT THIS IS WHAT WAS SHOWN TO INTERSIL.

4             THE COURT:  OKAY.  MR. ALIBHAI, DO YOU WANT

5   TO RESPOND?  AND I'M GOING TO MAKE A RULING SO WE CAN

6   GET GOING.

7             MR. ALIBHAI:  WELL, WITH RESPECT TO THE

8   PARTS THAT YOUR HONOR JUST REFERENCED, YOU'RE CORRECT

9   THAT DR. DIERSCHKE HAD THE KNOWLEDGE AND BACKGROUND, IS

10  FAMILIAR WITH THE PRODUCT, IS THE INVENTOR OF THE

11  PRODUCT THAT'S EMBODIED BY THE PATENT.

12            THE COURT:  RIGHT.

13            MR. ALIBHAI:  AND SO HE WAS ABLE TO AND WAS

14  ALLOWED TO DRAW THAT PICTURE.  THE TOP PART IS THE 2560

15  THAT HE WAS -- THAT WAS BEING DISCUSSED AT THE MEETING,

16  AND THE 2550, HE DREW FOR THE COURT'S BENEFIT, FOR THE

17  JURY'S BENEFIT, JUST AS TO SHOW THE DIFFERENCE.

18            THE COURT:  OKAY.

19            MR. ALIBHAI:  AND SO THAT WASN'T PART OF

20  THE MEETING.  IT WAS JUST SOMETHING THAT HE DREW BECAUSE

21  I WANTED TO SHOW THE COMPARISON BETWEEN THE TWO AND HOW

22  THEY CHANGED.

23            THE COURT:  OKAY.  BUT I THINK I AGREE WITH

24  MR. BRAGALONE, THAT LOOKING BACK AT THIS EXCHANGE, WHICH

25  IS IN THE MIDDLE OF A TRIAL, JURY'S IN THE BOX, HAPPENS

1    FAST, YOU -- YOU CANNOT -- LET'S SEE.  MR. DIERSCHKE'S

2    TESTIMONY CANNOT BE PORTRAYED TO THE JURY AS PRESENTING

3    WHAT ASWELL SAID BY WAY OF DRAWING ON A BOARD.

4                    MR. ALIBHAI:  WELL, THE --

5                    THE COURT:  IT CAN BE WHAT DIERSCHKE KNOWS

6    ABOUT THE PHOTODIODE STRUCTURE, BECAUSE HE HAS THAT KIND

7    OF KNOWLEDGE.

8                    MR. ALIBHAI:  RIGHT, BUT THIS -- THIS

9    EXCHANGE CONTINUES ON.  THE TESTIMONY CONTINUES ON.

10                   THE COURT:  I DIDN'T PRINT OFF -- I DON'T

11   KNOW HOW FAR I NEED TO READ HERE.

12                   MR. ALIBHAI:  WELL, THAT'S THE POINT, YOUR

13   HONOR.  I DON'T KNOW WHY I'M HAVING TO ADDRESS HEARSAY

14   OBJECTIONS ABOUT EVIDENCE THAT WAS ADMITTED INTO

15   EVIDENCE THAT OCCURRED DURING OUR CASE-IN-CHIEF, AND

16   THEY WAITED UNTIL NOW TO BRING IT UP.  I COULD HAVE

17   REMEDIED THE SITUATION AT THE TIME.  I COULD HAVE

18   BROUGHT MR. ASWELL WHEN HE RETURNED FROM BEING OUT OF

19   THE COUNTRY AND WAS UNAVAILABLE.  SO, THERE ARE A NUMBER

20   OF EXCEPTIONS THAT APPLY TO THIS, AND WE HAVEN'T HAD A

21   CHANCE TO BRIEF THAT TO YOUR HONOR.

22                   FIRST OF ALL, THE ISSUE IS -- AND ACCORDING

23   TO THEIR MOTION, THEY'RE SAYING THAT IT WAS MADE TO

24   PROVE THAT TAOS COMMUNICATED ITS ALLEGED TRADE SECRETS

25   TO INTERSIL.  IN THE VEMEX CASE AND THE UNITED STATES

1   VERSUS CANTU CASES, THE FIFTH CIRCUIT HAS SAID, IF

2   YOU'RE SHOWING WHAT WAS SAID TO SHOW THAT IT WAS

3   COMMUNICATED, IT'S NOT HEARSAY.  YOU'RE SHOWING --

4   YOU'RE OFFERING IT TO SHOW THAT IT WAS COMMUNICATED.

5               AND WHAT MR. DIERSCHKE DID -- DR. DIERSCHKE

6   DID WAS ON PAGE 133, I ASKED HIM --

7               THE COURT:  YOU MEAN, WHETHER IT'S TRUE OR

8   NOT?

9               MR. ALIBHAI:  THAT'S CORRECT.  AND ALSO,

10  IT'S HIS IMPRESSION OF WHAT WAS HAPPENING DURING THE

11  MEETING.  WE ASKED HIM, DID MR. ASWELL DRAW A SIMILAR

12  CROSS-SECTION AT THE MEETING THAT YOU SAW?  AND YOUR

13  HONOR SAID, YOU CAN ANSWER YES OR NO.  AND HE SAID -- HE

14  EVEN DREW A SIMILAR PICTURE AS TO WHAT I SHOWED UP THERE

15  ON THE 2560.  SO, WITH RESPECT TO THE FIRST PART OF

16  THE --

17              THE COURT:  WAS THERE AN OBJECTION TO THAT?

18              MR. ALIBHAI:  THEY -- THEY OBJECTED, THAT'S

19  RIGHT.

20              MR. BRAGALONE:  YES.

21              THE COURT:  WHAT PAGE IS THAT ON?

22              MR. ALIBHAI:  133 AND 34.

23              THE COURT:  WELL, I PRINTED OFF

24  THROUGH 133.  I DIDN'T PRINT 134.

25              MR. MCCABE:  MAY I APPROACH?

1          MR. ALIBHAI:  CAN MR. MCCABE APPROACH?

2          THE COURT:  YEAH, BUT HOW MUCH FURTHER DO

3   WE NEED TO GO HERE?  I MEAN, WHAT DO YOU WANT TO ARGUE?

4          MR. BRAGALONE:  I THINK WE NEED TO FIND OUT

5   WHAT THEY INTEND TO ARGUE, BECAUSE IF THEY INTEND TO

6   ARGUE AND OFFER THIS FOR THE TRUTH OF THE MATTER

7   ASSERTED, THAT THIS IS WHAT WAS SHOWN AT THE TIME TO

8   INTERSIL, THAT'S VERY DIFFERENT THAN, THIS IS A DRAWING

9   THAT DR. DIERSCHKE DID OF WHAT A PHOTODIODE LOOKS LIKE.

10          THE COURT:  WELL, I THINK WHAT

11   MR. ALIBHAI -- I THOUGHT I HEARD HIM SAY IS, IT DOESN'T

12   MATTER WHETHER THIS DRAWING IS ACCURATE OR NOT OR

13   WHETHER IT'S TRUE.  IT'S JUST WHAT WAS PRESENTED TO

14   INTERSIL AT THE MEETING.

15          MR. BRAGALONE:  HE -- HE'S VERY CLEARLY

16   OFFERING IT FOR THE TRUTH OF THE MATTER ASSERTED.  HE'S

17   NOT OFFERING -- HE'S OFFERING IT TO SHOW THAT THESE

18   PHOTODIODES, THE 2550 AND THE DIFFERENCE IN THE 2560,

19   WAS ACTUALLY COMMUNICATED TO INTERSIL AT THAT MEETING BY

20   THIS DRAWING.

21          THE COURT:  OKAY.

22          MR. BRAGALONE:  IT'S AN OUT-OF-COURT

23   STATEMENT OFFERED FOR THE TRUTH OF THE MATTER.

24          THE COURT:  LET'S PUT THIS IN CONTEXT.

25   THIS IS ONE MEETING ABOUT ONE ASPECT OF THE TECHNOLOGY

1    THAT TAOS HAS AND HOW IT WAS COMMUNICATED TO INTERSIL.

2                MR. ALIBHAI:  THAT'S CORRECT, YOUR HONOR.

3                MR. BRAGALONE:  AND MAY I PUT IT IN

4    CONTEXT, YOUR HONOR?  BECAUSE THIS IS THE ONLY TIME THAT

5    THERE IS ANY ALLEGATION THAT THE DIFFERENCES IN THE

6    PHOTODIODE ARRAY WERE COMMUNICATED TO INTERSIL, THE ONLY

7    EVIDENCE.  WE DIDN'T -- WE DIDN'T EVER HEAR ABOUT A

8    WHITEBOARD BEFORE WE CAME TO COURT.

9                MR. ALIBHAI:  THAT'S NOT TRUE.  THAT'S NOT

10   TRUE.

11               THE COURT:  DOES THE PLAINTIFF CONTEND THIS

12   IS A TRADE SECRET?

13               MR. BRAGALONE:  YES.  THEY ARE --

14               THE COURT:  OKAY.  SO WE'RE TALKING ABOUT

15   ONE TRADE SECRET IN THIS WHOLE TRIAL?

16               MR. BRAGALONE:  THIS IS THE BIG ONE, YOUR

17   HONOR.  THIS IS WHAT THEY'RE RELYING ON FOR THE TRUTH OF

18   THE MATTER ASSERTED, AND WE'RE ASKING MR. ALIBHAI, IS HE

19   GOING TO ARGUE TO THE JURY THAT THIS IS EVIDENCE OF WHAT

20   WAS COMMUNICATED TO INTERSIL?  IF ALL THIS IS A DRAWING

21   BY DR. DIERSCHKE AT TRIAL, THAT'S VERY DIFFERENT FROM

22   ARGUING THAT THIS SHOULD BE ALLOWED TO BE ARGUED TO THE

23   JURY AS EVIDENCE OF THE TRADE SECRET.  THEY HAVE NO

24   OTHER EVIDENCE --

25               THE COURT:  OKAY.

```
 1                    MR. BRAGALONE:  -- ON THIS.

 2                    THE COURT:  LET ME READ A FEW MORE PAGES

 3      HERE --

 4                    MR. BRAGALONE:  YES, YOUR HONOR.

 5                    THE COURT:  -- SEE IF THERE'S ANY MORE I

 6      NEED TO LOOK AT.

 7                    MR. BRAGALONE:  THE QUESTION THAT

 8      MR. ALIBHAI REFERRED TO IS AN PAGE 133 AT LINE 7.  AND

 9      THE OBJECTION BY MR. KIMBLE IS AT LINE 9.

10                    THE COURT:  OKAY.  LET ME GET TO THAT.

11                    OKAY, WE'LL TAKE UP WHERE I LEFT OFF ON

12      PAGE 131 OF THE TRANSCRIPT OF FEBRUARY 17, 2015.  I HAD

13      READ VERBATIM, ALMOST VERBATIM, PORTIONS OF PAGES 129

14      THROUGH 131, SO CONTINUING, QUESTION BY

15      MR. ALIBHAI, "I'M GOING TO WAIT UNTIL YOU GET BACK TO

16      YOUR SEAT."  HE'S TALKING TO MR. DIERSCHKE.  "BUT IS

17      THAT THE 2560 PHOTODIODE STRUCTURE?"

18                    ANSWER:  "YES."

19                    QUESTION:  "AND THEN JUST FOR MY BENEFIT

20      CAN YOU DRAW THE -- ARE YOU FAMILIAR WITH PHOTODIODE

21      STRUCTURE OF THE 2550?"  ANSWER:  "CORRECT."

22                    QUESTION:  "CAN YOU DRAW THAT CROSS-SECTION

23      FOR ME, PLEASE?"  AND I GUESS HE DRAWS IT.  MR. ALIBHAI

24      SAYS, "THE 2550, THAT'S A RELEASED PRODUCT, CORRECT, AT

25      THE TIME OF THIS MEETING?"  ANSWER:  "YES, IT HAD BEEN
```

 1  RELEASED."

 2                  QUESTION:  "AND THIS BLOCK WITH THE LITTLE

 3  LINES IN IT, CAN YOU DESCRIBE WHAT THAT IS?"  ANSWER:

 4  "THAT CORRESPONDS TO WHAT I'VE BEEN CALLING AN OPAQUE

 5  LAYER, SHIELDING CERTAIN PHOTODIODES, AND THAT WOULD

 6  PROTECT METAL."

 7                  QUESTION:  "OKAY.  SO THE STRUCTURE OF THE

 8  2550, DOES THAT LOOK LIKE THE FIGURE IN THE PATENT?"

 9  ANSWER:  "YES, IT DOES."

10                  QUESTION:  "AND WAS THERE A CHANGE BEING

11  MADE FROM THE 2550 TO THE 2560 IN TERMS OF THE LAYOUT OF

12  THE PHOTODETECTOR DIODES?"  MR. KIMBLE OBJECTS, LEADING.

13  THE COURT OVERRULES THE OBJECTION.

14                  ANSWER:  "THE 2560, AS I MENTIONED BEFORE,

15  BASICALLY CONVERTED THAT METAL SHIELDED DIODE, DIODE 3,

16  TO A D1 VERSION.  SO WE HAD ALTERNATING STRIPS OF

17  EXPOSED DIODE AND SHIELDED DIODES."

18                  QUESTION BY MR. ALIBHAI:  "SO THIS DESIGN

19  HAD ALTERNATING D1 AND D2?"

20                  ANSWER:  "CORRECT."

21                  QUESTION:  "DID MR. ASWELL DRAW A SIMILAR

22  CROSS-SECTION OF THE 2560 AT THE MEETING THAT YOU SAW?"

23                  MR. KIMBLE:  "OBJECTION, YOUR HONOR,

24  HEARSAY."  MR. KIMBLE SAID, "OBJECTION, YOUR HONOR,

25  AGAIN, THIS -- TO ME, THIS GOES TO HEARSAY AGAIN,

1   WHETHER MR. ASWELL DREW SOMETHING AKIN TO WHAT

2   MR. DIERSCHKE HAS JUST DRAWN HERE IN THE COURTROOM."

3   COURT:  "OVERRULED.  I DON'T THINK THAT'S HEARSAY.

4   OBSERVING SOMEONE DO SOMETHING IS NOT HEARSAY."

5                   MR. KIMBLE:  "I THINK THE QUESTION WAS

6   WHETHER HE ACTUALLY DID IT."  THE COURT:  "WHETHER THIS

7   WITNESS SAW MR. ASWELL GET UP AND DRAW SOMETHING?"

8   MR. KIMBLE:  "NO, WHETHER MR. ASWELL ACTUALLY DID DRAW

9   SOMETHING.  AND DRAWING SOMETHING CAN BE A STATEMENT AS

10  WELL.  DOESN'T HAVE TO BE JUST A VERBAL COMMUNICATION."

11  THE COURT:  "WELL, TRUE."

12                  AND THEN I LOOKED BACK AT THE QUESTION, AND

13  I SAID, "THE QUESTION WAS, DID MR. ASWELL DRAW A SIMILAR

14  CROSS-SECTION OF THE 2560 AT THE MEETING THAT YOU SAW?

15  IT'S A YES OR NO.  I'M GOING TO OVERRULE THE OBJECTION.

16  I DON'T THINK THAT'S HEARSAY FOR HIM TO ANSWER IF

17  MR. ASWELL DREW A SIMILAR CROSS-SECTION AT THE MEETING

18  THAT HE SAW.  YOU CAN ANSWER YES OR NO."  ANSWER:  "HE

19  DREW A SIMILAR PICTURE AS TO WHAT I SHOWED UP THERE ON

20  2560."

21                  THAT'S KIND OF WHERE IT WAS LEFT.

22                  MR. MCCABE:  YOUR HONOR --

23                  THE COURT:  I TOLD HIM TO ANSWER YES OR NO,

24  AND HE SAID, HE DREW A SIMILAR PICTURE.  SO, WHERE DOES

25  THAT LEAVE IT?

1              MR. MCCABE:  YOUR HONOR, MR. LANEY

2    TESTIFIED ON DIRECT EXAMINATION WITHOUT ANY OBJECTION

3    THAT MR. ASWELL DREW PHOTODIODE CHANGE ON THE

4    WHITEBOARD.  THAT WAS THE DAY BEFORE.  HE TESTIFIED TO

5    IT.  HE CAME IN WITHOUT OBJECTION.  HE TESTIFIED TO THE

6    1:1 STRUCTURE.  HE TESTIFIED THAT MR. ASWELL, HE'S VERY

7    GOOD IN FRONT OF A WHITEBOARD, AND I THINK BY THE TIME

8    THEY GOT FINISHED, THEY HAD TO ERASE PARTS OF IT TO GET

9    MORE STUFF ON THERE.  THAT WAS THE DAY BEFORE THIS

10   TESTIMONY.

11              THE COURT:  YEAH, WELL, THE -- WELL, I'M

12   FOCUSING -- I'M FOCUSING ON DIERSCHKE'S TESTIMONY.  IF

13   THERE WAS NO OBJECTION TO MR. LANEY, THEN THERE WAS NO

14   OBJECTION.

15              MR. MCCABE:  YOUR HONOR, IF -- IF MS. CHEN

16   SAYS TO ME THAT MR. ALIBHAI SEXUALLY HARASSED HER

17   YESTERDAY AND I FIRE -- AND SHE EXPLAINS IN DETAIL WHAT

18   IT WAS, AND I FIRE MS. CHEN TOMORROW, SHE SUES US FOR

19   RETALIATION, ALL OF HER COMPLAINT TO ME, WHICH WOULD

20   OTHERWISE BE HEARSAY, COMES IN.  IT'S THE SAME THING.

21   IT'S THE SAME.  I SAW HIM DO THIS.

22              MR. BRAGALONE:  THAT'S HEARSAY.

23              THE COURT:  WELL, NO, NOT TO SAY YES OR NO.

24              MR. BRAGALONE:  WELL, AND, YOUR HONOR,

25   YOU'LL -- YOU'LL NOTE THAT IN THEIR PRESENTATION, IN

```
 1   THEIR CLOSING SLIDES, AND THIS IS A DIFFERENT ONE,
 2   618-02, THEY USE THIS VERY SAME DRAWING, AND IT'S ONE OF
 3   THREE TECHNICAL TRADE SECRETS THAT THEY HAVE LISTED,
 4   TAOS TECHNICAL TRADE SECRETS.  SO THEY ARE RELYING ON
 5   THIS SAME DRAWING AS THE EVIDENCE -- THE ONLY EVIDENCE
 6   OF WHAT WAS SUPPOSEDLY COMMUNICATED TO INTERSIL AT THIS
 7   MEETING.  THEY -- IF THEY ARE GOING TO SAY THAT THIS IS
 8   JUST --
 9               THE COURT:  I DON'T KNOW WHAT YOU HAVE
10   THERE.  IS THAT A DRAWING THAT MR. DIERSCHKE DREW?
11               MR. BRAGALONE:  IT'S THE SAME THING, YOUR
12   HONOR.  LET ME --
13               THE COURT:  OKAY, IT'S THE DRAWING THAT WAS
14   UP ON THE SCREEN EARLIER?
15               MR. BRAGALONE:  YES, BUT IT'S LISTED IN
16   THEIR CLOSING SLIDES.  I'LL HAND YOU MY COPY, YOUR
17   HONOR.  I'LL GET ANOTHER ONE.
18               THE COURT:  I'LL GET IT.
19               MR. BRAGALONE:  YOU CAN SEE IT THERE.  IT'S
20   LISTED AS PART OF THEIR CLOSING SLIDES AS ONE OF THREE
21   TECHNICAL TRADE SECRETS, SO --
22               THE COURT:  WELL, MR. DIERSCHKE OF HIS OWN
23   KNOWLEDGE KNEW THIS.
24               MR. BRAGALONE:  WELL, NO --
25               THE COURT:  HE WAS ON THE STAND.
```

```
 1              MR. BRAGALONE:  YOUR HONOR, IF THEY'RE JUST
 2    GOING -- AND ALL OF THIS HAS TO DO WITH HOW MR. ALIBHAI
 3    IS GOING TO RELY ON THIS IN CLOSING.  IF HE IS RELYING
 4    ON THIS AS TO MAKE AN ARGUMENT THAT THIS IS WHAT WAS
 5    DISCLOSED TO INTERSIL, THEN THAT'S IMPROPER.  THAT'S
 6    CLEARLY RELYING ON HEARSAY.
 7              IF, ON THE OTHER HAND, HE'S GOING TO SAY
 8    THAT THIS IS MR. DIERSCHKE'S DRAWING OF A PHOTODIODE,
 9    THAT'S DIFFERENT.  BUT I THINK THIS ILLUSTRATES THE
10    EXHIBIT YOU HAVE IN FRONT OF YOU, THAT THAT'S NOT WHAT
11    THEY'RE DOING.  THEY ARE GOING TO RELY ON THIS TO SAY
12    THAT THIS IS EVIDENCE OF THE DISCLOSURE OF A TRADE
13    SECRET TO INTERSIL, AND THAT'S ENTIRELY IMPROPER, YOUR
14    HONOR.  IF MR. ALIBHAI SAYS HE'S NOT GOING TO DO THAT,
15    WE'LL ACCEPT HIS WORD, AND WE'LL WAIT FOR HIS CLOSING.
16    BUT I THINK THAT'S EXACTLY WHAT THEY'RE PLANNING TO DO.
17              THE COURT:  WELL, I ALLOWED MR. DIERSCHKE
18    TO ANSWER YES OR NO TO THE QUESTION, IF MR. ASWELL DREW
19    A SIMILAR CROSS-SECTION AT THE MEETING THAT HE SAW, YOU
20    CAN ANSWER YES OR NO.  HE SAID HE DREW A SIMILAR
21    PICTURE.
22              MR. BRAGALONE:  AND AGAIN, WE OBJECTED,
23    YOUR HONOR, BECAUSE THAT -- THAT, AGAIN, IS HEARSAY.
24    BUT THE ISSUE IS, YOUR HONOR HAS JUST RECOGNIZED THAT
25    THERE'S A DIFFERENCE BETWEEN ASKING MR. DIERSCHKE TO
```

1   DRAW A PHOTODIODE FROM HIS OWN BACKGROUND AND KNOWLEDGE

2   VERSUS SAYING THAT THIS IS WHAT MR. ASWELL DREW AT A

3   MEETING BACK IN 2004.  IT -- AND THIS WAS WHAT WAS

4   COMMUNICATED TO INTERSIL.

5               THE COURT:  OKAY.  LET ME ASK MR. ALIBHAI,

6   MR. ALIBHAI, HOW DO YOU WANT TO RESPOND TO THIS?  IF --

7   DO YOU WANT TO ARGUE TO THE JURY THAT MR. ASWELL --

8   BASED ON DIERSCHKE'S TESTIMONY, MR. ASWELL SAID

9   SOMETHING AT THAT MEETING BY DRAWING A SIMILAR DRAWING?

10  EVEN THOUGH THE DRAWING YOU HAVE IN YOUR -- YOUR CHART

11  HERE, IT LOOKS LIKE MR. DIERSCHKE'S DRAWING.  THIS IS

12  MR. DIERSCHKE'S DRAWING, CORRECT?

13              MR. ALIBHAI:  THAT'S CORRECT.

14              THE COURT:  OKAY.

15              MR. ALIBHAI:  SO, I WANT TO USE

16  DR. DIERSCHKE'S DRAWING TO SHOW THE DIFFERENCES IN THE

17  TWO PHOTODIODE STRUCTURES.

18              THE COURT:  ALL RIGHT.  BUT YOU WANT TO USE

19  DIERSCHKE'S DRAWING TO ARGUE TO THE JURY THAT ASWELL

20  SAID SOMETHING AT THE JUNE 17, 2004, MEETING; IS THAT

21  RIGHT?

22              MR. ALIBHAI:  NO.  I'M GOING TO ASK -- I'M

23  GOING TO -- I'M GOING TO ONLY SAY WHAT THE TESTIMONY

24  WAS, AND THE TESTIMONY WAS, BY MR. LANEY, THAT THIS WAS

25  EXPLAINED TO INTERSIL AND THAT MR. ASWELL PHYSICALLY

1    DREW THIS ON THE WHITEBOARD.  THAT'S PART OF THE

2    TESTIMONY I'M GOING TO RELY ON.

3                   THE COURT:  OF MR. LANEY?  MR. LANEY'S

4    TESTIMONY?

5                   MR. ALIBHAI:  I'M GOING TO USE MR. LANEY'S

6    TESTIMONY AS PART OF THE REASON THAT IS -- CAME IN WITH

7    NO OBJECTION.

8                   THE COURT:  OKAY.

9                   MR. ALIBHAI:  THE ONLY OTHER THING THAT I

10   MIGHT SAY IS DR. DIERSCHKE TESTIFIED THAT HE SAW A

11   SIMILAR DRAWING, WHICH THE COURT SAID HE COULD ANSWER

12   YES OR NO.  THAT'S THE ONLY THING I'M GOING TO SAY.

13                  THE COURT:  I DID.

14                  MR. BRAGALONE:  AND YOUR HONOR, WE'VE

15   BROUGHT TO THE COURT'S ATTENTION THAT MR. DIERSCHKE

16   CANNOT SAY THAT HE SAW MR. ASWELL DO THAT THING BECAUSE

17   THAT'S A NONVERBAL COMMUNICATION BY AN OUT-OF-COURT

18   DECLARANT, AND MR. LANEY DID NOT HAVE THIS DRAWING.  IF

19   MR. LANEY HAD COME UP AND STARTED TO DRAW WHAT HE

20   RECALLED MR. ASWELL DOING -- HE SAID MR. ASWELL USED A

21   WHITEBOARD.  HE DIDN'T SAY MR. ASWELL COMMUNICATED THIS

22   INFORMATION VIA A WHITEBOARD.  THAT'S WHEN WE OBJECTED.

23   SO, THEY CAN'T -- MR. LANEY NEVER TESTIFIED ABOUT THIS

24   DOCUMENT, YOUR HONOR.  THEY CAN'T --

25                  THE COURT:  WELL, I'VE READ THE TESTIMONY

1    HERE, AND MR. DIERSCHKE WAS --

2                  MR. BRAGALONE:  IT'S ONLY DIERSCHKE.

3                  THE COURT:  MR. DIERSCHKE WAS DRAWING FROM

4    HIS OWN TECHNICAL KNOWLEDGE.  HE'S AN INVENTOR OF THIS

5    PATENT.

6                  MR. BRAGALONE:  AND, YOUR HONOR, IF THAT'S

7    ALL THEY'RE GOING TO SAY --

8                  THE COURT:  SO HE SAID HE'S FAMILIAR WITH

9    IT, SO, THAT IS NOT HEARSAY.

10                  MR. BRAGALONE:  I AGREE WITH THAT, YOUR

11   HONOR.

12                  THE COURT:  NOW, THIS LATTER EXCHANGE ON

13   PAGES 133 AND 134, I UNDERSTAND HOW YOU CAN ARGUE THAT,

14   THAT HE CAN'T ANSWER YES OR NO.  USUALLY, YES OR NO

15   QUESTIONS ARE NOT HEARSAY.  I DON'T KNOW.  ALL I CAN

16   TELL YOU IS I'VE GOT TO STICK WITH MY RULINGS.  I CAN'T

17   CHANGE RULINGS AT THE BEGINNING OF FINAL ARGUMENT HERE.

18                  MR. BRAGALONE:  WILL YOUR HONOR TELL EITHER

19   THE JURY OR TELL MR. ALIBHAI THAT HE CANNOT SAY THAT

20   THIS IS WHAT WAS COMMUNICATED TO INTERSIL?  THAT'S THE

21   HARM HERE THAT WE'RE TRYING TO AVOID BEFORE CLOSING

22   ARGUMENT.

23                  THE COURT:  WELL, APPARENTLY, HE CAN,

24   BECAUSE MR. LANEY WAS THERE.

25                  MR. BRAGALONE:  NO, NO, MR. LANEY DID NOT

```
 1   EVER SPONSOR THIS.  THIS DRAWING WAS NEVER BROUGHT TO
 2   MR. LANEY'S ATTENTION.
 3               THE COURT:  WAS MR. LANEY AT THE JUNE 17,
 4   2004, MEETING?
 5               MR. ALIBHAI:  YES, YOUR HONOR.
 6               MR. BRAGALONE:  YES, AND ALL HE SAID IS
 7   THAT -- IS THAT MR. ASWELL DREW SOMETHING ON A
 8   WHITEBOARD.  HE DIDN'T -- HE DIDN'T EVER SPONSOR THIS.
 9   THEY CAN'T USE LANEY'S TESTIMONY BEFORE THIS WAS EVER
10   CREATED IN THE COURTROOM TO SAY THAT THIS IS WHAT
11   MR. LANEY SAW.
12               THE COURT:  OKAY.
13               MR. BRAGALONE:  MR. LANEY COULD HAVE TAKEN
14   THE STAND AGAIN AND SAID, YES, THAT'S WHAT I SAW, AND WE
15   WOULD OBJECT TO THAT.
16               THE COURT:  I DON'T REMEMBER EVERYTHING
17   MR. LANEY SAID.  DO YOU CONTEND MR. LANEY SAID THAT
18   HE -- THAT HE KNOWS OF HIS OWN PERSONAL KNOWLEDGE THAT
19   SOME SORT OF A STRUCTURE -- DIODE STRUCTURE WAS
20   COMMUNICATED TO INTERSIL AT THE MEETING?  I DON'T
21   REMEMBER WHAT YOU SAID EARLIER, MR. MCCABE.
22               MR. ALIBHAI:  YES, WE TALKED ABOUT THE 1:1
23   RATIO OF THE DIODE STRUCTURE, AND THAT IT WAS EXPLAINED
24   TO INTERSIL.  ANSWER:  "IN DEPTH, YES."  "WHO DID THAT?"
25   "MR. ASWELL."  "AND HOW DID HE PHYSICALLY DO THAT?"
```

```
 1    "HE'S VERY GOOD IN FRONT OF A WHITEBOARD."

 2               THE COURT:  THIS IS MR. LANEY'S TESTIMONY?

 3               MR. ALIBHAI:  YES, WITHOUT OBJECTION.

 4               THE COURT:  WITHOUT OBJECTION.

 5               MR. ALIBHAI:  PAGES 163 AND 164.

 6               THE COURT:  WELL, I THINK MR. ALIBHAI CAN

 7    ARGUE THAT.

 8               MR. BRAGALONE:  AND, YOUR HONOR, WE'VE GOT

 9    NO PROBLEM AS LONG AS THEY DON'T USE THIS.

10               THE COURT:  OKAY.

11               MR. BRAGALONE:  BECAUSE THIS IS

12    MR. DIERSCHKE.  MR. LANEY --

13               THE COURT:  I UNDERSTAND WHAT YOU'RE ASKING

14    ME.  LET ME HEAR FROM MR. ALIBHAI SO I CAN MAKE A RULING

15    ON THIS.  MR. ALIBHAI, THE REQUEST BY MR. BRAGALONE IS

16    THAT YOU NOT USE THE DRAWING BY -- WELL, HE DREW IT OF

17    HIS OWN PERSONAL KNOWLEDGE.  WHAT MR. BRAGALONE IS

18    ASKING IS THAT YOU NOT ARGUE THAT DIERSCHKE SAW ASWELL

19    DRAW SOMETHING SIMILAR.  I DID LET HIM ANSWER THAT

20    QUESTION DURING TRIAL.

21               MR. BRAGALONE:  AND THAT WAS OVER OUR

22    OBJECTION, YOUR HONOR.

23               THE COURT:  WHETHER THAT IS -- WAS

24    INCORRECT, MR. BRAGALONE MAY HAVE A GOOD ARGUMENT THERE.

25    I DON'T KNOW.  I'D HAVE TO LOOK AT IT A LITTLE CLOSER.
```

1    IT WAS A YES OR NO TYPE QUESTION, DID YOU SEE SOMEONE

2    ELSE DO SOMETHING SIMILAR, DID YOU OBSERVE SOMEONE ELSE

3    PHYSICALLY DO SOMETHING, IS THAT HEARSAY?

4                    MR. BRAGALONE:  AND YOUR HONOR --

5                    THE COURT:  WELL --

6                    MR. BRAGALONE:  THIS IS ALL CURED IF YOU

7    INSTRUCT MR. ALIBHAI THAT HE CANNOT USE THIS FOR THE

8    PROPOSITION THAT --

9                    THE COURT:  I KNOW WHAT YOU'RE ASKING.

10                   MR. BRAGALONE:  -- THIS IS WHAT MR. ASWELL

11   COMMUNICATED.

12                   THE COURT:  I NEED TO HEAR FROM MR. ALIBHAI

13   AND SEE IF HE CAN LIMIT HIS ARGUMENT TO WHAT MR. LANEY

14   SAID ABOUT WHAT WAS DONE AT THE MEETING RATHER THAN WHAT

15   MR. DIERSCHKE -- RATHER THAN WHETHER MR. DIERSCHKE

16   OBSERVED ASWELL DRAW SOMETHING SIMILAR.

17                   MR. ALIBHAI:  I'M ONLY GOING TO SAY WHAT

18   THAT QUESTION AND ANSWER SAID, YOUR HONOR.  DID YOU SEE

19   SOMEONE DRAW SOMETHING SIMILAR?  NO DIFFERENT THAN EVERY

20   CAR ACCIDENT WITNESS WHO COMES IN AND TRIES TO DRAW

21   SOMETHING AND SAYS, THIS REPRESENTS WHAT I SAW; NO

22   DIFFERENT THAN WHEN PEOPLE SAY, IT LOOKED LIKE THE CAR

23   WAS GOING FAST TO ME; NO DIFFERENT THAN WHEN PEOPLE SAY,

24   I SAW A RED LIGHT.  HE'S -- HE'S GOING TO TESTIFY AS TO

25   WHAT HE SAW, AND -- AND THE ONLY THING I ASKED HIM

1    WAS -- AND YOUR HONOR SAID I COULD ASK HIM A YES OR NO

2    QUESTION.  DID YOU SEE SOMEONE DRAW SOMETHING SIMILAR?

3    AND HE SAID, YES I DID.

4                   THE COURT:  OKAY.  WELL --

5                   MR. ALIBHAI:  THAT'S WHAT I'M GOING TO

6    ARGUE.

7                   THE COURT:  OKAY.  NOW ON MARCH 4TH, I HAVE

8    AN OBJECTION TO THIS TESTIMONY BACK ON FEBRUARY 17TH.

9                   MR. ALIBHAI:  IT'S UNTIMELY, YOUR HONOR.

10   IT'S AFTER THE CLOSE OF EVIDENCE.

11                  MR. BRAGALONE:  NO, IT'S NOT UNTIMELY.  WE

12   MADE THE OBJECTION AT THAT TIME.

13                  THE COURT:  YOU DID MAKE THE OBJECTION.

14                  MR. ALIBHAI:  AND IT WAS OVERRULED.  IT'S

15   IN EVIDENCE.

16                  THE COURT:  AND I OVERRULED IT.

17                  MR. ALIBHAI:  IT CAN'T COME OUT OF EVIDENCE

18   NOW.

19                  MR. BRAGALONE:  WHAT'S PREJUDICIAL ABOUT

20   THIS, YOUR HONOR, IS IF THEY ARE RELYING ON IT AS

21   EVIDENCE OF THIS BEING COMMUNICATED TO INTERSIL.  THAT

22   QUESTION WAS NEVER ASKED OF THE WITNESS.  IT -- THAT

23   QUESTION IS WHAT HE'S ATTEMPTING TO NOW USE THIS --

24                  THE COURT:  WELL, NO, IT WAS ASKED WHETHER

25   HE SAW ASWELL DRAW SOMETHING SIMILAR TO THIS, SO --

 1              MR. BRAGALONE:  AND, YOUR HONOR --

 2              THE COURT:  -- THE SIMILARITY ISSUE ALSO

 3  GOES TO THE WEIGHT OF THIS DRAWING.

 4              MR. BRAGALONE:  IT DOES, IT DOES, AND

 5  THAT'S WHY IT'S HEARSAY.  AND, YOUR HONOR, IF HE IS

 6  GOING --

 7              THE COURT:  OKAY.  YOU'LL -- YOU KNOW, I

 8  CAN'T CHANGE RULINGS IN THE MIDST OF TRIAL RIGHT HERE AT

 9  FINAL ARGUMENT.

10              MR. BRAGALONE:  WELL, ACTUALLY, BEFORE IT

11  GOES TO THE JURY IS THE TIME WHEN IT CAN BE DONE.

12              THE COURT:  NO, IT CAN'T, BECAUSE NOW

13  MR. ALIBHAI DOESN'T HAVE THE OPPORTUNITY TO RE-ASK THE

14  QUESTION OF MR. DIERSCHKE.

15              MR. BRAGALONE:  WELL, BUT THAT WAS HIS

16  CHOICE IN PROCEEDING TO ASK IT IN THE FIRST PLACE WHEN

17  WE OBJECTED.  IF WE WAIVED AN OBJECTION, THAT'S ONE

18  THING.

19              THE COURT:  IF HE RELIES ON MY RULINGS,

20  THEN, YOU KNOW, IT WOULD BE THE SAME CASE WITH YOU,

21  MR. BRAGALONE, IF YOU RELY ON MY RULINGS.  IF -- YOU

22  KNOW, YOU'LL JUST HAVE TO RAISE THIS AT ANOTHER LEVEL.

23  I CAN'T IMAGINE THAT THIS ONE RULING WOULD AFFECT THE

24  ENTIRE TRIAL, BUT I CANNOT CHANGE THIS RULING, AND I

25  DON'T EVEN KNOW, WITHOUT LOOKING AT IT A LITTLE MORE

1   CAREFULLY, WHETHER IT IS IMPROPER TO ALLOW DIERSCHKE TO

2   SAY YES OR NO AS TO WHETHER HE SAW SOMEONE DO SOMETHING

3   AT A MEETING.

4                MR. BRAGALONE:  YOUR HONOR, IF HE CAN'T DO

5   IT DIRECTLY, IF HE CAN'T SAY, HERE'S WHAT I SAW

6   MR. ASWELL -- HERE'S WHAT MR. ASWELL SAID AT THE

7   MEETING, YOU -- YOU SUSTAINED THAT OBJECTION.  THEN, HE

8   CAN'T -- IF HE CAN'T ALSO SAY, THIS IS WHAT MR. ASWELL

9   DREW AT THE MEETING, THEN HE CAN'T, HIMSELF, DRAW

10  SOMETHING AND ANSWER A QUESTION, IS THAT LIKE WHAT YOU

11  SAW MR. ASWELL DRAW AT THE MEETING?  IT'S THE SAME

12  THING.

13               THE COURT:  I UNDERSTAND YOUR ARGUMENT.  I

14  UNDERSTAND YOUR ARGUMENT.

15               MR. BRAGALONE:  HE'S BACK DOORING IT.

16               THE COURT:  BUT I'VE GOT TO STICK WITH MY

17  RULINGS.  I CAN'T CHANGE THE LANDSCAPE AT THIS POINT.

18               MR. BRAGALONE:  WELL, BUT YOU CAN PREVENT

19  HIM --

20               MR. ALIBHAI:  YOUR HONOR --

21               MR. BRAGALONE:  EXCUSE ME.

22               THE COURT:  NO, I DON'T WANT TO HEAR ANY

23  MORE ARGUMENT.

24               LET'S SEE.  ARE YOU READY, MR. ALIBHAI?

25               MR. ALIBHAI:  YES, YOUR HONOR, WE'RE READY.

```
 1                MR. MCCABE:  MAY I APPROACH?

 2                MR. BRAGALONE:  WE HAVE TWO MORE OBJECTIONS

 3   TO THE SLIDES, BRIEFLY, YOUR HONOR.

 4                MR. MCCABE:  TO GET THE PAGE BACK, BRIEFLY,

 5   YOUR HONOR, MAY I APPROACH?  IT WAS 134.

 6                MR. BRAGALONE:  AND I'M SORRY, MY REALTIME

 7   ISN'T FOLLOWING.  DID YOUR HONOR RULE ON THAT?

 8                THE COURT:  I'LL -- MY RULING IS THAT THE

 9   FIRST QUESTION THAT YOU OBJECTED TO WAS NOT HEARSAY

10   BECAUSE DIERSCHKE WAS DRAWING FROM HIS OWN KNOWLEDGE.

11   WHAT MR. ALIBHAI HAS IN HIS DEMONSTRATIVES, MY SECOND

12   RULING IS THAT, I GUESS, I'M NOT GOING TO CHANGE MY

13   EARLIER RULINGS THAT WERE MADE ON FEBRUARY 17TH.

14                MR. BRAGALONE:  AND ARE -- WILL YOU --

15                THE COURT:  I CAN'T CHANGE THEM NOW.  IT

16   WOULDN'T BE FAIR.

17                MR. BRAGALONE:  I UNDERSTAND, BUT I'M

18   MAKING THE OBJECTION NOW TO THE INCLUSION OF THE SLIDES

19   IF THEY INTEND TO RELY ON --

20                THE COURT:  OH, YOUR OBJECTION'S OVERRULED.

21                MR. BRAGALONE:  YOUR HONOR, OUR NEXT

22   OBJECTION IS TO A SLIDE ID 643 -- IT'S HARD TO MAKE OUT.

23   YES, IF WE CAN PUT IT -- THERE'S NO ELMO THERE.

24                THE COURT:  OKAY.  MORE OBJECTIONS?

25                MR. BRAGALONE:  YES, YOUR HONOR, BRIEFLY,
```

1   THEY'RE GOING TO PUT THIS UP ON THE PROJECTOR.  SO, YOUR

2   HONOR, THIS IS A SLIDE THAT SAYS, WHERE IS OLEG STECIW,

3   RAJEEVA LAHRI, AND XIJIAN LIN.  NONE OF THESE ARE

4   EMPLOYEES OF INTERSIL.  INTERSIL HAS NO CONTROL OVER

5   THESE INDIVIDUALS.  IT IS IMPROPER TO COMMENT UPON THE

6   FAILURE TO BRING A WITNESS TO TRIAL IF THE WITNESS IS

7   NOT WITHIN THE CONTROL OF A PARTY.

8               I WOULD CONTRAST THIS, FOR EXAMPLE, WITH

9   MR. ASWELL.  MR. ASWELL IS IN PLAINTIFF'S CONTROL.  THEY

10  COULD HAVE BROUGHT HIM TO TRIAL BUT DIDN'T.  THESE

11  INDIVIDUALS ARE FORMER EMPLOYEES.  THE LAW IN THE FIFTH

12  CIRCUIT AND IN NUMEROUS OTHER CIRCUITS -- THIS IS OFTEN

13  REFERRED TO AS THE MISSING WITNESS RULE, AND WHETHER

14  IT'S PROPER TO COMMENT UPON THE FAILURE OF A PARTY TO

15  BRING A WITNESS TO TRIAL.

16              THE --

17              THE COURT:  DO YOU HAVE A CASE YOU CAN

18  CITE?

19              MR. BRAGALONE:  YES, YOUR HONOR.

20              MR. ALIBHAI:  YOUR HONOR, I'LL WITHDRAW THE

21  SLIDE.

22              THE COURT:  OKAY.

23              MR. BRAGALONE:  OKAY.

24              MR. ALIBHAI:  REMOVE THE SLIDE, PLEASE.

25              THE COURT:  WHAT'S THE NEXT ONE?

1            MR. BRAGALONE:  AND WE WOULD ALSO ASK THAT

2   MR. ALIBHAI BE PRECLUDED FROM ARGUING TO THE JURY IN

3   CLOSING THAT INTERSIL FAILED TO BRING FORMER EMPLOYEES.

4   HE CAN ARGUE ALL DAY ABOUT CURRENT EMPLOYEES THAT ARE

5   WITHIN INTERSIL'S CONTROL, BUT FORMER EMPLOYEES AREN'T

6   WITHIN INTERSIL'S CONTROL.

7            THE COURT:  MR. ALIBHAI?

8            MR. ALIBHAI:  WELL, THE ISSUE I HAVE WITH

9   THAT, YOUR HONOR, IS ONE OF THEIR SLIDES IS GOING TO

10  TALK ABOUT THEIR FORMER EMPLOYEES, INCLUDING MR. LAHRI.

11  THAT'S MR. LAHRI ON THE BOTTOM LEFT, ISN'T IT?

12            MR. BRAGALONE:  YES, YOUR HONOR.  AND WE --

13            MR. ALIBHAI:  THEY'RE GOING TO MAKE AN

14  ARGUMENT ABOUT THEIR FORMER EMPLOYEES SHOWING UP HERE

15  AND WHAT THEY SAID AND DIDN'T SAY AND WHAT THEY HAVE TO

16  GAIN AND WHAT THEY DON'T HAVE TO GAIN.  I'M ENTITLED TO

17  SAY OF THOSE PEOPLE, IF THEY'RE GOING TO MAKE AN

18  ARGUMENT ABOUT THEIR FORMER EMPLOYEES -- I DON'T EVEN

19  KNOW WHO'S ON THE BOTTOM RIGHT.  IS THAT DAVID FOGG?

20            MR. BRAGALONE:  NO, IT'S RICH BEYER.

21            MR. ALIBHAI:  SO, MR. LAHRI AND MR. BEYER,

22  IF THEY'RE GOING TO MAKE COMMENTS ABOUT THEIR FORMER

23  EMPLOYEES, THEN I'M ENTITLED TO ASK WHY THEY DIDN'T SHOW

24  UP AND TESTIFY.

25            MR. BRAGALONE:  AND, YOUR HONOR, OKAY,

```
1   FIRST OF ALL, IT'S ONLY IMPROPER IF THE OPPOSING PARTY

2   IS COMMENTING ON THE OTHER PARTY'S FAILURE TO BRING

3   SOMEBODY TO TRIAL, BECAUSE THAT IS MADE OFTEN IN CLOSING

4   ARGUMENT TO SUGGEST THAT THE JURY SHOULD DRAW AN

5   INFERENCE THAT THAT PERSON'S TESTIMONY WOULD HAVE BEEN

6   UNFAVORABLE TO THEM.  TO MR. ALIBHAI'S SPECIFIC POINT,

7   WE'LL TAKE MR. LAHRI AND MR. BEYER OFF THE BOTTOM OF

8   THAT SLIDE AND I WON'T MENTION THEM.  SO, I'M NOT TRYING

9   TO ASK SOMETHING DIFFERENT THAT I WOULDN'T ALSO DO

10  MYSELF.

11                  THE COURT:  OKAY.

12                  MR. ALIBHAI:  AND MR. ASWELL WAS OUT OF THE

13  COUNTRY AND NOT AVAILABLE.  THEY SHOULDN'T BE ABLE TO

14  COMMENT ON HIS ABILITY TO SHOW UP EITHER.

15                  MR. BRAGALONE:  HE -- HE'S THEIR EMPLOYEE,

16  YOUR HONOR.  WE'RE ABSOLUTELY ENTITLED TO DO THAT.

17                  MR. ALIBHAI:  WELL, DR. LIN'S AN EMPLOYEE

18  OF INTERSIL TOO.  I MEAN, THERE'S NO POINT IN GETTING

19  INTO WHO'S AN EMPLOYEE AND WHO'S NOT.

20                  MR. BRAGALONE:  NO, HE'S NOT.

21                  MR. KIMBLE:  NOT ANYMORE.

22                  MR. ALIBHAI:  WHEN DID HE STOP BEING AN

23  EMPLOYEE?

24                  MR. BRAGALONE:  SEVERAL --

25                  MR. KIMBLE:  YEARS AGO.
```

```
 1              MR. BRAGALONE:  YEARS AGO.  NONE OF THESE
 2  INDIVIDUALS ARE EMPLOYEES OF INTERSIL.
 3              THE COURT:  ALL RIGHT.  SO YOU'RE TAKING
 4  OFF THE PICTURES AT THE BOTTOM OF THE --
 5              MR. BRAGALONE:  THE BOTTOM TWO, YES, YOUR
 6  HONOR.
 7              THE COURT:  WHATEVER EXHIBIT THIS IS.
 8  LOOKED LIKE IT WAS PAGE 108.
 9              MR. ALIBHAI:  THAT'S RIGHT, YOUR HONOR.
10              MR. BRAGALONE:  WE'RE GOING TO TAKE OFF THE
11  BOTTOM TWO.  WE'RE ONLY GOING TO TALK ABOUT THE ONES
12  THAT APPEARED AT TRIAL.
13              THE COURT:  WHAT OTHER OBJECTIONS DO YOU
14  HAVE?
15              MR. BRAGALONE:  AS I UNDERSTAND IT,
16  MR. ALIBHAI'S NOT GOING TO MAKE THAT ARGUMENT?
17              THE COURT:  WELL, I DON'T KNOW WHAT HE'S
18  GOING TO ARGUE, BUT HE'S GOING TO WITHDRAW THE SLIDES.
19              MR. BRAGALONE:  I UNDERSTAND, BUT I'M ALSO
20  ASKING THAT THE COURT ORDER THAT HE SHOULD NOT MAKE THE
21  ARGUMENT THAT INTERSIL FAILED TO BRING TO TRIAL ANY
22  WITNESS OVER WHICH IT DOESN'T HAVE CONTROL.
23              THE COURT:  THAT SOUNDS FAIR TO ME,
24  MR. ALIBHAI.
25              MR. ALIBHAI:  I WASN'T GOING TO DO THAT,
```

```
 1   YOUR HONOR.
 2                MR. BRAGALONE:  VERY GOOD.  THE LAST ONE,
 3   YOUR HONOR, IS --
 4                MR. ALIBHAI:  BUT IF THEY OPEN THE DOOR, I
 5   RESERVE THE RIGHT TO DO THAT.
 6                THE COURT:  OPEN THE DOOR BY ARGUING THAT
 7   YOU DIDN'T BRING SOME OF YOUR -- YOUR --
 8                MR. ALIBHAI:  IF THEY DO SOMETHING THAT
 9   OPENS THE DOOR, I'LL COME TALK TO YOU ABOUT IT, BUT I
10   WANT TO BE CLEAR THAT IF THEY OPEN THE DOOR, I HAVE THE
11   RIGHT TO TALK ABOUT IT.
12                THE COURT:  AND THE WAY THEY WOULD OPEN THE
13   DOOR IS ARGUING THAT YOU DIDN'T BRING FORMER EMPLOYEES
14   HERE TO TESTIFY?
15                MR. ALIBHAI:  I DON'T KNOW WHAT THEY'LL DO,
16   YOUR HONOR, BUT WE'LL WAIT TO SEE WHAT THOSE
17   90 MINUTES --
18                MR. BRAGALONE:  YOUR HONOR, I'M NOT GOING
19   TO MAKE ANY ARGUMENTS ABOUT FORMER EMPLOYEES.  I WILL
20   ARGUE ABOUT MR. ASWELL --
21                THE COURT:  WELL, BOTH OF YOU NEED TO STICK
22   TO THE RECORD, OKAY?  NO HITTING BELOW THE BELT HERE, NO
23   PERSONALITIES, NOTHING LIKE THAT.  I WANT TO SAY ALSO
24   THAT YOU NEED TO ARGUE FROM THE PODIUM.  DO NOT WANDER
25   OVER HERE BY THE JURY.  STAY AT THE PODIUM.
```

```
 1                    MR. ALIBHAI:  YES, SIR.

 2                    THE COURT:  WHAT ELSE?

 3                    MR. BRAGALONE:  LAST ONE, YOUR HONOR, IS ID

 4      949.

 5                    THE COURT:  YOU'RE MAKING REFERENCES TO

 6      DOCUMENTS I DON'T HAVE.

 7                    MR. ALIBHAI:  IT'S ON THE SCREEN, YOUR

 8      HONOR.

 9                    MR. BRAGALONE:  IT'S AN EXHIBIT ON THE

10      SCREEN, YOUR HONOR.  FRANKLY, YOUR HONOR, I'M NOT SURE

11      WHAT THE RELEVANCE IS OF THIS.  WE'RE NOT SURE HOW IT'S

12      GOING TO BE USED --

13                    THE COURT:  PROBABLY GOES TO EXEMPLARY

14      DAMAGES.

15                    MR. ALIBHAI:  THAT'S CORRECT, YOUR HONOR.

16      THIS IS FROM A DOCUMENT IN EVIDENCE.

17                    THE COURT:  YES, IT IS.

18                    MR. ALIBHAI:  WHAT'S NOT IN EVIDENCE AND

19      THEY -- I'M SURPRISED THAT MR. BRAGALONE'S COMPLAINING

20      ABOUT THIS.  HIS OWN SLIDE SAYS, AMS HAS A MARKET CAP OF

21      2.7 BILLION COMPARED TO 2 BILLION FOR INTERSIL.  HIS

22      SLIDE.

23                    THE COURT:  I THINK NET WORTH IS -- IS NET

24      WORTH NOT APPROPRIATE?

25                    MR. ALIBHAI:  IT'S ONE OF THE FACTORS YOU
```

1    CONSIDER FOR EXEMPLARY DAMAGES.  IT'S IN THE COURT'S

2    INSTRUCTIONS FROM THE PATTERN JURY CHARGE.

3                   THE COURT:  YEAH.

4                   MR. BRAGALONE:  YOUR HONOR, I'M GOING TO

5    BRING UP SOMETHING ABOUT AMS IF THIS IS A KIND OF TIT

6    FOR TAT.  THAT'S FAIR.  I'LL WITHDRAW OUR OBJECTION.

7                   MR. ALIBHAI:  IT'S NOT TIT FOR TAT, YOUR

8    HONOR.  IT'S A RELEVANT FACTOR IN EXEMPLARY DAMAGES.

9                   THE COURT:  I MEAN, THERE'S NO OBJECTION TO

10   THIS.  THIS DOCUMENT YOU HAVE ON THE SCREEN IS IN

11   EVIDENCE WITHOUT OBJECTION.  I THINK THAT'S WHAT

12   HAPPENED.

13                  MR. ALIBHAI:  THAT'S CORRECT.  I DON'T

14   THINK MR. BRAGALONE WAS HERE FOR THAT.

15                  MR. BRAGALONE:  THAT'S FINE, YOUR HONOR.

16                  THE COURT:  ANYTHING ELSE?

17                  MR. BRAGALONE:  NO, YOUR HONOR.

18                  THE COURT:  OKAY.  ALL RIGHT.  I THINK

19   WE'RE READY TO GO.

20                  MR. ALIBHAI:  YOUR HONOR, CAN WE TAKE A

21   2-MINUTE BREAK?

22                  THE COURT:  OKAY, SURE.  5 MINUTES.

23                  MR. ALIBHAI:  THANK YOU, YOUR HONOR.

24                  (BREAK TAKEN FROM 10:17 A.M. TO 10:21 A.M.)

25                  THE COURT:  KEEP YOUR SEATS, THANK YOU.

1  JUST KEEP YOUR SEATS.

2              I THINK WE'RE WAITING FOR MR. KIMBLE.

3  OKAY.  MR. KIMBLE IS HERE.  ALL RIGHT, EVERYONE'S HERE

4  AND READY.  SO, LET'S BRING IN THE JURY.

5              (JURY PRESENT)

6              THE COURT:  ALL RIGHT.  PLEASE BE SEATED.

7  MEMBERS OF THE JURY, GOOD MORNING TO YOU.

8              JUROR:  GOOD MORNING.

9              THE COURT:  THANK YOU FOR YOUR PATIENCE.  I

10  CAN ASSURE YOU THAT I DO NOT BRING JURIES BACK BEFORE I

11  THINK WE'LL BE READY FOR YOU, BUT SOMETIMES THE COURT

12  CANNOT ANTICIPATE ISSUES THAT WILL ARISE AT THE

13  BEGINNING OF THE DAY, AND SOMETIMES THE PARTIES CANNOT

14  ANTICIPATE THAT EITHER.

15              THEY HAVE WORKED COOPERATIVELY TO EXCHANGE

16  EXHIBITS, AND SOMETIMES, BECAUSE WE'VE BEEN WORKING INTO

17  THE NIGHT, BOTH LAST NIGHT AND THE NIGHT BEFORE, THE

18  LAWYERS AND THE COURT, IN ORDER TO GET THIS CASE READY

19  FOR FINAL ARGUMENTS, SOMETIMES THEY HAVE TO EXCHANGE

20  INFORMATION LATE AT NIGHT, AND THOSE -- AND ANY

21  OBJECTIONS CANNOT BE HEARD UNTIL THE NEXT MORNING.  AND

22  SOMETIMES THEY TAKE A WHILE.

23              SO ANYWAY, WE'RE READY TO PROCEED AT THIS

24  TIME.  YOU HAVE ON YOUR CHAIRS THERE A COPY OF THE

25  COURT'S INSTRUCTIONS TO YOU.  AS YOU'LL SEE, IN TOTAL,

1  THE INSTRUCTIONS AND THE QUESTIONS THAT I POSED TO YOU

2  ARE ABOUT 45 PAGES.  THE LAW REQUIRES THAT I READ THESE

3  INSTRUCTIONS TO YOU, SO I'M GOING TO READ THE

4  INSTRUCTIONS FIRST.  YOU CAN FOLLOW ALONG ON YOUR

5  COPIES.  YOU CAN TAKE THOSE COPIES WITH YOU BACK TO THE

6  JURY ROOM WHEN YOU START YOUR DELIBERATIONS.  MY

7  INSTRUCTIONS TO YOU ARE ON THE LAW.

8             AGAIN, AS I TOLD YOU AT THE BEGINNING OF

9  THE TRIAL, YOU ARE THE JUDGES OF THE FACTS.  YOU ARE THE

10 ONES WHO EVALUATE THE WITNESSES AND ALL OF THE DOCUMENTS

11 THAT YOU'VE SEEN ON THE SCREEN, AND SO YOU'LL BE THE

12 JUDGES OF THE FACTS, BUT I'LL INSTRUCT YOU ON THE LAW

13 HERE IN JUST A MOMENT.

14            BEFORE I DO THAT, LET ME SAY THAT THE --

15 THE LAWYERS HAVE AGREED TO A FINAL ARGUMENT TIME OF

16 90 MINUTES PER SIDE.  OBVIOUSLY, WE'RE GETTING STARTED

17 AT 10:30.  IT'LL TAKE ME AN HOUR, MAYBE MORE THAN AN

18 HOUR, TO READ THESE INSTRUCTIONS TO YOU.  THEN, I DIDN'T

19 VISIT WITH THE LAWYERS ABOUT THIS BEFORE YOU CAME OUT,

20 BUT WE'LL START THE PLAINTIFF'S OPENING ARGUMENT.  THE

21 PLAINTIFF, HAVING THE BURDEN OF PROOF, THE PLAINTIFF

22 BEING TAOS, HAVING THE BURDEN OF PROOF, HAS THE RIGHT TO

23 OPEN AND CLOSE FINAL ARGUMENTS.

24            NOW, THE DEFENDANT HAS THE BURDEN OF PROOF

25 ON SOME OF ITS AFFIRMATIVE DEFENSES, WHICH I'LL VISIT

1   WITH YOU ABOUT IN THE COURT'S INSTRUCTIONS, BUT THE

2   PLAINTIFF, OBVIOUSLY, HAS THE BURDEN OF PROOF ON THE

3   FOUR CLAIMS THAT ARE BEFORE YOU, PATENT INFRINGEMENT,

4   TRADE SECRET MISAPPROPRIATION, BREACH OF CONTRACT, AND

5   TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS

6   RELATIONS.  SO THE PLAINTIFF HAS THE RIGHT TO OPEN AND

7   CLOSE FINAL ARGUMENTS.

8            SO, YOU WILL HEAR FROM MR. ALIBHAI AND

9   MR. MCCABE IN THEIR OPENING ARGUMENT.  THEY'LL USE PART

10  OF THEIR 90 MINUTES.  THEN, MR. BRAGALONE -- AND THIS

11  MAY BE AFTER LUNCH -- WILL MAKE HIS FULL ARGUMENT TO

12  YOU, AND THEN MR. ALIBHAI AND MR. MCCABE CAN USE THEIR

13  REMAINING TIME FOR CLOSING ARGUMENTS.  BUT EACH SIDE

14  WILL HAVE A TOTAL OF UP TO 90 MINUTES FOR FINAL

15  ARGUMENTS.  IT'S BEEN A LONG TRIAL.  I THINK AN HOUR AND

16  A HALF PER SIDE IS FAIR.

17           BEFORE I READ THE INSTRUCTIONS TO YOU, I

18  WANT TO TELL YOU THAT YOU'VE -- DURING THE COURSE OF THE

19  TRIAL, YOU MAY HAVE HEARD EVIDENCE THAT THIS CASE WAS

20  FILED IN NOVEMBER OF 2008.  WE BEGAN THE TRIAL ON

21  FEBRUARY 9TH OF 2015, SO IT'S BEEN ABOUT SIX YEARS, A

22  LITTLE OVER SIX YEARS SINCE THE LAWSUIT WAS FILED TO THE

23  TRIAL.  I WANT TO TELL YOU THAT BOTH PARTIES IN THIS

24  CASE, TAOS AND INTERSIL, HAVE BEEN DILIGENT IN PREPARING

25  THIS CASE FOR TRIAL.  THREE-AND-A-HALF YEARS OF THAT

1  SIX YEARS WAS THE RESULT OF THE COURT DELAYING AND

2  ISSUING ITS CLAIM CONSTRUCTION ORDER.

3           THE CLAIM CONSTRUCTION HEARING IN THIS CASE

4  ON THE PATENT ISSUES WAS HELD ON NOVEMBER 17TH OF 2009.

5  THE COURT, BEING ME, ISSUED THE CLAIM CONSTRUCTION ORDER

6  IN JUNE OF 2013.  THE ORDER IS 30 PAGES LONG.  IT IS --

7  IT'S INVOLVED.  IT'S A LOT OF TECHNICAL INFORMATION.  I

8  HAVE FOUND IN THIS JOB THAT BASED UPON THE CASE LOAD

9  THAT I HAVE, THAT SOMETIMES I HAVE TO CHOOSE BETWEEN

10  TIMELINESS AND THOROUGHNESS.  I DON'T LIKE THE CHOICE,

11  BUT I CHOOSE THOROUGHNESS OVER TIMELINESS, AND THAT

12  MEANS THAT THERE ARE TIMES WHEN, IN COMPLEX MATTERS THAT

13  REQUIRE HOURS AND HOURS TO WORK ON THAT I DON'T HAVE,

14  SOMETIMES, I SIMPLY HAVE TO PUT MATTERS ON THE SHELF

15  UNTIL I CAN GET TO THEM.

16           SO, I WANT YOU TO KNOW -- I DON'T WANT YOU

17  TO THINK THAT BECAUSE IT'S BEEN SIX YEARS SINCE FILING

18  THE LAWSUIT UNTIL THIS TRIAL THAT SOMEHOW THE PARTIES

19  HAVE BEEN NEGLECTING PREPARING THE CASE FOR TRIAL.  THEY

20  HAVE NOT.  THREE-AND-A-HALF YEARS OF THAT WAS THE

21  COURT'S OWN DELAY IN ISSUING THE CLAIM CONSTRUCTION

22  ORDER.  SO, I WANTED TO TELL YOU THAT.

23           MEMBERS OF THE JURY, I'M GOING TO READ THE

24  COURT'S INSTRUCTIONS TO YOU, AND YOU CAN FOLLOW ALONG.

25           MEMBERS OF THE JURY, IT IS MY DUTY AND

1   RESPONSIBILITY TO INSTRUCT YOU ON THE LAW YOU ARE TO

2   APPLY IN THIS CASE.  THE LAW CONTAINED IN THESE

3   INSTRUCTIONS IS THE ONLY LAW YOU MAY FOLLOW.  IT IS YOUR

4   DUTY TO FOLLOW WHAT I INSTRUCT YOU THE LAW IS,

5   REGARDLESS OF ANY OPINION THAT YOU MIGHT HAVE AS TO WHAT

6   THE LAW OUGHT TO BE.

7                IF I HAVE GIVEN YOU THE IMPRESSION DURING

8   THE TRIAL THAT I FAVOR EITHER PARTY, YOU MUST DISREGARD

9   THAT IMPRESSION.  IF I HAVE GIVEN YOU THE IMPRESSION

10  DURING THE TRIAL THAT I HAVE AN OPINION ABOUT THE FACTS

11  OF THIS CASE, YOU MUST DISREGARD THAT IMPRESSION.  YOU

12  ARE THE SOLE JUDGES OF THE FACTS OF THIS CASE.  OTHER

13  THAN MY INSTRUCTIONS TO YOU ON THE LAW, YOU SHOULD

14  DISREGARD ANYTHING I MAY HAVE SAID OR DONE DURING THE

15  TRIAL IN ARRIVING AT YOUR VERDICT.

16               YOU SHOULD CONSIDER ALL OF THE INSTRUCTIONS

17  ABOUT THE LAW AS A WHOLE AND REGARD EACH INSTRUCTION IN

18  LIGHT OF THE OTHERS, WITHOUT ISOLATING A PARTICULAR

19  STATEMENT OR PARAGRAPH.

20               THE TESTIMONY OF THE WITNESSES AND OTHER

21  EXHIBITS INTRODUCED BY THE PARTIES CONSTITUTE THE

22  EVIDENCE.  THE STATEMENTS OF COUNSEL ARE NOT EVIDENCE;

23  THEY ARE ONLY ARGUMENTS.  IT IS IMPORTANT FOR YOU TO

24  DISTINGUISH BETWEEN THE ARGUMENTS OF COUNSEL AND THE

25  EVIDENCE ON WHICH THOSE ARGUMENTS REST.  WHAT THE

1   LAWYERS SAY OR DO IS NOT EVIDENCE.  YOU MAY, HOWEVER,

2   CONSIDER THEIR ARGUMENTS IN LIGHT OF THE EVIDENCE THAT

3   HAS BEEN ADMITTED AND DETERMINE WHETHER THE EVIDENCE

4   ADMITTED IN THIS TRIAL SUPPORTS THE ARGUMENTS.  YOU MUST

5   DETERMINE THE FACTS FROM ALL THE TESTIMONY THAT YOU HAVE

6   HEARD AND THE OTHER EVIDENCE SUBMITTED.  YOU ARE THE

7   JUDGES OF THE FACTS, BUT IN FINDING THOSE FACTS, YOU

8   MUST APPLY THE LAW AS I INSTRUCT YOU.

9              YOU ARE REQUIRED BY LAW TO DECIDE THE CASE

10  IN A FAIR, IMPARTIAL, AND UNBIASED MANNER, BASED

11  ENTIRELY ON THE LAW AND ON THE EVIDENCE PRESENTED TO YOU

12  IN THE COURTROOM.  YOU MAY NOT BE INFLUENCED BY PASSION,

13  PREJUDICE, OR SYMPATHY YOU MIGHT HAVE FOR THE PLAINTIFF

14  OR THE DEFENDANT IN ARRIVING AT YOUR VERDICT.  A

15  CORPORATION AND ALL OTHER PERSONS ARE EQUAL BEFORE THE

16  LAW AND MUST BE TREATED AS EQUALS IN A COURT OF JUSTICE.

17             THE PLAINTIFF HAS THE BURDEN OF PROVING ITS

18  CASE BY A PREPONDERANCE OF THE EVIDENCE.  TO ESTABLISH

19  BY A PREPONDERANCE OF THE EVIDENCE MEANS TO PROVE

20  SOMETHING IS MORE LIKELY SO THAN NOT SO.  IF YOU FIND

21  THAT THE PLAINTIFF HAS FAILED TO PROVE ANY ELEMENT OF

22  ITS CLAIM BY A PREPONDERANCE OF THE EVIDENCE, THEN IT

23  MAY NOT RECOVER ON THAT CLAIM.

24             IN THIS CASE, THE DEFENDANT ASSERTS SEVERAL

25  AFFIRMATIVE DEFENSES.  EVEN IF THE PLAINTIFF PROVES ITS

1  CLAIMS BY A PREPONDERANCE OF THE EVIDENCE, THE DEFENDANT

2  CAN PREVAIL IN THIS CASE IF IT PROVES AN AFFIRMATIVE

3  DEFENSE BY THE APPROPRIATE STANDARD OF PROOF AS

4  EXPLAINED IN THESE INSTRUCTIONS.

5              WHEN MORE THAN ONE AFFIRMATIVE DEFENSE IS

6  INVOLVED, YOU SHOULD CONSIDER EACH ONE SEPARATELY.

7              I CAUTION YOU THAT THE DEFENDANT DOES NOT

8  HAVE TO DISPROVE THE PLAINTIFF'S CLAIMS, BUT IF THE

9  DEFENDANT RAISES AN AFFIRMATIVE DEFENSE, THE ONLY WAY IT

10 CAN PREVAIL ON THAT SPECIFIC DEFENSE IS IF IT PROVES

11 THAT DEFENSE BY THE APPROPRIATE STANDARD OF PROOF AS

12 EXPLAINED IN THESE INSTRUCTIONS.

13             CLEAR AND CONVINCING EVIDENCE IS EVIDENCE

14 THAT PRODUCES IN YOUR MIND A FIRM BELIEF OR CONVICTION

15 AS TO THE TRUTH OF THE MATTER SOUGHT TO BE ESTABLISHED.

16 IT IS EVIDENCE SO CLEAR, DIRECT, WEIGHTY, AND CONVINCING

17 AS TO ENABLE YOU TO COME TO A CLEAR CONVICTION WITHOUT

18 HESITANCY.

19             THE EVIDENCE YOU ARE TO CONSIDER CONSISTS

20 OF THE TESTIMONY OF THE WITNESSES, THE DOCUMENTS AND

21 OTHER EXHIBITS ADMITTED INTO EVIDENCE, AND ANY FAIR

22 INFERENCES AND REASONABLE CONCLUSIONS YOU CAN DRAW FROM

23 THE FACTS AND CIRCUMSTANCES THAT HAVE BEEN PROVEN.

24             GENERALLY SPEAKING, THERE ARE TWO TYPES OF

25 EVIDENCE.  ONE IS DIRECT EVIDENCE, SUCH AS TESTIMONY OF

1   AN EYE-WITNESS.  THE OTHER IS INDIRECT OR CIRCUMSTANTIAL

2   EVIDENCE.  CIRCUMSTANTIAL EVIDENCE IS EVIDENCE THAT

3   PROVES A FACT FROM WHICH YOU CAN LOGICALLY CONCLUDE

4   ANOTHER FACT EXISTS.

5                    AS A GENERAL RULE, THE LAW MAKES NO

6   DISTINCTION BETWEEN DIRECT AND CIRCUMSTANTIAL EVIDENCE

7   BUT SIMPLY REQUIRES THAT YOU FIND THE FACTS FROM A

8   PREPONDERANCE OF ALL THE EVIDENCE, BOTH DIRECT AND

9   CIRCUMSTANTIAL.

10                   A STIPULATION IS AN AGREEMENT.  WHEN THERE

11  IS NO DISPUTE ABOUT CERTAIN FACTS, THE ATTORNEYS MAY

12  AGREE OR STIPULATE TO THOSE FACTS.  YOU MUST ACCEPT A

13  STIPULATED FACT AS EVIDENCE AND TREAT THAT FACT AS

14  HAVING BEEN PROVEN HERE IN COURT.

15                   WHEN TESTIMONY OR AN EXHIBIT IS ADMITTED

16  FOR A LIMITED PURPOSE, YOU MAY CONSIDER THAT TESTIMONY

17  OR EXHIBIT ONLY FOR THE SPECIFIC LIMITED PURPOSE FOR

18  WHICH IT WAS ADMITTED.

19                   CERTAIN CHARTS AND SUMMARIES HAVE BEEN

20  SHOWN TO YOU SOLELY TO HELP EXPLAIN OR SUMMARIZE THE

21  FACTS DISCLOSED BY THE BOOKS, RECORDS, AND OTHER

22  DOCUMENTS THAT ARE IN EVIDENCE.  THESE CHARTS AND

23  SUMMARIES ARE NOT EVIDENCE OR PROOF OF ANY FACTS.  YOU

24  SHOULD DETERMINE THE FACTS FROM THE EVIDENCE.

25                   CERTAIN EXHIBITS HAVE BEEN SHOWN TO YOU AS

1   ILLUSTRATIONS.  IT IS A PARTY'S DESCRIPTION, PICTURE, OR

2   MODEL USED TO DESCRIBE SOMETHING INVOLVED IN THIS TRIAL.

3   IF YOUR RECOLLECTION OF THE EVIDENCE DIFFERS FROM THE

4   EXHIBIT, RELY ON YOUR RECOLLECTION.

5                   YOU ALONE ARE TO DETERMINE THE QUESTIONS OF

6   CREDIBILITY OR TRUTHFULNESS OF THE WITNESSES.  IN

7   WEIGHING THE TESTIMONY OF THE WITNESSES, YOU MAY

8   CONSIDER THE WITNESS'S MANNER AND DEMEANOR ON THE

9   WITNESS STAND, ANY FEELINGS OR INTEREST IN THE CASE OR

10  ANY PREJUDICE OR ANY BIAS ABOUT THE CASE THAT HE OR SHE

11  MAY HAVE AND THE CONSISTENCY OR INCONSISTENCY OF HIS OR

12  HER TESTIMONY CONSIDERED IN THE LIGHT OF THE

13  CIRCUMSTANCES.  HAS THE WITNESS BEEN CONTRADICTED BY

14  OTHER CREDIBLE EVIDENCE?  HAS HE OR SHE MADE STATEMENTS

15  AT OTHER TIMES AND PLACES CONTRARY TO THOSE MADE HERE ON

16  THE WITNESS STAND?

17                  YOU MUST GIVE THE TESTIMONY OF EACH WITNESS

18  THE CREDIBILITY THAT YOU THINK IT DESERVES.

19                  YOU ARE NOT TO DECIDE THIS CASE BY COUNTING

20  THE NUMBER OF WITNESSES WHO HAVE TESTIFIED ON THE

21  OPPOSING SIDES.  WITNESS TESTIMONY IS WEIGHED:

22  WITNESSES ARE NOT COUNTED.  THE TEST IS NOT THE RELATIVE

23  NUMBER OF WITNESSES, BUT THE RELATIVE CONVINCING FORCE

24  OF THE EVIDENCE.  THE TESTIMONY OF A SINGLE WITNESS IS

25  SUFFICIENT TO PROVE ANY FACT, EVEN IF A GREATER NUMBER

1  OF WITNESSES TESTIFIED TO THE CONTRARY, IF AFTER

2  CONSIDERING ALL OF THE OTHER EVIDENCE, YOU BELIEVE THAT

3  WITNESS.

4         IN DETERMINING THE WEIGHT TO GIVE TO THE

5  TESTIMONY OF A WITNESS, CONSIDER WHETHER THERE WAS

6  EVIDENCE THAT AT SOME OTHER TIME THE WITNESS SAID OR DID

7  SOMETHING, OR FAILED TO SAY OR DO SOMETHING THAT WAS

8  DIFFERENT FROM THE TESTIMONY GIVEN AT THE TRIAL.

9         A SIMPLE MISTAKE BY A WITNESS DOES NOT

10  NECESSARILY MEAN THAT THE WITNESS DID NOT TELL THE TRUTH

11  AS HE OR SHE REMEMBERS IT.  PEOPLE MAY FORGET SOME

12  THINGS OR REMEMBER OTHER THINGS INACCURATELY.  IF A

13  WITNESS MADE A MISSTATEMENT, CONSIDER WHETHER THAT

14  MISSTATEMENT WAS AN INTENTIONAL FALSEHOOD OR SIMPLY AN

15  INNOCENT MISTAKE.  THE SIGNIFICANCE OF THAT MAY DEPEND

16  ON WHETHER IT HAS TO DO WITH AN IMPORTANT FACT OR WITH

17  ONLY AN UNIMPORTANT DETAIL.

18         CERTAIN TESTIMONY HAS BEEN PRESENTED TO YOU

19  THROUGH DEPOSITIONS.  A DEPOSITION IS THE SWORN RECORDED

20  ANSWERS TO QUESTIONS A WITNESS WAS ASKED IN ADVANCE OF

21  THE TRIAL.  UNDER SOME CIRCUMSTANCES, IF A WITNESS

22  CANNOT BE PRESENT TO TESTIFY FROM THE WITNESS STAND,

23  THAT WITNESS'S TESTIMONY MAY BE PRESENTED UNDER OATH IN

24  THE FORM OF A DEPOSITION.  SOMETIME BEFORE THIS TRIAL,

25  ATTORNEYS REPRESENTING THE PARTIES IN THIS CASE

1   QUESTIONED THIS WITNESS UNDER OATH.  A COURT REPORTER

2   WAS PRESENT AND RECORDED THE TESTIMONY.  THE QUESTIONS

3   AND ANSWERS HAVE BEEN PRESENTED TO YOU.  THE DEPOSITION

4   TESTIMONY IS ENTITLED TO THE SAME CONSIDERATION AND IS

5   TO BE JUDGED BY YOU AS TO CREDIBILITY AND WEIGHED AND

6   OTHERWISE CONSIDERED BY YOU IN THE SAME WAY AS IF THE

7   WITNESS HAD BEEN PRESENTED -- HAD BEEN PRESENT AND HAD

8   TESTIFIED FROM THE WITNESS STAND IN COURT.

9        WHEN KNOWLEDGE OF TECHNICAL SUBJECT MATTER

10  MAY BE HELPFUL TO THE JURY, A PERSON WHO HAS SPECIAL

11  TRAINING OR EXPERIENCE IN THAT TECHNICAL FIELD IS

12  PERMITTED TO STATE HIS OR HER OPINION ON THOSE TECHNICAL

13  MATTERS.  HOWEVER, YOU ARE NOT REQUIRED TO ACCEPT THAT

14  OPINION.  AS WITH ANY OTHER WITNESS, IT IS UP TO YOU TO

15  DECIDE WHETHER TO RELY ON IT.

16       THE FACT THAT A PARTY BROUGHT A LAWSUIT AND

17  IS IN COURT SEEKING DAMAGES CREATES NO INFERENCE THAT

18  THE PARTY IS ENTITLED TO A JUDGMENT.  ANYONE MAY MAKE A

19  CLAIM AND FILE A LAWSUIT.  THE ACT OF MAKING A CLAIM IN

20  A LAWSUIT, BY ITSELF, DOES NOT IN ANY WAY ESTABLISH --

21  OR DOES NOT IN ANY WAY TEND TO ESTABLISH THAT CLAIM AND

22  IS NOT EVIDENCE.

23       IF THE PLAINTIFF HAS PROVED ITS CLAIMS

24  AGAINST THE DEFENDANT BY A PREPONDERANCE OF THE EVIDENCE

25  AND THE DEFENDANT HAS FAILED TO PROVE ONE OR MORE OF ITS

1   AFFIRMATIVE DEFENSES BY THE APPROPRIATE STANDARD OF

2   PROOF AS EXPLAINED IN THESE INSTRUCTIONS, YOU MUST

3   DETERMINE THE DAMAGES TO WHICH THE PLAINTIFF IS

4   ENTITLED.  YOU SHOULD NOT INTERPRET THE FACT THAT I AM

5   GIVING INSTRUCTIONS ABOUT THE PLAINTIFF'S DAMAGES AS AN

6   INDICATION IN ANY WAY THAT I BELIEVE THAT THE PLAINTIFF

7   SHOULD, OR SHOULD NOT WIN THIS CASE.  IT IS YOUR TASK

8   FIRST TO DECIDE WHETHER THE DEFENDANT IS LIABLE.  I AM

9   INSTRUCTING YOU ON DAMAGES ONLY SO THAT YOU WILL HAVE

10  GUIDANCE IN THE EVENT YOU DECIDE THAT THE DEFENDANT IS

11  LIABLE AND THAT THE PLAINTIFF IS ENTITLED TO RECOVER

12  MONEY FROM THE DEFENDANT.

13           THE PLAINTIFF HAS ASSERTED CLAIMS FOR

14  BREACH OF CONTRACT, MISAPPROPRIATION OF TRADE SECRETS,

15  TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS

16  RELATIONS, AND PATENT INFRINGEMENT.  IF YOU DECIDE THAT

17  THE DEFENDANT IS LIABLE TO THE PLAINTIFF ON MORE THAN

18  ONE OF THE PLAINTIFF'S CLAIMS, YOU SHOULD ASSESS DAMAGES

19  FOR EACH CLAIM SEPARATELY AND WITHOUT REGARD TO WHETHER

20  YOU HAVE ALREADY AWARDED THE SAME DAMAGES ON ANOTHER

21  CLAIM.  I WILL ENSURE THAT THERE IS NO DOUBLE RECOVERY.

22           BREACH OF CONTRACT.  YOU ARE INSTRUCTED AS

23  A MATTER OF LAW THAT THE DEFENDANT RETAINED CONFIDENTIAL

24  INFORMATION IN BREACH OF THE JUNE 3, 2004,

25  CONFIDENTIALITY AGREEMENT FOR WHICH THE PLAINTIFF MAY

1   RECOVER ONLY NOMINAL DAMAGES.  THE PLAINTIFF ALSO CLAIMS

2   THAT THE DEFENDANT BREACHED THE CONFIDENTIAL INFORMATION

3   BY (1) USING THE PLAINTIFF'S CONFIDENTIAL INFORMATION TO

4   CONDUCT A BUILD VERSUS BUY ANALYSIS TO DETERMINE WHETHER

5   THE DEFENDANT SHOULD DESIGN AND BUILD ITS OWN COMPETING

6   AMBIENT LIGHT SENSORS INSTEAD OF ACQUIRING THE

7   PLAINTIFF; AND (2) UTILIZING THE PLAINTIFF'S

8   CONFIDENTIAL INFORMATION TO REVAMP THE DESIGNS FOR ITS

9   FIRST DIGITAL AMBIENT LIGHT SENSOR AND DEVELOP ITS NEW

10  LINE OF AMBIENT LIGHT SENSORS TO COMPETE WITH THE

11  PLAINTIFF IN THE AMBIENT LIGHT SENSOR MARKET.

12              THE PLAINTIFF FURTHER CLAIMS THAT THE

13  DEFENDANT'S BREACH OF THE CONFIDENTIALITY AGREEMENT

14  CAUSED HARM TO THE PLAINTIFF FOR WHICH THE DEFENDANT

15  SHOULD PAY DAMAGES.

16              THE DEFENDANT DENIES LIABILITY FOR BREACH

17  OF THE CONFIDENTIALITY AGREEMENT.  THE DEFENDANT ALLEGES

18  THAT IT DID NOT USE THE PLAINTIFF'S INFORMATION IN ANY

19  WAY PROHIBITED BY THE CONFIDENTIALITY AGREEMENT, THAT IT

20  INSTRUCTED ITS EMPLOYEES TO DESTROY ALL COPIES OF THE

21  PLAINTIFF'S INFORMATION, THAT THE PLAINTIFF'S

22  INFORMATION WAS NEVER USED IN ANY WAY AFTER THE

23  PLAINTIFF REJECTED THE DEFENDANT'S OFFERS TO ACQUIRE THE

24  PLAINTIFF, AND THAT THE PLAINTIFF HAS NOT ALLEGED OR

25  ESTABLISHED ANY HARM FROM THE PURPORTED BREACH AND THAT

1  THE CONFIDENTIALITY AGREEMENT EXPIRED ON JUNE 3, 2007.

2            TO RECOVER DAMAGES FROM THE DEFENDANT FOR

3  BREACH OF CONTRACT, THE PLAINTIFF MUST PROVE ALL OF THE

4  FOLLOWING:

5            1.  THAT THE PLAINTIFF AND THE DEFENDANT

6  ENTERED INTO A CONTRACT;

7            2.  THAT THE PLAINTIFF DID ALL OR

8  SUBSTANTIALLY ALL, OF THE SIGNIFICANT THINGS THAT THE

9  CONTRACT REQUIRED IT TO DO OR THAT IT WAS EXCUSED FROM

10  DOING THOSE THINGS;

11            3.  THAT ALL CONDITIONS REQUIRED BY THE

12  CONTRACT FOR THE DEFENDANT'S PERFORMANCE HAD OCCURRED OR

13  WERE EXCUSED;

14            4.  THAT THE DEFENDANT DID SOMETHING THAT

15  THE CONTRACT PROHIBITED IT FROM DOING; AND

16            5.  THAT THE PLAINTIFF WAS HARMED BY THAT

17  FAILURE.

18            THE PARTIES AGREED IN THE CONFIDENTIALITY

19  AGREEMENT THAT THE PARTIES' AGREEMENT SURVIVED UNTIL

20  JUNE 3, 2007.

21            THE DEFENDANT CONTENDS THAT IT DID NOT HAVE

22  TO ABIDE BY THE TERMS OF THE CONFIDENTIALITY AGREEMENT

23  AFTER JUNE 3, 2007.

24            TO OVERCOME THIS CONTENTION, THE PLAINTIFF

25  MUST PROVE BY A PREPONDERANCE OF THE EVIDENCE THAT THE

1   VIOLATIONS OF THE CONFIDENTIALITY AGREEMENT OF WHICH IT

2   ACCUSES THE DEFENDANT OCCURRED PRIOR TO JUNE 3, 2007.

3              IF THE PLAINTIFF DOES NOT PROVE THAT THE

4   FACTS OF WHICH IT ACCUSES THE DEFENDANT OF DOING

5   OCCURRED PRIOR TO JUNE 3, 2007, THEN THE DEFENDANT WAS

6   NOT REQUIRED TO ABIDE BY THE TERMS OF THE

7   CONFIDENTIALITY AGREEMENT.

8              IF YOU DECIDE THAT THE PLAINTIFF HAS PROVED

9   ITS CLAIM AGAINST THE DEFENDANT FOR BREACH OF THE

10  CONFIDENTIALITY AGREEMENT, YOU MUST ALSO DECIDE HOW MUCH

11  MONEY, IF ANY, WOULD REASONABLY COMPENSATE THE PLAINTIFF

12  FOR THE HARM CAUSED BY THE BREACH.  THIS COMPENSATION IS

13  CALLED DAMAGES.  THE PURPORTED -- I'M SORRY.  THE

14  PURPOSE OF SUCH DAMAGES IS TO PUT THE PLAINTIFF IN AS

15  GOOD A POSITION AS IT WOULD HAVE BEEN IF THE DEFENDANT

16  HAD PERFORMED AS PROMISED.

17             TO RECOVER DAMAGES FOR ANY HARM, THE

18  PLAINTIFF MUST PROVE THAT WHEN THE CONTRACT WAS MADE,

19  BOTH PARTIES KNEW OR COULD REASONABLY HAVE FORESEEN THAT

20  THE HARM WAS LIKELY TO OCCUR IN THE ORDINARY COURSE OF

21  EVENTS AS A RESULT OF THE BREACH OF CONTRACT.

22             THE PLAINTIFF ALSO MUST PROVE THAT -- THE

23  AMOUNT OF ITS DAMAGES ACCORDING TO THE FOLLOWING

24  INSTRUCTIONS.  IT DOES NOT HAVE TO PROVE THE EXACT

25  AMOUNT OF DAMAGES.  YOU MUST NOT SPECULATE OR GUESS IN

1   AWARDING DAMAGES.

2            FOR THE DEFENDANT'S RETENTION OF THE

3   PLAINTIFF'S CONFIDENTIALITY -- CONFIDENTIAL INFORMATION

4   IN VIOLATION OF THE TERMS OF THE CONFIDENTIALITY

5   AGREEMENT, THE PLAINTIFF SEEKS NOMINAL DAMAGES, SUCH AS

6   AN AWARD OF $1.

7            FOR THE DEFENDANT'S ALLEGED USE OF THE

8   PLAINTIFF'S CONFIDENTIAL INFORMATION IN VIOLATION OF THE

9   TERMS OF THE CONFIDENTIALITY AGREEMENT, THE PLAINTIFF

10  CLAIMS DAMAGES IN THE FORM OF A REASONABLE ROYALTY.

11           IF THE DEFENDANT BREACHED THE CONTRACT AND

12  THE BREACH CAUSED HARM, THE PLAINTIFF IS NOT ENTITLED TO

13  RECOVER DAMAGES FOR HARM THAT THE DEFENDANT PROVES THE

14  PLAINTIFF COULD HAVE AVOIDED WITH REASONABLE EFFORTS OR

15  EXPENDITURES.  YOU SHOULD CONSIDER THE REASONABLENESS OF

16  THE PLAINTIFF'S EFFORTS IN LIGHT OF THE CIRCUMSTANCES

17  FACING IT AT THE TIME, INCLUDING ITS ABILITY TO MAKE THE

18  EFFORTS OR EXPENDITURES WITHOUT UNDUE RISK OR HARDSHIP.

19           UNDER THE DOCTRINE OF UNCLEAN HANDS, A

20  PLAINTIFF MUST ACT FAIRLY IN THE MATTER FOR WHICH HE

21  SEEKS A REMEDY.  HE MUST COME INTO COURT WITH CLEAN

22  HANDS AND KEEP THEM CLEAN OR HE WILL BE DENIED RELIEF

23  REGARDLESS OF THE MERITS OF THE ACTION.  THUS, THE

24  PLAINTIFF MAY NOT RECOVER FOR BREACH OF CONTRACT IF IT

25  ENGAGED IN CONDUCT THAT VIOLATES CONSCIENCE OR GOOD

1    FAITH OR OTHER EQUITABLE STANDARDS OF CONTACT.

2              SIMILARLY, THE PLAINTIFF CANNOT RECOVER

3    DAMAGES FOR BREACH OF CONTRACT IF THE PLAINTIFF

4    COMMITTED A MATERIAL BREACH OF THE CONFIDENTIALITY

5    AGREEMENT PRIOR TO ANY ALLEGED BREACH BY THE DEFENDANT.

6    WHEN A PARTY'S FAILURE TO PERFORM A CONTRACTUAL

7    OBLIGATION CONSTITUTES A MATERIAL BREACH OF THE

8    CONTRACT, THE OTHER PARTY MAY BE DISCHARGED FROM ITS

9    DUTY TO PERFORM UNDER THE CONTRACT.  WHETHER A PARTIAL

10   BREACH OF CONTRACT IS MATERIAL DEPENDS ON THE IMPORTANCE

11   OR SERIOUSNESS OF THE BREACH AND THE PROBABILITY OF THE

12   INJURED PARTY GETTING SUBSTANTIAL PERFORMANCE.  A

13   MATERIAL BREACH OF ONE ASPECT OF THE CONTRACT GENERALLY

14   CONSTITUTES A MATERIAL BREACH OF THE WHOLE CONTRACT.

15             MISAPPROPRIATION OF TRADE SECRETS.  THE

16   PLAINTIFF CLAIMS THAT AFTER THE PLAINTIFF AND THE

17   DEFENDANT ENTERED INTO A CONFIDENTIALITY AGREEMENT IN

18   JUNE, 2004, THE DEFENDANT MISAPPROPRIATED THE

19   PLAINTIFF'S TRADE SECRETS THAT WERE PROVIDED TO THE

20   DEFENDANT UNDER THE TERMS OF THE CONFIDENTIALITY

21   AGREEMENT.  SPECIFICALLY, THE PLAINTIFF CLAIMS THAT THE

22   DEFENDANT MISAPPROPRIATED THE PLAINTIFF'S TRADE SECRETS

23   WHEN THE DEFENDANT, NUMBER ONE, USED THE PLAINTIFF'S

24   TRADE SECRETS TO CONDUCT A BUILD VERSUS BUY ANALYSIS TO

25   DETERMINE WHETHER THE DEFENDANT SHOULD DESIGN AND BUILD

1    THE DEFENDANT'S COMPETING AMBIENT LIGHT SENSORS INSTEAD

2    OF ACQUIRING THE PLAINTIFF AND (2) UTILIZED THE

3    PLAINTIFF'S TRADE SECRETS TO REVAMP THE DESIGNS FOR ITS

4    FIRST DIGITAL AMBIENT LIGHT SENSOR AND DEVELOP ITS NEW

5    LINE OF AMBIENT LIGHT SENSORS TO COMPETE WITH THE

6    PLAINTIFF IN THE AMBIENT LIGHT SENSOR MARKET.

7                  THE PLAINTIFF FURTHER ALLEGES THAT THE

8    DEFENDANT'S MISAPPROPRIATION OF THE PLAINTIFF'S TRADE

9    SECRETS CAUSED HARM TO THE PLAINTIFF FOR WHICH THE

10   DEFENDANT SHOULD PAY DAMAGES.

11                  THE DEFENDANT DENIES THAT IT

12   MISAPPROPRIATED THE PLAINTIFF'S TRADE SECRETS.  THE

13   DEFENDANT ASSERTS THAT NONE OF THE PLAINTIFF'S

14   CONFIDENTIAL INFORMATION RECEIVED BY THE DEFENDANT

15   CONSTITUTES A PROTECTABLE TRADE SECRET AND THAT THE

16   PLAINTIFF HAS NOT DEMONSTRATED THAT THE DEFENDANT USED

17   ANY SPECIFIC ALLEGED TRADE SECRET.  THE DEFENDANT ALSO

18   CLAIMS THAT THE PLAINTIFF'S TRADE SECRET

19   MISAPPROPRIATION CLAIMS ARE BARRED BY THE APPLICABLE

20   STATUTE OF LIMITATIONS AND THAT THE PLAINTIFF'S ALLEGED

21   TRADE SECRETS WERE READILY ASCERTAINABLE BY PROPER

22   MEANS.

23                  TO SUCCEED ON ITS TRADE SECRET

24   MISAPPROPRIATION CLAIM, THE PLAINTIFF MUST PROVE THE

25   FOLLOWING BY A PREPONDERANCE OF THE EVIDENCE:

1                      1.   A TRADE SECRET EXISTS;

2                      2.   THE TRADE SECRET WAS ACQUIRED THROUGH A

3    BREACH OF A CONFIDENTIAL RELATIONSHIP OR DISCOVERED BY

4    IMPROPER MEANS;

5                      3.   THE DEFENDANT USED THE TRADE SECRET

6    WITHOUT AUTHORIZATION FROM THE PLAINTIFF; AND

7                      4.   THE DEFENDANT'S USE OF THE TRADE SECRET

8    CAUSED DAMAGE TO THE PLAINTIFF.

9                      A TRADE SECRET IS ANY FORMULA, PATTERN,

10   DEVICE, OR COMPILATION OF INFORMATION WHICH IS USED IN

11   ONE'S BUSINESS AND PRESENTS AN OPPORTUNITY TO OBTAIN AN

12   ADVANTAGE OVER COMPETITORS WHO DO NOT KNOW OR USE IT.

13   INFORMATION THAT IS PUBLIC KNOWLEDGE OR THAT IS

14   GENERALLY KNOWN IN AN INDUSTRY CANNOT BE A TRADE SECRET.

15   IN ADDITION, INFORMATION THAT IS GENERALLY KNOWN OR

16   READILY ASCERTAINABLE BY INDEPENDENT INVESTIGATION IS

17   NOT SECRET FOR PURPOSES OF TRADE SECRECY.

18                     A TRADE SECRET CAN EXIST IN A COMBINATION

19   OF CHARACTERISTICS AND COMPONENTS, EACH OF WHICH BY

20   ITSELF IS IN THE PUBLIC DOMAIN.  BUT THE UNIFIED

21   PROCESS, DESIGN, AND OPERATION OF WHICH IN UNIQUE

22   COMBINATION AFFORDS A COMPETITIVE ADVANTAGE AND IS A

23   PROTECTABLE TRADE SECRET.  ALTHOUGH THE LAW REQUIRES THE

24   TRADE SECRET OWNER TO TAKE REASONABLE PRECAUTIONS TO

25   MAINTAIN THE SECRECY OF ITS TRADE SECRETS, SECRECY NEED

1   NOT BE ABSOLUTE.

2                IN DECIDING WHETHER SOMETHING CONSTITUTES A

3   TRADE SECRET, YOU MAY CONSIDER THE FOLLOWING FACTORS:

4                1.  THE EXTENT TO WHICH THE INFORMATION IS

5   KNOWN OUTSIDE OF THE PLAINTIFF'S BUSINESS;

6                2.  THE EXTENT TO WHICH IT IS KNOWN BY

7   EMPLOYEES AND OTHERS INVOLVED IN THE PLAINTIFF'S

8   BUSINESS;

9                3.  THE EXTENT OF THE MEASURES TAKEN BY THE

10  PLAINTIFF TO GUARD THE SECRECY OF THE INFORMATION;

11               4.  THE VALUE OF THE INFORMATION TO THE

12  PLAINTIFF AND TO ITS COMPETITORS;

13               5.  THE AMOUNT OF EFFORT OR MONEY EXPENDED

14  BY THE PLAINTIFF IN DEVELOPING THE INFORMATION; AND

15               6.  THE EASE OR DIFFICULTY WITH WHICH THE

16  INFORMATION COULD BE PROPERLY ACQUIRED OR DUPLICATED BY

17  OTHERS.

18               THE WEIGHT TO BE GIVEN TO EACH OF THESE

19  FACTORS IS UP TO YOU TO DETERMINE.

20               IMPROPER MEANS ARE THOSE THAT FALL BELOW

21  THE GENERALLY ACCEPTED STANDARDS OF COMMERCIAL MORALITY

22  AND REASONABLE CONDUCT.  THE CONCEPT OF IMPROPER MEANS

23  DOES NOT INCLUDE REVERSE ENGINEERING OF PROPERLY

24  ACQUIRED DEVICES.

25               USE OF A TRADE SECRET MEANS ANY

1    EXPLOITATION OF THE TRADE SECRET THAT IS LIKELY TO

2    RESULT IN INJURY TO THE TRADE SECRET OWNER OR ENRICHMENT

3    TO THE DEFENDANT.  MARKETING GOODS THAT EMBODY THE TRADE

4    SECRET, EMPLOYING THE TRADE SECRET IN MANUFACTURING OR

5    PRODUCTION, RELYING ON THE TRADE SECRET TO ASSIST OR

6    ACCELERATE RESEARCH OR DEVELOPMENT, OR SOLICITING

7    CUSTOMERS THROUGH THE USE OF INFORMATION THAT IS A TRADE

8    SECRET ALL CONSTITUTE "USE."

9              THE DEFENDANT ASSERTS AS A DEFENSE THAT THE

10   STATUTE OF LIMITATIONS BARS THE PLAINTIFF'S TRADE SECRET

11   MISAPPROPRIATION CLAIMS.  TO PREVAIL ON THIS DEFENSE,

12   THE DEFENDANT MUST PROVE BY A PREPONDERANCE OF THE

13   EVIDENCE THAT THE PLAINTIFF MUST HAVE KNOWN OR

14   REASONABLY -- OR MUST HAVE BEEN REASONABLY ABLE TO

15   DISCOVER THAT THE DEFENDANT HAD USED THE PLAINTIFF'S

16   PROPRIETARY INFORMATION TO CREATE COMPETING PRODUCTS

17   BEFORE NOVEMBER 25, 2005.

18             THE PLAINTIFF CLAIMS THAT THE DEFENDANT, BY

19   DENYING WRONGDOING, FRAUDULENTLY CONCEALED THE FACTS

20   UPON WHICH ITS CLAIMS FOR MISAPPROPRIATION OF TRADE

21   SECRETS IS BASED, THEREBY TOLLING THE STATUTE OF

22   LIMITATIONS.  THE DENIAL OF WRONGDOING CONSTITUTES

23   FRAUDULENT CONCEALMENT WHEN THE CIRCUMSTANCES MAKE IT

24   REASONABLE FOR THE PLAINTIFF TO RELY ON THE DEFENDANT'S

25   DENIAL.

1              IF YOU FIND THAT THE PLAINTIFF PROVED BY A

2    PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT

3    MISAPPROPRIATED THE PLAINTIFF'S TRADE SECRETS, YOU MUST

4    THEN DETERMINE THE PLAINTIFF'S REMEDY FOR THE

5    DEFENDANT'S CONDUCT.  REMEDIES FOR MISAPPROPRIATION OF

6    TRADE SECRETS INCLUDE THE AMOUNT OF MONEY, IF ANY, IF

7    PAID NOW IN CASH THAT WOULD FAIRLY AND REASONABLY

8    COMPENSATE THE PLAINTIFF FOR THE HARM THAT WAS

9    PROXIMATELY CAUSED BY THE DEFENDANT AS A RESULT OF THE

10   MISAPPROPRIATION OF THE PLAINTIFF'S TRADE SECRETS.

11              REMEDIES MAY INCLUDE:

12              1.  DISGORGEMENT OF THE DEFENDANT'S PROFITS

13   FOR THE PRODUCTS AT ISSUE; OR

14              2.  REASONABLE ROYALTY FOR THE DEFENDANT'S

15   SALES OF THE PRODUCTS AT ISSUE.

16              UNDER THE DISGORGEMENT REMEDY, THE

17   PLAINTIFF IS ONLY ENTITLED TO THE NET PROFITS RESULTING

18   FROM THE ACTS OF TRADE SECRET MISAPPROPRIATION.

19              THE PLAINTIFF IS ALSO SEEKING EXEMPLARY

20   DAMAGES.  EXEMPLARY DAMAGES MEANS AN AMOUNT THAT YOU

21   MAY, IN YOUR DISCRETION, AWARD AS A PENALTY OR BY WAY OF

22   PUNISHING THE WRONGDOER.

23              THE PLAINTIFF IS ENTITLED TO EXEMPLARY

24   DAMAGES IF IT PROVES BY CLEAR AND CONVINCING EVIDENCE

25   THAT THE HARM IT SUFFERED RESULTED FROM THE DEFENDANT'S

 1   FRAUD, MALICE, OR GROSS NEGLIGENCE.

 2                PROOF OF FRAUD REQUIRES PROOF THAT THE

 3   OFFENDING PARTY MADE A MATERIAL MISREPRESENTATION, THAT

 4   THE MISREPRESENTATION WAS MADE WITH KNOWLEDGE OF ITS

 5   FALSITY OR MADE RECKLESSLY WITHOUT ANY KNOWLEDGE OF THE

 6   TRUTH AND AS A POSITIVE ASSERTION, THAT THE

 7   REPRESENTATION WAS MADE WITH THE INTENTION THAT IT

 8   SHOULD BE ACTED UPON BY THE OTHER PARTY AND THAT THE

 9   OTHER PARTY RELIED ON THE MISREPRESENTATION AND THEREBY

10   SUFFERED INJURY.

11                PROOF OF MALICE REQUIRES PROOF THAT THE

12   OFFENDING PARTY ACTED WITH THE PURPOSE OF CAUSING

13   SUBSTANTIAL INJURY TO THE OTHER PARTY.

14                PROOF OF GROSS NEGLIGENCE REQUIRES PROOF OF

15   AN ACT OR OMISSION BY THE DEFENDANT, WHICH, WHEN VIEWED

16   OBJECTIVELY FROM THE DEFENDANT'S STANDPOINT AT THE TIME

17   OF ITS OCCURRENCE, INVOLVED AN EXTREME DEGREE OF RISK

18   CONSIDERING THE PROBABILITY AND MAGNITUDE OF THE

19   POTENTIAL HARM TO OTHERS AND OF WHICH THE DEFENDANT HAD

20   ACTUAL, SUBJECTIVE AWARENESS BUT NEVERTHELESS PROCEEDED

21   WITH CONSCIOUS INDIFFERENCE TO THE RIGHTS, SAFETY, OR

22   WELFARE OF OTHERS.

23                IN DECIDING WHETHER TO AWARD EXEMPLARY

24   DAMAGES, YOU MAY CONSIDER THE FOLLOWING:

25                     1.  THE NATURE OF THE WRONG;

1              2.   THE CHARACTER OF THE CONDUCT INVOLVED;

2              3.   THE DEFENDANT'S DEGREE OF CULPABILITY;

3              4.   THE SITUATION AND SENSIBILITIES OF THE

4    PARTIES CONCERNED;

5              5.   THE EXTENT TO WHICH SUCH CONDUCT

6    OFFENDS A PUBLIC SENSE OF JUSTICE AND PROPRIETY; AND

7              6.   THE DEFENDANT'S NET WORTH.

8              TORTIOUS INTERFERENCE WITH PROSPECTIVE

9    BUSINESS RELATIONS.  THE PLAINTIFF CLAIMS THAT THE

10   DEFENDANT TORTIOUSLY INTERFERED WITH THE PLAINTIFF'S

11   PROSPECTIVE RELATIONS WITH APPLE.  THE PLAINTIFF CLAIMS

12   THAT THE DEFENDANT DID SO WITH A CONSCIOUS DESIRE TO

13   PREVENT THE RELATIONSHIP FROM OCCURRING AND/OR KNEW THAT

14   THE INTERFERENCE WAS CERTAIN OR SUBSTANTIALLY CERTAIN TO

15   OCCUR AS A RESULT OF THE DEFENDANT'S CONDUCT.  THE

16   PLAINTIFF FURTHER CLAIMS THAT IT HAS INCURRED ACTUAL

17   HARM AND DAMAGES AS A RESULT OF THE DEFENDANT'S

18   INTERFERENCE.

19             THE DEFENDANT DENIES THAT IT TORTIOUSLY

20   INTERFERED WITH THE PLAINTIFF'S PROSPECTIVE RELATIONS

21   WITH APPLE.  THE DEFENDANT CONTENDS THAT IT HAD A

22   PREEXISTING RELATIONSHIP WITH APPLE CONCERNING AMBIENT

23   LIGHT SENSOR PRODUCTS THAT PREDATED THE CONFIDENTIALITY

24   AGREEMENT WITH THE PLAINTIFF, THAT THE PLAINTIFF NEVER

25   IDENTIFIED APPLE AS A TARGET CUSTOMER TO THE DEFENDANT,

1  THAT THE DEFENDANT DID NOT USE ANY INFORMATION FROM THE

2  PLAINTIFF TO OBTAIN APPLE'S BUSINESS, THAT THE PLAINTIFF

3  DID NOT HAVE A PROSPECTIVE CONTRACT WITH APPLE, AND THAT

4  EVEN IF ONE EXISTED, THE DEFENDANT DID NOT INTERFERE

5  WITH ANY SUCH PROSPECTIVE CONTRACT.

6           IN ORDER TO SHOW THAT THE DEFENDANT

7  INTENTIONALLY INTERFERED WITH POTENTIAL BUSINESS

8  RELATIONSHIPS WITH APPLE, THE PLAINTIFF MUST PROVE BY A

9  PREPONDERANCE OF THE EVIDENCE THE FOLLOWING:

10          1.  THE EXISTENCE OF A REASONABLE

11  PROBABILITY THAT THE PLAINTIFF WOULD HAVE ENTERED INTO A

12  CONTRACTUAL OR BUSINESS RELATIONSHIP WITH APPLE;

13          2.  THE DEFENDANT COMMITTED AN

14  INDEPENDENTLY TORTIOUS OR UNLAWFUL ACT THAT WAS A

15  SUBSTANTIAL FACTOR IN PREVENTING THE CONTRACTUAL OR

16  BUSINESS RELATIONSHIP FROM OCCURRING;

17          3.  THE DEFENDANT ACTED WITH A CONSCIOUS

18  DESIRE TO PREVENT THE RELATIONSHIP FROM OCCURRING OR

19  KNEW THAT THE INTERFERENCE WAS CERTAIN OR SUBSTANTIALLY

20  CERTAIN TO OCCUR AS A RESULT OF THE CONDUCT; AND

21          4.  THE PLAINTIFF SUFFERED ACTUAL HARM OR

22  DAMAGE AS A RESULT OF THE INTERFERENCE.

23          IF YOU FIND THE DEFENDANT INTERFERED WITH

24  THE PLAINTIFF'S PROSPECTIVE BUSINESS RELATIONS WITH

25  APPLE, YOU WILL BE ASKED WHAT SUM OF MONEY WOULD

1    REASONABLY COMPENSATE THE PLAINTIFF FOR ITS LOST

2    PROFITS, IF ANY, CAUSED BY THE INTERFERENCE.  LOST

3    PROFITS ARE DAMAGES FOR THE LOSS OF NET INCOME TO A

4    BUSINESS, REFLECTING INCOME FROM THE LOST BUSINESS

5    ACTIVITY LESS EXPENSES THAT WOULD HAVE BEEN ATTRIBUTABLE

6    TO THAT ACTIVITY.  THE CALCULATION OF LOST PROFIT

7    DAMAGES MUST BE BASED ON NET PROFITS, NOT ON GROSS

8    PROFITS.  THE PLAINTIFF IS ALSO SEEKING EXEMPLARY

9    DAMAGES WHICH I PREVIOUSLY EXPLAINED TO YOU.

10              PATENT ISSUES.  THE PLAINTIFF CONTENDS THAT

11   THE DEFENDANT MAKES, USES, OFFERS TO SELL, SELLS, OR

12   IMPORTS PRODUCTS AND METHODS THAT INFRINGE CLAIMS 16,

13   17, 18, 43, 45, AND 46 OF THE '981 PATENT.

14              THE DEFENDANT DENIES THAT IT INFRINGES THE

15   CLAIMS OF THE '981 PATENT.  THE DEFENDANT ALSO CONTENDS

16   THAT CLAIMS 16, 17, 18, 43, 45, AND 46 OF THE '981

17   PATENT ARE INVALID.

18              I'M GOING TO START WITH THE PLAINTIFF'S

19   CLAIM THAT THE DEFENDANT INFRINGED ITS PATENT.  I WILL

20   DISCUSS WITH YOU SHORTLY THE DEFENDANT'S CLAIM -- LET ME

21   RE-READ THAT.

22              I'M GOING TO START WITH THE PLAINTIFF'S

23   CLAIM THAT THE DEFENDANT INFRINGED ITS PATENT.  I WILL

24   DISCUSS WITH YOU SHORTLY THE DEFENDANT'S CLAIM THAT THE

25   PLAINTIFF'S PATENT IS INVALID.

1            NOW, WHAT IS PATENT INFRINGEMENT?  ONCE A

2    PATENT IS ISSUED, THE OWNER OF THE PATENT, IF IT IS

3    VALID, HAS THE RIGHT TO EXCLUDE OTHERS FROM MAKING,

4    USING, OR SELLING THE PATENTED INVENTION THROUGHOUT THE

5    UNITED STATES FOR A PERIOD OF 20 YEARS.  INFRINGEMENT

6    OCCURS WHEN A PERSON, WITHOUT THE PATENT OWNER'S

7    PERMISSION, MAKES, USES, SELLS, OR OFFERS FOR SALE,

8    SOMETHING THAT IS WITHIN THE SCOPE OF WHAT THE PATENT

9    COVERS.

10           NOW, HOW DO WE DECIDE WHAT THE PATENT

11   COVERS?  WE DO THAT BY LOOKING AT THE PATENT'S CLAIMS.

12   THE PATENT CLAIMS ARE THE NUMBERED PARAGRAPHS AT THE END

13   OF THE PATENT.  THE CLAIMS ARE IMPORTANT BECAUSE IT IS

14   THE WORDS OF THE CLAIMS THAT DEFINE WHAT A PATENT

15   COVERS.  THE FIGURES AND TEXT IN THE REST OF THE PATENT

16   PROVIDE A DESCRIPTION OR EXAMPLES OF THE INVENTION AND

17   PROVIDE A CONTEXT FOR THE CLAIMS, BUT IT IS THE CLAIMS

18   THAT DEFINE THE BREADTH OF THE PATENT'S COVERAGE.  EACH

19   CLAIM IS EFFECTIVELY TREATED AS IF IT WERE A SEPARATE

20   CLAIM, AND EACH CLAIM MAY COVER MORE OR LESS THAN ANY

21   OTHER CLAIM.  THEREFORE, WHAT A PATENT COVERS DEPENDS,

22   IN TURN, ON WHAT EACH OF ITS CLAIMS COVERS.

23           AS YOU HAVE HEARD, THE PLAINTIFF SAYS THAT

24   THE DEFENDANT DIRECTLY INFRINGES SIX CLAIMS OF THE '981

25   PATENT.  I WILL EXPLAIN DIRECT INFRINGEMENT IN A MINUTE.

1              ALTHOUGH THERE ARE A LOT OF CLAIMS TO

2   REVIEW, YOU WILL NOTICE THERE IS A LOT OF OVERLAP AMONG

3   THEM.  MANY OF THE TERMS IN THE CLAIMS WILL BE EASY FOR

4   YOU TO UNDERSTAND.  FOR THE MOST PART, YOU CAN JUST GIVE

5   THE WORDS THEIR ORDINARY MEANING, EVEN THOUGH THE CLAIM

6   LANGUAGE USES ABSTRACT TERMS RATHER THAN CONCRETE

7   EXAMPLES.  THERE ARE A FEW EXAMPLES -- THERE ARE A FEW

8   TERMS, HOWEVER, THAT I WILL DEFINE FOR YOU, ALTHOUGH MY

9   DEFINITIONS ALSO USE SOME ABSTRACT TERMS.  I HAVE

10  DEFINED CERTAIN TERM AS FOLLOWS:

11              TERM:  AT LEAST ONE INPUT OF THE AT LEAST

12  ONE A/D CONVERTER FOR CONVERTING A RESPECTIVE ONE OF THE

13  FIRST AND SECOND PHOTOCURRENT INTO A DIGITAL OUTPUT.

14              THE COURT'S DEFINITION OR CONSTRUCTION IS,

15  AT LEAST ONE INPUT OF THE AT LEAST ONE A/D CONVERTER FOR

16  CHANGING EITHER THE FIRST OR SECOND PHOTOCURRENT INTO A

17  DIGITAL OUTPUT.

18              THE NEXT TERM IS, ESTABLISHING A SPECTRAL

19  CONTENT RESPONSE.

20              THE COURT'S CONSTRUCTION OF THAT TERM IS,

21  ESTABLISHING A RESPONSE BASED UPON THE WAVELENGTH OF

22  INCIDENT LIGHT.

23              THE NEXT TERM IS, SPECTRAL CONTENT RESPONSE

24  CONFIGURED TO SIMULATE THAT WHICH WOULD BE OBSERVED BY A

25  HUMAN EYE.

1            THE COURT'S CLAIM CONSTRUCTION IS, A

2  RESPONSE BASED UPON THE WAVELENGTH OF INCIDENT LIGHT

3  THAT IS CONFIGURED TO SIMULATE WHAT WOULD BE OBSERVED BY

4  THE HUMAN EYE.

5            AND MEMBERS OF THE JURY, YOU'LL SEE THAT

6  UNDER THE -- THE COLUMN "TERM," I HAVE IDENTIFIED FOR

7  YOU WHICH CLAIMS -- IN WHICH CLAIMS IN THE PATENT -- AND

8  YOU'LL HAVE A COPY OF THE PATENT -- YOU WILL FIND THESE

9  TERMS.  SO, WHEN YOU READ THOSE TERMS, YOU CAN SIMPLY

10 LOOK AT MY CONSTRUCTION AND PUT MY CONSTRUCTION IN PLACE

11 OF THE QUOTED LANGUAGE IN THE CLAIM TERMS.  YOU'LL HAVE

12 A COPY OF THE PATENT.  YOU CAN LOOK FOR THE CLAIM TERMS

13 THERE AT THE END OF THE PATENT, AS I'VE SAID, AND YOU

14 CAN SIMPLY TAKE MY LANGUAGE AND PUT -- PUT THAT RIGHT IN

15 PLACE OF THE LANGUAGE THAT'S IN THE PATENT ITSELF.  SO,

16 THAT'S WHAT I'M GOING OVER HERE FOR YOU, IS MY

17 DEFINITION OR CONSTRUCTION OF SOME OF THE TERMS IN THE

18 PATENT.

19            ALL RIGHT, THE NEXT ONE IS -- AND I'M ON

20 PAGE 18 -- SPECTRAL CONTENT RESPONSE CONFIGURED TO

21 SIMULATE THAT WHICH WOULD BE OBSERVED BY HUMAN EYE.

22            THE COURT'S DEFINITION OR CONSTRUCTION IS,

23 A RESPONSE BASED UPON THE WAVELENGTH OF INCIDENT LIGHT

24 THAT IS CONFIGURED TO SIMULATE WHAT WOULD BE OBSERVED BY

25 THE HUMAN EYE.

1                    THE NEXT TERM IS, MONOLITHIC OPTICAL

2     DETECTOR.

3                    THE COURT'S CONSTRUCTION IS, AN OPTICAL

4     DETECTOR FORMED ON OR IN A SINGLE SEMICONDUCTOR

5     SUBSTRATE.

6                    THE NEXT TERM IS, INTEGRATED WITH.

7                    THE COURT'S CONSTRUCTION IS, COMBINED

8     PHYSICALLY AS WELL AS ELECTRICALLY.

9                    NEXT TERM, MONOLITHIC INTEGRATED CIRCUIT.

10                    COURT'S CONSTRUCTION IS, AN ELECTRONIC

11    INTEGRATED CIRCUIT FORMED ON OR IN A SINGLE

12    SEMICONDUCTOR SUBSTRATE.

13                    THE NEXT TERM IS, ANALOG TO DIGITAL

14    CONVERTER INTEGRATED WITH SAID FIRST AND SECOND WELLS

15    AND FORMED AS A MONOLITHIC INTEGRATED CIRCUIT.

16                    THE COURT'S CONSTRUCTION IS, AN ANALOG TO

17    DIGITAL A/D CONVERTER COMBINED PHYSICALLY AS WELL AS

18    ELECTRICALLY WITH SAID FIRST AND SECOND WELLS AND FORMED

19    ON OR IN A SINGLE SEMICONDUCTOR SUBSTRATE.

20                    THE NEXT TERM IS, EXPOSED TO INCIDENT

21    LIGHT.

22                    THE COURT'S CONSTRUCTION OF THAT TERM IS,

23    RECEIVES OR IS SUBJECTED TO INCIDENT LIGHT INCLUDING

24    WAVELENGTHS OF LIGHT IN THE VISIBLE AND NONVISIBLE

25    SPECTRUM.

1                    THE NEXT TERM IS, SHIELDED FROM THE

2    INCIDENT LIGHT.

3                    THE COURT'S DEFINITION OR CONSTRUCTION IS,

4    BLOCKS ALL INCIDENT LIGHT, INCLUDING ALL WAVELENGTHS OF

5    LIGHT IN BOTH THE VISIBLE AND NON-VISIBLE SPECTRUM.

6                    THE NEXT TERM IS, AS A FUNCTION OF THE

7    INCIDENT LIGHT.

8                    THE COURT'S CONSTRUCTION IS, DEPENDS ON OR

9    VARIES WITH THE WAVELENGTH(S) AND/OR INTENSITY OF THE

10   INCIDENT LIGHT.

11                   THE NEXT TERM, ALTERNATING CURRENT (AC)

12   LIGHTING.

13                   THE COURT'S CONSTRUCTION, LIGHT GENERATED

14   THROUGH THE USE OF ALTERNATING CURRENT.

15                   THE NEXT TERM, MEANS FOR DETERMINING AN

16   INDICATION OF SPECTRAL CONTENT OF THE INCIDENT LIGHT.

17                   THE COURT'S CONSTRUCTION IS THAT THE

18   FUNCTION OF THE MEANS FOR DETERMINING TERM IS

19   DETERMINING AN INDICATION OF SPECTRAL CONTENT OF THE

20   INCIDENT LIGHT.  THE CORRESPONDING STRUCTURE OF THE

21   MEANS FOR DETERMINING TERM IS A PROCESSING AND CONTROL

22   UNIT 46 OF FIGURE 3 AND ITS EQUIVALENTS.

23                   THE LAST TERM IS, "WELL."

24                   THE COURT'S CONSTRUCTION IS, A REGION OF A

25   FIRST TYPE WITHIN A SUBSTRATE REGION OF A SECOND TYPE

1   THAT FORMS A JUNCTION THERE BETWEEN.

2             A CLAUSE USED IN CLAIM 1 OF THE '981 PATENT

3   IS WRITTEN IN A SPECIAL FORM CALLED A MEANS PLUS

4   FUNCTION CLAUSE.  THESE CLAUSES REQUIRE A SPECIAL

5   INTERPRETATION.  THE WORDS OF EACH OF THESE CLAUSES DO

6   NOT COVER ALL MEANS THAT PERFORM THE RECITED FUNCTION,

7   BUT COVER ONLY THE STRUCTURE DESCRIBED IN THE PATENT

8   SPECIFICATION AND DRAWINGS THAT PERFORM THE RECITED

9   FUNCTION.

10            THE PARTIES AGREE THAT THE PHRASE, "MEANS

11  FOR DETERMINING AN INDICATION OF SPECTRAL CONTENT OF THE

12  INCIDENT LIGHT," IS A MEANS-PLUS-FUNCTION CLAUSE.  FOR

13  THE PURPOSES OF THIS CASE, I HAVE IDENTIFIED IN MY

14  DEFINITIONS THE STRUCTURE DEFINED -- EXCUSE ME -- THE

15  STRUCTURE DESCRIBED IN THE '981 PATENT THAT PERFORMS THE

16  FUNCTION OF DETERMINING AN INDICATION OF SPECTRAL

17  CONTENT OF THE INCIDENT LIGHT.  YOU SHOULD APPLY MY

18  DEFINITION OF THE FUNCTION AND THE STRUCTURES DESCRIBED

19  IN THE '981 PATENT FOR PERFORMING IT AS YOU WOULD APPLY

20  MY DEFINITION OF ANY OTHER CLAIM TERM.

21            SOME OF THE ASSERTED CLAIMS USE THE WORD,

22  "COMPRISING."  COMPRISING IS A WORD USED A LOT IN

23  PATENTS AND NOT MUCH IN ORDINARY CONVERSATION.  IT

24  MEANS, INCLUDING OR CONTAINING.  A CLAIM THAT USES THE

25  WORD, "COMPRISING," OR, "COMPRISES," IS NOT LIMITED TO

1    PRODUCTS OR METHODS HAVING ONLY THE ELEMENTS THAT ARE

2    CONTAINED IN THE CLAIM BUT ALSO COVERS PRODUCTS OR

3    METHODS THAT ADD ADDITIONAL ELEMENTS.

4            FOR EXAMPLE, TAKE A CLAIM THAT COVERS A

5    TABLE.  IF THE CLAIM REFERS TO A TABLE COMPRISING A

6    TABLETOP, LEGS, AND GLUE, THE CLAIM WILL COVER ANY TABLE

7    THAT CONTAINS THOSE STRUCTURES, EVEN IF THE TABLE ALSO

8    CONTAINS OTHER STRUCTURES, SUCH AS A LEAF OR WHEELS ON

9    THE LEGS.  HOWEVER, IF A TABLE CONTAINS A TABLETOP,

10   LEGS, BUT NO GLUE, THEN THE CLAIM DOES NOT COVER THE

11   TABLE.

12           A PATENT OWNER HAS THE RIGHT TO STOP OTHERS

13   FROM USING THE INVENTION COVERED BY THE PATENT CLAIMS

14   DURING THE LIFE OF THE PATENT.  IF ANY PERSON MAKES,

15   USES, OR OFFERS TO SELL WHAT IS COVERED BY THE PATENT

16   CLAIMS WITHOUT THE PATENT OWNER'S PERMISSION, THAT

17   PERSON IS SAID TO INFRINGE THE PATENT.

18           TO DETERMINE WHETHER THERE IS INFRINGEMENT,

19   YOU MUST COMPARE THE ALLEGEDLY INFRINGING PRODUCT WITH

20   THE SCOPE OF THE PATENT CLAIMS AS I HAVE DEFINED THEM

21   FOR YOU.

22           IN ORDER TO INFRINGE A PATENT CLAIM, A

23   PRODUCT OR METHOD MUST INCLUDE EVERY ELEMENT OF THE

24   CLAIM.  SO, IN DETERMINING WHETHER THE DEFENDANT

25   INFRINGES THE PLAINTIFF'S ASSERTED CLAIMS, YOU MUST

1    DETERMINE FOR THE ACCUSED PRODUCT WHETHER THAT PRODUCT

2    OR THE USE OF THAT PRODUCT CONTAINS EACH AND EVERY

3    ELEMENT CONTAINED IN A CLAIM.  I'LL REFER TO THE

4    SEPARATE PARAGRAPHS IN EACH OF THE CLAIMS AT ISSUE IN

5    THIS CASE AS ELEMENTS.  SOMETIMES, IN THIS CASE, THE

6    PARTIES HAVE REFERRED TO THE ELEMENTS OF THE CLAIMS AS

7    LIMITATIONS.  A CLAIM ELEMENT IS PRESENT IF IT EXISTS IN

8    THE ACCUSED PRODUCT JUST AS IT IS DESCRIBED IN THE CLAIM

9    LANGUAGE.

10              YOU MUST CONSIDER EACH OF THE ASSERTED

11   PATENT CLAIMS SEPARATELY.  IN THE VERDICT FORM, YOU WILL

12   BE ASKED TO ENTER A SEPARATE VERDICT FOR EACH OF THE

13   CLAIMS ASSERTED IN THE CASE.

14              I MENTIONED DIRECT INFRINGEMENT EARLIER.

15   DIRECT INFRINGEMENT REFERS TO INFRINGEMENT IN WHICH A

16   SINGLE PARTY COMMITS ALL THE ACTS NECESSARY TO INFRINGE.

17   IN ORDER TO PROVE DIRECT INFRINGEMENT, IT IS NOT

18   NECESSARY TO SHOW THAT THE PARTY WHO IS ACCUSED OF

19   INFRINGEMENT INTENDED TO INFRINGE OR EVEN KNEW THAT IT

20   WAS INFRINGING.  AS I MENTIONED EARLIER, THE PLAINTIFF

21   CLAIMS THAT THE DEFENDANT DIRECTLY INFRINGES A NUMBER OF

22   THE CLAIMS IN THE '918 PATENT BY MAKING, USING, OFFERING

23   TO SELL, SELLING, OR IMPORTING THE ACCUSED PRODUCTS.

24              THERE ARE TWO DIFFERENT TYPES OF CLAIMS IN

25   THE '981 PATENT.  ONE TYPE OF CLAIM IS CALLED AN

```
 1   INDEPENDENT CLAIM.  THE OTHER TYPE OF CLAIM IS CALLED A

 2   DEPENDENT CLAIM.

 3                AN INDEPENDENT CLAIM IS A CLAIM THAT DOES

 4   NOT REFER TO ANY OTHER CLAIM OF THE PATENT.  AN

 5   INDEPENDENT CLAIM MUST BE READ SEPARATELY FROM THE OTHER

 6   CLAIMS TO DETERMINE THE SCOPE OF THE CLAIM.

 7                A DEPENDENT CLAIM IS A CLAIM THAT REFERS TO

 8   AT LEAST ONE OTHER CLAIM IN THE PATENT.  A DEPENDENT

 9   CLAIM INCORPORATES ALL OF THE ELEMENTS OF THE CLAIM TO

10   WHICH THE DEPENDENT CLAIM REFERS, AS WELL AS THE

11   ELEMENTS RECITED IN THE DEPENDENT CLAIM ITSELF.

12                FOR EXAMPLE, CLAIM 1 OF THE '981 PATENT IS

13   AN INDEPENDENT CLAIM AND RECITES SEVERAL ELEMENTS.

14   CLAIM 16 OF THE '981 PATENT IS A DEPENDENT CLAIM THAT

15   REFERS TO CLAIM 1 AND INCLUDES ADDITIONAL ELEMENTS.  FOR

16   EXAMPLE, CLAIM 16 REQUIRES EACH OF THE ELEMENTS OF CLAIM

17   1 AS WELL AS THE ADDITIONAL ELEMENTS IDENTIFIED IN CLAIM

18   16 ITSELF.

19                TO ESTABLISH LITERAL INFRINGEMENT OF CLAIM

20   16, THE PLAINTIFF MUST SHOW THAT IT IS MORE LIKELY THAN

21   NOT THAT THE DEFENDANT'S ACCUSED PRODUCT INCLUDES EACH

22   AND EVERY ELEMENT OF CLAIM 16.

23                IF YOU FIND THAT CLAIM 1, FROM WHICH CLAIM

24   16 DEPENDS, IS NOT LITERALLY INFRINGED, THEN YOU CANNOT

25   FIND THAT CLAIM 16 IS LITERALLY INFRINGED.
```

1            AS I HAVE PREVIOUSLY EXPLAINED, CLAIM 1 OF

2    THE '981 PATENT INCLUDES REQUIREMENTS THAT ARE IN

3    MEANS-PLUS-FUNCTION FORM.

4            A PRODUCT OR PROCESS MEETS A

5    MEANS-PLUS-FUNCTION REQUIREMENT OF A CLAIM IF, (1) IT

6    HAS A STRUCTURE THAT PERFORMS THE IDENTICAL FUNCTION

7    RECITED IN THE CLAIM, AND (2) THAT STRUCTURE IS EITHER

8    IDENTICAL OR EQUIVALENT TO THE DESCRIBED STRUCTURE THAT

9    I DEFINED EARLIER AS PERFORMING THE FUNCTION OF, QUOTE,

10   DETERMINING AN INDICATION OF SPECTRAL CONTENT OF THE

11   INCIDENT LIGHT, END QUOTE.  IF THE ACCUSED PRODUCTS DO

12   NOT PERFORM THIS SPECIFIC FUNCTION RECITED IN THE CLAIM,

13   THE MEANS-PLUS-FUNCTION REQUIREMENT IS NOT MET AND THE

14   ACCUSED PRODUCTS DO NOT LITERALLY INFRINGE THE CLAIM.

15           ALTERNATIVELY, IF THE ACCUSED PRODUCTS HAVE

16   A STRUCTURE THAT PERFORMS THE FUNCTION RECITED IN THE

17   CLAIM BUT THE STRUCTURE IS NOT EITHER IDENTICAL OR

18   EQUIVALENT TO THE STRUCTURE THAT I DEFINED TO YOU AS

19   BEING DESCRIBED IN THE '981 PATENT AND PERFORMING THIS

20   FUNCTION, THE ACCUSED PRODUCTS DO NOT LITERALLY INFRINGE

21   THE ASSERTED CLAIM.

22           A STRUCTURE MAY BE FOUND TO BE EQUIVALENT

23   TO THE STRUCTURE I HAVE DEFINED AS BEING DESCRIBED IN

24   THE '981 PATENT IF A PERSON HAVING ORDINARY SKILL IN THE

25   FIELD OF TECHNOLOGY OF THE '981 PATENT EITHER WOULD HAVE

1   CONSIDERED THE DIFFERENCES BETWEEN THEM TO BE

2   INSUBSTANTIAL AT THE TIME THE '981 PATENT ISSUED OR IF

3   THAT PERSON WOULD HAVE FOUND THE STRUCTURE PERFORMED THE

4   FUNCTION IN SUBSTANTIALLY THE SAME WAY TO ACCOMPLISH

5   SUBSTANTIALLY THE SAME RESULT.  IN DECIDING WHETHER THE

6   DIFFERENCES WOULD BE INSUBSTANTIAL, YOU MAY CONSIDER

7   WHETHER A PERSON HAVING AN ORDINARY LEVEL OF SKILL IN

8   THE FIELD OF TECHNOLOGY OF THE PATENT WOULD HAVE KNOWN

9   OF THE INTERCHANGEABILITY OF THE TWO STRUCTURES.

10              INTERCHANGEABILITY ITSELF IS NOT

11  SUFFICIENT.  IN ORDER FOR THE STRUCTURES TO BE

12  CONSIDERED TO BE INTERCHANGEABLE, THE INTERCHANGEABILITY

13  OF THE TWO STRUCTURES MUST HAVE BEEN KNOWN TO PERSONS OF

14  ORDINARY SKILL IN THE ART AT THE TIME THE PATENT ISSUED.

15  THE FACT THAT A STRUCTURE IS KNOWN NOW AND IS EQUIVALENT

16  IS NOT ENOUGH.  THE STRUCTURE MUST ALSO HAVE BEEN

17  AVAILABLE AT THE TIME THE '981 PATENT ISSUED.

18              IN ORDER TO PROVE DIRECT INFRINGEMENT BY

19  LITERAL INFRINGEMENT OF A

20  MEANS-PLUS-FUNCTION/STEP-PLUS-FUNCTION LIMITATION, THE

21  PLAINTIFF MUST PROVE THE ABOVE REQUIREMENTS ARE MET BY A

22  PREPONDERANCE OF THE EVIDENCE.

23              WILLFUL INFRINGEMENT.  IN THIS CASE, THE

24  PLAINTIFF ALLEGES BOTH THAT THE DEFENDANT INFRINGED THE

25  '981 PATENT AND FURTHER THAT THE DEFENDANT INFRINGED

1  WILLFULLY.  IF YOU HAVE DECIDED THAT THE DEFENDANT HAS

2  INFRINGED, YOU MUST GO ON AND ADDRESS THE ADDITIONAL

3  ISSUE OF WHETHER OR NOT THIS INFRINGEMENT WAS WILLFUL.

4  WILLFULNESS REQUIRES YOU TO DETERMINE BY CLEAR AND

5  CONVINCING EVIDENCE THAT THE DEFENDANT ACTED RECKLESSLY.

6           TO PROVE THAT THE DEFENDANT ACTED

7  RECKLESSLY, THE PLAINTIFF MUST PROVE TWO THINGS BY CLEAR

8  AND CONVINCING EVIDENCE.  THE FIRST PART OF THE TEST IS

9  OBJECTIVE:  THE PATENT HOLDER MUST PERSUADE YOU THAT THE

10 DEFENDANT ACTED DESPITE A HIGH LIKELIHOOD THAT THE

11 DEFENDANT'S ACTIONS INFRINGED A VALID AND ENFORCEABLE

12 PATENT.  IN MAKING THIS DETERMINATION, YOU MAY NOT

13 CONSIDER THE DEFENDANT'S STATE OF MIND.  LEGITIMATE OR

14 CREDIBLE DEFENSES TO INFRINGEMENT, EVEN IF NOT

15 ULTIMATELY SUCCESSFUL, DEMONSTRATE A LACK OF

16 RECKLESSNESS.

17          ONLY IF YOU CONCLUDE THAT THE DEFENDANT'S

18 CONDUCT WAS RECKLESS DO YOU NEED TO CONSIDER THE SECOND

19 PART OF THE TEST.  THE SECOND PART OF THE TEST DOES

20 DEPEND ON THE STATE OF MIND OF THE DEFENDANT.  THE

21 PLAINTIFF MUST PERSUADE YOU THAT THE DEFENDANT ACTUALLY

22 KNEW OR SHOULD HAVE KNOWN THAT ITS ACTIONS CONSTITUTED

23 AN UNJUSTIFIABLY HIGH RISK OF INFRINGEMENT OF A VALID

24 AND ENFORCEABLE PATENT.  TO DETERMINE WHETHER INTERSIL

25 HAD THIS STATE OF MIND, CONSIDER ALL OF THE FACTS WHICH

1   MAY INCLUDE BUT ARE NOT LIMITED TO:

2                    1.   WHETHER OR NOT THE DEFENDANT ACTED IN

3   ACCORDANCE WITH THE STANDARDS OF COMMERCE FOR ITS

4   INDUSTRY;

5                    2.   WHETHER OR NOT THE DEFENDANT

6   INTENTIONALLY COPIED A PRODUCT OF THE PLAINTIFF THAT IS

7   COVERED BY THE '981 PATENT;

8                    3.   WHETHER OR NOT THERE IS A REASONABLE

9   BASIS TO BELIEVE THAT THE DEFENDANT DID NOT INFRINGE OR

10  HAD A REASONABLE DEFENSE TO INFRINGEMENT;

11                   4.   WHETHER OR NOT THE DEFENDANT MADE A

12  GOOD-FAITH EFFORT TO AVOID INFRINGING THE '981 PATENT,

13  FOR EXAMPLE, WHETHER THE DEFENDANT ATTEMPTED TO DESIGN

14  AROUND THE '981 PATENT;

15                   5.   WHETHER OR NOT THE DEFENDANT TRIED TO

16  COVER UP ITS INFRINGEMENT; AND

17                   6.   THE DEFENDANT ARGUES THAT IT DID NOT

18  ACT RECKLESSLY BECAUSE IT RELIED ON A LEGAL OPINION THAT

19  ADVISED THE DEFENDANT EITHER, (1) THAT THE DEFENDANT'S

20  PRODUCT DID NOT INFRINGE THE '981 PATENT OR (2) THAT THE

21  '981 PATENT WAS INVALID OR UNENFORCEABLE.  YOU MUST

22  EVALUATE WHETHER THE OPINION WAS OF A QUALITY THAT

23  RELIANCE ON ITS CONCLUSIONS WAS REASONABLE.

24                   PATENT INVALIDITY.  I WILL NOW INSTRUCT YOU

25  ON THE RULES YOU MUST FOLLOW IN DECIDING WHETHER OR NOT

1  THE DEFENDANT HAS PROVEN THAT CLAIMS 16, 17, 18, 43, 45,

2  AND 46 OF THE '981 PATENT ARE INVALID.  TO PROVE THAT

3  ANY CLAIM OF A PATENT IS INVALID, THE DEFENDANT MUST

4  PERSUADE YOU BY CLEAR AND CONVINCING EVIDENCE THAT THE

5  CLAIM IS INVALID.

6              ONCE A PATENT IS ISSUED, IT IS PRESUMED TO

7  BE VALID.  THAT MEANS THAT THE FACT THAT THE PATENT WAS

8  ISSUED TO A PARTICULAR PERSON DOES NOT GUARANTEE THAT

9  THE PATENT IS VALID, BUT ONCE IT ISSUES, THE LAW SAYS

10 THAT IF A CHALLENGER WANTS TO SHOW THAT IT IS INVALID,

11 THE CHALLENGER HAS TO MAKE THAT SHOWING BY CLEAR AND

12 CONVINCING EVIDENCE.  SO PATENT INVALIDITY IS ONE OF THE

13 ISSUES IN THIS CASE TO WHICH THE CLEAR AND CONVINCING

14 EVIDENCE STANDARD APPLIES.  IN DECIDING WHETHER

15 PARTICULAR CLAIMS ARE INVALID, YOU WILL INTERPRET THE

16 CLAIMS IN THE SAME WAY THAT YOU HAVE IN DECIDING

17 INFRINGEMENT.

18             THE PATENT LAW CONTAINS CERTAIN

19 REQUIREMENTS FOR THE PART OF THE PATENT CALLED THE

20 SPECIFICATION.  THE DEFENDANT CONTENDS THAT CLAIMS 16,

21 17, 18, 43, 45, AND 46 OF THE '981 PATENT ARE INVALID

22 BECAUSE THE SPECIFICATION OF THE '981 PATENT DOES NOT

23 CONTAIN AN ADEQUATE WRITTEN DESCRIPTION OF THE

24 INVENTION.  TO SUCCEED, THE DEFENDANT MUST SHOW BY CLEAR

25 AND CONVINCING EVIDENCE THAT THE SPECIFICATION FAILS TO

1   MEET THE LAW'S REQUIREMENTS FOR WRITTEN DESCRIPTION OF

2   THE INVENTION.  IN THE PATENT APPLICATION PROCESS, THE

3   APPLICANT MAY KEEP THE ORIGINALLY FILED CLAIMS OR CHANGE

4   THE CLAIMS BETWEEN THE TIME THE PATENT APPLICATION IS

5   FIRST FILED AND THE TIME THE PATENT IS ISSUED.  AN

6   APPLICANT MAY AMEND THE CLAIMS OR ADD NEW CLAIMS.  THESE

7   CHANGES MAY NARROW OR BROADEN THE SCOPE OF THE CLAIMS.

8   THE WRITTEN DESCRIPTION REQUIREMENT ENSURES THAT THE

9   ISSUED CLAIMS CORRESPOND TO THE SCOPE OF THE WRITTEN

10  DESCRIPTION THAT WAS PROVIDED FOR THE ORIGINAL

11  APPLICATION.

12          IN DECIDING WHETHER THE PATENT SATISFIES

13  THIS WRITTEN DESCRIPTION REQUIREMENT, YOU MUST CONSIDER

14  THE DESCRIPTION FROM THE VIEWPOINT OF A PERSON HAVING

15  ORDINARY SKILL IN THE FIELD OF TECHNOLOGY OF THE PATENT

16  WHEN THE PATENT -- WHEN THE APPLICATION WAS FILED.  THE

17  WRITTEN DESCRIPTION REQUIREMENT IS SATISFIED IF A PERSON

18  HAVING ORDINARY SKILL READING THE ORIGINAL PATENT

19  APPLICATION WOULD HAVE RECOGNIZED THAT IT DESCRIBES THE

20  FULL SCOPE OF THE CLAIMED INVENTION AS IT IS FINALLY

21  CLAIMED IN THE ISSUED PATENT AND THAT THE INVENTOR

22  ACTUALLY POSSESSED THAT FULL SCOPE OF THE FILING --

23  EXCUSE ME -- THAT THE INVENTOR ACTUALLY POSSESSED THAT

24  FULL SCOPE BY THE FILING DATE OF THE ORIGINAL

25  APPLICATION.

1            THE WRITTEN DESCRIPTION REQUIREMENT MAY BE

2    SATISFIED BY ANY COMBINATION OF THE WORDS, STRUCTURES,

3    FIGURES, DIAGRAMS, FORMULAS CONTAINED IN THE PATENT

4    APPLICATION.  THE FULL SCOPE OF A CLAIM OR ANY

5    PARTICULAR REQUIREMENT IN A CLAIM NEED NOT BE EXPRESSLY

6    DISCLOSED IN THE ORIGINAL PATENT APPLICATION IF A PERSON

7    HAVING ORDINARY SKILL IN THE FIELD OF TECHNOLOGY OF THE

8    PATENT AT THE TIME OF THE FILING WOULD HAVE UNDERSTOOD

9    THAT THE FULL SCOPE OR MISSING REQUIREMENT IS IN THE

10   WRITTEN DESCRIPTION IN THE PATENT APPLICATION.

11           ALL RIGHT, NOW, LADIES AND GENTLEMEN, KEEP

12   IN MIND, WE'RE UNDER ROMAN NUMERAL 3, PATENT INVALIDITY.

13   THESE ARE ASSERTIONS BY THE DEFENDANT, INTERSIL.  WE'VE

14   COVERED THE WRITTEN DESCRIPTION REQUIREMENT.  NOW, I'M

15   GOING TO MOVE TO THE NEXT ARGUMENT BY INTERSIL INVOLVING

16   ENABLEMENT.

17           THE DEFENDANT ALSO CONTENDS THAT CLAIMS 16,

18   17, 18, 43, 45, AND 46 OF THE '981 PATENT ARE INVALID

19   BECAUSE THE SPECIFICATION DOES NOT CONTAIN A

20   SUFFICIENTLY FULL AND CLEAR DESCRIPTION OF HOW TO MAKE

21   AND USE THE FULL SCOPE OF THE CLAIMED INVENTION.  TO

22   SUCCEED, THE DEFENDANT MUST SHOW BY CLEAR AND CONVINCING

23   EVIDENCE THAT THE '981 PATENT DOES NOT CONTAIN A

24   SUFFICIENTLY FULL AND CLEAR DESCRIPTION OF THE CLAIMED

25   INVENTION.  TO BE SUFFICIENTLY FULL AND CLEAR, THE

1   DESCRIPTION MUST CONTAIN ENOUGH INFORMATION TO HAVE

2   ALLOWED A PERSON HAVING ORDINARY SKILL IN THE FIELD OF

3   TECHNOLOGY OF THE PATENT TO MAKE AND USE THE FULL SCOPE

4   OF THE CLAIMED INVENTION AT THE TIME THE PATENT

5   APPLICATION WAS FILED.  THIS IS KNOWN AS THE ENABLEMENT

6   REQUIREMENT.  IF A PATENT CLAIM IS NOT ENABLED, IT IS

7   INVALID.

8            IN ORDER TO BE ENABLING, THE PATENT MUST

9   PERMIT PERSONS HAVING ORDINARY SKILL IN THE FIELD OF

10  TECHNOLOGY OF THE PATENT TO MAKE AND USE THE FULL SCOPE

11  OF THE CLAIMED INVENTION AT THE TIME OF FILING WITHOUT

12  HAVING TO CONDUCT UNDUE EXPERIMENTATION.  HOWEVER, SOME

13  AMOUNT OF EXPERIMENTATION TO MAKE AND USE THE INVENTION

14  IS ALLOWABLE.  IN DECIDING WHETHER A PERSON HAVING

15  ORDINARY SKILL WOULD HAVE TO EXPERIMENT UNDULY IN ORDER

16  TO MAKE AND USE THE INVENTION, YOU MAY CONSIDER SEVERAL

17  FACTORS:

18            1.  THE TIME AND COST OF ANY NECESSARY

19  EXPERIMENTATION;

20            2.  HOW ROUTINE ANY NECESSARY

21  EXPERIMENTATION IS IN THE FIELD OF INVENTION;

22            3.  WHETHER THE PATENT DISCLOSES SPECIFIC

23  WORKING EXAMPLES OF THE CLAIMED INVENTION;

24            4.  THE AMOUNT OF GUIDANCE PRESENTED IN THE

25  PATENT;

1               5.   THE NATURE AND PREDICTABILITY OF THE

2    FIELD OF INVENTION;

3               6.   THE LEVEL OF ORDINARY SKILL IN THE

4    FIELD OF INVENTION; AND

5               7.   THE SCOPE OF THE CLAIMED INVENTION.

6               NO ONE OR MORE OF THESE FACTORS IS ALONE

7    DISPOSITIVE.  RATHER, YOU MUST MAKE YOUR DECISION

8    WHETHER THE DEGREE OF EXPERIMENTATION REQUIRED IS UNDUE

9    BASED UPON ALL OF THE EVIDENCE PRESENTED TO YOU.  YOU

10   SHOULD WEIGH THESE FACTORS AND DETERMINE WHETHER OR NOT

11   IN THE CONTEXT OF THIS INVENTION AND THE STATE OF THE

12   ART AT THE TIME OF THE APPLICATION A PERSON HAVING

13   ORDINARY SKILL WOULD NEED TO EXPERIMENT UNDULY TO MAKE

14   AND USE THE FULL SCOPE OF THE CLAIMED INVENTION.

15               OBVIOUSNESS.  PRIOR ART.  EVEN THOUGH AN

16   INVENTION MAY NOT HAVE BEEN IDENTICALLY DISCLOSED OR

17   DESCRIBED BEFORE IT WAS MADE BY AN INVENTOR, IN ORDER TO

18   BE PATENTABLE, THE INVENTION MUST ALSO NOT HAVE BEEN

19   OBVIOUS TO A PERSON OF ORDINARY SKILL IN THE FIELD OF

20   THE TECHNOLOGY OF THE PATENT AT THE TIME THE INVENTION

21   WAS MADE.  IN THIS CASE, THE DEFENDANT CONTENDS THAT

22   CLAIMS 16, 17, 18, 43, 45, AND 46 OF THE '981 PATENT ARE

23   INVALID AS OBVIOUS.

24               THE DEFENDANT MAY ESTABLISH THAT A PATENT

25   CLAIM IS INVALID BY SHOWING BY CLEAR AND CONVINCING

1   EVIDENCE THAT THE CLAIMED INVENTION WOULD HAVE BEEN

2   OBVIOUS TO PERSONS HAVING ORDINARY SKILL IN THE ART AT

3   THE TIME THE INVENTION WAS MADE IN THE FIELD OF

4   INVENTION.

5              IN DETERMINING WHETHER A CLAIMED INVENTION

6   IS OBVIOUS, YOU MUST CONSIDER THE LEVEL OF ORDINARY

7   SKILL IN THE FIELD OF THE INVENTION THAT SOMEONE WOULD

8   HAVE HAD AT THE TIME THE INVENTION WAS MADE, THE SCOPE

9   AND CONTENT OF THE PRIOR ART, AND ANY DIFFERENCES

10  BETWEEN THE PRIOR ART AND THE CLAIMED INVENTION.

11             KEEP IN MIND THAT THE EXISTENCE OF EACH AND

12  EVERY ELEMENT OF THE CLAIMED INVENTION IN THE PRIOR ART

13  DOES NOT NECESSARILY PROVE OBVIOUSNESS.  MOST IF NOT ALL

14  INVENTIONS RELY ON BUILDING BLOCKS OF PRIOR ART.

15             IN CONSIDERING WHETHER A CLAIMED INVENTION

16  IS OBVIOUS, YOU MAY, BUT ARE NOT REQUIRED TO, FIND

17  OBVIOUSNESS IF YOU FIND THAT AT THE TIME OF THE CLAIMED

18  INVENTION THERE WAS A REASON THAT WOULD HAVE PROMPTED A

19  PERSON HAVING ORDINARY SKILL IN THE FIELD OF

20  INVENTION -- OF THE INVENTION TO COMBINE THE KNOWN

21  ELEMENTS IN A WAY THE CLAIMED INVENTION DOES, TAKING

22  INTO ACCOUNT SUCH FACTORS AS:

23             1.  WHETHER THE CLAIMED INVENTION WAS

24  MERELY THE PREDICTABLE RESULT OF USING PRIOR ART

25  ELEMENTS ACCORDING TO THEIR KNOWN FUNCTIONS;

1                    2.   WHETHER THE CLAIMED INVENTION PROVIDES

2    AN OBVIOUS SOLUTION TO A KNOWN PROBLEM IN THE RELEVANT

3    FIELD;

4                    3.   WHETHER THE PRIOR ART TEACHES OR

5    SUGGESTS THE DESIRABILITY OF COMBINING ELEMENTS CLAIMED

6    IN THE INVENTION;

7                    4.   WHETHER THE PRIOR ART TEACHES AWAY FROM

8    COMBINING ELEMENTS IN THE CLAIMED INVENTION;

9                    5.   WHETHER IT WOULD HAVE BEEN OBVIOUS TO

10   TRY THE COMBINATIONS OF ELEMENTS SUCH AS WHEN THERE IS A

11   DESIGN NEED OR MARKET PRESSURE TO SOLVE A PROBLEM AND

12   THERE ARE A FINITE NUMBER OF IDENTIFIED, PREDICTABLE

13   SOLUTIONS; AND

14                    6.   WHETHER THE CHANGE RESULTED MORE FROM

15   DESIGN INCENTIVES OR OTHER MARKET FORCES.

16                    TO FIND IT RENDERED THE INVENTION OBVIOUS,

17   YOU MUST FIND THAT THE PRIOR ART PROVIDED A REASONABLE

18   EXPECTATION OF SUCCESS.  OBVIOUS TO TRY IS NOT

19   SUFFICIENT IN UNPREDICTABLE TECHNOLOGIES.

20                    IN DETERMINING WHETHER THE CLAIMED

21   INVENTION WAS OBVIOUS, CONSIDER EACH CLAIM SEPARATELY.

22   DO NOT USE HINDSIGHT; I.E., DO NOT -- I'M SORRY.

23   CONSIDER ONLY WHAT WAS KNOWN AT THE TIME OF THE

24   INVENTION.

25                    IN MAKING THESE ASSESSMENTS, YOU SHOULD

1   TAKE INTO ACCOUNT ANY OBJECTIVE EVIDENCE, SOMETIMES

2   CALLED SECONDARY CONSIDERATIONS, THAT MAY SHED LIGHT ON

3   THE OBVIOUSNESS OR NOT OF THE CLAIMED INVENTION, SUCH

4   AS:

5                   A.   WHETHER THE INVENTION WAS COMMERCIALLY

6   SUCCESSFUL AS A RESULT OF THE MERITS OF THE CLAIMED

7   INVENTION (RATHER THAN THE RESULT OF DESIGN NEEDS OR

8   MARKET PRESSURE ADVERTISING OR SIMILAR ACTIVITIES);

9                   B.   WHETHER THE INVENTION SATISFIED A LONG

10  FELT NEED;

11                  C.   WHETHER OTHERS HAD TRIED AND FAILED TO

12  MAKE THE INVENTION;

13                  D.   WHETHER OTHERS INVENTED THE INVENTION

14  AT ROUGHLY THE SAME TIME;

15                  E.   WHETHER OTHERS COPIED THE INVENTION;

16                  F.   WHETHER THERE WERE CHANGES OR RELATED

17  TECHNOLOGIES OR MARKET NEEDS CONTEMPORANEOUS WITH THE

18  INVENTION;

19                  G.   WHETHER THE INVENTION ACHIEVED

20  UNEXPECTED RESULTS;

21                  H.   WHETHER OTHERS IN THE FIELD PRAISED THE

22  INVENTION;

23                  I.   WHETHER PERSONS HAVING ORDINARY SKILL

24  IN THE ART OF THE INVENTION EXPRESSED SURPRISE OR

25  DISBELIEF REGARDING THE INVENTION;

1                    J.   WHETHER OTHERS SOUGHT OR OBTAINED

2    RIGHTS TO THE PATENT FROM THE PATENT HOLDER; AND

3                    K.   WHETHER THE INVENTOR PROCEEDED CONTRARY

4    TO ACCEPTED WISDOM IN THE FIELD.

5                    ALL RIGHT.   LADIES AND GENTLEMEN, NOW I'M

6    GOING TO MOVE INTO EQUITABLE DEFENSES.   THE FIRST ONE IS

7    LACHES.   THE DEFENDANT CONTENDS THAT THE PLAINTIFF IS

8    NOT ENTITLED TO RECOVER DAMAGES FOR ACTS THAT OCCURRED

9    BEFORE IT FILED THE LAWSUIT BECAUSE: (1) THE PLAINTIFF

10   DELAYED FILING THE LAWSUIT FOR AN UNREASONABLY LONG AND

11   INEXCUSABLE PERIOD OF TIME AND (2) THE DEFENDANT HAS

12   BEEN OR WILL BE PREJUDICED IN A SIGNIFICANT WAY DUE TO

13   THE PLAINTIFF'S DELAY IN FILING THE LAWSUIT.   THIS IS

14   REFERRED TO AS LACHES.   THE DEFENDANT MUST PROVE DELAY

15   AND PREJUDICE BY A PREPONDERANCE OF THE EVIDENCE.

16                   WHETHER THE PLAINTIFF'S DELAY WAS

17   UNREASONABLY WRONG AND UNJUSTIFIED IS A QUESTION THAT

18   MUST BE ANSWERED BY CONSIDERING THE FACTS AND

19   CIRCUMSTANCES AS THEY EXISTED DURING THE PERIOD OF

20   DELAY.   THERE IS NO MINIMUM AMOUNT OF DELAY REQUIRED TO

21   ESTABLISH LACHES.   IF A SUIT WAS DELAYED FOR SIX YEARS,

22   A REBUTTABLE PRESUMPTION ARISES THAT THE DELAY WAS

23   UNREASONABLE AND UNJUSTIFIED AND THAT MATERIAL PREJUDICE

24   RESULTED.   THIS PRESUMPTION SHIFTS THE BURDEN OF PROOF

25   TO THE PLAINTIFF TO COME FORWARD WITH EVIDENCE TO PROVE

1    THAT THE DELAY WAS JUSTIFIED OR THAT MATERIAL PREJUDICE

2    DID NOT RESULT.  AND IF THE PLAINTIFF PRESENTS SUCH

3    EVIDENCE, THE BURDEN OF PROVING LACHES REMAINS WITH THE

4    DEFENDANT.

5                LACHES MAY BE FOUND FOR DELAYS OF LESS THAN

6    SIX YEARS IF THERE IS PROOF OF UNREASONABLY LONG AND

7    UNJUSTIFIABLE DELAY CAUSING MATERIAL PREJUDICE TO THE

8    DEFENDANT.  FACTS AND CIRCUMSTANCES THAT CAN JUSTIFY A

9    LONG DELAY CAN INCLUDE:

10               1.  BEING INVOLVED IN OTHER LITIGATION

11   DURING THE PERIOD OF DELAY;

12               2.  BEING INVOLVED IN NEGOTIATIONS WITH THE

13   DEFENDANT DURING THE PERIOD OF DELAY;

14               3.  POVERTY OR ILLNESS DURING THE PERIOD OF

15   DELAY;

16               4.  WARTIME CONDITIONS DURING THE PERIOD OF

17   DELAY;

18               5.  BEING INVOLVED IN A DISPUTE ABOUT

19   OWNERSHIP OF THE PATENT DURING THE PERIOD OF DELAY; OR

20               6.  MINIMAL AMOUNTS OF ALLEGEDLY INFRINGING

21   ACTIVITY BY THE DEFENDANT DURING THE PERIOD OF DELAY.

22               IF YOU FIND UNREASONABLE AND UNJUSTIFIED

23   DELAY OCCURRED, TO FIND LACHES, YOU MUST ALSO DETERMINE

24   IF THE DEFENDANT SUFFERED MATERIAL PREJUDICE AS A RESULT

25   OF THE DELAY.  PREJUDICE TO THE DEFENDANT CAN BE

1   EVIDENTIARY OR ECONOMIC.  WHETHER THE DEFENDANT SUFFERED

2   EVIDENTIARY PREJUDICE IS A QUESTION THAT MUST BE

3   ANSWERED BY EVALUATING WHETHER DELAY IN FILING THIS CASE

4   RESULTED IN THE DEFENDANT NOT BEING ABLE TO PRESENT A

5   FULL AND FAIR DEFENSE ON THE MERITS OF THE PLAINTIFF'S

6   INFRINGEMENT CLAIM.  NOT BEING ABLE TO PRESENT A FULL

7   AND FAIR DEFENSE ON THE MERITS TO AN INFRINGEMENT CLAIM

8   CAN OCCUR DUE TO THE LOSS OF IMPORTANT RECORDS, THE

9   DEATH OR IMPAIRMENT OF AN IMPORTANT WITNESS OR

10  WITNESSES, THE UNRELIABILITY OF MEMORIES ABOUT IMPORTANT

11  EVENTS BECAUSE THEY OCCURRED IN THE DISTANT PAST, OR

12  OTHER SIMILAR TYPES OF THINGS.

13          ECONOMIC PREJUDICE IS DETERMINED BY WHETHER

14  OR NOT INTERSIL CHANGED ITS ECONOMIC POSITION IN A

15  SIGNIFICANT WAY DURING THE PERIOD OF DELAY RESULTING IN

16  LOSSES BEYOND MERELY PAYING FOR INFRINGEMENT (SUCH AS IF

17  THE DEFENDANT COULD HAVE SWITCHED TO A NONINFRINGING

18  PRODUCT IF SUED EARLIER), AND ALSO WHETHER THE

19  DEFENDANT'S LOSSES AS A RESULT OF THAT CHANGE IN

20  ECONOMIC POSITION LIKELY WOULD HAVE BEEN AVOIDED IF THE

21  PLAINTIFF HAD FILED THIS LAWSUIT SOONER.

22          IN ALL SCENARIOS, THOUGH, THE ULTIMATE

23  DETERMINATION OF WHETHER LACHES SHOULD APPLY IN THIS

24  CASE IS A QUESTION OF FAIRNESS, GIVEN ALL THE FACTS AND

25  CIRCUMSTANCES.  THUS, YOU MAY FIND THAT LACHES DOES NOT

1    APPLY IF THERE IS NO EVIDENCE ESTABLISHING EACH OF THE

2    THREE ELEMENTS NOTED ABOVE ON REASONABLE DELAY, (LACK OF

3    EXCUSE OR JUSTIFICATION, AND SIGNIFICANT PREJUDICE).

4    YOU MAY ALSO FIND THAT EVEN THOUGH ALL OF THE ELEMENTS

5    OF LACHES HAVE BEEN PROVED, IT SHOULD NOT, IN FAIRNESS,

6    APPLY, GIVEN ALL THE FACTS AND CIRCUMSTANCES IN THE

7    CASE.

8              THE NEXT EQUITABLE DEFENSE IS CALLED

9    UNCLEAN HANDS.  THE OWNER OF A PATENT MAY BE BARRED FROM

10   ENFORCING THE PATENT AGAINST AN INFRINGER WHERE THE

11   OWNER OF THE PATENT ACTS OR ACTED INEQUITABLY, UNFAIRLY,

12   OR DECEITFULLY TOWARD THE INFRINGER OR THE COURT IN A

13   WAY THAT HAS IMMEDIATE AND NECESSARY RELATION TO THE

14   RELIEF THAT THE PATENT HOLDER SEEKS IN A LAWSUIT.  THIS

15   IS REFERRED TO AS UNCLEAN HANDS, AND IT IS A DEFENSE

16   THAT THE DEFENDANT CONTENDS PRECLUDES ANY RECOVERY BY

17   THE PLAINTIFF IN THIS LAWSUIT.

18             YOU MUST CONSIDER AND WEIGH ALL THE FACTS

19   AND CIRCUMSTANCES TO DETERMINE WHETHER YOU BELIEVE THAT

20   ON BALANCE THE PLAINTIFF ACTED IN SUCH AN UNFAIR WAY

21   TOWARD THE DEFENDANT OR THE COURT IN THE MATTERS

22   RELATING TO THE CONTROVERSY BETWEEN THE PLAINTIFF AND

23   THE DEFENDANT THAT, IN FAIRNESS, THE PLAINTIFF SHOULD BE

24   DENIED THE RELIEF IT SEEKS IN THIS LAWSUIT.  THE

25   DEFENDANT MUST PROVE UNCLEAN HANDS BY A PREPONDERANCE OF

1   THE EVIDENCE.

2                PATENT DAMAGES.  IF YOU FIND THAT THE

3   DEFENDANT INFRINGED ANY VALID CLAIM OF THE '981 PATENT,

4   YOU MUST THEN CONSIDER WHAT AMOUNT OF DAMAGES TO AWARD

5   TO THE PLAINTIFF.  I WILL NOW INSTRUCT YOU ABOUT THE

6   MEASURE OF DAMAGES.  BY INSTRUCTING YOU ON DAMAGES, I AM

7   NOT SUGGESTING WHICH PARTIES SHOULD WIN THIS CASE ON ANY

8   ISSUE.

9                THE DAMAGES YOU AWARD MUST BE ADEQUATE TO

10  COMPENSATE THE PLAINTIFF FOR THE INFRINGEMENT.  THEY ARE

11  NOT MEANT TO PUNISH AN INFRINGER.  YOUR DAMAGES AWARD,

12  IF YOU REACH THIS ISSUE, SHOULD PUT THE PLAINTIFF IN

13  APPROXIMATELY THE SAME FINANCIAL CONDITION -- POSITION

14  THAT IT WOULD HAVE BEEN IN HAD THE INFRINGEMENT NOT

15  OCCURRED.

16               THE PLAINTIFF HAS THE BURDEN OF

17  ESTABLISHING -- I'M SORRY.  THE PLAINTIFF HAS THE BURDEN

18  TO ESTABLISH THE AMOUNT OF ITS DAMAGES BY A

19  PREPONDERANCE OF THE EVIDENCE.  IN OTHER WORDS, YOU

20  SHOULD AWARD ONLY THOSE DAMAGES THAT THE PLAINTIFF

21  ESTABLISHES THAT IT MORE LIKELY THAN NOT SUFFERED.

22               THERE ARE DIFFERENT TYPES OF DAMAGES THAT

23  THE PLAINTIFF MAY BE ENTITLED TO RECOVER.  IN THIS CASE,

24  THE PLAINTIFF SEEKS A REASONABLE ROYALTY.  A REASONABLE

25  ROYALTY IS DEFINED AS THE MONEY AMOUNT THE PLAINTIFF AND

1   THE DEFENDANT WOULD HAVE AGREED UPON AS A FEE FOR USE OF

2   THE INVENTION AT THE TIME PRIOR TO WHEN THE INFRINGEMENT

3   BEGAN.  IF YOU FIND THAT THE DEFENDANT HAS ESTABLISHED

4   INFRINGEMENT, THE PLAINTIFF IS ENTITLED TO A REASONABLE

5   ROYALTY TO COMPENSATE IT FOR THAT INFRINGEMENT.

6                   IN DETERMINING THE AMOUNT OF DAMAGES, YOU

7   MUST DETERMINE WHEN THE DAMAGES BEGAN.  DAMAGES COMMENCE

8   ON THE DATE THAT THE DEFENDANT HAS BOTH INFRINGED AND

9   BEEN NOTIFIED OF THE ALLEGED INFRINGEMENT OF THE '981

10  PATENT.

11                  IF YOU FIND THAT THE PLAINTIFF SELLS A

12  PRODUCT THAT INCLUDES THE CLAIMED INVENTION, YOU MUST

13  DETERMINE WHETHER THE PLAINTIFF HAS MARKED THAT PRODUCT

14  WITH THE PATENT NUMBER.  "MARKING" IS PLACED EITHER --

15  I'M SORRY.  "MARKING" IS PLACING EITHER THE

16  WORD, "PATENT," OR THE ABBREVIATION, "PAT." WITH THE

17  PATENT'S NUMBER ON SUBSTANTIALLY ALL OF THE PRODUCTS

18  THAT INCLUDE THE PATENTED INVENTION.  THE PLAINTIFF HAS

19  THE BURDEN OF ESTABLISHING THAT IT SUBSTANTIALLY

20  COMPLIED WITH THE MARKING REQUIREMENT.  THIS MEANS THE

21  PLAINTIFF MUST SHOW THAT IT MARKED SUBSTANTIALLY ALL OF

22  THE PRODUCTS IT MADE, OFFERED FOR SALE, OR SOLD UNDER

23  THE '981 PATENT.

24                  IF THE PLAINTIFF HAS NOT MARKED THAT

25  PRODUCT WITH THE PATENT NUMBER, YOU MUST DETERMINE THE

1   DATE THAT THE DEFENDANT RECEIVED ACTUAL NOTICE OF THE

2   '981 PATENT AND THE SPECIFIC PRODUCT ALLEGED TO

3   INFRINGE.  ACTUAL NOTICE MEANS THAT THE PLAINTIFF

4   COMMUNICATED TO THE DEFENDANT A SPECIFIC CHARGE OF

5   INFRINGEMENT OF THE '981 PATENT BY A SPECIFIC ACCUSED

6   PRODUCT OR DEVICE.  THE FILING OF THE COMPLAINT IN THIS

7   CASE QUALIFIES AS ACTUAL NOTICE, SO THE DAMAGES

8   PERIOD -- PERIOD BEGINS NO LATER THAN THE DATE THE

9   COMPLAINT WAS FILED.

10          HOWEVER, THE PLAINTIFF CLAIMS TO HAVE

11  PROVIDED ACTUAL NOTICE PRIOR TO THE FILING OF THE

12  COMPLAINT, ON APRIL 6, 2006, WHEN IT SENT AN E-MAIL TO

13  THE DEFENDANT.  THE PLAINTIFF HAS THE BURDEN OF

14  ESTABLISHING THAT IT IS MORE PROBABLE THAN NOT THE

15  DEFENDANT RECEIVED NOTICE OF INFRINGEMENT ON APRIL 6,

16  2006.

17          A ROYALTY IS A PAYMENT MADE TO A PATENT

18  OWNER IN EXCHANGE FOR THE RIGHT TO MAKE, USE, OR SELL

19  THE CLAIMED INVENTION.  A REASONABLE ROYALTY IS THE

20  AMOUNT OF ROYALTY PAYMENT THAT A PATENT HOLDER AND THE

21  INFRINGER WOULD HAVE AGREED TO IN A HYPOTHETICAL

22  NEGOTIATION TAKING PLACE AT A TIME PRIOR TO WHEN THE

23  INFRINGEMENT FIRST BEGAN.  IN CONSIDERING THIS

24  HYPOTHETICAL NEGOTIATION, YOU SHOULD FOCUS ON WHAT THE

25  EXPECTATIONS OF THE PATENT HOLDER AND THE INFRINGER

1  WOULD HAVE BEEN HAD THEY ENTERED INTO AN AGREEMENT AT

2  THAT TIME AND HAD THEY ACTED REASONABLY IN THEIR

3  NEGOTIATIONS.  IN DETERMINING THIS, YOU MUST ASSUME THAT

4  BOTH PARTIES BELIEVED THE PATENT WAS VALID AND INFRINGED

5  AND THE PATENT HOLDER AND INFRINGER WERE WILLING TO

6  ENTER INTO AN AGREEMENT.  THE REASONABLE ROYALTY YOU

7  DETERMINE MUST BE A ROYALTY THAT WOULD HAVE RESULTED

8  FROM THE HYPOTHETICAL NEGOTIATION, AND NOT SIMPLY A

9  ROYALTY EITHER PARTY WOULD HAVE PREFERRED.

10            EVIDENCE OF THINGS THAT HAPPENED AFTER THE

11  INFRINGEMENT FIRST BEGAN CAN BE CONSIDERED IN EVALUATING

12  THE REASONABLE ROYALTY ONLY TO THE EXTENT THAT THE

13  EVIDENCE AIDS IN ASSESSING THAT -- WHAT ROYALTY WOULD

14  HAVE RESULTED FROM A HYPOTHETICAL NEGOTIATION.  ALTHOUGH

15  EVIDENCE OF THE ACTUAL PROFITS AN ALLEGED INFRINGER MADE

16  MAY BE USED TO DETERMINE THE ANTICIPATED PROFITS AT THE

17  TIME OF THE HYPOTHETICAL NEGOTIATION, THE ROYALTY MAY

18  NOT BE LIMITED OR INCREASED BASED ON THE ACTUAL PROFITS

19  THE ALLEGED INFRINGER MADE.

20            IN DETERMINING THE REASONABLE ROYALTY, YOU

21  SHOULD CONSIDER ALL THE FACTS KNOWN AND AVAILABLE TO THE

22  PARTIES AT THE TIME OF THE INFRINGEMENT BEGAN.  SOME OF

23  THE KINDS OF FACTORS THAT YOU MAY CONSIDER IN MAKING

24  YOUR DETERMINATION ARE:

25            1.  THE ROYALTIES RECEIVED BY THE PATENTEE

1   FOR THE LICENSING OF THE PATENT IN SUIT, PROVING OR

2   TENDING TO PROVE AN ESTABLISHED ROYALTY;

3                2.   THE RATES PAID BY THE LICENSEE FOR THE

4   USE OF OTHER PATENTS COMPARABLE TO THE PATENT IN SUIT;

5                3.   THE NATURE AND THE SCOPE OF THE LICENSE

6   AS EXCLUSIVE OR NONEXCLUSIVE OR AS RESTRICTED OR

7   NONRESTRICTED IN TERMS OF TERRITORY OR WITH RESPECT TO

8   WHOM THE MANUFACTURED PRODUCT MAY BE SOLD;

9                4.   THE LICENSOR'S ESTABLISHED POLICY AND

10  MARKETING PROGRAM TO MAINTAIN HIS OR HER PATENT MONOPOLY

11  BY NOT LICENSING OTHERS TO USE THE INVENTION OR GRANTING

12  LICENSES UNDER SPECIAL CONDITIONS DESIGNED TO PRESERVE

13  THAT MONOPOLY;

14               5.   THE COMMERCIAL RELATIONSHIP BETWEEN THE

15  LICENSOR AND THE LICENSEE SUCH AS WHETHER THEY ARE

16  COMPETITORS IN THE SAME TERRITORY IN THE SAME LINE OF

17  BUSINESS OR WHETHER THEY ARE INVENTOR AND PROMOTER;

18               6.   THE EFFECT OF SELLING THE PATENTED

19  SPECIALTY IN PROMOTING SALES OF OTHER PRODUCTS OF THE

20  LICENSEE, THE EXISTING VALUE OF THE INVENTION TO THE

21  LICENSOR AS A GENERATOR OF SALES OF HIS NONPATENTED

22  ITEMS, AND THE EXTENT OF SUCH DERIVATIVE OR CONVOYED

23  SALES;

24               7.   THE DURATION OF THE PATENT AND THE

25  TERMS OF THE LICENSE;

1                    8.   THE ESTABLISHED PROFITABILITY OF A

2      PRODUCT MADE UNDER THE PATENTS, ITS COMMERCIAL SUCCESS,

3      AND ITS CURRENT POPULARITY;

4                    9.   THE UTILITY AND ADVANTAGES OF THE

5      PATENTED PROPERTY OVER THE OLD MODES OR DEVICES, IF ANY,

6      THAT HAD BEEN USED FOR WORKING OUT SIMILAR RESULTS;

7                    10.   THE NATURE OF THE PATENTED INVENTION,

8      THE CHARACTER OF THE COMMERCIAL EMBODIMENT OF IT AS

9      OWNED AND PRODUCED BY THE LICENSOR, AND THE BENEFITS TO

10     THOSE WHO HAVE USED THE INVENTION;

11                   11.   THE EXTENT TO WHICH THE INFRINGER HAS

12     MADE USE OF THE INVENTION AND ANY EVIDENCE PROBATIVE OF

13     THE VALUE OF THAT USE;

14                   12.   THE PORTION OF THE PROFIT OR OF THE

15     SELLING PRICE THAT MAY BE CUSTOMARY IN THE PARTICULAR

16     BUSINESS OR IN COMPARABLE BUSINESS TO ALLOW FOR THE USE

17     OF THE INVENTION OR ANALOGOUS INVENTIONS.

18                   13.   THE PORTION OF THE REALIZABLE PROFITS

19     THAT SHOULD BE CREDITED TO THE INVENTION AS

20     DISTINGUISHED FROM NONPATENTED ELEMENTS, THE

21     MANUFACTURING PROCESS, BUSINESS RISKS, OR SIGNIFICANT

22     FEATURES OR IMPROVEMENTS ADDED BY THE INFRINGER;

23                   14.   THE OPINION AND TESTIMONY OF QUALIFIED

24     EXPERTS;

25                   15.   THE AMOUNT THAT A LICENSOR (SUCH AS

1  THE PATENTEE) AND A LICENSEE (SUCH AS THE INFRINGER)

2  WOULD HAVE AGREED UPON (AT THE TIME THE INFRINGEMENT

3  BEGAN) IF BOTH HAD BEEN REASONABLY AND VOLUNTARILY

4  TRYING TO REACH AN AGREEMENT, THAT IS, THE AMOUNT THAT A

5  PRUDENT LICENSEE WHO DESIRED AS A BUSINESS PROPOSITION

6  TO OBTAIN A LICENSE TO MANUFACTURE AND SELL A PARTICULAR

7  ARTICLE EMBODYING THE PATENTED INVENTION WOULD HAVE BEEN

8  WILLING TO PAY AS A ROYALTY AND YET BE ABLE TO MAKE A

9  REASONABLE PROFIT AND WHICH AMOUNT WOULD HAVE BEEN

10 ACCEPTABLE BY A PRUDENT PATENTEE WHO WAS WILLING TO

11 GRANT A LICENSE;

12           16.   ANY OTHER ECONOMIC FACTOR THAT A

13 NORMALLY PRUDENT BUSINESS PERSON WOULD, UNDER SIMILAR

14 CIRCUMSTANCES, TAKE INTO CONSIDERATION IN NEGOTIATING

15 THE HYPOTHETICAL LICENSE.

16           NO ONE FACTOR IS DISPOSITIVE, AND YOU CAN

17 AND SHOULD CONSIDER THE EVIDENCE THAT HAS BEEN PRESENTED

18 TO YOU IN THIS CASE ON EACH OF THESE FACTORS.  YOU MAY

19 ALSO CONSIDER ANY OTHER FACTORS WHICH IN YOUR MIND WOULD

20 HAVE INCREASED OR DECREASED THE ROYALTY THE INFRINGER

21 WOULD HAVE BEEN WILLING TO PAY AND THE PATENT HOLDER

22 WOULD HAVE BEEN WILLING TO ACCEPT, ACTING AS NORMALLY

23 PRUDENT BUSINESS PEOPLE.

24           THE FINAL FACTOR ESTABLISHES THE FRAMEWORK

25 WHICH YOU SHOULD USE IN DETERMINING A REASONABLE

1  ROYALTY, THAT IS, THE PAYMENT THAT WOULD HAVE RESULTED

2  FROM A NEGOTIATION BETWEEN THE PATENT HOLDER AND THE

3  INFRINGER TAKING PLACE AT A TIME PRIOR TO WHEN THE

4  INFRINGEMENT BEGAN.

5           IT IS NOW YOUR DUTY TO DELIBERATE AND TO

6  CONSULT WITH ONE ANOTHER IN AN EFFORT TO REACH A

7  VERDICT.  EACH OF YOU MUST DECIDE THE CASE FOR YOURSELF,

8  BUT ONLY AFTER AN IMPARTIAL CONSIDERATION OF THE

9  EVIDENCE WITH YOUR FELLOW JURORS.  DURING YOUR

10 DELIBERATIONS, DO NOT HESITATE TO RE-EXAMINE YOUR OWN

11 OPINIONS AND CHANGE YOUR MIND IF YOU ARE CONVINCED THAT

12 YOU WERE WRONG.  BUT DO NOT GIVE UP ON YOUR HONEST

13 BELIEFS BECAUSE THE OTHER JURORS THINK DIFFERENTLY OR

14 JUST TO FINISH THE CASE.

15          REMEMBER AT ALL TIMES, YOU ARE THE JUDGES

16 OF THE FACTS.  YOU HAVE BEEN ALLOWED TO TAKE NOTES

17 DURING THIS TRIAL.  ANY NOTES THAT YOU TOOK DURING THIS

18 TRIAL ARE ONLY AIDS TO YOUR MEMORY.  IF YOUR MEMORY

19 DIFFERS FROM YOUR NOTES, YOU SHOULD RELY ON YOUR MEMORY

20 AND NOT ON THE NOTES.  THE NOTES ARE NOT EVIDENCE.  IF

21 YOU DID NOT TAKE NOTES, RELY ON YOUR INDEPENDENT

22 RECOLLECTION OF THE EVIDENCE AND DO NOT BE UNDULY

23 INFLUENCED BY THE NOTES OF OTHER JURORS.  NOTES ARE NOT

24 ENTITLED TO GREATER WEIGHT THAN THE RECOLLECTION OR

25 IMPRESSION OF EACH JUROR ABOUT THE TESTIMONY.

1              WHEN YOU GO INTO THE JURY ROOM TO

2    DELIBERATE, YOU MAY TAKE WITH YOU A COPY OF THIS CHARGE,

3    MEANING THESE INSTRUCTIONS, THE EXHIBITS THAT I HAVE

4    ADMITTED INTO EVIDENCE, AND YOUR NOTES.  YOU MUST SELECT

5    A JURY FOREPERSON TO GUIDE YOU IN YOUR DELIBERATIONS AND

6    TO SPEAK FOR YOU HERE IN THE COURTROOM.

7              YOUR VERDICT MUST BE UNANIMOUS.  AFTER YOU

8    HAVE REACHED A UNANIMOUS VERDICT, YOUR JURY FOREPERSON

9    SHOULD FILL OUT THE ANSWERS TO THE WRITTEN QUESTIONS ON

10   THE VERDICT FORM AND SIGN AND DATE IT.  AFTER YOU HAVE

11   CONCLUDED YOUR SERVICE AND I HAVE DISCHARGED THE JURY,

12   YOU ARE NOT REQUIRED TO TALK WITH ANYONE ABOUT THE CASE.

13             IF YOU NEED TO COMMUNICATE WITH ME DURING

14   YOUR DELIBERATIONS, THE FOREPERSON SHOULD WRITE THE

15   INQUIRY AND GIVE IT TO THE COURT SECURITY OFFICER.

16   AFTER CONSULTING WITH THE ATTORNEYS, I WILL RESPOND

17   EITHER IN WRITING OR BY MEETING WITH YOU IN THE

18   COURTROOM.  KEEP IN MIND, HOWEVER, THAT YOU MUST NEVER

19   DISCLOSE TO ANYONE, NOT EVEN TO ME, YOUR NUMERICAL

20   DIVISION ON ANY QUESTION.

21             ALL RIGHT, LADIES AND GENTLEMEN, THE NEXT

22   SEVERAL PAGES ARE THE VERDICT FORM, AND THE VERDICT FORM

23   CONTAINS A NUMBER OF QUESTIONS THAT YOU ARE -- YOU ARE

24   ASKED TO ANSWER.  LET'S GO OVER THOSE.  AND I HAVE

25   DIVIDED UP THE VERDICT FORM ACCORDING TO THE VARIOUS

1    CLAIMS THAT ARE ALLEGED BY THE PLAINTIFF IN ITS

2    COMPLAINT.  AND THEN, ALSO, I HAVE QUESTIONS FOR YOU ON

3    THE DEFENDANT'S EQUITABLE DEFENSES AT THE VERY END.

4              SO, LET'S GO THROUGH THE VERDICT FORM.  A,

5    BREACH OF CONTRACT.  QUESTION NUMBER 1, ON RETENTION OF

6    DOCUMENTS.  YOU HAVE BEEN INSTRUCTED AS A MATTER OF LAW

7    THAT THE DEFENDANT RETAINED CONFIDENTIAL INFORMATION IN

8    BREACH OF THE JUNE 3, 2004, CONFIDENTIALITY AGREEMENT.

9    WHAT AMOUNT OF NOMINAL DAMAGES, IF ANY, DID THE

10   PLAINTIFF PROVE BY A PREPONDERANCE OF THE EVIDENCE IS

11   ATTRIBUTABLE TO THE DEFENDANT'S RETENTION OF THE

12   PLAINTIFF'S CONFIDENTIAL INFORMATION UNDER THE

13   CONFIDENTIALITY AGREEMENT?  ANSWER IN DOLLARS AND CENTS,

14   IF ANY.

15             QUESTION NUMBER 2, USE OF THE PLAINTIFF'S

16   CONFIDENTIAL INFORMATION.

17             A.  DO YOU FIND THAT THE PLAINTIFF PROVED

18   BY A PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT

19   FAILED TO COMPLY WITH THE JUNE 3, 2004, CONFIDENTIALITY

20   AGREEMENT?

21             B.  IF YOU ANSWERED YES TO QUESTION 2A,

22   WHAT SUM OF MONEY, IF ANY, PAID NOW IN CASH, WOULD

23   REASONABLY AND FAIRLY COMPENSATE THE PLAINTIFF AS A

24   REASONABLE ROYALTY ARISING FROM THE DEFENDANT'S FAILURE

25   TO COMPLY WITH THE JUNE 3, 2004, CONFIDENTIALITY

 1  AGREEMENT?  ANSWER IN DOLLARS AND CENTS, IF ANY.

 2              PART B, MISAPPROPRIATION OF TRADE SECRETS.

 3  QUESTION NUMBER 3, DID THE PLAINTIFF PROVE BY A

 4  PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT

 5  MISAPPROPRIATED THE PLAINTIFF'S TRADE SECRETS?  ANSWER

 6  YES OR NO.  IF YOU ANSWERED YES TO QUESTION 3, THEN

 7  PROCEED TO ANSWER QUESTION 4.  OTHERWISE, PROCEED TO

 8  QUESTION 9.

 9              QUESTION 4, WHAT SUM OF MONEY, IF ANY, IF

10  PAID NOW IN CASH, WOULD FAIRLY AND REASONABLY COMPENSATE

11  THE PLAINTIFF FOR THE DEFENDANT'S MISAPPROPRIATION OF

12  THE PLAINTIFF'S TRADE SECRETS?  ANSWER IN DOLLARS AND

13  CENTS, IF ANY; DISGORGEMENT, IF ANY; OR REASONABLE

14  ROYALTY, IF ANY.

15              QUESTION NUMBER 5, DID THE PLAINTIFF PROVE

16  BY CLEAR AND CONVINCING EVIDENCE THAT THE DEFENDANT'S

17  MISAPPROPRIATION OF THE PLAINTIFF'S TRADE SECRETS

18  RESULTED FROM THE DEFENDANT'S FRAUD, MALICE, OR GROSS

19  NEGLIGENCE?  ANSWER YES OR NO.  IF YOU ANSWERED YES TO

20  QUESTION NUMBER 5, THEN PROCEED TO QUESTION NUMBER 6.

21  OTHERWISE, PROCEED TO QUESTION NUMBER 9.

22              QUESTION NUMBER 6, WHAT SUM OF MONEY, IF

23  ANY, IF PAID NOW IN CASH, SHOULD BE ASSESSED AGAINST THE

24  DEFENDANT AND AWARDED TO THE PLAINTIFF AS EXEMPLARY

25  DAMAGES, IF ANY, FOR THE DEFENDANT'S TRADE SECRET

1   MISAPPROPRIATION?

2                QUESTION NUMBER 7, DID THE DEFENDANT PROVE

3   BY A PREPONDERANCE OF THE EVIDENCE THAT THE PLAINTIFF

4   MUST HAVE KNOWN OR MUST HAVE BEEN REASONABLY ABLE TO

5   DISCOVER THAT THE DEFENDANT HAD USED THE PLAINTIFF'S

6   PROPRIETARY INFORMATION TO CREATE A COMPETING PRODUCTS

7   BEFORE NOVEMBER 25, 2005?  ANSWER YES OR NO.

8                QUESTION NUMBER 8, DID THE PLAINTIFF PROVE

9   BY A PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT

10  FRAUDULENTLY CONCEALED THE FACTS UPON WHICH THE

11  PLAINTIFF'S MISAPPROPRIATION OF TRADE SECRETS CLAIM IS

12  BASED?  ANSWER YES OR NO.

13               TORTIOUS INTERFERENCE, QUESTION NUMBER 9,

14  DID THE DEFENDANT INTENTIONALLY INTERFERE WITH THE

15  PLAINTIFF'S PROSPECTIVE BUSINESS RELATIONS WITH APPLE?

16  ANSWER YES OR NO.  IF YOU ANSWERED YES TO QUESTION 9,

17  THEN PROCEED TO QUESTION 10.  OTHERWISE, PROCEED TO

18  QUESTION 13.

19               QUESTION NUMBER 10.  WHAT SUM OF MONEY, IF

20  ANY, PAID NOW IN CASH, WOULD REASONABLY AND FAIRLY

21  COMPENSATE THE PLAINTIFF FOR ITS LOST PROFITS DAMAGES

22  ARISING FROM THE DEFENDANT'S INTENTIONAL INTERFERENCE

23  WITH THE PLAINTIFF'S PROSPECTIVE RELATIONS WITH APPLE?

24  ANSWER IN DOLLARS AND CENTS, IF ANY.

25               QUESTION 11, DID THE DEFENDANT PROVE BY

1    CLEAR AND CONVINCING EVIDENCE THAT THE DEFENDANT'S

2    TORTIOUS INTERFERENCE WAS THE RESULT OF FRAUD, MALICE,

3    OR GROSS NEGLIGENCE?  ANSWER YES OR NO.

4              QUESTION 12, WHAT SUM OF MONEY, IF ANY, IF

5    PAID NOW IN CASH, SHOULD BE ASSESSED AGAINST THE

6    DEFENDANT AND AWARDED TO THE PLAINTIFF AS EXEMPLARY

7    DAMAGES, IF ANY, FOR THE DEFENDANT'S TORTIOUS

8    INTERFERENCE?  ANSWER IN DOLLARS AND CENTS, IF ANY.

9              D.  PATENT INFRINGEMENT.  QUESTION NUMBER

10   13, DO YOU FIND THAT THE PLAINTIFF PROVED BY A

11   PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT

12   DIRECTLY INFRINGED THE FOLLOWING CLAIMS OF THE '981

13   PATENT?  ANSWER YES OR NO FOR EACH CLAIM.

14             AND THERE YOU HAVE A CHART THAT LISTS THE

15   SIX CLAIMS THAT ARE ASSERTED HERE AS HAVING BEEN

16   INFRINGED AND THE FOUR PRODUCTS THAT THE PLAINTIFF

17   ASSERTS INFRINGED ONE OR MORE OF THOSE SIX CLAIMS.  SO,

18   YOU WILL ANSWER YES OR NO TO -- FOR EACH PRODUCT WITH

19   RESPECT TO EACH OF THE ASSERTED CLAIMS.

20             QUESTION NUMBER 14, DO YOU FIND THAT THE

21   DEFENDANT HAS PROVED BY CLEAR AND CONVINCING EVIDENCE

22   THAT ANY OF THE FOLLOWING CLAIMS OF THE '981 PATENT ARE

23   INVALID DUE TO OBVIOUSNESS?  AND YOU'LL ANSWER YES OR NO

24   FOR EACH OF THE SIX ASSERTED CLAIMS.

25             QUESTION NUMBER 15, DO YOU FIND THAT THE

DAILY COPY                    117

1    DEFENDANT HAS PROVED BY CLEAR AND CONVINCING EVIDENCE

2    THAT ANY OF THE FOLLOWING CLAIMS OF THE '981 PATENT ARE

3    INVALID FOR FAILING TO SATISFY THE WRITTEN DESCRIPTION

4    REQUIREMENT?  ANSWER YES OR NO FOR EACH OF THE SIX

5    ASSERTED CLAIMS.

6                    QUESTION NUMBER 16, DO YOU FIND THAT THE

7    DEFENDANT HAS PROVED BY CLEAR AND CONVINCING EVIDENCE

8    THAT ANY OF THE FOLLOWING CLAIMS OF THE '981 PATENT ARE

9    INVALID FOR FAILING TO CONTAIN A SUFFICIENTLY FULL AND

10   CLEAR DESCRIPTION OF HOW TO MAKE AND USE THE FULL SCOPE

11   OF THE CLAIMED INVENTION?  ANSWER YES OR NO FOR EACH OF

12   THE SIX ASSERTED CLAIMS.  IF YOU ANSWERED YES TO ANY

13   CLAIM IN RESPONSE TO QUESTION NUMBER 13, AND NO TO THE

14   SAME CLAIM IN RESPONSE TO QUESTION NUMBERS 14 AND 15,

15   PROCEED TO QUESTION 17.  OTHERWISE, PROCEED TO QUESTION

16   19.

17                   QUESTION 17, WHAT SUM OF MONEY IF PAID NOW

18   IN CASH WOULD FAIRLY AND ADEQUATELY COMPENSATE THE

19   PLAINTIFF AS A REASONABLE ROYALTY FOR THE DEFENDANT'S

20   INFRINGEMENT OF THE '981 PATENT?  ANSWER IN DOLLARS AND

21   CENTS, IF ANY.

22                   QUESTION NUMBER 18, DO YOU FIND THAT THE

23   PLAINTIFF HAS PROVED BY CLEAR AND CONVINCING EVIDENCE

24   THAT THE DEFENDANT'S INFRINGEMENT, IF ANY, OF THE '981

25   PATENT WAS WILLFUL?  ANSWER YES OR NO.

1                   PART E, DEFENDANT'S EQUITABLE DEFENSES.

2      QUESTION NUMBER 19, DO YOU FIND FROM A PREPONDERANCE OF

3      THE EVIDENCE THAT THE DEFENDANT PROVED THAT THE

4      DEFENDANT'S CONDUCT WAS EXCUSED BECAUSE OF LACHES?

5                   QUESTION NUMBER 20, DO YOU FIND FROM A

6      PREPONDERANCE OF THE EVIDENCE THAT THE DEFENDANT PROVED

7      THAT THE PLAINTIFF HAD UNCLEAN HANDS?  ANSWER YES OR NO.

8                   ALL RIGHT.  MEMBERS OF THE JURY, THOSE ARE

9      THE 20 QUESTIONS THAT ARE PRESENTED TO YOU.  YOU WILL

10     ANSWER ALL OR SOME OF THOSE QUESTIONS DEPENDING ON HOW

11     YOU ANSWER THE QUESTIONS IN THE ORDER IN WHICH THEY'RE

12     PRESENTED TO YOU, AND THEN WHOEVER YOU ELECT AS THE

13     FOREPERSON WILL SIGN THE VERDICT FORM AND DATE IT.  AND

14     THEN WHEN YOU'VE REACHED A VERDICT, YOU'LL INFORM THE

15     COURT SECURITY OFFICER.

16                  OKAY.  BEFORE WE GET THERE, THOUGH, YOU

17     NEED TO HEAR THE FINAL ARGUMENTS OF THE LAWYERS.  THEY

18     HAVE AN OPPORTUNITY TO SUM UP THE EVIDENCE FOR YOU.  YOU

19     ARE THE JUDGES OF THE EVIDENCE.  SO, IF DURING FINAL

20     ARGUMENTS YOU HEAR SOMETHING THAT YOU DON'T BELIEVE IS

21     PART OF THE EVIDENCE, THEN YOU DON'T -- YOU SHOULD RELY

22     ON THE EVIDENCE, NOT ON THE FINAL ARGUMENTS.  KEEP IN

23     MIND THAT AS WITH THE OPENING STATEMENTS, FINAL

24     ARGUMENTS BY THE LAWYERS ARE NOT EVIDENCE.  THE EVIDENCE

25     CAME FROM THE WITNESS STAND AND FROM THE DOCUMENTS THAT

```
 1   WERE PRESENTED TO YOU AND ADMITTED INTO EVIDENCE.
 2               OKAY.  NOW, I STARTED READING PROBABLY AN
 3   HOUR AND 20 MINUTES AGO, ROUGHLY.  I'M GUESSING.
 4               DEPUTY COURT CLERK:  10:32.
 5               THE COURT:  I STARTED READING ABOUT AN HOUR
 6   AND 30 MINUTES AGO.  EXACTLY AN HOUR AND 30 MINUTES AGO.
 7   SO, I HAVEN'T VISITED WITH THE LAWYERS AS TO WHETHER WE
 8   SHOULD TAKE LUNCH AT THIS TIME OR TAKE A BREAK AND THEN
 9   LET THE PLAINTIFF MAKE ITS OPENING ARGUMENT.  LET'S AT
10   LEAST TAKE A BREAK.  LET ME VISIT WITH THE LAWYERS.
11   IT'S NOON, SO LET'S TAKE A 10-MINUTE RECESS AND THEN --
12   AND THEN WE'LL DECIDE WHETHER TO HAVE LUNCH NOW AND COME
13   BACK AFTER LUNCH FOR ARGUMENTS OR WHETHER TO START THE
14   ARGUMENTS, BREAK FOR LUNCH, AND THEN FINISH THE
15   ARGUMENTS LATER.
16               SO, WOULD YOU PLEASE GO WITH MR. SERRATO.
17               COURT SECURITY OFFICER:  ALL RISE.
18               (JURY NOT PRESENT)
19               THE COURT:  ALL RIGHT.  YOU MAY BE SEATED.
20   I ALSO WANT TO ASK THE JURY WHAT THEY'D LIKE TO DO.  DO
21   COUNSEL HAVE ANY PREFERENCE HERE?
22               MR. ALIBHAI:  WE'D LIKE TO PROCEED AT THIS
23   TIME, YOUR HONOR, PLAINTIFF WOULD, AND AT LEAST GET
24   THROUGH THE FIRST HOUR.
25               THE COURT:  OKAY.
```

1              MR. BRAGALONE:  PERHAPS IF WE HAD SOME IDEA

2    OF HOW THEY WERE SPLITTING, THE PLAINTIFFS WERE

3    SPLITTING THE ARGUMENT.

4              THE COURT:  HE SAID AN HOUR.

5              MR. ALIBHAI:  60 TO 65 MINUTES IN THE

6    OPENING.

7              THE COURT:  LEAVING 25 TO 30 MINUTES FOR

8    CLOSING?

9              MR. ALIBHAI:  YES, YOUR HONOR.

10             THE COURT:  OKAY.  SO, WE WOULD GO UNTIL A

11   LITTLE AFTER 1:00.

12             MR. ALIBHAI:  YES, YOUR HONOR.

13             THE COURT:  OKAY.

14             MR. BRAGALONE:  SUBJECT TO WHAT THE JURY

15   WANTS TO DO, YOUR HONOR, DEFENDANTS HAVE NO OBJECTION.

16             THE COURT:  OKAY.  ALL RIGHT, MR. SERRATO,

17   WOULD YOU ASK THE MEMBERS OF THE JURY IF -- THERE ARE

18   TWO CHOICES.  EITHER WE CAN BREAK FOR LUNCH NOW AND COME

19   BACK NOW AND THEY CAN HEAR ALL -- ALL OF THE ARGUMENTS.

20   OR WE CAN GET STARTED WITH THE ARGUMENTS AND HEAR ONE

21   HOUR OF ARGUMENT AND BREAK FOR LUNCH A LITTLE AFTER

22   1:00.

23             COURT SECURITY OFFICER:  YES, SIR.

24             THE COURT:  TELL ME WHAT THEY WOULD LIKE TO

25   DO.

```
 1                COURT SECURITY OFFICER:  YES, SIR.

 2                MR. ALIBHAI:  CAN WE BE EXCUSED FOR A

 3   MOMENT, YOUR HONOR?

 4                THE COURT:  SURE.  I DIDN'T KNOW IF HE

 5   WOULD COME RIGHT BACK, BUT SURE, IF YOU NEED TO BE

 6   EXCUSED, GO AHEAD.

 7                LET'S SEE.  ARE ANY OF THE LAWYERS -- DID

 8   BOTH MR. MCCABE AND MR. ALIBHAI LEAVE?  I THINK THEY

 9   DID.  AND MR. WILSON.  LET ME WAIT JUST A MOMENT UNTIL

10   THEY COME BACK.

11                MR. SERRATO, TELL THEM DON'T LEAVE YET.

12                OKAY.

13                MR. WILSON:  HE JUST WENT DOWN THE HALL.

14                THE COURT:  THAT'S OKAY.  HERE'S

15   MR. ALIBHAI.

16                MR. WILSON:  OKAY.

17                THE COURT:  OKAY, COUNSEL FOR BOTH SIDES

18   ARE IN THE COURTROOM.  THE COURT SECURITY OFFICER HAS

19   INFORMED ME THAT THE JURY WANTS TO GO TO LUNCH NOW, SO

20   WE'RE GOING TO BREAK FOR LUNCH FOR ONE HOUR.  I'M GOING

21   TO BRING THEM BACK IN THE COURTROOM, THOUGH, TO INSTRUCT

22   THEM THAT THEY CANNOT DELIBERATE AT LUNCH.  THEY HAVE TO

23   WAIT UNTIL FINAL ARGUMENTS AND THEN WHEN THEY'RE ALL

24   TOGETHER IN THE JURY ROOM.

25                SO, MR. SERRATO --
```

```
 1              COURT SECURITY OFFICER:  A FEW OF THEM ARE

 2   IN THE RESTROOM, YOUR HONOR.

 3              THE COURT:  OH, OKAY.  WELL, OKAY.  LET'S

 4   SEE.  WE'RE STILL WAITING FOR MR. MCCABE, SO -- AND

 5   HERE'S MR. MCCABE.

 6              OKAY, MR. SERRATO, EVERYBODY'S BACK IN THE

 7   COURTROOM, SO WHENEVER THEY'RE READY, BRING THEM IN.

 8              COURT SECURITY OFFICER:  ALL RISE.

 9              (JURY PRESENT)

10              THE COURT:  ALL RIGHT.  TAKE YOUR SEATS,

11   PLEASE.  ALL RIGHT, MEMBERS OF THE JURY, MR. SERRATO,

12   THE COURT SECURITY OFFICER INFORMS ME THAT YOU WOULD

13   LIKE TO GO TO LUNCH NOW.  SO WE WILL RECESS FOR ONE

14   HOUR.  IT IS ABOUT 8 MINUTES AFTER 12:00 ACCORDING TO MY

15   WATCH, SO CAN WE RECESS UNTIL 1:10 P.M.  IS THAT ENOUGH

16   TIME FOR YOU?  TELL ME IF IT'S NOT.

17              JUROR:  THAT'S PLENTY.

18              THE COURT:  THAT'S ENOUGH TIME.  ALL RIGHT.

19   LET'S RECESS FOR ONE HOUR UNTIL 1:10.  I NEED TO TELL

20   YOU THAT YOU CAN -- AS I'VE TOLD YOU BEFORE, YOU CAN GO

21   TO LUNCH TOGETHER IF YOU WANT TO.  I DON'T KNOW HOW YOU

22   TAKE LUNCH DURING THIS TRIAL, BUT YOU CANNOT TALK ABOUT

23   THE CASE.  YOU CAN ONLY DELIBERATE ON THE CASE WHEN ALL

24   OF YOU ARE TOGETHER, ALL NINE OF YOU ARE TOGETHER, IN

25   THE JURY ROOM AFTER YOU HEAR THE FINAL ARGUMENTS OF THE
```

```
 1   LAWYERS.  SO, KEEP YOUR THOUGHTS ABOUT THE CASE TO

 2   YOURSELF UNTIL THAT TIME.

 3                  OKAY, SEE YOU BACK AT 1:10.

 4                  COURT SECURITY OFFICER:  ALL RISE.

 5                  (JURY NOT PRESENT)

 6                  THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS

 7   UNTIL 1:10 P.M.

 8                  (BREAK TAKEN FROM 12:11 P.M. TO 1:15 P.M.)

 9                  (JURY NOT PRESENT)

10                  COURT SECURITY OFFICER:  ALL RISE.

11                  THE COURT:  THANK YOU.  PLEASE TAKE YOUR

12   SEATS.  OKAY.

13                  MR. KIMBLE:  I'M GUESSING MR. BRAGALONE'S

14   IN THE BATHROOM.  HE'LL BE BACK IN A MINUTE.

15                  THE COURT:  OKAY.  OKAY.  FOR THE RECORD,

16   MR. BRAGALONE AND MR. KIMBLE ARE IN THE COURTROOM ALONG

17   WITH MR. ALIBHAI AND MR. MCCABE, MR. WILSON.  MR. GRAHAM

18   IS HERE, AND MR. TOKOS AND MR. LANEY, SO -- AND

19   MS. CHEN.  SO WE ARE READY TO BEGIN FINAL ARGUMENTS.

20                  MR. WESTBERG, WOULD YOU BRING IN THE JURY,

21   PLEASE.

22                  COURT SECURITY OFFICER:  ALL RISE.

23                  (JURY PRESENT)

24                  THE COURT:  ALL RIGHT.  TAKE YOUR SEATS,

25   PLEASE.  OKAY, LADIES AND GENTLEMEN, WE'RE GOING TO
```

1   START WITH FINAL ARGUMENTS.  PLAINTIFF HAS THE RIGHT TO

2   GO FIRST, AND SO WE WILL BEGIN WITH MR. ALIBHAI.

3               MR. ALIBHAI?

4               MR. ALIBHAI:  THANK YOU, YOUR HONOR.  MAY

5   IT PLEASE THE COURT.

6               THE COURT:  YES.

7               MR. ALIBHAI:  LADIES AND GENTLEMEN OF THE

8   JURY, LIE, CHEAT, AND STEAL, THOSE ARE THE CONCEPTS THAT

9   WE'RE TAUGHT AS YOUNG CHILDREN ARE NOT PROPER TYPES OF

10  BEHAVIOR AS HUMAN BEINGS.  THOSE ARE THE CONCEPTS THAT

11  WE'RE TAUGHT THAT MORAL PEOPLE DON'T DO.  AND WHETHER

12  YOU LEARN IT IN KINDERGARTEN OR SUNDAY SCHOOL OR FROM

13  YOUR PARENTS OR FROM SOMEBODY ELSE, WHAT YOU'VE SEEN

14  OVER THE LAST FEW WEEKS IS THAT IN 2004, INTERSIL HAD

15  THE OPPORTUNITY AND ABILITY TO BUY TAOS, LEGALLY, BUT

16  INSTEAD CHOSE TO EMBARK ON A COURSE OF CONDUCT THAT

17  INVOLVED LYING, CHEATING, AND STEALING.

18              WHEN MR. MCCABE STOOD UP HERE THREE WEEKS

19  AGO AND SAID TO YOU, THIS IS A VERY SIMPLE CASE,

20  EVERYTHING YOU NEED TO KNOW ABOUT THIS CASE, YOU LEARNED

21  IN KINDERGARTEN.  AND WHEN YOU LOOK AT THE CONDUCT THAT

22  INTERSIL HAS ENGAGED IN, THOSE SAME RULES THAT I'M

23  TALKING ABOUT THAT APPLY TO EACH OF US AS WE LIVE OUR

24  DAILY LIVES APPLY IN THE BUSINESS WORLD.  WE HEARD THE

25  JUDGE READ THROUGH THE CHARGE AND THE DIFFERENT CAUSES

1    OF ACTION.

2                    LYING.  IF YOU MAKE AN AGREEMENT, YOU HAVE

3    TO STAND BY IT.  YOU DON'T BREAK YOUR WORD.  THAT'S

4    CALLED BREACH OF CONTRACT.

5                    YOU DON'T CHEAT.  YOU DON'T GO TO CUSTOMERS

6    OF SOMEBODY ELSE AND USE STOLEN THINGS TO TRY TO GET

7    THEIR BUSINESS.  IT'S CALLED TORTIOUS INTERFERENCE.

8                    AND YOU CERTAINLY DON'T STEAL.  YOU DON'T

9    MISAPPROPRIATE TAOS'S TRADE SECRETS.  SO, DURING THE

10   COURSE OF THE NEXT HOUR, MR. MCCABE AND I WOULD LIKE TO

11   TALK TO YOU ABOUT THE EVIDENCE THAT YOU'VE HEARD AND SUM

12   IT UP INTO THE IDEAS THAT THE JUDGE TALKED ABOUT WITH

13   THE DIFFERENT CAUSES OF ACTION.

14                   BUT BEFORE I DO THAT, I NEED TO STOP, AND I

15   NEED TO APPRECIATE AND UNDERSTAND THAT THE NINE OF YOU

16   HAVE SAT HERE FOR FOUR WEEKS, DRIVEN ON ICY ROADS,

17   WATCHED IT SNOW, AND TAKEN NOTES AND LISTENED TO THINGS

18   ABOUT DUAL-DIODES AND EXPOSED WELLS AND SHIELDED WELLS

19   AND THE '981 PATENT AND KUIJK AND ALL SORTS OF THINGS,

20   AND YOU'VE DONE IT DILIGENTLY AND YOU'VE DONE IT

21   ATTENTIVELY.  AND FOR THAT, TAOS, MR. LANEY,

22   MR. STRIPPOLI, AND DR. DIERSCHKE THANK YOU.  BECAUSE IN

23   THE AMERICAN JUDICIAL SYSTEM, IT'S A CONSTITUTIONAL

24   RIGHT TO A JURY, BUT IT TAKES EACH OF YOU UPHOLDING YOUR

25   OATH TO BE JURORS AND SITTING HERE AND TAKING TIME FROM

1   EVERYTHING ELSE THAT YOU HAD GOING ON OVER FOUR WEEKS.

2   AND SO WE APPRECIATE THAT.  NOT ONLY DOES TAOS

3   APPRECIATE THAT, MR. MCCABE AND I, MS. CHEN AND

4   MR. WILSON APPRECIATE THAT BECAUSE TAOS DOESN'T GET

5   JUSTICE WITHOUT YOU DECIDING THE FACTS OF THIS CASE.

6            WHEN MR. MCCABE STOOD UP HERE THREE WEEKS

7   AGO, HE STARTED TALKING ABOUT WHAT THE EVIDENCE WILL

8   SHOW, AND I THINK WHAT THE EVIDENCE HAS SHOWN ARE THE

9   THINGS THAT HE TOLD YOU THAT THE EVIDENCE WOULD SHOW.

10  AND IF YOU THINK ABOUT ALL THE EVIDENCE YOU'VE HEARD

11  OVER A PERIOD OF FOUR WEEKS AND YOU PUT IT INTO THESE

12  FIVE BUCKETS, IT WILL HELP YOU ANSWER THE QUESTIONS THAT

13  THE JUDGE ASKED THAT YOU HAVE TO ASK -- ANSWER AT THE

14  END OF THIS CASE.

15           ONE, WHETHER TAOS DEVELOPED TRADE SECRETS

16  AND PATENTED TECHNOLOGY REGARDING AMBIENT LIGHT SENSORS.

17           TWO, WHETHER INTERSIL LEARNED ABOUT THAT

18  INFORMATION OVER THE COURSE OF THE DUE DILIGENCE AND

19  ILLEGALLY KEPT THAT INFORMATION.

20           THREE, WHETHER THEY CREATED A COMPETING

21  AMBIENT LIGHT SENSOR PRODUCT LINE THROUGH THE WRONGFUL

22  USE OR NOT PERMITTED USE OF THOSE TRADE SECRETS AND

23  CONFIDENTIAL INFORMATION.

24           FOUR, WHETHER THEY INFRINGED THE PATENT.

25           AND FIVE, WHETHER THEY USED THAT TO TAKE

1    APPLE IPHONE BUSINESS AWAY.

2             SO LET'S START TALKING ABOUT TAOS AND WHAT

3    IT IS AND WHO IT IS.  TAOS, AS YOU SAW -- AND THIS

4    RELATES TO THE MISAPPROPRIATION CLAIM IN WHICH YOU MUST

5    SHOW THAT A TRADE SECRET EXISTS, THAT IT WAS ACQUIRED

6    THROUGH A CONFIDENTIAL RELATIONSHIP, THERE WAS A

7    CONFIDENTIALITY AGREEMENT HERE.  THAT'S HOW THEY FOUND

8    OUT OUR TRADE SECRETS.  WE GAVE THEM TO THEM UNDER A

9    CONFIDENTIALITY AGREEMENT.  THEY USED THOSE TRADE

10   SECRETS FOR THEIR OWN PURPOSES, AND IT CAUSED DAMAGE TO

11   THE PLAINTIFF.

12            ON THE CONTRACT SIDE, THERE'S A CONTRACT,

13   WHICH IS THE CONFIDENTIALITY AGREEMENT THAT EXISTS.  THE

14   PLAINTIFF DID WHAT IT WAS SUPPOSED TO DO UNDER THE

15   CONTRACT AND GAVE THEM INFORMATION AND ENTERED INTO DUE

16   DILIGENCE WITH THEM.  AND THAT THE DEFENDANT DID

17   SOMETHING THAT THE CONTRACT PROHIBITED IT FROM DOING.

18   WE'RE GOING TO TALK ABOUT PERMITTED USE A LOT TODAY,

19   WHICH IS A PROVISION OF THE CONTRACT.  AND THAT THE

20   PLAINTIFF WAS HARMED BY THAT.

21            SO YOU'VE HEARD ABOUT TAOS, AND YOU'VE

22   HEARD HOW TAOS WAS CREATED IN 1999 BY MR. LANEY AND

23   MR. STRIPPOLI AND DR. DIERSCHKE AND A NUMBER OF

24   INDIVIDUALS, AND THESE PEOPLE, IF YOU THINK ABOUT THEIR

25   EXPERIENCE, WHEN YOU LISTEN TO MR. LANEY AND

1    MR. STRIPPOLI AND DR. DIERSCHKE, JUST THREE OF THE

2    PEOPLE WHO WERE FOUNDERS, THEY HAVE OVER A HUNDRED YEARS

3    OF EXPERIENCE WITH OPTOELECTRONIC DEVICES.  THEY'VE

4    DEVOTED THEIR LIVES TO SEMICONDUCTOR CHIPS THAT SENSE

5    LIGHT.

6              AND THESE PEOPLE FOUNDED THIS COMPANY AFTER

7    THEY LEFT T.I. AND GOT A PATENT ON AN IDEA THAT THEY

8    CAME UP WITH FOR AN AMBIENT LIGHT SENSOR, AND THAT WAS

9    IN JANUARY OF 2002.  THEY WORKED ON A PRODUCT, AND THEY

10   RELEASED THE 2550 IN AUGUST OF 2002, AND THEN YOU SEE

11   THAT IT TAKES A LONG TIME FOR THEM TO MAKE IMPROVEMENTS

12   TO IT, MAKE IT BETTER, AND CREATE THE NEXT VERSION OF

13   THAT, WHICH WAS THE 2560, WHICH WASN'T RELEASED UNTIL

14   2005, AFTER THE DUE DILIGENCE WITH INTERSIL.

15             SO, THE '981 PATENT, WE CERTAINLY HEARD A

16   LOT ABOUT THAT.  THE FIRST DUAL-DIODE AMBIENT LIGHT

17   SENSOR WAS THE 2550.  THE SECOND ONE WAS THE 2560, WHICH

18   APPROXIMATES A HUMAN EYE RESPONSE TO CHANGE THE WAY THAT

19   THE PHONE REACTS IN THE DISPLAY OR THE TABLET OR A

20   MONITOR OR COMPUTER.

21             AND HOW DID INTERSIL AND TAOS MEET?  YOU

22   HEARD MR. MAHESWARAN SAY, WELL, WE READ ABOUT THEM IN

23   SOME BOOK.  THAT'S NOT HOW THEY MET.  THE FIRST TIME

24   THEY MET WAS FEBRUARY OF 2004.  INTERSIL CAME TO TAOS

25   AND SAID, WE WANT TO PAY YOU A ROYALTY PAYMENT.  WE WANT

1    TO PAY YOU TO USE YOUR TECHNOLOGY.  YOU HEARD MR. TOKOS

2    TESTIFY.  WE THOUGHT THAT WE WERE DOING SOMETHING.  WE

3    WOULD HAVE ASKED THEM FOR A LICENSE.  THEY DID.

4    FEBRUARY OF 2004, THEY ASKED FOR A LICENSE.  MR. LANEY

5    SAYS, I CAN'T DO THAT.  THIS COMPANY IS 50 TIMES THE

6    SIZE WE ARE.  WE'VE CREATED THIS REVOLUTIONARY PRODUCT.

7    NOBODY HAS IT.  WE CAN'T GIVE IT TO SOMEBODY WHO'S MUCH

8    BIGGER THAN US.  IT WOULD PUT US OUT OF BUSINESS.  AND

9    SO HE SAID, NO.

10           THEN THEY COME BACK LATER, AND THEY SAY,

11   LET'S HAVE DUE DILIGENCE TALKS.  WE'LL JUST BUY YOUR

12   WHOLE COMPANY.  AND SO THAT TAKES US TO THE JUNE, 2004,

13   CONFIDENTIALITY AGREEMENT.  AND WHAT THE CONFIDENTIALITY

14   AGREEMENT SAYS IS THAT INFORMATION ABOUT TAOS'S

15   PROPERTIES, EMPLOYEES, FINANCES, BUSINESS, AND

16   OPERATIONS, IT LISTS ALL THOSE THINGS OUT.  INFORMATION

17   RELATING TO OUR BUSINESS AND OPERATION, THAT'S

18   CONFIDENTIAL INFORMATION.

19           WHEN YOU HEAR, THROUGHOUT THE COURSE OF THE

20   DAY TODAY, WHETHER SOMETHING WAS CONFIDENTIAL OR NOT

21   CONFIDENTIAL, THIS DOCUMENT TELLS YOU WHETHER IT'S

22   CONFIDENTIAL OR NOT, THAT DEFINITION, PROPERTIES,

23   EMPLOYEES, FINANCES, BUSINESSES, AND OPERATIONS.  YOU

24   WILL HEAR, OVER THE COURSE OF THE NEXT HOUR, THE TYPES

25   OF INFORMATION, AND YOU'VE CERTAINLY HEARD OVER THE

1   PERIOD OF WEEKS, OF INFORMATION THAT TAOS GAVE TO

2   INTERSIL THAT WAS CONFIDENTIAL.

3                  AND THERE WAS ONE AND ONLY ONE THING THAT

4   INTERSIL COULD DO WITH THAT INFORMATION.  IT'S CALLED A

5   PERMITTED USE, AND IT'S TO -- SOLELY FOR THE LIMITED

6   PURPOSE OF ENABLING INTERSIL TO INVESTIGATE AND EVALUATE

7   THE BUSINESS AND FINANCIAL CONDITION OF THE OTHER IN

8   CONNECTION WITH SUCH DISCUSSIONS AND NEGOTIATIONS.

9                  THEY'RE TRYING TO BUY US.  THEY WANT TO

10  KNOW WHAT WE DO, HOW WE DO IT, AND WHETHER WE MAKE MONEY

11  DOING IT.  IF WE DON'T GIVE THEM THAT INFORMATION, THEY

12  CAN'T MAKE THE DECISION AS TO WHETHER TO BUY US AND HOW

13  MUCH TO PAY FOR US.  AND IF SOMEBODY STANDS UP HERE AND

14  SAYS THAT MR. LANEY GAVE US TOO MUCH INFORMATION, WELL,

15  ONE, THEY ASKED FOR IT, NUMBER TWO, WAS THERE SOMETHING

16  WRONG WITH MR. LANEY RELYING ON THIS AGREEMENT?  THEY

17  SAID THEY'D USE THE INFORMATION FOR ONE PURPOSE.  IS IT

18  HIS FAULT THAT THEY DIDN'T DO THAT?

19                 AND FINALLY, THEY'RE NOT ALLOWED TO RETAIN

20  CONFIDENTIAL INFORMATION.  AS YOU HEARD WHEN THE JUDGE

21  READ THE JURY INSTRUCTIONS, THE COURT HAS ALREADY FOUND

22  THAT AS A MATTER OF LAW, INTERSIL BREACHED THE

23  CONFIDENTIAL INFORMATION BY RETAINING DOCUMENTS.  NOW,

24  WHEN WE TALK ABOUT PERMITTED USE AND RETENTION AND

25  CONFIDENTIALITY, SOME OF YOU MAY REMEMBER THAT I SPOKE

1    TO YOU WHEN YOU WERE PANEL MEMBERS AND SITTING BACK

2    HERE, AND I TALKED ABOUT AN EXAMPLE.  AND THE EXAMPLE

3    THAT I THINK OF WHEN I THINK ABOUT PERMITTED USE IS

4    CHICK-FIL-A BECAUSE WE HAD CHICK-FIL-A FOR LUNCH TODAY.

5    SO, CHICK-FIL-A DOESN'T SELL HAMBURGERS, DOESN'T HAVE

6    ANY, JUST DOESN'T HAVE THEM.  AND THEY SAY, WELL, WE

7    WANT TO START MAKING BURGERS.  GREAT.  IT'S A MIRACLE.

8    YOU WANT TO MAKE SOMETHING?  GO OUT THERE AND MAKE IT.

9              BUT THEY GO TO MCDONALD'S AND SAY, HEY,

10   WHAT KIND OF BURGERS DO YOU HAVE?  AND WHAT TYPE OF

11   THINGS DO YOU USE?  AND WHAT'S THE SECRET SAUCE?  AND

12   MCDONALD'S TELLS THEM BECAUSE THEY SAY, WE'RE GOING TO

13   BUY MCDONALD'S.  THEN THEY DECIDE, NOPE, WE'RE NOT GOING

14   TO BUY MCDONALD'S.  WE'RE JUST GOING TO MAKE THE BURGERS

15   THAT MCDONALD'S MAKES AND WE'RE GOING USE THE SECRET

16   SAUCE.  THAT'S NOT A PERMITTED USE.  THE PERMITTED USE

17   DOESN'T LET YOU BUILD YOUR OWN PRODUCTS USING OUR

18   INFORMATION.  THE PERMITTED USE DOESN'T LET YOU USE

19   CONFIDENTIAL INFORMATION FOR YOUR OWN BENEFIT.  IT'S TO

20   MAKE AN OFFER.  AND YOU HAVE TO DECIDE WHETHER THEY MADE

21   AN OFFER.

22             SO THIS STARTS OFF WITH A MEETING THAT

23   OCCURS IN CALIFORNIA ON JUNE 8TH OF 2004.  IT'S THE

24   FIRST MEETING BETWEEN THE TWO COMPANIES.  AND THIS IS

25   PLAINTIFF'S EXHIBIT 52.  TAOS MAKES A LONG CORPORATE

1  PRESENTATION ABOUT ITS COMPANY, ABOUT ITS FINANCES,

2  ABOUT ITS PRODUCTS.  ONE OF THE THINGS IT SPECIFICALLY

3  TALKED ABOUT WAS THE 2560.  THAT'S WHAT THE LITTLE

4  PRODUCT LOOKS LIKE.  I DON'T THINK YOU EVER SAW ONE, BUT

5  THAT'S HOW TINY THEY ARE.  THEY FIT ON A PENNY.  THAT'S

6  A LITTLE AMBIENT LIGHT SENSOR.

7                  FIRST MEETING, JUNE 8, 2004, TAOS TELLS

8  INTERSIL WE'RE WORKING ON OUR SECOND GENERATION, 2560/61

9  AMBIENT LIGHT SENSOR.  AND WHO SITS IN ON THAT MEETING?

10 A NUMBER OF PEOPLE, INCLUDING BRIAN NORTH WHO HAS

11 ENGINEERING EXPERIENCE.  IN FACT, THE TESTIMONY YOU

12 HEARD WAS HE WAS THE ONLY PERSON WITH ENGINEERING

13 EXPERIENCE ON THAT DUE DILIGENCE TEAM.

14                 AND WHAT DOES HE SAY AFTER THAT MEETING?

15 AND THIS IS VERY IMPORTANT BECAUSE YOU'RE GOING TO

16 HEAR -- YOU'RE GOING TO HEAR SOME EVIDENCE TODAY OR

17 CONCEPTS TODAY ABOUT WHAT INTERSIL HAD BEFORE THEY MET

18 US AND WHAT THEY DIDN'T HAVE.  HERE'S THE PERSON WHO

19 WORKED ON THE ONLY AMBIENT LIGHT SENSOR THAT INTERSIL'S

20 EXPERT CALLED, "HORRIBLE," THAT THEIR DESIGN ENGINEER

21 CALLED, "NOT VERY GOOD."  THAT PERSON, ONE DAY AFTER THE

22 MEETING, SAYS, WE HAVE IMPLEMENTED THE FUNCTION IN A

23 DIFFERENT WAY."  HE DIDN'T SAY, WE HAVE THE SAME

24 PRODUCT.  HE DIDN'T SAY, THAT'S THE WAY WE DO IT.  "WE

25 HAVE IMPLEMENTED THE FUNCTION IN A DIFFERENT WAY."

1           THIS IS ONE OF THE MOST TELLING E-MAILS IN

2   THIS ENTIRE CASE.  IT IS PLAINTIFF'S EXHIBIT 65.  IT IS

3   A TRUE STATEMENT OF WHAT BRIAN NORTH THOUGHT ON JUNE 9,

4   2004.  WHEN YOU HEAR THE EVIDENCE AND YOU HEAR ME TALK

5   ABOUT OR HEAR ANYONE STAND UP HERE AND TALK ABOUT IT,

6   THINK ABOUT WHAT THE EVIDENCE SAID BACK THEN, NOT WHAT

7   I'M TELLING YOU TODAY, NOT WHAT MR. MCCABE OR

8   MR. BRAGALONE TELLS YOU.  WHAT WAS THE EVIDENCE BACK

9   THEN?  BECAUSE E-MAILS DON'T LIE.

10          THE NEXT THING HE SAYS IS, THEIR PORTFOLIO

11  IS EXACTLY THE SAME GROUP OF PRODUCTS THAT I WOULD

12  SUGGEST WE BUILD, NOT THAT WE HAVE, SUGGEST WE BUILD.

13  THEY DIDN'T HAVE THEM.  AND THEY THOUGHT OURS WAS PRETTY

14  CUTE.

15          WHAT HAPPENS THEN, WHEN MR. NORTH COMES

16  HERE TO TESTIFY?  WE ASKED HIM ABOUT THIS MEETING, AND

17  HE SAYS, WELL, I DON'T REMEMBER IF I WENT TO THIS

18  MEETING.  I THINK I LOOKED IT UP ON DATA SHEETS AND

19  ONLINE.  FINE.  WHY DID HE PRETEND NOT TO KNOW ABOUT THE

20  MEETING?  WHY DID HE PRETEND, AFTER HE WAS ASKED FOR HIS

21  COMMENTS FROM THE MEETING AND HE WROTE AN E-MAIL SAYING,

22  HERE'S THE THINGS THAT I LEARNED ABOUT THE MEETING, THAT

23  HE WOULD COME HERE AND SAY, OH, DATA SHEET SAID, AND

24  ONLINE?  BECAUSE YOU'RE GOING TO HEAR A LOT OF ARGUMENT

25  BY INTERSIL ABOUT, OH, THE INFORMATION WAS PUBLIC, IT'S

1    NOT CONFIDENTIAL, DON'T WORRY ABOUT IT.  NONE OF THIS IS

2    CONFIDENTIAL.

3              SO, THEY HAD A WITNESS SAY, I LOOKED IT UP

4    ONLINE.  WELL, THAT'S NOT WHAT HE TESTIFIED TO.  WHEN I

5    DEPOSED HIM, I SAID, DO YOU REMEMBER WHERE YOU LEARNED

6    ABOUT TAOS'S IP?  AND HE SAID, I THOUGHT IT WAS DURING A

7    VISIT TO TEXAS.  AND THEN HE SAID, "BUT I MUST HAVE

8    LEARNED ABOUT IT BEFORE."  "DO YOU REMEMBER HOW YOU

9    LEARNED OF IT?"  IT'S CERTAINLY FROM DISCLOSING IT TO

10   US."  SO, MR. NORTH ADMITTED THAT HE WAS GIVEN

11   INFORMATION FROM TAOS ABOUT THEIR IP AND THEIR PRODUCTS,

12   AND HE MADE DECISIONS ABOUT, THAT'S THE TYPE OF THINGS

13   THAT WE SHOULD DEVELOP, AND THAT'S THE THINGS THAT WE

14   DON'T DO IN THE SAME WAY.  THIS LINE NUMBER 1 OF

15   MR. NORTH'S TESTIMONY ABOUT WHERE HE GOT THIS

16   INFORMATION FROM.

17             INTERSIL THOUGHT THAT TAOS'S IP WAS VERY

18   COOL.  THIS IS ANOTHER PERSON WHO SAT IN AT THAT

19   MEETING.  THE NEXT PERSON SAID, REALLY COOL, PRETTY

20   CLEVER.  NOTICE HOW NONE OF THE PEOPLE SITTING IN ON THE

21   MEETING ARE SAYING, WE DO THIS, WE DO IT THE SAME WAY,

22   OR WE HAVE AN ENTIRE LINE OF PRODUCTS JUST LIKE THAT.

23   THEY THINK OUR STUFF'S PRETTY COOL AND IT'S CLEVER.

24             AND SO WHAT HAPPENS IS THAT INTERSIL

25   REALIZES THAT THERE'S AN ISSUE ABOUT HOW LONG YOU CAN

1   GET TO MARKET, AND TAOS HAS A HEAD START.  TAOS ALREADY

2   HAS PRODUCTS.  AS MR. MAHESWARAN TESTIFIED, "THEY WERE

3   FURTHER AHEAD THAN US FOR SURE."  AND DID THEY TELL TAOS

4   ANY OF THIS?  MR. LANEY TESTIFIED THAT HE DID NOT

5   CONSIDER INTERSIL TO BE A COMPETITOR AND THAT IF HE HAD

6   KNOWN THEY WERE COMPETITORS, HE WOULDN'T HAVE SPOKEN

7   WITH THEM.  HE WOULDN'T HAVE GIVEN THEM THIS

8   INFORMATION.

9            "DID ANYBODY SPEAK UP AND SAY THAT THEY

10  WERE WORKING TO DEVELOP AT INTERSIL A DIGITAL AMBIENT

11  LIGHT SENSOR?"  "NO."  WELL, THERE WAS ONLY ONE PERSON

12  THAT HAD DESIGNED A LIGHT SENSOR BEFORE THAT, MR. NORTH,

13  THE HORRIBLE ONE.  DID HE SAY THAT HE TOLD HIM?  "I

14  DON'T REMEMBER IF WE DISCLOSED THAT OR NOT."  LIE NUMBER

15  TWO.  KEEP FROM TAOS INFORMATION ABOUT HOW YOU'RE GOING

16  TO BE A COMPETITOR AND YOU'RE GOING TO TRY TO DO

17  SOMETHING JUST LIKE TAOS IS DOING AND SHOWING YOU.

18            AND WHAT'S THE PROBLEM WITH THIS?  THE ONE

19  GUY WHO'S DESIGNING IS THE SAME GUY WHO'S DOING THE DUE

20  DILIGENCE.  YOU HEARD MR. MCALEXANDER TESTIFY THAT IT IS

21  EASIER TO MISAPPROPRIATE TRADE SECRETS IF THE SAME

22  PERSON IS DOING THE SAME FUNCTION.  HOW DO YOU DO THAT?

23  IT'S CALLED A CLEAN ROOM.  YOU HAVE ONE PERSON WHO'S ON

24  THE DESIGN TEAM AND A SEPARATE TEAM THAT DOES THE DUE

25  DILIGENCE.  THAT WAY, THERE'S NO QUESTION THAT THOSE

1   PEOPLE WHO ARE DOING THE DESIGN DIDN'T LEARN TAOS'S

2   INFORMATION.  HERE, THE ONE PERSON WORKING ON THE DESIGN

3   OF THE PHOTODETECTOR LAYOUT KNEW TAOS'S INFORMATION.

4             TWO OTHER INDIVIDUALS CONTINUE TO DO TAOS'S

5   DUE DILIGENCE, RAJEEVA LAHRI, THE CHIEF TECHNOLOGY

6   OFFICER, AND BRIAN NORTH, THE DESIGN DIRECTOR.  THEY

7   HAVE A CALL WITH CECIL ASWELL.  HE'S ONE OF THE

8   INVENTORS OF THE '981 PATENT, AND HE'S ALSO ONE OF THE

9   ENGINEERS AT TAOS, AND HE'S GIVING THEM TECHNICAL

10  INFORMATION ABOUT PHOTODIODES, SPEED, STRUCTURES,

11  EFFICIENCY, ABSORPTION DEPTH, CARRIER LIFETIMES.  THIS

12  IS TECHNICAL INFORMATION.  THIS IS AN HOUR AND 15 MINUTE

13  CALL ABOUT HOW OUR PRODUCTS WORK.  WHAT DOES BRIAN NORTH

14  SAY ABOUT THIS?  I DON'T REMEMBER THIS CALL.  HE'S

15  LISTED THERE.

16            THEN THEY COME TO TEXAS.  AND THEY HAVE AN

17  IN-DEPTH, FULL-DAY MEETING.  THEY LEARN ABOUT OUR

18  TECHNICAL TRADE SECRETS, THEY LEARN ABOUT OUR PATENTS,

19  AND THEY LEARN ABOUT OUR FINANCIAL INFORMATION.  AND

20  I'LL TALK ABOUT A COUPLE OF THOSE THAT WE'VE ALREADY

21  TALKED ABOUT OVER THE COURSE OF THE WEEKS.

22            MR. STRIPPOLI TESTIFIED THAT THEY TOLD HIM

23  ABOUT THE 2561 CHIPSCALE PACKAGE, A NEW PRODUCT THAT HAD

24  NOT BEEN RELEASED YET, AND THEN THE MONSTER SPREADSHEET.

25  YOU'RE GOING TO HEAR ABOUT WHETHER TAOS DISCLOSED

1    CONFIDENTIAL FINANCIAL INFORMATION.  THIS EXHIBIT,

2    PLAINTIFF'S EXHIBIT 94 -- IS THAT SITTING THERE?  IT'S

3    300 PAGES.  IF YOU HAVE ANY QUESTION ABOUT WHETHER TAOS

4    DISCLOSED CONFIDENTIAL FINANCIAL INFORMATION,

5    PLAINTIFF'S EXHIBIT 94 IS THE EXHIBIT THAT HAS THAT

6    INFORMATION.  NOT ONLY DID IT SHOW INFORMATION IN THAT

7    SPREADSHEET TO INTERSIL, INTERSIL REQUESTED A COPY OF

8    THE SPREADSHEET AND IT WAS FORWARDED TO THEM AT THEIR

9    REQUEST.  THEY WANTED THIS INFORMATION.

10             AND MR. LANEY TESTIFIED, THIS EFFECTIVELY

11   TELLS ONE IN THE SEMICONDUCTOR INDUSTRY EVERY COMPONENT

12   THAT MAKES UP THE COST OF THE PRODUCT, INCLUDING

13   PACKAGING.

14             NOW, THIS PRODUCT, THE 2560, IF IT'S

15   SOMETHING THAT'S NOT YET RELEASED, DR. TURNER WHO SHOWED

16   UP HERE AND TESTIFIED, WHO HAD JOINED INTERSIL IN 2012,

17   HAD NO INVOLVEMENT IN THE DUE DILIGENCE, EVEN HE SAYS,

18   IT HAS VALUE IF YOU TELL SOMEBODY ABOUT THE PRODUCT THAT

19   HASN'T YET COME OUT.

20             SO, DURING THAT MEETING, TAOS DISCLOSED

21   DETAILS OF THE SECOND GENERATION AMBIENT LIGHT SENSOR.

22   YOU'VE SEEN THIS PICTURE BEFORE, THE STRUCTURE AND THE

23   DISCUSSION THAT OCCURRED AT THAT MEETING.  MR. LANEY

24   TESTIFIED ABOUT THAT MEETING.  DR. DIERSCHKE TESTIFIED

25   ABOUT THAT MEETING, AND DR. DIERSCHKE TESTIFIED

1  SPECIFICALLY THAT DURING THAT MEETING, WHEN HE LOOKED AT

2  THIS SLIDE, THERE WAS DISCUSSION ABOUT THAT PRODUCT AND

3  THAT THERE WERE -- AND THAT PRODUCT HAD NOT YET BEEN

4  RELEASED AND THAT THERE WERE A NUMBER OF QUESTIONS AND

5  INCLUDING ABOUT THE PHOTODIODE ITSELF.

6              AND THEN WHEN YOU WERE SITTING HERE IN

7  TRIAL, DR. DIERSCHKE DREW ON THIS WHITEBOARD, A DIAGRAM

8  OF WHAT THE 2550 PHOTODETECTOR LOOKED LIKE, AND HE ALSO

9  DREW WHAT THE 2560 LOOKED LIKE AND HE TESTIFIED THAT HE

10 SAW CECIL ASWELL DRAW A SIMILAR PICTURE OF THE 2560

11 DURING THE MEETING.  MR. LANEY TESTIFIED THAT THERE WAS

12 INFORMATION GIVEN BY MR. ASWELL ABOUT THE 2560 AND THE

13 PHOTODIODE STRUCTURE.

14             NOW, MR. MAHESWARAN, WHO NOW WORKS AT

15 SEMTECH, SAID TO YOU THAT HE COULDN'T TELL YOU ABOUT

16 CONFIDENTIAL PRODUCTS OF HIS NEW COMPANY BECAUSE THE

17 PRODUCTS YOU'RE GOING TO OFFER IN THE FUTURE ARE

18 CONFIDENTIAL TO A COMPANY.

19             AND EVEN DR. TURNER SAID, THINGS THAT ARE

20 GOING INTO THE DESIGN OF A PRODUCT, THINGS OF A

21 TECHNICAL NATURE ARE TRADE SECRET, SO, FINANCIAL

22 INFORMATION, TECHNICAL INFORMATION, THINGS ABOUT A

23 PRODUCT NOT YET RELEASED.

24             SO THEN AFTER THE JUNE 17TH MEETING,

25 BROADVIEW, THE TOP E-MAIL, ASKED MR. LANEY TO FORWARD

1   THE INFORMATION FROM THOSE MEETINGS.  NOW, IF IT'S ALL

2   PUBLIC AND IT DOESN'T REALLY MATTER, WHY WOULD YOU WANT

3   A COPY?  SO, HE SAYS, I WANT YOU TO FORWARD IT.  AND SO,

4   MR. LANEY FORWARDS THAT INFORMATION PER THEIR REQUEST,

5   AND DUNCAN WEAVER SENDS IT AROUND TO THAT ENTIRE TEAM,

6   INCLUDING MR. LAHRI AND MR. TOKOS.  HE SAYS, "ATTACHED

7   ARE THE SLIDES FROM LAST WEEK'S MEETING WITH TITAN.

8   PLEASE KEEP IN MIND THAT THIS MATERIAL HAS BEEN PROVIDED

9   PURSUANT TO A NONDISCLOSURE AGREEMENT BETWEEN INTERSIL

10  AND TITAN."  HE TOLD EVERYBODY IN JUNE OF 2004,

11  INCLUDING MR. LAHRI AND MR. TOKOS, THAT THIS INFORMATION

12  WAS PRODUCED PURSUANT TO CONFIDENTIALITY AGREEMENT

13  BETWEEN INTERSIL AND TAOS.

14               LIE NUMBER 3 COMING UP.  "SO YOU WEREN'T

15  AWARE OF AN NDA BETWEEN INTERSIL AND TAOS?"  "I WAS NOT

16  AWARE OF IT."  MR. LAHRI.

17               MR. TOKOS:  "MR. BALOG AND I WERE NOT AWARE

18  AT THE TIME OF THE DOCUMENT THAT YOU HAVE SHOWN, THE

19  NDA."  HE'S COPIED ON AN E-MAIL THAT SAYS THERE'S AN NDA

20  BETWEEN THE COMPANIES IN JUNE OF 2004.  THEN HE

21  TESTIFIES UNDER OATH THAT HE DIDN'T KNOW ABOUT IT.  AND

22  WHEN MR. MAHESWARAN WAS ASKED ABOUT IT, HE SAID IT WOULD

23  SURPRISE HIM THAT MR. LAHRI AND MR. TOKOS WOULD TESTIFY

24  UNDER OATH THAT THEY DID NOT KNOW.  AND SO AFTER ALL

25  THAT DUE DILIGENCE, INTERSIL MAKES A PROPOSED OFFER OF

1    $30 MILLION, AND IT LOOKS LIKE THIS.

2              SO WHEN YOU GET A CHANCE, LOOK AT

3    PLAINTIFF'S EXHIBIT 103, AND LOOK AT, IF YOU CAN SELL

4    YOUR COMPANY FOR $30 MILLION ON A DOCUMENT THAT SAYS, ON

5    INTERSIL LETTERHEAD THAT'S NOT AN INTERSIL LETTERHEAD,

6    AND LOOK AT WHETHER A DOCUMENT THAT'S NOT EVEN SIGNED

7    LOOKS LIKE AN OFFER TO YOU.  MR. MCCABE'S GOING TO TALK

8    ABOUT WHAT HAPPENED AFTER THIS OFFER AND COUNTEROFFER.

9              MR. MCCABE:  GOOD AFTERNOON.  LIKE

10   MR. ALIBHAI, I WANT TO THANK YOU FOR BEING HERE, ACTING

11   AS JURORS IN THIS CASE, BECAUSE IT IS IMPORTANT TO TAOS.

12             WHAT HAPPENED AFTER THIS OFFER WAS MADE?

13   THERE WAS A SLIDE IN MR. BRAGALONE'S PRESENTATION THAT

14   STRUCK US.  IT'S THIS TOOLBOX SLIDE.  WHAT DO YOU HAVE

15   IN YOUR TOOLBOX?  I THINK MR. BRAGALONE TOLD YOU THAT HE

16   OFTEN IS TEMPTED TO BUY TOOLS, LOTS OF TOOLS, AND

17   SOMETIMES HE DOESN'T, OFTEN HE DOESN'T, BECAUSE HE

18   ALREADY HAS THEM.  I THINK, ACTUALLY, HIS TESTIMONY WAS,

19   SOMETIMES HIS WIFE STOPS HIM FROM BUYING AND SAYS, YOU

20   ALREADY HAVE THIS.

21             SO ONE OF THE QUESTIONS THAT COMES UP IN

22   THIS CASE HAS TO DO WITH THE VALUE THAT INTERSIL PLACED

23   ON TAOS.  THE EVIDENCE SHOWS THAT THE VALUE THAT

24   INTERSIL PLACED ON TAOS WAS 35 TO $45 MILLION.  THAT WAS

25   BY THEIR BOARD OF DIRECTORS.  THEY SAID, THIS DEAL WOULD

1   BE WORTH 35 TO $45 MILLION.  SO, WOULD INTERSIL'S

2   BOARD -- WOULD THEY PAY 35 TO $45 MILLION FOR SOMETHING

3   THAT THEY ALREADY HAD?

4               I KNOW ONE PERSON THAT WOULDN'T.  THAT'S MY

5   SON.  HE'S IN THIRD GRADE.  HE TRADES FOOTBALL CARDS.

6   WE USED TO DO BASEBALL CARDS.  HE DOES FOOTBALL CARDS.

7   THE OTHER DAY I WAS PICKING UP THE KITCHEN AND I HEARD

8   HIM TALKING TO HIS FRIEND, AND HE SAID, HEY, I'LL GIVE

9   YOU PEYTON MANNING IF YOU GIVE ME THREE OF THESE GUYS.

10  MY SON SAID, NO, I'VE ALREADY GOT PEYTON MANNING.  YOU

11  DON'T PAY FOR SOMETHING YOU ALREADY HAVE.  THEY DID NOT

12  HAVE AMBIENT LIGHT SENSORS, AND WE KNOW THEY DIDN'T

13  BECAUSE MR. MAHESWARAN TOLD US THAT.  MR. ALIBHAI ASKED

14  HIM ON CROSS-EXAMINATION.

15              THE PRODUCTS, WOULD YOU PAY FOR PRODUCTS

16  THAT YOU ALREADY HAVE?  YOU WOULDN'T.  MR. MAHESWARAN

17  SAID, THAT'S CORRECT, I WOULDN'T.  IF THEY'RE NOT GOING

18  TO PAY FOR PRODUCTS THEY ALREADY HAVE, THEY DIDN'T HAVE

19  AMBIENT LIGHT SENSORS.

20              THEIR ENTIRE DEFENSE COMES DOWN TO THEIR

21  CLAIM THAT THEY HAD THIS PRODUCT IN DEVELOPMENT, THIS

22  TECHNOLOGY IN DEVELOPMENT BEFORE THEY MET WITH US.  WHY

23  WOULD THEY OFFER 35 TO $45 MILLION TO BUY OUR COMPANY IF

24  THEY HAD IT?  A THIRD GRADER KNOWS THAT MAKES NO SENSE.

25              SO, WHAT DID THEY DO?  THEY GOT THE

1   INFORMATION, AND THEY CONDUCTED A BUILD VERSUS BUY

2   ANALYSIS.  IT'S ALL OVER THE DOCUMENTS.  IT'S ALL OVER

3   THE TESTIMONY.  I'M GOING TO SHOW YOU A COUPLE.  THIS IS

4   A JEFFRIES DOCUMENT.  IT'S PLAINTIFF'S 116.  YOU'RE

5   GOING TO SEE IT IN THE EXHIBITS BACK THERE IF YOU CARE

6   TO LOOK AT IT.

7              RIGHT THERE, IT SAYS, HERE'S WHAT HAPPENED,

8   MR. LANEY'S COUNTERPROPOSAL CAUSED INTERSIL TO RETHINK

9   ITS POSITION.  THEY LOOK AT IT, IT'S CUTE, IT'S COOL,

10  IT'S SO INTERESTING, WE COULD DO THIS, IT COULD AFFECT

11  SO MANY BACKLIGHT DISPLAYS.  THEY CONDUCT IN JEFFRIES

12  REPORTS A BUILD VERSUS BUY ANALYSIS RELATED TO THE

13  PRODUCTS.  MOHAN MAHESWARAN, RAJEEVA LAHRI, THE CTO,

14  WERE SPEARHEADING IT, AND THEY WERE WORKING TO BETTER

15  UNDERSTAND THE DESIGN AND PACKAGING/THE SECRET SAUCE.

16  THAT'S WHAT THEY WERE USING TO CONDUCT THE BUILD VERSUS

17  BUY ANALYSIS.

18              DUNCAN WEAVER WROTE IN HIS OWN E-MAIL,

19  "WE'RE SUGGESTING INPUT FROM OUR CTO CONCERNING AN

20  INTERNALLY GROWN OPTO PROGRAM."  AND HERE IT IS.

21  RAJEEVA LAHRI, JULY 4TH, 7:40 P.M. I DON'T REMEMBER THAT

22  DATE, I DON'T REMEMBER THAT TIME, BUT I KNOW WHAT I WAS

23  DOING ON JULY 4TH AT 7:40 P.M., AND IT WAS NOT WRITING

24  E-MAILS ABOUT WHAT ANOTHER COMPANY'S SECRET SAUCE WAS.

25  BUT THAT'S WHAT MR. LAHRI WAS DOING.

1           AND HE ASKS, YOU'VE SEEN THIS, THIS IS THE

2  MONSTER SPREADSHEET, AND YOU'VE HEARD INTERSIL'S LAWYERS

3  REPEATEDLY ATTACK MR. LANEY ON THE BASIS THAT HE DID NOT

4  PROVIDE ANY PACKAGING COST INFORMATION TO INTERSIL

5  DURING THE DUE DILIGENCE.  HERE IS THE JULY 6TH E-MAIL.

6  DENNIS FOSTER WRITES, HERE IS AN EXAMPLE OF SOME GENERAL

7  PACKAGING COST RANGES, AND HE PROVIDES THIS INFORMATION

8  HERE.  AND THERE'S BEEN TESTIMONY AND MR. LANEY HAD TO

9  SUFFER THROUGH CROSS-EXAMINATION ABOUT, THAT DOESN'T

10 SHOW THIS, AND THAT DOESN'T SHOW THIS.

11          MAY I APPROACH, YOUR HONOR, THE BOARD?

12          THE COURT:  YES.

13          MR. MCCABE:  YOU CAN SEE IT.  IT'S A MATCH.

14 AOSOIC, SOIC.  ASSEMBLY AND TEST 105.  ASSEMBLE AND TEST

15 COST, 105.  YIELD, 12 TO 21.  12, 11, YOU CAN LOOK AT

16 THIS IN THE DOCUMENT.  IT GOES UP AND DOWN.  OTHER

17 MATERIAL YIELD COSTS, 5 CENTS.  5 CENTS, IT'S RIGHT

18 THERE.  IT'S A MATCH.  THEY TOOK INFORMATION FROM THIS

19 DOCUMENT, THE MONSTER SPREADSHEET, PLAINTIFF'S

20 EXHIBIT 98, 106.  YOU CAN SEE IT RIGHT THERE.  THEY DID

21 IT.  YOU CAN SEE IN THE DOCUMENTS.

22          AND WE KNOW THEY DID IT BECAUSE

23 MR. MAHESWARAN ADMITTED IT, RIGHT HERE IN

24 CROSS-EXAMINATION.  HE SAID, INTERSIL DID A -- HE WAS

25 ASKED ABOUT CONFIDENTIAL INFORMATION.  HE WAS

1  SPECIFICALLY ASKED ABOUT CONFIDENTIAL INFORMATION

2  PROVIDED UNDER THE NDA, AND HE SAID, WE DID A MAKE

3  VERSUS BUY ANALYSIS USING THAT INFORMATION; ISN'T THAT

4  CORRECT?  THAT'S CORRECT.  UH-HUH.  THAT'S NOT

5  PERMITTED.  THE PERMITTED USE IS THEY COULD LOOK AT

6  TAOS'S INFORMATION TO DETERMINE WHETHER THEY WANTED TO

7  BUY TAOS, NOT WHETHER THEY WANTED TO MAKE THEIR OWN

8  PRODUCTS.  BUT THAT'S WHAT THEY DID WITH IT.

9              SO, THE TIME LINE.  WE'VE HEARD A LOT OF

10  TALK ABOUT THE TIME LINE IN THIS CASE, HOW LONG IT TAKES

11  TO PUT SOMETHING TOGETHER.  THIS IS AN IMPORTANT TIME

12  LINE BECAUSE THIS IS INTERSIL'S AMBIENT LIGHT SENSOR

13  DEVELOPMENT TIME LINE.  LET'S TAKE A LOOK, PLEASE, IF WE

14  COULD, AT PLAINTIFF'S EXHIBIT 40, WHICH IS DATED

15  OCTOBER 2, 2003.  YOU'VE SEEN THIS FLOOR PLAN SEVERAL

16  TIMES BEFORE.  THIS WAS THE FLOOR PLAN OF THE EL7900 IN

17  OCTOBER OF 2003, PLAINTIFF'S EXHIBIT 40.

18              THANK YOU.

19              LET'S LOOK AT MR. HOBBS, WHAT THEIR EXPERT

20  WITNESS SAID ABOUT THAT EL7900.  IT WAS A HORRIBLE

21  PHOTOSENSOR.  IT'S HORRIBLE.  ITS INFRARED REJECTION IS

22  HORRIBLE.  THEIR EXPERT SAT ON THE WITNESS STAND AND

23  SAID THAT ABOUT THIS PRODUCT, WHICH APPARENTLY IS WHAT

24  THEY CLAIM WAS IN EXISTENCE BEFORE THEY MET WITH US.  A

25  HORRIBLE PRODUCT.

1          MR. LIN, I'M NOT GOING TO GO INTO HIS

2   TESTIMONY, HE SAID IT WAS BAD AT DOING IR REJECTION.  PX

3   61, PLEASE, RIGHT HERE, ON JUNE 2, 2004, THAT'S THE DATE

4   BEFORE DUE DILIGENCE.  THIS IS THE DATE BEFORE IT

5   BEGINS, THEY HAD 7903 PRODUCT PROPOSAL.

6          THANK YOU.

7          AND MR. NORTH ADMITTED THAT AT THAT TIME,

8   THE DESIGN OF 7903 WAS THE SAME AS THE 7900.  THE DAY

9   BEFORE THEY MET WITH US, THEY HAD THE SAME HORRIBLE

10  DESIGN IN PLACE, 24 HOURS BEFORE THE NONDISCLOSURE

11  AGREEMENT WAS DESIGNED.  WHAT WAS DISCLOSED DURING THE

12  DUE DILIGENCE WAS, IF WE COULD LOOK AT THE PRODUCT

13  DIAGRAM, PLEASE, YOU'VE SEEN THIS.  THIS IS THE

14  INFORMATION THAT WAS DISCLOSED.

15         THANK YOU.

16         AND THEN PX 111, PLAINTIFF'S EXHIBIT 111.

17  8 WEEKS AFTER THE DUE DILIGENCE, THEY HAD A DESIGN

18  REVIEW.  BRIAN NORTH WAS RESPONSIBLE FOR THE

19  PHOTODETECTOR LAYOUT AT THIS DESIGN REVIEW, AND YOU'VE

20  SEEN THIS DOCUMENT BEFORE.  IT'S 8 WEEKS AFTER THE DUE

21  DILIGENCE.  A NEW PHOTODETECTOR LAYOUT DIFFERENT FROM

22  THE 7900 WILL BE USED.  IT HAS THE LIGHT CURRENT CELLS

23  INTERLEAVING THE DARK CURRENT CELLS.  THE RATIO WILL BE

24  1.

25         I THINK MR. NORTH TESTIFIED THAT HE MADE

1   THIS CHANGE BECAUSE OF HIS WORK IN PDIC'S.  HE JOINED IN

2   APRIL OF 2003 AND HE WENT ALL THIS WAY, HAVING IMMERSED

3   HIMSELF IN PDIC'S.  HE WAS SWIMMING IN IT OR SOMETHING

4   LIKE THAT, HE TESTIFIED TO, NEVER MADE THE CHANGE

5   BEFORE.  HE WAS RESPONSIBLE FOR THE 7900.  HE'S DOING

6   ALL THIS.  EIGHT WEEKS AFTER THIS DUE DILIGENCE IS WHEN

7   HE FINALLY MAKES THE CHANGE.  AND YOU CAN SEE, IF YOU

8   LOOK AT THE DESIGN ON AUGUST 31ST, PLEASE.

9             THANK YOU.

10            HE CLAIMS HE RELIED ON THIS PATENT

11  APPLICATION.  THIS, IF YOU FOLLOW THIS, IT TEACHES TO DO

12  SOMETHING DIFFERENT THAN WHAT HE DID.  THIS IS NOT A 1:1

13  RATIO OF EXPOSED TO COVERED WELLS.  IT'S DIFFERENT.  THE

14  LIGHT ONES ARE EXPOSED, THE DARK ONES ARE SHIELDED.

15  IT'S NOT A 1:1 RATIO.  DR. HOBBS ADMITTED THAT.  ITS

16  HONEYCOMB IS NOT WHAT THIS IS.  THIS IS THEIR PRODUCT.

17  THEIRS IS THE CHECKERBOARD.  THAT IS NOT THE SAME THING

18  AT ALL.  THIS PRODUCT DOES NOT DO IR REJECTION.  THEIR

19  EXPERTS ADMITTED TO THAT.  IT DOESN'T DO HUMAN EYE

20  RESPONSE.  THEY COULD NOT HAVE RELIED UPON IT.

21            THE PICTURES IN THE PATENT APPLICATION, THE

22  PATENTS THAT RELATE TO IT, THEY LOOK KIND OF LIKE OURS.

23  THAT'S WHY THEY'RE TRYING TO ON THAT.  THAT'S IT.  IT'S

24  NOT THE SAME TECHNOLOGY, IT'S NOT THE SAME SCIENCE.  IT

25  DOESN'T DO THE SAME THING.  AND IF YOU DO WHAT THESE

1   APPLICATIONS TALK ABOUT, THESE PATENTS TALK ABOUT, YOU

2   WILL NOT GET ANYWHERE CLOSE TO THAT.

3               THANK YOU.

4               SO, JUST QUICKLY, IF WE COULD GO ON HERE,

5   AND I'M NOT GOING TO GO INTO ALL THESE, OKAY?  ONE THAT

6   I DO WANT TO GO INTO, THOUGH, IS 226.  THIS IS JANUARY

7   OF 2005.  THIS IS 6 MONTHS, NOT EVEN, AFTER DUE

8   DILIGENCE IS OVER.  THEY WENT TO INTERSIL AND OFFERED

9   THEM THE 29001 DEVICE, AND THEY CLAIM THAT APPLE WAS

10  REALLY EXCITED ABOUT IT.  THIS IS LESS THAN 6 MONTHS

11  AFTER DUE DILIGENCE.  THEY'VE GOT, NOW, THIS 29001

12  DEVICE, PRESENTING IT TO APPLE.  THEY MADE THE DESIGN

13  CHANGE IN AUGUST.  IT'S NOW JANUARY AND APPLE'S SAYING,

14  WOW, THIS LOOKS REALLY GOOD.  YOU GUYS ARE QUICK.

15              BACK, PLEASE.

16              ENTER THE LIGHT SENSOR MARKET IN 2005.

17  29001 IS RELEASED IN DECEMBER.  29003 IS RELEASED IN

18  JANUARY.  AND THIS IS SO IMPORTANT.  JANUARY 26, 2006,

19  THEY DID A CROSS-SECTIONAL ANALYSIS.  I'D LIKE TO SEE

20  IT.  THEY ARE GOING TO TRY TO ABSOLVE THEMSELVES OF ALL

21  SINS IN THIS CASE BY SAYING THEY DID A CROSS-SECTIONAL

22  ANALYSIS AT THE END OF JANUARY, 2006.  HERE'S THE

23  PROBLEM.  THEY ALREADY RELEASED THE 001 AND THE 003.  IT

24  IS A RED HERRING, AND THEY ARE GOING TO PUT UP ALL THIS

25  DEPOSITION TESTIMONY OF DR. DIERSCHKE AND MR. ASWELL AND

1   THEY'RE GOING TO SAY, TAOS DOES IT.  YOU CAN'T ABSOLVE

2   YOURSELF OF SINS, THOUGH, BY TRYING TO COME BACK AND

3   SAY, WE DID IT AFTER IT WAS ALREADY DONE.

4              HERE'S THE 7900 DEVELOPMENT, 2 YEARS AND

5   3 MONTHS.  THE DUE DILIGENCE IS RIGHT HERE.  THEY TOOK

6   THEM UNTIL JULY TO RELEASE THIS PRODUCT, AND HERE'S THE

7   ENTIRE DEFENSE OF THEIR CASE.  THIS IS MR. TOKOS'S

8   E-MAIL TO KIRK LANEY IN APRIL OF 2006.  HE SAYS, "THE IR

9   CANCELLATION TECHNIQUE WAS DEVELOPED BEFORE WE MET WITH

10  YOU.  IT WAS BASED ON INTERSIL'S OWN EFFORTS WITHOUT

11  MISAPPROPRIATION OF TAOS'S CONFIDENTIAL INFORMATION."

12  I'M GOING TO GO BACK.  HE WROTE THAT.  HERE'S WHERE THE

13  DUE DILIGENCE OCCURRED.  THAT PRODUCT WASN'T RELEASED

14  UNTIL HERE.  THE DESIGN REVIEW DIDN'T OCCUR UNTIL HERE.

15             THE TIME LINE MAKES NO SENSE.  IT'S NOT

16  TRUE.  AND WE KNOW IT'S NOT TRUE BECAUSE MR. LANEY

17  CALLED IT A LIE.  IN HIS DIRECT TESTIMONY, WHEN HE

18  LOOKED AT THAT, HE SAID, IT'S A LIE.  THEY NEVER SHOWED

19  ME ANYTHING THAT COULD CANCEL IR, THEY NEVER TALKED

20  ABOUT IT, THEY NEVER SHOWED ME ANYTHING IN THEIR

21  PORTFOLIO.  IT WAS SOME OF THE STRONGEST TESTIMONY THAT

22  CAME OUT OF HIS MOUTH ON THAT WITNESS STAND.  MR. TOKOS

23  IS SITTING RIGHT THERE.  HE DIDN'T HAVE ANY PROBLEM

24  SAYING THAT.

25             DESIGN REVIEW?  HERE'S THE VISIT TO APPLE,

1   JANUARY 20, FIVE MONTHS.  THEY MADE THE CHANGE ON

2   AUGUST 31ST TO THE 7903 WHICH IS THE 29001.  FIVE MONTHS

3   LATER THEY'RE TALKING TO APPLE ABOUT IT.  THEY'RE AT

4   APPLE'S HEADQUARTERS IN CUPERTINO, CALIFORNIA, AND

5   APPLE'S SAYING, WOW, THIS IS GOOD.  YEAH, IT WAS GOOD.

6   IT WAS OUR PRODUCT.  IT WAS REALLY GOOD.

7                  MR. HOBBS ON THIS WITNESS STAND HERE LAST

8   WEEK SAID, WELL, YOU KNOW, THERE'S COPYING AND THEN

9   THERE'S COPYING.  I DON'T THINK WE TEACH OUR KIDS THAT.

10  THERE'S COPYING.

11                 THOSE TWO PRODUCTS THAT WERE RELEASED

12  BEFORE THE CROSS-SECTIONAL ANALYSIS, THAT AMOUNT'S RIGHT

13  HERE.  THAT'S 88,500,000 UNITS OUT OF A TOTAL OF

14  172,000 UNITS SOLD.  THOSE ARE ALL THE AT-ISSUE PRODUCTS

15  THAT MR. UGONE TALKED ABOUT.  THEY'RE ALL THE ONES THAT

16  INCORPORATE THE DUAL-DIODE.  THOSE TWO THAT WERE DONE

17  BEFORE THE CROSS-SECTIONAL ANALYSIS COUNT FOR MORE THAN

18  HALF.

19                 SO, MR. UGONE HAS TESTIFIED ABOUT

20  MISAPPROPRIATION OF TRADE SECRETS DAMAGES AND BREACH OF

21  CONTRACT DAMAGES.  HE'S TALKED ABOUT THE DISGORGEMENT.

22  YOU HEARD HIM TESTIFY ABOUT THE PROFITS THAT INTERSIL

23  MADE ON THE SALE OF THOSE.  IT'S 48.78 MILLION.  IF YOU

24  APPLY THE SAME SET OF ROYALTIES THAT HE TESTIFIED TO,

25  IT'S 19.0, SAME AS THE BREACH OF CONTRACT.

1              SO WHEN YOU GET THE JURY VERDICT TODAY,

2     YOU'RE GOING TO HAVE THESE QUESTIONS ASK,

3     MISAPPROPRIATION OF TRADE SECRETS, YES OR NO, THE ANSWER

4     IS YES.  THE AMOUNT, DISGORGEMENT, 48,780,000 OR

5     17,200,000.

6              BREACH OF CONTRACT, YES.  BUILD VERSUS BUY,

7     MOHAN MAHESWARAN TESTIFIED TO IT.  IT'S CLEAR AS DAY

8     THEY DID IT.  THE AMOUNT?  10 CENT ROYALTY, 17,200,000.

9     THANK YOU.

10             MR. ALIBHAI:  SO LET'S TALK ABOUT THE NEXT

11    CLAIM, PATENT INFRINGEMENT.  BECAUSE IT WASN'T GOOD

12    ENOUGH FOR THEM TO VIOLATE THE PERMITTED USE OF THE

13    CONTRACT, BUILD A COMPETING LINE OF PRODUCTS USING OUR

14    INFORMATION FROM THE MONSTER SPREADSHEET, FROM OUR

15    TECHNICAL INFORMATION, OUR FINANCIAL INFORMATION.  IT

16    WASN'T GOOD ENOUGH TO USE OUR TRADE SECRETS AND ALL

17    THAT.  THEY DECIDED THAT THEY WANTED TO COPY THE

18    APPROACH OF OUR PATENT.

19             HIS HONOR INSTRUCTED YOU, A PATENT OWNER

20    HAS THE RIGHT TO STOP OTHERS FROM USING THEIR INVENTION

21    DURING THAT 20-YEAR LIFE, AND IT IS YOUR JOB TO

22    DETERMINE WHETHER IT'S INFRINGEMENT BY COMPARING THE

23    INFRINGING PRODUCTS WITH THE CLAIMS OF THE PATENT.

24    YOU'RE ALL FAMILIAR WITH THE '981 PATENT.

25             IT'S A VERY SIMPLE DISCUSSION WHEN IT COMES

1   TO INFRINGEMENT OF THIS PATENT.  THE REASON IS BECAUSE

2   MOST OF THE THINGS, THEIR EXPERT AGREES, THEY DO IN

3   THEIR PATENT, IN THEIR PRODUCTS.  THEY HAVE A HUMAN EYE

4   RESPONSE ALL FOUR PRODUCTS.  THAT'S WHAT THESE AMBIENT

5   LIGHT SENSORS ARE DESIGNED TO DO.

6             ALL OF THEM HAVE A FIRST WELL EXPOSED TO AN

7   INCIDENT LIGHT.  HE TESTIFIED TO THAT AS WELL.

8   MR. MCALEXANDER TESTIFIED TO THAT, DR. BUCKMAN TESTIFIED

9   TO THAT.  YOU'LL REMEMBER THAT WE WENT DOWN THIS

10  CHECKLIST THAT I MADE OF ALL THE DIFFERENT ELEMENTS.

11  THEN THE SECOND WELL IS SHIELDED FROM THE INCIDENT LIGHT

12  AS WELL.  AND THEY HAVE A MEANS FOR DETERMINING

13  INDICATION OF SPECTRAL CONTENT.

14            CAN WE ENLARGE ONE OF THOSE?

15            SO, WE TALKED ABOUT THIS MODE3, AND

16  MR. BENZEL SHOWED UP HERE, AND HE TOLD YOU THAT ALL OF

17  THE PRODUCTS THAT ARE ACCUSED HAVE A MODE3, EVERY SINGLE

18  ONE OF THEM.  AND HE EVEN TESTIFIED, THEY'RE BASED ON

19  THE EXACT SAME DIGITAL CORE SO THEY OPERATE EXACTLY THE

20  SAME.  AND WHAT DOES MODE3 DO?  IT FORMS A SUBTRACTION,

21  MODE1 AND MODE2.  AND WHAT DOES THAT GET YOU?  THEIR

22  EXPERT:  YOU CAN TAKE THE TOTAL POWER OF ALL LIGHT,

23  VISIBLE PLUS INFRARED, SUBTRACT OUT THE POWER FROM

24  INFRARED, AND WHAT YOU HAVE IN THE END IS A MEASURE OF

25  THE POWER IN THE VISIBLE.  THAT'S BASICALLY AN

1  APPROXIMATION TO A PHOTOPIC RESPONSE.  AND PHOTOPIC IS

2  SIMILAR TO THE HUMAN EYE RESPONSE, CORRECT?  RIGHT.

3          THE PATENT REQUIRES A MEANS FOR DETERMINING

4  AN INDICATION FOR SPECTRAL CONTENT.  WHAT THAT MEANS IS

5  THAT WHEN YOU TAKE ALL THE LIGHT AND YOU CANCEL OUT THE

6  INFRARED, WHICH IS WHAT THEIR PRODUCTS ARE ADVERTISED TO

7  DO, YOU'RE LEFT WITH WHAT THE HUMAN EYE SEES, AND WHAT

8  THE HUMAN EYE SEES IS LIGHT WITHIN 400 TO 700

9  NANOMETERS.  WE HAVE ALL BECOME EXPERTS IN LIGHT NOW.

10  400 TO 700 NANOMETERS, AN INDICATION OF SPECTRAL

11  CONTENT, PHOTOPIC RESPONSE, THE HUMAN EYE RESPONSE.

12  DOES THE AMBIENT LIGHT SENSOR TELL THE PHONE OR THE

13  COMPUTER OR THE TABLET, HERE'S HOW MUCH LIGHT A HUMAN

14  WOULD SEE?  OF COURSE IT DOES.  THERE'S NO DOUBT ABOUT

15  THAT.

16          THEIR OWN DESIGN REVIEW DOCUMENTS SAY WHEN

17  YOU TAKE I LIGHT MINUS I DARK, YOU GET IR REJECTION AND

18  THE HUMAN EYE RESPONSE.  THAT'S INTERSIL'S DESIGN REVIEW

19  DOCUMENT.

20          THEY HAVE ANALOG TO DIGITAL CONVERTER.

21  DR. BUCKMAN DOESN'T DISAGREE WITH THAT.  THEY HAVE A

22  MULTIPLEXER THAT'S SHOWN ON THE DATA SHEET, SO WE'LL GET

23  TO PULL THESE DATA SHEETS UP IF YOU WANT TO TAKE A LOOK

24  AT THEM.  13, 15, 16, AND 19 ARE THESE FOUR PRODUCTS.

25          AND THEN THEY HAVE THE A AND D CONVERTER

1   THAT INTEGRATES OVER TIME AND DEALS WITH THE FLICKER OF

2   LIGHT, 50 HERTZ, 60 HERTZ FLICKER.  IT DEALS WITH THAT.

3              SO DR. BUCKMAN -- YOUR HONOR, CAN I USE THE

4   SHEET FOR A SECOND?

5              THE COURT:  YES.

6              MR. ALIBHAI:  DR. BUCKMAN SAID, WITH

7   RESPECT TO ALL THESE ELEMENTS, HE AGREED THAT EVERY

8   SINGLE ONE OF THEM WAS MET EXCEPT FOR THE MEANS FOR

9   DETERMINING THE INDICATION OF SPECTRAL CONTENT.  BUT

10  THEN HE TESTIFIED UNDER OATH THAT THE PRODUCTS GIVE YOU

11  A PHOTOPIC RESPONSE, WHICH IS A HUMAN EYE RESPONSE, AND

12  TELLS YOU ABOUT THE LIGHT THAT'S BETWEEN 400 TO 700

13  NANOMETERS.  AND WITH RESPECT TO THESE APPARATUS CLAIMS,

14  16, 17, AND 18 OF THESE CERTAIN ONES, WE TALKED ABOUT

15  43, 45, AND 46, WHICH WERE SIMILAR, EXCEPT 46 REQUIRED A

16  HUMAN EYE RESPONSE.  AND DR. BUCKMAN TESTIFIED THAT'S

17  WHAT IT TRIES TO GIVE YOU IS THAT HUMAN EYE RESPONSE.

18             SO, ALL OF THE ACCUSED PRODUCTS INFRINGE

19  ALL OF THE ASSERTED CLAIMS, 16, 17, 18, 43, 45, AND 46.

20  AND MR. LANEY TESTIFIED THAT WHEN HE READ THE DATA

21  SHEET, HE SAID, IT FELT LIKE I WAS READING THE TAOS

22  PATENT HERE.  THAT'S EXACTLY THE OPERATION OF THE DIODE

23  STRUCTURE THAT WE PATENTED AND BROUGHT TO THE MARKET FOR

24  A COMPETITIVE ADVANTAGE.  THESE PEOPLE THAT HAD A

25  HUNDRED YEARS OF EXPERIENCE CAME UP WITH A PATENT.

1  DR. DIERSCHKE IS ONE OF THE INVENTORS OF THAT PATENT.

2  AND THEY CREATED PRODUCTS BASED UPON THAT PATENT.  AND

3  INTERSIL JUST DECIDED, DOESN'T MATTER IF SOMEBODY ELSE

4  CREATED IT, WE WANT TO DO IT, WE'LL DO IT.  LIE, CHEAT,

5  AND STEAL.

6          SO, WHAT DOES MR. LANEY DO?  HE TELLS

7  INTERSIL, WAIT A MINUTE, I'M A LITTLE CONCERNED, HE

8  WRITES TO MR. MAHESWARAN.  AND MR. MAHESWARAN -- AND

9  MR. MAHESWARAN FORWARDS IT TO MR. TOKOS.  MR. TOKOS

10 WRITES BACK AND SAYS, DON'T WORRY, YOUR CONFIDENTIAL

11 INFORMATION WAS DESTROYED.  THAT WASN'T TRUE.  BUT PUT

12 THAT ASIDE.  MR. LANEY WRITES BACK AND SAYS, I'M NOT

13 ASKING ABOUT MY CONFIDENTIAL INFORMATION.  YOU ALREADY

14 TOLD ME TWO YEARS AGO THAT WAS DESTROYED.  HE DIDN'T

15 KNOW IT HADN'T BEEN.  HE SAYS, I'M WORRIED ABOUT HOW YOU

16 CAME UP WITH AN IR CANCELLATION TECHNIQUE THAT MIRRORS

17 OURS.  IT APPEARS TO MIRROR OUR TECHNIQUE THAT WE

18 DISCLOSED UNDER A CONFIDENTIALITY AGREEMENT AND HAVE

19 COVERED BY A PATENT.  HE TOLD THEM THAT THE 29001 DEVICE

20 AND PRODUCT FAMILY INFRINGES THAT PATENT, THAT '981

21 PATENT.

22          AND SO WHAT DOES INTERSIL DO?  IT HIRES

23 MR. FOGG THREE WEEKS LATER AND TELLS HIM IT'S HIS

24 HIGHEST PRIORITY TO GO LOOK AT THAT TAOS PATENT AND MAKE

25 SOME ARGUMENTS AS TO WHETHER IT'S INVALID SO IT CAN TRY

1   TO GET AROUND IT, SO IT CAN KEEP SELLING AND USING

2   PATENTED TECHNOLOGY, AND THEN MR. TOKOS TRIES TO BE COY

3   WITH YOU ABOUT WHETHER HE KNEW IT WAS ABOUT THE '918

4   PATENT.  DO YOU KNOW WHAT PATENT HE'S REFERRING TO?  I

5   DON'T SEE A PATENT REFERENCE IN HERE.  MR. MCCABE ASKED

6   HIM, FAIR ENOUGH, DO YOU KNOW WHAT PATENT HE'S REFERRING

7   TO?  I WOULD ASSUME IT'S THE '981 PATENT.

8                 WE'VE BEEN HERE FOR FOUR WEEKS.  HAVE WE

9   TALKED ABOUT ANY OTHER PATENTS OF TAOS'S?  THEY HAVE

10  OVER 30, BUT THERE'S ONLY ONE THAT COVERS THIS

11  DUAL-DIODE AMBIENT LIGHT SENSOR, THE '981 PATENT.

12                AND IT WASN'T JUST MR. TOKOS THAT KNEW

13  ABOUT INTERSIL'S -- ABOUT TAOS'S PATENT.  MR. BENZEL WAS

14  LOOKING AT THE PATENT AND LOOKING AT WHAT THEY HAD TO

15  REDESIGN THEIR PRODUCTS BASED UPON THE PATENT.  THEY

16  TALKED ABOUT HOW TAOS WAS TELLING PEOPLE THAT THEY

17  INFRINGED THEIR PATENT.  WELL, WHAT'S WRONG WITH THAT?

18  IF YOUR NEIGHBOR WALKED ACROSS YOUR YARD EVERY DAY AND

19  DUG IT UP, WOULD YOU TELL YOUR NEIGHBORS, HEY, THE GUY

20  DOWN THE STREET KEEPS WALKING ACROSS MY YARD AND DIGGING

21  IT UP?  WHAT'S WRONG WITH THAT ?  IT'S YOUR PROPERTY.

22  TAOS WAS ENTITLED TO SAY THAT INTERSIL WAS INFRINGING ON

23  THAT PATENT, AND ANY SUGGESTION TO THE CONTRARY IS JUST

24  THEM TRYING TO COVER THEIR TRACKS.

25                THEY WENT ALL THE WAY TO THEIR CEO AND

1  CHIEF OPERATING OFFICER, RICH BEYER AND LOU DINARDO, AND

2  LOOKED AT THE TAOS PATENT BECAUSE THEY WERE CONCERNED

3  ABOUT IT, NOT CONCERNED ENOUGH TO STOP USING THE

4  PATENTED TECHNOLOGY, BUT CONCERNED ENOUGH.

5           AND YOU HEARD MR. MCCABE TALK ABOUT THIS

6  E-MAIL.  MR. TOKOS HAS TESTIFIED UNDER OATH AND HAS SAT

7  HERE AND HAS WRITTEN THIS E-MAIL THAT SAYS, WE DEVELOPED

8  IT BEFORE.  WE'VE SHOWN YOU THE DOCUMENTS ABOUT WHAT

9  THEY HAD BEFORE.  WE'VE SHOWN YOU THAT THE DAY BEFORE

10 THE CONFIDENTIALITY AGREEMENT WAS SIGNED, THEY SAID THEY

11 WERE GOING TO USE THE SAME DESIGN AS THE 7900.  THE GUY

12 THEY PAID FROM NEW YORK TO COME DOWN HERE AND TESTIFY

13 ABOUT TRADE SECRETS SAID IT WAS A HORRIBLE PHOTOSENSOR.

14 THEIR DESIGN ENGINEER SAID IT DID A VERY, VERY BAD JOB

15 OF IR REJECTION.  THEY DIDN'T USE THAT TECHNOLOGY.  THEY

16 SWITCHED.  THEY SWITCHED TO TAOS'S TECHNOLOGY, AND

17 TAOS'S PATENTED TECHNOLOGY, AND FOR THAT, WE'RE SEEKING

18 PATENT DAMAGES.

19           THE LAW ALLOWS REASONABLE ROYALTY.

20 DR. UGONE TESTIFIED TO 10 CENTS PER UNIT, AND THIS IS

21 THE NUMBER OF UNITS THAT WERE SOLD IN THE UNITED STATES,

22 MULTIPLIED BY 10 CENTS.  IT'S $105,000, AND THAT'S THE

23 AMOUNT THAT YOU SHOULD AWARD FOR PATENT INFRINGEMENT

24 DAMAGES.

25           SO, WHEN YOU GET ASKED THE QUESTION,

1   QUESTION NUMBER 13, YES OR NO FOR EACH CLAIM, 16, 17,

2   18, 43, 45, 46, ALL FOUR ACCUSED PRODUCTS, THE ANSWER IS

3   YES.  EACH ONE OF THOSE INFRINGES EACH OF THOSE CLAIMS.

4   AND WHAT SUM OF MONEY WOULD BE PAID TO COMPENSATE TAOS?

5   $105,000.

6              NOW, VALIDITY.  YOU DON'T HAVE TO KNOW ANY

7   OF THE LAW ABOUT VALIDITY.  YOU DON'T HAVE TO KNOW ABOUT

8   KUIJK AND PDIC'S AND AMBIENT LIGHT SENSORS.  THE ONLY

9   THING YOU HAVE TO KNOW IS, WHAT DID THOSE E-MAILS SAY

10  ABOUT OUR TECHNOLOGY ON JUNE 9, 2004?  IT WAS CLEVER.

11  IT WAS INNOVATIVE.  IT WAS SOMETHING DIFFERENT THAN

12  ANYONE HAD DONE BEFORE.  NOW, INTERSIL'S GOING TO COME

13  IN, NOW THAT THEY'VE BEEN CAUGHT LYING AND CHEATING AND

14  STEALING, AND GO, OH, THAT PATENT, IT'S INVALID.  LET'S

15  LOOK AT WHAT THEY SAID IN 2004.

16              NOT ONLY DO YOU NOT PAY FOR PRODUCTS YOU

17  DON'T HAVE, YOU DON'T PAY FOR TECHNOLOGY THAT'S

18  WORTHLESS.  $45 MILLION IS WHAT THEY GOT BOARD APPROVAL

19  TO PAY FOR AN INVALID PATENT?  NO.  COMMON SENSE TELLS

20  YOU THAT PATENT'S NOT INVALID, THAT THEY'RE WILLING TO

21  PAY FOR THAT PATENT AND THE TECHNOLOGY THAT CAME ALONG

22  WITH IT.

23              THIS PATENT IS PRESUMED VALID, AND FOR THEM

24  TO STAND UP AND SHOW YOU A PDIC PATENT AND SAY THAT ONE

25  TEACHES WHAT THE TAOS PATENT TEACHES, THERE'S THREE EASY

1   REASONS THAT IT DOESN'T.  IT'S NOT EXPOSED TO INCIDENT

2   LIGHT.  THE JUDGE GAVE YOU THE DEFINITIONS OF THE

3   DIFFERENT TERMS.  TO BE INCIDENT LIGHT, IT HAS TO BE

4   VISIBLE AND NONVISIBLE.  THESE ARE ONE WAVELENGTH AT A

5   TIME IN A CD PLAYER OR A DVD PLAYER, 860 NANOMETERS OR

6   635 NANOMETERS.  NOT ANYWHERE IN KUIJK DOES IT SAY

7   THERE'S AMBIENT LIGHT, NOR DOES IT SAY IT HAS VISIBLE

8   AND NONVISIBLE.  IT'S ONE OR THE OTHER.  SO THE FIRST

9   WELL IS NOT EXPOSED TO INCIDENT LIGHT.

10          THE SECOND WELL IS NOT SHIELDED FROM

11  INCIDENT LIGHT.  FIRST REASON, THERE IS NO INCIDENT

12  LIGHT.  WE JUST TALKED ABOUT THAT.  IT HAS TO BE BLOCKED

13  FROM VISIBLE AND NONVISIBLE.  AND YOU HEARD TESTIMONY

14  AND YOU CAN READ THIS PATENT YOURSELF, IT SAYS THE

15  INCIDENT LIGHT IS PARTLY BLOCKED BY SEVERAL OPAQUE

16  ELEMENTS.  THE SHADOW MASK BLOCKING THE INCIDENT LIGHT

17  PARTIALLY CAN BE MADE OF METAL.  WHAT DID THE JUDGE TELL

18  YOU ABOUT WHAT IT MEANS?  BLOCKS ALL INCIDENT LIGHT.

19  PARTIALLY IS NOT ALL.

20          PDIC IS NOT AN AMBIENT LIGHT SENSOR.

21  MR. MAHESWARAN SAID, IT'S -- IT SENSES A SPECIFIC

22  WAVELENGTH FROM A LASER.  AND THE AMBIENT LIGHT SENSOR

23  IS ALL THE LIGHT IN THE ROOM OR OUTSIDE.  AND SO WITH

24  RESPECT TO HUMAN EYE RESPONSE, THERE'S NO HUMAN EYE

25  RESPONSES IN DVD DRIVE, RIGHT?  YOU DON'T HAVE TO HAVE A

```
 1    SINGLE DEGREE IN ENGINEERING TO KNOW THAT INSIDE YOUR
 2    DVD PLAYER AT HOME, THERE'S NO AMBIENT LIGHT.
 3              MR. NORTH TESTIFIED TO THE SAME THING.
 4    "THERE'S NO AMBIENT LIGHT IN THERE, CORRECT?"  "THAT'S
 5    CORRECT."  KUIJK JUST TELLS YOU WHETHER THERE WAS OR WAS
 6    NOT LIGHT, HIGH OR LOW, LIGHT, NO LIGHT.  IT DOESN'T SAY
 7    HUMAN EYE RESPONSE, AND FOR THAT REASON, IT DOES NOT
 8    RENDER THE CLAIMS OBVIOUS.
 9              AND MR. MCALEXANDER EXPLAINED THAT IN SOME
10    DETAIL.  IT JUST SAYS THE LIGHT IS THERE OR THE LIGHT IS
11    NOT.
12              NOW, THEY'RE ALSO GOING TO SAY THAT, WELL,
13    IF YOU READ THE PATENT, YOU CAN'T REALLY FIGURE OUT WHAT
14    IT'S ABOUT.  I'D SUGGEST TO YOU THAT AFTER THREE WEEKS
15    OF SITTING HERE, WHEN YOU READ THIS PATENT, PLAINTIFF'S
16    EXHIBIT 1, YOU'LL KNOW EXACTLY WHAT IT'S TALKING ABOUT.
17    IT'S TALKING ABOUT A VERY INTERESTING AND NEW WAY TO
18    SENSE AMBIENT LIGHT THAT NOBODY HAD EVER COME UP WITH IN
19    THE ENTIRE WORLD BEFORE THAT.  AND SO WHEN THEY SAY TO
20    YOU, WELL, WE DON'T KNOW THAT IT TEACHES SUBTRACTION,
21    YOU'LL FIND THIS COLUMN THAT SAYS, ARITHMETIC PROCESSING
22    AND YOU'LL REMEMBER MR. MCALEXANDER'S TESTIMONY THAT
23    ARITHMETIC PROCESSING TELLS YOU WHAT THE DIFFERENCE IS
24    SO YOU GET AN INDICATION.
25              WHAT ARE YOU DOING?  YOU'RE TAKING THE
```

1    DIODE THAT LOOKS AT ALL THE LIGHT AND YOU'RE LOOKING AT

2    THE DIODE THAT HAS ONLY INFRARED, AND YOU SUBTRACT IT

3    OUT AND YOU GET THE VISIBLE LIGHT.  IT'S PRETTY

4    STRAIGHTFORWARD.  IT'S GENIUS.  THEY SHOULD BE

5    COMPLIMENTED NOT CHALLENGED ON THE VALIDITY OF THEIR

6    PATENT.

7              SO, THIS PATENT IS NOT VALID, THEY HAVE THE

8    BURDEN BY CLEAR AND CONVINCING EVIDENCE.  THEY DIDN'T

9    BRING YOU A SINGLE PATENT ABOUT AN AMBIENT LIGHT SENSOR

10   AND SAY, HERE'S THE AMBIENT LIGHT SENSOR PATENT THAT

11   DOES IT THE SAME WAY.  THEY SAID, HERE'S THE PDIC THING.

12   IT DOESN'T DO IT, BUT IT LOOKS SORT OF THE SAME.

13   THEY'LL PROBABLY SHOW YOU PICTURES ABOUT, WELL, IT LOOKS

14   SORT OF THE SAME.  WELL, A GLASS AND A CUP LOOK THE

15   SAME.  EVER TRIED TO DRINK COFFEE FROM A GLASS?  IT

16   DOESN'T REALLY WORK.  JUST BECAUSE SOMETHING LOOKS ALIKE

17   DOESN'T MEAN IT ACHIEVES THE FUNCTION THAT IT'S REQUIRED

18   TO ACHIEVE.

19             SO THE LAST CLAIM IS TORTIOUS INTERFERENCE

20   WITH PROSPECTIVE RELATIONS, AND THIS IS PRETTY

21   STRAIGHTFORWARD.  DID THEY GO TO APPLE WITH OUR

22   TECHNOLOGY, OUR TRADE SECRETS, OUR PATENTED TECHNOLOGY

23   AND SAY, APPLE, BUY FROM US INSTEAD?  TAOS, AFTER THE

24   DUE DILIGENCE, STARTED TO WORK ON ITS AMBIENT LIGHT

25   SENSOR PROGRAMS, SOLD IT TO APPLE, IT WAS PUT INTO THE

1    IMAC AND THE IPHONE.  2005, THE IMAC.  2006, THE FIRST

2    GENERATION IPHONE.

3                  INTERSIL TAKES TAOS'S PATENTED TECHNOLOGY,

4    TAOS'S APPROACH TO THIS, AND MAKES A PRODUCT, THE 2901

5    FIRST, AND THE '3 NEXT, THAT LOOKS EXACTLY THE SAME AS

6    TAOS'S PRODUCT, USES THE DUAL-DIODE APPROACH,

7    INTERLEAVED PHOTODIODE ARRAY, A 1:1 RATIO IN AREA,

8    MULTIPLE CELLS, ALL THE THINGS THAT YOU DON'T SEE

9    ONE PIECE OF EVIDENCE BEFORE TAOS MET INTERSIL THAT

10   INTERSIL HAD.  YOU WON'T FIND THE DESIGN REVIEW DOCUMENT

11   THAT HAD ALL THOSE FEATURES IN IT BEFORE THEY MET US.

12                 BUT MR. MCCABE SHOWED YOU, THEY CAME UP

13   WITH IT SOMEHOW TWO MONTHS LATER, AND THE SAME PERSON

14   WHO DID THE DUE DILIGENCE COMES UP WITH THE NEW

15   PHOTODETECTOR LAYOUT.  LIKE HE SAID, IF HE'D KNOWN ABOUT

16   IT SINCE 2003, BECAUSE HE'D BEEN WORKING ON PDIC'S, WHY

17   DIDN'T HE DO IT IN 2003, WHY DIDN'T HE DO IT IN 2004

18   BEFORE HE MET US?

19                 JANUARY 20, 2005, THEY'RE ALREADY AT APPLE.

20   HERE YOU GO, APPLE.  WE GOT A PRODUCT FOR YOU.  WHAT'S

21   IT SAY?  WE CAN GIVE YOU SAMPLES IN A MONTH TO USE IN

22   YOUR COMPUTERS.  AND IT WAS APPLE AND INTERSIL, YOU'VE

23   HEARD EVIDENCE, AND YOU WILL HEAR FROM THE DEFENDANTS

24   THAT THERE WERE ALL THESE COMPETITORS.  WHEN IT COMES TO

25   APPLE, SHOW ME AN E-MAIL WHERE THEY'RE EVALUATING OTHER

1   PEOPLE.  SHOW ME WHERE APPLE HAS EVER BOUGHT A DIGITAL

2   AMBIENT LIGHT SENSOR FROM ANYONE OTHER THAN TAOS.  DID I

3   SAY THAT?  ANYONE OTHER THAN TAOS?  THEY SAID, IT'S JUST

4   INTERSIL THAT USED TO COMPETE WITH THEM.

5           OVER AND OVER AGAIN, THE E-MAILS SAY, TAOS

6   DESIGNED IN, WE'RE TRYING TO GET IN, WE'RE TRYING TO

7   FIGURE OUT WHAT TO DO.  AND THEN, THEY GET IN, FIRST TO

8   THE IPOD USING OUR TECHNOLOGY.  THEN, THE APPLE IPHONE

9   PLATFORM, APPLE SECOND IPHONE.  THEY FINALLY DID IT.

10  THEY TOOK THE 29003, GAVE IT TO APPLE, AND APPLE SAID,

11  FINE, WE'LL USE THAT.

12          APPLE HAS INCLUDED A TAOS AMBIENT LIGHT

13  SENSOR IN EVERY IPHONE IT'S MADE EXCEPT ONE.  WHEN

14  INTERSIL WENT TO IT IN 2006 USING TAOS'S PATENTED

15  TECHNOLOGY AND TAOS'S TRADE SECRETS AND GAVE THEM THAT

16  AMBIENT LIGHT SENSOR, APPLE DECIDED TO MAKE A SWITCH.

17  BUT AFTER THAT, BECAUSE THEY COULDN'T PERFORM WELL,

18  BECAUSE THEY COULDN'T FIGURE OUT HOW TO MAKE THOSE

19  THINGS WORK, BECAUSE IT WASN'T THEIR OWN DESIGN, THEY

20  WERE USING SOMEBODY ELSE'S DESIGN AND COULDN'T MAKE IT

21  WORK, COULDN'T MAKE IT WORK AS WELL AS WE DID, EVERY

22  PHONE.  THAT'S A TESTAMENT TO HOW POWERFUL AND HOW GREAT

23  THOSE PRODUCTS ARE AND HOW VALID AND SUCCESSFUL THE

24  PRODUCTS MADE UNDER THAT PATENT ARE.

25          NO COMPETITORS OTHER THAN INTERSIL FOR A

1  DUAL-DIODE DIGITAL AMBIENT LIGHT SENSOR.  IF YOU HEAR

2  ABOUT COMPETITORS, THE QUESTION YOU NEED TO ASK IS, DO

3  THEY HAVE A DUAL-DIODE DIGITAL AMBIENT LIGHT SENSOR?

4              SO, WITH RESPECT TO TORTIOUS INTERFERENCE,

5  TAOS LOST OUT ON 69 MILLION UNITS.  69 MILLION AMBIENT

6  LIGHT SENSORS GOT SOLD TO APPLE BY INTERSIL WRONGFULLY.

7  TAOS WAS IN THE IPHONE 1, WAS RAMPING UP TO SELL TO THE

8  IPHONE 2, HAD A CONTRACT WITH APPLE, HAD GOTTEN

9  STATEMENT OF WORKS WITH APPLE, WAS IN OTHER APPLE

10  PRODUCTS.  BUT INTERSIL, USING THEIR TECHNOLOGY, WAS

11  ABLE TO UNSEAT THEM FROM ONE IPHONE, SO THAT $13 MILLION

12  IS MONEY THAT TAOS LOST BECAUSE IT DIDN'T MAKE THOSE 69

13  MILLION SALES.

14              SO, WHEN YOU ASK, DID THEY TORTIOUSLY

15  INTERFERE?  THE ANSWER IS YES, AND IT'S $13 MILLION IN

16  DAMAGES.

17              NOW, THERE'S TWO OTHER CONCEPTS THAT WE

18  HAVEN'T REALLY TALKED ABOUT DURING THE COURSE OF THIS

19  TRIAL.  ONE IS CALLED WILLFUL INFRINGEMENT.  IN THIS

20  CASE, YOU HAVE TO DETERMINE IF INTERSIL INFRINGED THE

21  PATENT, WHICH WE TALKED ABOUT, WHETHER THEY DID THIS

22  WILLFULLY.  IT REQUIRES EVIDENCE THAT THE DEFENDANT

23  ACTED RECKLESSLY.  IN ADDITION TO THAT, THERE'S A

24  CONCEPT IN TEXAS LAW CALLED EXEMPLARY DAMAGES, DAMAGES

25  MEANT TO PUNISH OR TO STOP PEOPLE FROM PERFORMING

1  WRONGFUL ACTS.  IT'S A PENALTY.  AND THAT'S FOR THE

2  TRADE SECRET AND TORTIOUS INTERFERENCE CLAIMS.

3              AND SO I WANT TO TALK ABOUT THE EVIDENCE

4  THAT SHOWS THAT INTERSIL KNEW WHAT IT WAS DOING AND

5  DECIDED TO DO IT ANYWAY, KNEW THAT IT WAS LYING,

6  CHEATING, AND STEALING, AND DECIDED TO GO ON THAT COURSE

7  OF ACTION ANYWAY.

8              WE TALKED ABOUT THIS DOCUMENT.  THEIR CEO

9  AND COO, THEIR DESIGN ENGINEER, THEIR GENERAL COUNSEL,

10  THEY ALL KNEW ABOUT OUR PATENT AND DECIDED, WE'RE NOT

11  GOING TO REDESIGN.  WE DON'T HAVE TO.  WE DON'T NEED TO.

12  WE'LL SEE WHAT HAPPENS.

13              SAMSUNG TELLS THEM, YOU'RE MAKING A

14  PATENTED PRODUCT THAT MAY INFRINGE TAOS'S PRODUCT USING

15  TWO PHOTODIODES, IT OBTAINS A VISIBLE GRAPH COMBINING

16  THE TWO PHOTODIODES.  WHAT DO THEY DO?  DO THEY STOP

17  MAKING IT?  DO THEY TELL SAMSUNG, WE HAVE A DIFFERENT

18  PRODUCT YOU CAN BUY INSTEAD THAT DOESN'T DO IT THIS WAY?

19  NO.  TYPICAL INTERSIL.  YOU KNOW WHAT?  IF YOU GET SUED,

20  WE'LL PAY FOR IT.  WE'LL INDEMNIFY YOU.

21              AND HERE'S THEIR OWN DESIGN REVIEW OF THE

22  29003.  LOOK ON THE RIGHT-HAND SIDE IN PLAINTIFF'S

23  EXHIBIT 137, FEW PAGES DOWN.  THAT'S A TAOS DATA SHEET.

24  IN THEIR OWN DESIGN REVIEW, THEY'RE COPYING TAOS'S

25  PRODUCT.  DON'T TAKE MY WORD FOR IT.  WHAT DID DR. LIN

1   SAY?  YOU DIDN'T WRITE THIS DOCUMENT.  I COPIED FROM

2   COMPETITOR DATA SHEET.  COMPETITOR'S TAOS?  YEP.  2560,

3   2561?  YES.  THEY ADMIT THEY'RE COPYING OUR PRODUCT.

4            AND THE 76683, WE TALKED ABOUT THAT PRODUCT

5   VERY BRIEFLY WITH MR. MCALEXANDER, BUT YOU'LL REMEMBER

6   THAT ONE OF THE THINGS THAT MR. MCALEXANDER DID WITH

7   PRODUCTS IS NOT JUST LOOK AT DATA SHEETS.  HE LOOKED AT

8   CIRCUIT DIAGRAMS, HE LOOKED AT DESIGN REVIEWS, HE LOOKED

9   AT FEASIBILITY STUDIES.  HE GOT SOME OF THESE IMAGES

10  UNDER A MICROSCOPE.  HE GOT CROSS-SECTION IMAGES AND

11  SHOWED YOU SOME OF THESE PICTURES LIKE THIS ONE.

12           THIS IS ONE OF THE ONES THAT HE SHOWED US.

13  THIS ONE'S FUNNY, THOUGH.  IT HAS THIS FUNNY NUMBER,

14  ISL76683.  THAT'S NOT LIKE ANY OF THE OTHER NUMBERS

15  WE'VE TALKED ABOUT DURING THE LAST THREE WEEKS.  WHAT

16  HAPPENS WHEN YOU STRIP THE PACKAGING AWAY AND LOOK AT

17  THE DIE?  IT SAYS 29003.  EVEN AFTER THIS LAWSUIT WAS

18  FILED, THEY'RE INTRODUCING NEW PRODUCTS WITH A DIFFERENT

19  NAME, DIFFERENT NUMBERING MECHANISM, BUT STILL USING THE

20  SAME DIE FOR THE 29003.  I THOUGHT THEY'D COME UP WITH

21  BETTER WAYS.

22           THEY'RE COPYING THE COMPETITOR.  THEY TALK

23  ABOUT IT ALL THE TIME, WHETHER THEY ACTUALLY END UP

24  DOING IT OR NOT, THEY'RE ALWAYS TALKING ABOUT COPYING

25  TAOS WITH EVERYTHING, 2 BITS VERSUS 4 BITS.  EVEN THE

1   INTERRUPT, THEY'RE COPYING.

2              AND THEN, YOU CAN SEE THAT THERE'S A

3   MALICIOUS INTENT THAT'S THERE AT INTERSIL.  MR. STECIW,

4   OVER AND OVER AGAIN, TALKS ABOUT HOW MUCH PAIN THEY CAN

5   INFLICT ON TAOS.  WE HURT THEM BIG TIME.  THEY TAKE

6   PLEASURE IN COMPETING WITH TAOS USING TAOS'S TECHNOLOGY

7   AND TAOS'S PATENTED INFORMATION.  THEY WANT TO PUT TAOS

8   OUT OF BUSINESS ONCE AND FOR ALL.  DID YOU SEE ANY OTHER

9   E-MAILS WHERE THEY TALKED ABOUT OTHER COMPETITORS THAT

10  WAY?  I THOUGHT THERE WAS 18, 20 COMPETITORS OUT THERE.

11  HOW COME YOU DON'T SEE E-MAILS LIKE THAT ABOUT OTHER

12  PEOPLE?  WHY TAOS?  WHY DID THEY HAVE TO PUT US OUT OF

13  BUSINESS ONCE AND FOR ALL?

14             LET'S GET APPLE READY.  "THIS PART WILL BE

15  THE LAST NAIL IN THE TAOS COFFIN."  THIS IS NOT THE

16  AMERICAN WAY.  THIS IS NOT HOW YOU COMPETE.  FIRST OF

17  ALL, YOU DON'T LIE, CHEAT, AND STEAL.  BUT THEN, THIS,

18  THIS TYPE OF INTENT, TO PUT THE COMPANY OUT OF BUSINESS,

19  TO BE THE LAST NAIL IN THEIR COFFIN?  SO, WHEN YOU LOOK

20  AT QUESTIONS ABOUT MISAPPROPRIATION, THE QUESTION WILL

21  ASK YOU, DID WE PROVE THAT THEY ACTED WITH FRAUD,

22  MALICE, OR GROSS NEGLIGENCE.  IT'S RARE THAT YOU SEE

23  E-MAILS LIKE THAT, ONE COMPANY TALKING ABOUT ANOTHER

24  COMPANY.  THAT'S FRAUD, MALICE, AND GROSS NEGLIGENCE.

25  THEY WERE COPYING ON PURPOSE.

1          THEY WERE TRYING TO GET THAT APPLE

2    BUSINESS.  THEY HAD TO BE THAT TYPE OF PRODUCT IN ORDER

3    TO GET THE APPLE BUSINESS.  APPLE WASN'T BUYING ANYTHING

4    OTHER THAN A DIGITAL DUAL-DIODE.  EVEN TO THIS DAY IN

5    2015, THAT'S ALL THAT APPLE BUYS.  SO, THE ANSWER IS

6    YES.

7          AND WHAT SUM OF MONEY?  HIS HONOR WILL

8    INSTRUCT YOU, AS HE HAS, THAT'S UP TO YOU TO DETERMINE.

9    WHAT YOU KNOW IS, THEY TRIED TO PUT US OUT OF BUSINESS,

10   AND THE MISAPPROPRIATION OF THE TRADE SECRETS CAUSED US

11   UP TO $49 MILLION IN DAMAGES.  THE $49 MILLION IS MONEY

12   THEY MADE DOING THE WRONG THING.  IN THE AMERICAN

13   JUDICIAL SYSTEM, YOU DON'T GET TO KEEP YOUR MONEY IF YOU

14   STOLE IT.  YOU HAVE TO GIVE IT BACK.  THAT $49 MILLION

15   THEY MADE SELLING AMBIENT LIGHT SENSORS IS PROFITS THAT

16   ARE ILL-GOTTEN GAINS.  THEY SHOULD HAVE NEVER HAD THAT

17   MONEY IN THE FIRST PLACE, SO THEY SHOULD PAY THAT BACK.

18          AND WHEN YOU TALK ABOUT INTERSIL, YOU'RE

19   TALKING ABOUT A VERY LARGE CORPORATION.  ITS NET WORTH

20   IS $950 MILLION.  WHEN YOU TAKE $49 MILLION FROM A

21   COMPANY THAT'S NET WORTH IS $950 MILLION, IT'S LIKE

22   TAKING A DOLLAR OUT OF MR. MCCABE'S POCKET WHEN HE HAS

23   20.  HE MIGHT NOT WANT YOU TO TAKE THE DOLLAR, BUT HE'S

24   NOT REALLY GOING TO MISS IT THAT MUCH.

25          SO THIS IS WHERE YOU GET TO TELL INTERSIL,

1  THOSE RULES THAT MR. MCCABE TALKED ABOUT THREE WEEKS

2  AGO, THAT I TALKED ABOUT TODAY, ABOUT LYING AND CHEATING

3  AND STEALING, WHAT WE TEACH OUR KIDS, HOW WE WERE TAUGHT

4  IN SUNDAY SCHOOL, WHAT WE THINK IS THE APPROPRIATE WAY

5  THAT HUMAN BEINGS SHOULD ACT TOWARD ONE ANOTHER, THOSE

6  RULES APPLY IN THE BUSINESS WORLD.

7           AND THE SAME THING WITH RESPECT TO TORTIOUS

8  INTERFERENCE.  THEY SHOULDN'T HAVE GONE TO APPLE WITH

9  OUR INFORMATION.  IT WOULD HAVE BEEN ONE THING FOR THEM

10  TO COMPETE GENERALLY.  IT'S ANOTHER THING FOR THEM TO

11  COMPETE IMPROPERLY.  AND SO THE ANSWER IS YES HERE, AND

12  AGAIN, THIS IS UP TO YOU TO DETERMINE HOW MUCH YOU

13  BELIEVE SHOULD BE AWARDED AS EXEMPLARY DAMAGES TO PUNISH

14  OR AS A PENALTY, TO TELL THEM, THIS TYPE OF CONDUCT

15  DOESN'T FLY IN TEXAS.

16           AND HE TOLD YOU THAT THEIR NET WORTH IS

17  $957 MILLION.  AND THEN WILLFUL INFRINGEMENT.  THAT'S

18  ONE OF THE LAST QUESTIONS YOU'LL BE ASKED, AND YOU'LL

19  HAVE TO DETERMINE WHETHER THEIR INFRINGEMENT WAS

20  WILLFUL, THEY KNEW ABOUT A PATENT FOR THE DUE DILIGENCE,

21  THEY THOUGHT IT WAS CLEVER, THEY THOUGHT THAT WE'D DONE

22  IT IN A NEW WAY, AN INTERESTING WAY, THEY THOUGHT THAT

23  IT WAS THE SAME LINE OF PRODUCTS THAT THEY SHOULD

24  DEVELOP, AND THEY DID USING OUR PATENTED TECHNOLOGY.

25           THIS IS NOT AN ACCIDENT THAT THEY INFRINGED

1   OUR PATENT.  THEY SET ON A COURSE OF ACTION TO LIE,

2   CHEAT, AND STEAL.  THEY SET OUT ON A COURSE OF ACTION TO

3   USE OUR TECHNOLOGY, OUR TRADE SECRETS, OUR KNOW-HOW, A

4   HUNDRED YEARS OF AMBIENT LIGHT SENSOR AND OPTOELECTRONIC

5   EXPERIENCE THAT THESE PEOPLE PUT TOGETHER, A COMPANY

6   THEY HAD STARTED JUST SIX YEARS BEFORE, WERE STRUGGLING,

7   AND THEY DECIDE, LET'S NOT BUY THEM, LET'S TAKE THEIR

8   STUFF AND LET'S PUT THEM OUT OF BUSINESS ONCE AND FOR

9   ALL.

10            I'LL HAVE A CHANCE TO TALK TO YOU ONE MORE

11  TIME AFTER MR. BRAGALONE SPEAKS, BUT AS YOU'RE LISTENING

12  TO MR. BRAGALONE, THE THINGS YOU NEED TO THINK ABOUT ARE

13  THE THINGS THAT WE TALKED ABOUT THAT FALL INTO THOSE

14  FIVE CATEGORIES.  DID THEY LEARN ABOUT OUR INFORMATION?

15  IF IT WASN'T VALUABLE, WHY WERE THEY PAYING $45 MILLION

16  FOR IT?  DID THEY LEARN ABOUT OUR PATENTED TECHNOLOGY?

17  AND DID THEY START USING OUR PATENTED TECHNOLOGY WITHIN

18  WEEKS, WEEKS OF MEETING US?

19            AND WHEN IT TOOK THEM TWO YEARS TO DO THEIR

20  FIRST PRODUCT, WHICH WAS HORRIBLE, HOW IS IT THAT THEY

21  WERE ABLE TO GO TO ONE OF THE BEST CORPORATIONS WITH

22  SOME OF THE GREATEST TECHNOLOGY OUT THERE, APPLE

23  CORPORATION, FIVE MONTHS AFTER DOING A DESIGN REVIEW FOR

24  THE 29001?  THAT TIME LINE DOESN'T MAKE SENSE.  YOU

25  HEARD IT TAKES A YEAR-PLUS TO DEVELOP A PRODUCT,

1   SOMETIMES YEARS.  FIVE MONTHS, DESIGN REVIEW CHANGE, USE

2   OUR TRADE SECRETS, USE OUR PATENTED TECHNOLOGY, AND

3   THEY'RE AT APPLE.  AND THEY HURT US BIG TIME.

4                   THE COURT:  ALL RIGHT.  THANK YOU,

5   MR. ALIBHAI.

6                   MR. ALIBHAI:  THANK YOU, YOUR HONOR.

7                   THE COURT:  LADIES AND GENTLEMEN, YOU'VE

8   BEEN IN THE COURTROOM FOR A LITTLE OVER AN HOUR.

9   MR. BRAGALONE NOW HAS AN OPPORTUNITY TO MAKE HIS FULL

10  ARGUMENT TO YOU.  DO YOU WANT TO HEAR THAT, OR DO YOU

11  WANT TO TAKE A 10-MINUTE RECESS?

12                  MR. BRAGALONE:  YOUR HONOR, IF I MIGHT ASK

13  FOR A SHORT RECESS MYSELF JUST TO SET UP?

14                  THE COURT:  OKAY.  LET'S HAVE A 10-MINUTE

15  RECESS.

16                  COURT SECURITY OFFICER:  ALL RISE.

17                  (JURY NOT PRESENT)

18                  THE COURT:  WE'LL RECESS FOR 10 MINUTES.

19                  (BREAK TAKEN FROM 2:26 P.M. TO 2:38 P.M.)

20                  (JURY NOT PRESENT)

21                  COURT SECURITY OFFICER:  ALL RISE.

22                  THE COURT:  ALL RIGHT.  PLEASE TAKE YOUR

23  SEATS.  MR. ALIBHAI AND MR. MCCABE, JUST SO YOU KNOW, I

24  CALCULATE THAT YOU HAVE 24 MINUTES LEFT.

25                  MR. MCCABE:  THANK YOU, YOUR HONOR.

1           THE COURT:  OKAY.  ALL RIGHT.

2           MR. BRAGALONE, ARE YOU READY?

3           MR. BRAGALONE:  YES, YOUR HONOR.

4           THE COURT:  ALL RIGHT.

5           MR. WESTBERG, PLEASE BRING IN THE JURY.

6           COURT SECURITY OFFICER:  ALL RISE.

7           (JURY PRESENT)

8           THE COURT:  ALL RIGHT.  YOU MAY BE SEATED.

9           ALL RIGHT, LADIES AND GENTLEMEN, PLEASE

10  GIVE YOUR ATTENTION TO MR. BRAGALONE.

11           MR. BRAGALONE?

12           MR. BRAGALONE:  LADIES AND GENTLEMEN OF THE

13  JURY, I TOO WANT TO THANK YOU SO MUCH FOR BEING HERE AND

14  ESPECIALLY BEING HERE FOR THE PAST THREE OR FOUR WEEKS,

15  MUCH LONGER THAN ANY OF US IN THE COURTROOM BELIEVED WE

16  WERE GOING TO HAVE TO TAKE TO GO THROUGH THIS TRIAL.

17  BUT MY CLIENT, INTERSIL, ESPECIALLY, WANTS TO PASS ON

18  ITS THANKS TO YOU BECAUSE OF WHAT YOU'RE DOING HERE,

19  ENGAGING IN JURY SERVICE.  THEY HAVE AN OPPORTUNITY FOR

20  A FINAL RESOLUTION OF THIS MATTER, AND AFTER YEARS,

21  SIX YEARS OF LITIGATION, TO FINALLY GET THE VERDICT THAT

22  THEY'VE BEEN LOOKING FOR, THE ACQUITTAL OF THESE

23  HORRENDOUS CHARGES THAT HAVE BEEN LEVIED BY THE

24  PLAINTIFF, TAOS.

25           LET ME GO THROUGH SOME OF THE FACTORS THAT

1    I BELIEVE ARE GOING TO DEMONSTRATE THAT YOU SHOULD

2    RENDER A VERDICT IN FAVOR OF INTERSIL.  FIRST OF ALL,

3    LET'S GET TO THE KEY POINTS.  INTERSIL MADE TWO, NOT

4    ONE, BUT TWO GOOD-FAITH OFFERS TO ACQUIRE TAOS.

5    INTERSIL COMPARED THE ALTERNATIVES, AS THEY WERE

6    ENTITLED TO DO.  THEY LOOKED AT THE INTERNAL

7    INFORMATION, AND WHAT DID THEY DO?  THEY DECIDED TO BUY.

8    THEY DECIDED TO INCREASE THEIR OFFER JUST LIKE THEY SAID

9    THEIR PLAN WAS.

10              INTERSIL INDEPENDENTLY DEVELOPED ITS LINE

11   OF AMBIENT LIGHT SENSORS.  TAOS CANNOT PROVE AND DOESN'T

12   PROVE THAT INTERSIL MISAPPROPRIATED ANY TRADE SECRETS.

13   WHEN INTERSIL DID INVESTIGATE THE DEVICE, IT DID SO

14   LAWFULLY.  AFTER YEARS OF TRIAL AND ERROR, INCLUDING

15   TRIAL AND ERROR RELATED TO ITS FIRST DIGITAL LIGHT

16   SENSOR PRODUCT, INTERSIL ULTIMATELY DEVELOPED A

17   SUCCESSFUL LIGHT SENSOR IN THE ISL29003, AND THAT WAS

18   THE ONE THAT WAS SELECTED BY APPLE FOR USE IN THE SECOND

19   GENERATION IPHONE.

20              TAOS, HOWEVER, AFTER THAT HAPPENED, USED

21   UNFAIR COMPETITIVE TACTICS TO DRIVE INTERSIL OUT OF THE

22   MARKETPLACE.  TAOS'S PATENT INFRINGEMENT CLAIMS ARE

23   WHOLLY WITHOUT MERIT.  TAOS IS ENTITLED ONLY, AS YOU'VE

24   SEEN, TO NOMINAL DAMAGES FOR THE BREACH OF CONTRACT

25   ALLEGATION RELATING TO RETENTION OF DOCUMENTS.

1          NOW, WHERE MOHAN MAHESWARAN FIRST LEARNED

2   OF TAOS WAS NOT FROM RICK FURTNEY BUT FROM A BROADVIEW

3   PRESENTATION BOOK THAT HE RECEIVED ON APRIL 7, 2004.  IN

4   FACT, THAT BOOK PROVIDED INTERSIL WITH A WHOLE HOST OF

5   POTENTIAL ACQUISITIONS.  ONE OF THEM WAS TAOS, AND HE

6   FOLLOWED UP.  IN FACT, YOU'VE HEARD ABOUT THIS CONTACT

7   WITH RICK FURTNEY.  AS IT TURNED OUT, MR. FURTNEY DIDN'T

8   GET BACK TO MR. STRIPPOLI, AND SO MR. STRIPPOLI ACTUALLY

9   HAD TO RESPOND AGAIN.  HE SAID, MR. FURTNEY, SINCE I DID

10  NOT RECEIVE A RESPONSE FROM MY ORIGINAL MESSAGE BELOW, I

11  THOUGHT I WOULD RESEND IT.  THIS HAPPENS ON APRIL 26TH.

12          MR. FURTNEY ULTIMATELY WRITES BACK AND

13  SAYS, I AM INTERESTED IN TALKING TO YOU ALONG WITH

14  ANOTHER GENERAL MANAGER AT INTERSIL.  MY ASSISTANT CAN

15  SET UP THE CONFERENCE CALL.  AND THEN FINALLY, THAT

16  PERSON IS MOHAN MAHESWARAN.  HE GETS INVOLVED HERE IN

17  MAY OF 2004 WELL AFTER HE FIRST LEARNED OF TAOS THROUGH

18  THE BROADVIEW PITCH BOOK.

19          AND LET'S GO TO ONE OF THE EXHIBITS THAT

20  TAOS BROUGHT UP ABOUT THIS ALLEGED LICENSE, ID 854.  I

21  WANT TO SHOW YOU THE REST OF WHAT THEY DIDN'T SHOW YOU

22  ABOUT THIS FIRST MEETING.  SO, MR. FURTNEY COMES BY, BUT

23  THEN THERE'S AN UNIDENTIFIED COLLEAGUE OF RICK'S WHO

24  CAME BY LATER TO DISCUSS THE TSL2500.  NOW, HE ASKED,

25  APPARENTLY, ABOUT ROYALTY PAYMENTS, THIS UNIDENTIFIED

1    PERSON, BUT THERE'S NOTHING IN HERE ABOUT A LICENSE.

2    THERE'S NOTHING IN HERE ABOUT A PATENT LICENSE AS TAOS'S

3    LAWYERS HAVE MISLED YOU ABOUT.  IN FACT, TO THE

4    CONTRARY, HE'S ASKING ABOUT WORKING SOMETHING OUT SO

5    THEY COULD SELL OUR DEVICE.  THAT'S A RESELL AGREEMENT,

6    WHICH WAS ONE OF THE THINGS THAT KIRK LANEY AND MOHAN

7    MAHESWARAN DID TALK ABOUT LATER.

8              SO, AFTER THEY ORIGINALLY HAD THIS

9    INTRODUCTION, THEY ENGAGED IN DUE DILIGENCE.  MOHAN

10   MAHESWARAN SAID HE WAS INTERESTED IN TAOS FOR SEVERAL

11   REASONS.  HE THOUGHT TAOS COULD HELP INTERSIL WITH ITS

12   PDIC DEVELOPMENT BECAUSE TAOS HAD A WHOLE HOST OF

13   EXPERIENCED OPTICAL ENGINEERS.  TAOS WAS ALWAYS GOING TO

14   BE A TWO-PART DUE DILIGENCE, AND THIS IS IMPORTANT.  HE

15   TOLD LANEY, DON'T DISCLOSE CONFIDENTIAL INFORMATION THAT

16   YOU THINK IS CRITICAL TO YOUR FUTURE, AND LANEY

17   ACKNOWLEDGED THIS.

18             HE TOLD LANEY THAT INTERSIL HAD A LIGHT

19   SENSOR PLATFORM BEFORE HE MET WITH TAOS.  AND HE NEVER

20   HAD ANY UNDERSTANDING THAT THE VALUATION OF A BUSINESS

21   BETWEEN THE COMPANIES WAS NOT A PERMITTED USE UNDER THE

22   NONDISCLOSURE AGREEMENT.  IN FACT, LANEY ALWAYS KNEW

23   THAT INTERSIL COULD BE A COMPETITOR.

24             HERE, ON MAY 19, 2004, BEFORE THEY EVER

25   ENTERED INTO A CONFIDENTIALITY AGREEMENT, LANEY

1  ACKNOWLEDGES, THERE IS A POSSIBILITY OF COMPETING IN THE

2  FUTURE IF WE ULTIMATELY GO OUR SEPARATE WAYS.  MOHAN

3  ALSO ECHOED THIS.  ABOUT TELLING THEM ABOUT THE PRODUCT

4  DEVELOPMENT, MOHAN DISAGREES WITH MR. LANEY.  HE SAYS,

5  IN RESPONSE TO A QUESTION, OKAY, DID YOU DISCUSS AT ALL

6  THAT INTERSIL HAD BEEN WORKING ON SENSORS IN THIS SPACE?

7  WE DID.

8          NOW, YOU'LL NOTICE, THE QUESTIONS THAT WERE

9  ASKED TO MR. LANEY, DID YOU SEE INTERSIL AS A

10 COMPETITOR, DID INTERSIL HAVE COMPETITIVE DEVICES?  NO.

11 BOTH PARTIES AGREE AT THIS TIME THAT INTERSIL HADN'T

12 RELEASED AN AMBIENT LIGHT SENSOR, BUT MOHAN MAHESWARAN

13 TESTIFIED UNDER OATH THAT HE TOLD TAOS THAT THEY WERE

14 WORKING ON DEVELOPING SENSORS, AND MR. MAHESWARAN IS

15 INDEPENDENT.  HE CAME HERE OF HIS OWN VOLITION.  HE

16 WANTED TO BE SURE THAT THE TRUTH CAME OUT.  HE DOESN'T

17 STAND TO BENEFIT, LIKE EVERY SINGLE ONE OF THE TAOS

18 WITNESSES YOU HEARD FROM.

19          AND THINK ABOUT IT.  DID ANYBODY FROM APPLE

20 COME TO SUPPORT TAOS'S STORY?  DID ANYONE FROM BROADVIEW

21 OR JEFFRIES COME TO SUPPORT THAT STORY?  I WOULD SAY TO

22 YOU THAT ONLY TAOS'S WITNESSES SHOWED UP, AND SOME OF

23 THEM DIDN'T EVEN MAKE THE TRIP.

24          SO, LANEY AGREED TO THE TWO-PART DUE

25 DILIGENCE, IT WAS ACKNOWLEDGED HERE IN THIS NOTE FROM

1   TODD COLEMAN.  AND THIS IS HOW THEY DID THEIR NOTES.  HE

2   SAID HE HAD A TUESDAY, JUNE 4, 2004, WITH KIRK LANEY,

3   CONVERSATION WITH LANEY.  THAT'S WHAT THIS INTERNAL NOTE

4   IS, THAT LANEY AGREED TO BREAK THE PROCESS INTO TWO

5   STEPS, THE FIRST STEP DESIGNED TO MAKE INTERSIL

6   KNOWLEDGEABLE ON COMPANY PRODUCTS, OPPORTUNITY MARKETS,

7   ETC.  WHAT DOES HE SAY?  WITHOUT COMPROMISING

8   COMPETITIVE POSITION.  SO, TAOS AND LANEY KNEW ALL ALONG

9   THAT THEY SHOULDN'T DISCLOSE TRADE SECRETS, AND YOU KNOW

10  WHAT?  THEY DIDN'T.

11              SO, BROADVIEW WORKED AND VALUED THE TAOS

12  DEAL.  THEY ACTUALLY LOOKED AT TEN DIFFERENT OTHER

13  ACQUISITIONS OF SIMILAR COMPANIES.  SO THEY VALUED THE

14  TAOS DEAL LOW AT 20 MILLION; MEDIUM, 30; MEAN, 31; AND A

15  HIGH OF $42 MILLION.  THESE WERE THE ADVISERS TO

16  INTERSIL ON THIS DEAL.  AND THEY MAKE MONEY LIKE A

17  REALTOR ONLY WHEN A SALE ACTUALLY HAPPENS, SO THEY WERE

18  INTERESTED IN CLOSING THE SALE.

19              INTERSIL'S BOARD APPROVED A DEAL IN THE

20  RANGE OF 35 TO $45 MILLION.  AND THEN, INTERSIL AND

21  TAOS, TOGETHER, COLLABORATED TO DETERMINE WHETHER IT --

22  THERE WAS A BUSINESS FIT.  YES, IT'S ABSOLUTELY TRUE

23  THAT TAOS SENT FINANCIAL INFORMATION TO INTERSIL, AND

24  INTERSIL DID WITH THAT INFORMATION WHAT IT WAS SUPPOSED

25  TO DO.  THEY INVESTIGATED -- HERE'S DAVID CRAIG SENDING

1    FILES.  HE SAYS, THIS WILL -- INCLUDES RECLASSING SOME

2    OF THE OPERATING EXPENSES AND ANOTHER LEVEL OR TWO OF

3    DRILL DOWN ON THE MARGINS WE ARE RUNNING AND THE WAFER

4    EXPENSES WE ARE PAYING.

5                 SO THE PARTIES NEEDED TO GET TOGETHER AND

6    DETERMINE THAT IF THE COMPANIES COMBINED INTERSIL WOULD

7    BE ABLE TO SAVE MONEY FOR THE COMBINED COMPANIES.  SO,

8    WOULD THEY, FOR EXAMPLE, REDUCE THE WAFER COSTS OF TAOS?

9    THEY HAD NO REASON TO LOOK AT THIS ISSUE OTHER THAN TO

10   SEE WHAT THE BENEFITS WOULD BE OF MERGING THE COMPANIES.

11                AND IN FACT, THEY DETERMINED THAT AFTER

12   THEY UPDATED THE MODEL WITH ADDITIONAL SHEET ON WAFER

13   COST DETAILS, THAT BASED ON THE INFORMATION THE UPDATED

14   FINANCIAL MODEL COULD PROVIDE AN AVERAGE 25 PERCENT

15   WAFER COST SYNERGIES.  SO, TAOS AND INTERSIL TOGETHER

16   WERE LOOKING AT THE BUSINESS FIT.

17                AND BASED ON THIS, INTERSIL INITIALLY

18   OFFERS $30 MILLION TO BUY TAOS.  THIS IS THE PRELIMINARY

19   TERM SHEET, AND YOU HEARD LOTS OF TESTIMONY THAT DURING

20   THE TWO STAGES OF DUE DILIGENCE, THIS IS HOW IT'S DONE

21   WITH THE INITIAL STAGE, 15 MILLION IN CASH, ANOTHER 15

22   MILLION IN CONTINGENT COMPENSATION BASED ON EARN-OUTS.

23                TAOS'S LAWYERS TOLD YOU SOMETHING

24   DIFFERENT.  THEY STOOD UP HERE IN OPENING, AND THEY

25   REPRESENTED TO YOU THAT LANEY COUNTERED THIS AND NEVER

1  RECEIVED A RESPONSE.  WHAT DID THEY TELL YOU?  HE WAS

2  FRUSTRATED, BUT IN THE SPIRIT OF KEEPING THE

3  NEGOTIATIONS GOING, HE MADE A COUNTEROFFER.  HOWEVER,

4  THERE WAS NO -- NOTHING TO BE HEARD FROM INTERSIL.

5          THEY WENT ON, BUT HE DID NOT GET A

6  COUNTERPROPOSAL OF ANY KIND.  AND FINALLY, HIS

7  COUNTEROFFER WAS NOT EVEN RESPONDED TO, AND THEN THEY

8  JUST SAID, BYE-BYE.  THAT WAS THE STORY THAT THEY TOLD

9  YOU IN OPENING STATEMENTS, BUT LADIES AND GENTLEMEN,

10 THAT JUST ISN'T TRUE.

11          LANEY WAS WELL AWARE OF THE FACT THAT MOHAN

12 WAS GOING ON VACATION.  IT'S DISCUSSED IN THEIR E-MAILS.

13 HE EVEN SAID, THANKS, MOHAN, TRY NOT TO DILUTE YOUR

14 VACATION TOO MUCH.  BUT MOHAN DID WORK ON VACATION,

15 BECAUSE HE HAD TO CONTINUE TO SUPERVISE THE DUE

16 DILIGENCE.  IN FACT, THIS PACKAGING TEST DETAIL, SO,

17 THIS IS ANOTHER NOTE BY JON KUNSCHNER.  HE SAYS -- AND

18 THIS IS FROM BROADVIEW -- THAT THIS IS WITH KIRK LANEY

19 AGAIN.  AND HE'S TALKING ABOUT THIS, AND HE SAYS, KIRK

20 DID ASK TO SPEAK WITH ISL SALES FORCE TO GET A SENSE FOR

21 THE EFFORT REQUIRED TO EQUIP THEM AND SELL THE TAOS

22 PRODUCTS IN THE CHANNEL.  FAR FROM THERE BEING ANYTHING

23 IMPROPER ABOUT CONDUCTING A BUY VERSUS BUILD ANALYSIS,

24 TAOS WAS AWARE OF THIS, AND INTERSIL TOLD ITS INVESTMENT

25 BANKER, BROADVIEW, ALL ABOUT WHAT IT WAS DOING.  THERE'S

1    NO QUESTION THAT BROADVIEW KNEW ABOUT IT.  THIS IS IN

2    BROADVIEW'S NOTES.

3                INTERSIL WAS IN THE MIDST OF DOING A BUILD

4    VERSUS BUY ANALYSIS RELATING TO THE TAOS PRODUCTS,

5    SPEARHEADED BY MOHAN AND RAJEEVA LAHRI, AND WHAT THEY

6    ASKED ABOUT IS, THEY NEED TO BETTER UNDERSTAND THE

7    DESIGN AND PACKAGING, TEST SECRET SAUCE.  IN OTHER

8    WORDS, WHAT CAN BE DONE TO IMPROVE THE MARGINS HERE?

9    WHAT IS TAOS DOING THAT WE CAN IMPROVE ON IF WE PUT THEM

10   ON OUR SYSTEMS?  AND THAT'S THE INFORMATION THAT, AFTER

11   THE FIRST OFFER, CONTINUED TO BE EXCHANGED.

12               AND IN FACT, THE BEST EVIDENCE OF THIS,

13   BROADVIEW PROVIDED A TEMPLATE TO TAOS, BECAUSE TAOS WAS

14   NOT A PUBLICLY TRADED COMPANY.  THEIR FINANCIAL

15   INFORMATION WASN'T IN THE FORM THAT IT COULD BE COMPARED

16   WITH INTERSIL'S, SO THEY ACTUALLY PROVIDED A BLANK

17   TEMPLATE.  THE E-MAIL SAYS, ATTACHED IS A FINANCIAL

18   TEMPLATE BROADVIEW ASKED TO BE FILLED IN.  IT PROVIDES A

19   WAY TO HELP GUIDE THEM THROUGH A HELPFUL WAY TO ORGANIZE

20   THE FINANCIAL DATA, AND AS YOU CAN SEE, WHAT'S EXACTLY

21   WHAT WAS ATTACHED, A BLANK TEMPLATE FOR THE SPREADSHEET.

22               AND TAOS, HOWEVER, NEVER ACTUALLY PROVIDED

23   THE PACKAGING/TEST DETAIL FOR THE NEW PRODUCT.  SO

24   REMEMBER, THEY PROVIDED LOTS OF FINANCIAL DETAIL, BUT

25   WHAT TAOS ACCUSES INTERSIL OF MISAPPROPRIATING, IT WAS

1  THE FINANCIAL INFORMATION ON THE PACKAGING AND TEST

2  COSTS FOR THEIR UPCOMING PRODUCT, THE 2560 AND '61

3  CHIPSCALE, BUT IT'S VIRTUALLY UNDISPUTED THAT THAT

4  INFORMATION WAS NEVER PROVIDED TO INTERSIL.

5              SO, IN THE WORDS OF DAVE CRAIG HIMSELF, HE

6  SAYS, WE DID NOT INPUT DETAILS FOR ASSEMBLY, TEST,

7  PACKAGING, BY PRODUCT OR PRODUCT FAMILY, BUT IT IS

8  INCLUDED IN THE ALL OTHER LINE ON THE COST OF GOODS SOLD

9  SUMMARY.  AND WE SAW DURING THE TRIAL THAT THAT "ALL

10 OTHER" LINE WAS JUST A GENERAL CATCHALL LINE.  IT DIDN'T

11 BREAK OUT ANYTHING.

12             AND THEY GO ON.  SO, INTERNALLY, WE NOTED

13 THAT JUST A COUPLE OF UPDATES, WHAT CHARLIE MENTIONED,

14 WE DIDN'T GET DETAILED ANALYSIS OF ASSEMBLY AND TEST

15 COSTS FROM THEM YET.  TITAN WAS SUPPOSED TO SUPPLY US

16 THAT LAST WEEK.  AND THEY SAID, HERE IS AN EXAMPLE OF

17 SOME GENERAL PACKAGING COSTS, BUT THEY KNOW, THESE DO

18 NOT INCLUDE THE MULTI-DIE HYBRID-STYLE PACKAGES OR THE

19 CLEAR GLASS SHELL CASE (CHIPSCALE) PACKAGE.

20             LADIES AND GENTLEMEN, THAT'S THE PACKAGE

21 THAT THEY ACTUALLY NOW ACCUSE INTERSIL OF

22 MISAPPROPRIATING COST INFORMATION.  INTERSIL NEVER GOT

23 IT.  IN FACT, WE ASKED DAVE CRAIG ABOUT THAT IN HIS

24 DEPOSITION.  CRAIG SAID -- WE ASKED HIM, DO YOU KNOW

25 IF -- DID TAOS EVER PROVIDE TO BROADVIEW OR INTERSIL THE

1    TESTING AND PACKAGING COSTS?  ANSWER:  "NOT THAT I KNOW

2    OF."

3              AND HE WAS THE ONE PROVIDING THE

4    INFORMATION.  WE ASKED RICH TURNER TO LOOK AT THE SAME

5    SPREADSHEET THAT MR. LANEY TOOK THE STAND, THE MONSTER

6    SPREADSHEET, AND HE SAID, OH, IT'S IN THERE SOMEWHERE

7    UNDER ASSEMBLY AND TEST COSTS.  WE ASKED HIM, CAN YOU

8    TELL ANYTHING ABOUT THE PACKAGING COSTS OF THE SPECIFIC

9    PRODUCT?  HE SAID, YOU CANNOT DETERMINE TAOS'S PACKAGING

10   COSTS FOR THE TSL2560 FROM THE INFORMATION TAOS PROVIDED

11   IN 2004.  HE REVIEWED THE SAME SPREADSHEET, TOOK YOU

12   THROUGH THAT AND SHOWED YOU HOW IT JUST SIMPLY WAS NEVER

13   THERE.

14             AND IN FACT, WE ALL SAW WHAT, IN FACT, WAS

15   THE DETAIL THAT WAS RETURNED.  IT LOOKED JUST LIKE THE

16   BLANK SPREADSHEET THAT WAS SENT TO TAOS IN THE FIRST

17   PLACE.  THEY DIDN'T FILL THIS OUT.  BUT THAT WASN'T

18   INFORMATION THAT INTERSIL HAD TO HAVE AT THE TIME

19   BECAUSE THEY DETERMINED, ON THEIR OWN, THAT AFTER

20   LOOKING AT WHETHER THERE WAS A BUSINESS FIT, THAT THEY

21   HAD ENOUGH INFORMATION TO INCREASE THEIR OFFER TO TAOS.

22   SO, THIS IS AN E-MAIL FROM KIRK LANEY.  NOTICE THAT HE'S

23   AGREEING THAT, UNDER THE MUTUAL NDA, BOTH SIDES CAN

24   EVALUATE THE BUSINESS FIT.  OBVIOUSLY, INTERSIL NEEDS TO

25   UNDERSTAND, WHAT IS THE BENEFIT OF ACQUIRING TAOS?

1        AND IN FACT, THE ENGINEERS WHO LOOKED AT

2   THE TECHNOLOGY SAID, THEY'VE GOT A ONE-YEAR HEAD START.

3   THEY'VE GOT SAMPLES OF THE PRODUCT READY.  IF WE ACQUIRE

4   TAOS, WE WILL GET A ONE-YEAR JUMP START INTO THE MARKET.

5   THAT WAS SIGNIFICANT.  AND THAT WAS ONE OF THE REASONS

6   WHY INTERSIL UPPED ITS OFFER.  BUT IT HAD TO COMPARE

7   WHAT IT WOULD GET FROM ACQUIRING TAOS TO WHAT IT HAD ON

8   ITS OWN, AND BASED UPON THAT COMPARISON, THEY AGREED TO

9   PAY MORE.

10        NOW, INTERESTINGLY, MR. LANEY DID HIS OWN

11  COMPARISON.  SO, THEY WANT TO TELL YOU THAT YOU CAN'T

12  COMPARE THE DEAL WITH AN ALTERNATIVE THAT YOU HAVE IN

13  YOUR COMPANY?  WELL, MR. LANEY SURE DID.  HE SAID, AS

14  YOU KNOW, WE ARE WEIGHING POSSIBILITIES OF MERGERS

15  AGAINST MOVING THROUGH A RAPID GROWTH PHASE WITH EQUITY

16  INVESTMENT TO EXPAND OUR SALES, APPLICATION, AND

17  DEVELOPMENT TEAMS.  HE WAS LOOKING AT BOTH.  HE WAS

18  COMPARING WHAT IT WOULD BE LIKE TO HAVE AN EQUITY

19  INVESTMENT VERSUS WHAT IT WOULD BE LIKE TO BE ACQUIRED

20  AND WAS COMPARING THE TWO.

21        THE IDEA THAT THAT'S NOT A PERMITTED USE

22  UNDER THE AGREEMENT IS CONTRADICTED BY WHAT TAOS DID,

23  AND IT'S CONTRADICTED BY EVERY WITNESS, SUCH AS

24  DR. HOBBS, DR. TURNER, WHO TOOK THE STAND AND SAID, NO,

25  THIS IS COMMONLY DONE IN AN ACQUISITION.  YOU HAVE TO

1    UNDERSTAND WHAT ARE THE REDUNDANCIES IN ORDER TO

2    UNDERSTAND WHAT THE POSSIBLE SYNERGIES ARE.

3              AND UPON EVALUATION, INTERSIL DECIDED TO

4    BUY.  IT DIDN'T DECIDE TO GO FORWARD WITH ITS HOMEGROWN

5    OPTO PROGRAM.  YOU CAN SEE THE TEXT HERE IN DETAIL.  HE

6    SAYS, THEY'RE LOOKING AT AN INTERNALLY GROWN OPTO

7    PROGRAM AND WHETHER THAT'S PREFERABLE TO ACQUIRING

8    TITAN.  SO WE'RE ON HOLD, AT LEAST TEMPORARILY.  AND

9    THEN WHAT DOES HE SAY?  HE SAYS, "ON THE ASSUMPTION THAT

10   WE DECIDE TO STAY ON TRACK WITH TITAN, ATTACHED IS A

11   POTENTIAL RESPONSE TO KIRK'S COUNTEROFFER."  SO, IN

12   RESPONSE TO THIS $70 MILLION COUNTEROFFER, IF THEY

13   DECIDED TO BUY INSTEAD OF BUILD, WHAT WERE THEY GOING TO

14   DO?

15             THEY WERE GOING TO OFFER $42 MILLION; 17

16   MILLION OF THAT GUARANTEED WITH AN ADDITIONAL 18 MILLION

17   SPREAD OUT OVER YEARLY TARGETS, AND FINALLY, A

18   $7 MILLION KICKER FOR A TOTAL PACKAGE THERE OF 42

19   MILLION.  AND IN ADDITION TO THAT, BECAUSE MR. LANEY HAD

20   ASKED FOR $3 MILLION COMMITMENT FOR INVESTMENT INTO

21   TAOS, THEY HAD THAT TOO, AN AGREEMENT IN PRINCIPLE TO

22   INVEST 3 MILLION TO BUILD THE TAOS BUSINESS.  AND SO

23   THEY DECIDED TO BUY.  THIS OFFER WAS COMMUNICATED.  AND

24   HOW DO WE KNOW?  WE HAVE THE INTERNAL MEMO FROM DUNCAN

25   WEAVER THAT ACTUALLY SAYS WHAT THE VERBAL OFFER WAS

1    THROUGH BROADVIEW.  SO, THIS WAS FROM DUNCAN WEAVER AT

2    INTERSIL, AND IT WAS DOCUMENTED BY BROADVIEW.  THIS IS

3    FROM BROADVIEW'S OWN DOCUMENTS.  IT WAS THEIR JOB TO

4    DOCUMENT THESE THINGS.

5              SO, THIS IS ON JULY 12TH, AND THIS OFFER

6    SHALL BE UP TO 42 MILLION (THE CONSIDERATION) CONSISTING

7    OF 17 MILLION IN CASH UP TO AN ADDITION CONSIDERATION OF

8    25 MILLION, AND THAT INDIGO AGREES IN PRINCIPLE TO

9    INVEST AN INCREMENTAL AMOUNT OF 3 MILLION TOWARDS HUMAN

10   RESOURCES EXPENSES AND WORKING CAPITAL TO AUGMENT THE

11   DEVELOPMENT OF THE TITAN BUSINESS.

12             AND YOU'LL RECALL, WHAT DID MR. LANEY SAY

13   ABOUT THIS?  HE ACTUALLY -- HE APPRECIATED THE CALL.  HE

14   ACKNOWLEDGES THAT THERE WAS A CALL.  AND I NOTE THAT

15   WHILE THIS SAYS, WEDNESDAY, IT'S WEDNESDAY AT 12:14

16   A.M., AFTER MIDNIGHT, SO THE CALL YESTERDAY WOULD HAVE

17   BEEN THE CALL ON MONDAY, THE 12TH.  AND HE SAYS, I

18   GLEANED FROM OUR MONDAY DISCUSSION THAT THERE IS A

19   REASONABLE ENTERPRISE VALUE PERCEIVED FOR A TAOS

20   ACQUISITION IN THE 40 TO $50 MILLION RANGE, EXACTLY THE

21   RANGE THAT WAS COMMUNICATED.

22             AND HE GOES ON TO SAY, THUS, MY PUSH FOR

23   THE DEAL HEADING FOR 70 MILLION AT THE GRAND-SLAM LEVEL

24   MAY BE A TOUGH SALE.  SO, HE KNEW HIS COUNTEROFFER WAS

25   GOING TO BE A TOUGH SELL AT INTERSIL.  HE EVEN CALLED IT

1    A GRAND SLAM.  NOW, HE FALSELY DENIED THAT HE RECEIVED

2    THIS OFFER.  YOU SAW THAT ON THE STAND.  OKAY.  SO

3    YOU'RE SAYING THERE WAS NO VERBAL OFFER THAT WAS

4    PRESENTED TO YOU FOR 42 MILLION?  I DON'T BELIEVE THERE

5    WAS.

6                AND THEN, AND YOU ASKED HIM, THOUGH,

7    REFERRING TO CONVERSATION WITH MOHAN HERE, "WHETHER THE

8    DEALS WERE STILL ON THE TABLE, DIDN'T YOU?"  "I DID."

9    "IS THE ORIGINAL ACQUISITION OFFER SENT AS YOU WERE

10   HEADING TO EUROPE OR THE SLIGHTLY MODIFIED VERBAL OFFER

11   FROM DUNCAN (THROUGH BROADVIEW) STILL ON THE TABLE?"

12   "YES, I DID."

13               "THIS -- THE SECOND OFFER, THAT'S WHAT I

14   WANT TO ASK YOU ABOUT.  YOU CALLED THAT AN OFFER HERE IN

15   YOUR E-MAIL TO MR. MAHESWARAN, DIDN'T YOU?"  "I DID."

16   "AND YOU NOTED THAT IT WAS AN OFFER FROM DUNCAN.  THAT'S

17   DUNCAN WEAVER OF INTERSIL, RIGHT?"  ANSWER:  "IT IS."

18   "AND THAT WAS COMMUNICATED TO YOU THROUGH BROADVIEW,

19   RIGHT?"  "CORRECT."

20               SO, HE RECANTED HIS PRIOR TESTIMONY THAT

21   THERE WAS NO $42 MILLION OFFER.  AND IN FACT, IN HIS OWN

22   WORDS, HE REFERRED TO THE SLIGHTLY MODIFIED VERBAL OFFER

23   FROM DUNCAN THROUGH BROADVIEW IN HIS SUBSEQUENT

24   CONVERSATION WITH MOHAN MAHESWARAN.  BY THAT TIME, AS

25   YOU HEARD, INTERSIL HAD JUST ACQUIRED A COMPANY CALLED

1  PSI CORP. FOR 530 MILLION AND WAS UNDERGOING A

2  REORGANIZATION, AND MOHAN WAS ACTUALLY GIVEN A

3  RESPONSIBILITY FOR RUNNING A NEW $200 MILLION BUSINESS

4  UNIT.  AND AS A RESULT, THE OFFER WAS NO LONGER ON THE

5  TABLE AS OF -- AS OF AUGUST HERE.

6          NOW, KIRK LANEY WAS TOLD THIS MIGHT HAPPEN.

7  HE WAS ACTUALLY TOLD BY A BOARD MEMBER, JACOB JACOBSON,

8  THAT A MORE AGGRESSIVE STANCE WITH INTERSIL OBVIOUSLY

9  INVOLVES THE RISK OF NOT DOING INTERSIL AT ALL.  "I

10 THINK INTERSIL AS IT STANDS IS THE BETTER ALTERNATIVE."

11 SO, BEFORE HE WENT BACK AND SPOKE TO MOHAN MAHESWARAN,

12 HE WAS CAUTIONED IN AUGUST OF 2004, I THINK YOU SHOULD

13 TAKE THE DEAL.  THE DEAL ON THE TABLE AT THE TIME WAS

14 THE $45 MILLION.

15          THEN TAOS, THEIR CEO -- I'M SORRY, CFO,

16 DAVID CRAIG, HE ACTUALLY AGREED THAT INTERSIL'S

17 $30 MILLION OFFER MADE SENSE BASED ON TAOS'S PAST

18 FINANCIAL PERFORMANCE.  YOU VALUE A COMPANY BASED ON

19 PAST FINANCIALS.  HE WAS ASKED, SO YOU THINK THE OFFER

20 THAT INTERSIL SUBSEQUENTLY MADE WAS BASED ON TAOS'S PAST

21 PERFORMANCE?  IS THAT WHAT -- ABSOLUTELY CORRECT.  YEAH.

22 WAS THERE OFFER -- DID THEIR OFFER MAKE SENSE TO YOU AT

23 THAT TIME, IF THAT WAS THE BASIS FOR IT?  ANSWER:  YES.

24 I MEAN, IT -- THAT'S WHERE I FIGURED IT CAME FROM, YES.

25          AND IN FACT, LANEY ADMITTED LATER, AFTER

DAILY COPY                    187

1  THE OFFER AND THE NEGOTIATIONS WERE DONE, THAT TAOS'S

2  OWN FINANCIALS DIDN'T SUPPORT HIS GRAND-SLAM OFFER.  HE

3  ACTUALLY SAID, OUR PRESENT DAY FINANCIALS TURNED IT INTO

4  A TOUGH SELL TO INTERSIL FINANCIAL FOLKS AND THEIR BOARD

5  OF DIRECTORS.  I THINK WE PARTED ON GOOD TERMS, AND

6  PERHAPS THERE IS AN OPPORTUNITY TO REVISIT THIS IN THE

7  FUTURE.

8            HE UNDERSTOOD THAT IT WAS THE FINANCIALS

9  AND HIS OWN GREED IN ASKING, DEMANDING $70 MILLION FOR

10  HIS COMPANY, AND THERE'S NO EVIDENCE THAT HE EVER

11  WAVERED OFF THAT $70 MILLION DEMAND.  SO, ON THE ONE

12  HAND, MOHAN MAHESWARAN, HE GAVE THE LAST DOLLAR THAT HE

13  HAD TO SPEND.  HE HAD AUTHORIZATION UP TO 45, AND HE

14  AUTHORIZED IT ALL IN THIS DEAL AND OFFERED IT ALL, BUT

15  THAT WASN'T ENOUGH.  AND SO INTERSIL WAS NOT ABLE TO BUY

16  TAOS, DESPITE ITS BEST EFFORTS.

17            AND IF YOU LOOK AT THE FINANCIALS, IT'S NO

18  WONDER.  IN 2004, ACCORDING TO TAOS'S OWN DOCUMENT, TAOS

19  LOST HP, ITS LARGEST CUSTOMER, AND YOU CAN SEE THE

20  LARGEST SOURCE OF REVENUE ACTUALLY SHRUNK TO NOTHING AS

21  IT WAS PROJECTED TO DO BY THE END OF 2004.  THEIR OWN

22  FINANCIALS TOLD A VERY SOMBER STORY.  ON 7 AND A HALF

23  MILLION DOLLARS OF GROSS REVENUE, THEY WERE ACTUALLY

24  GOING TO LOSE $2.4 MILLION OF THE MONEY.

25            NOW, I'M A BIG FAN OF THE SHOW, SHARK TANK.

1    I'VE KIND OF GOTTEN TO -- MARK CUBAN'S ON IT.  A LOT OF

2    ENTREPRENEURS GO ON IT AND PITCH THEIR PRODUCTS.  AND I

3    THOUGHT TO MYSELF, WHAT WOULD KIRK LANEY DO IF HE WAS

4    GOING IN THE SHARK TANK?  WOULD HE SAY, I'M ASKING

5    $7 MILLION FOR 10 PERCENT OF MY COMPANY?  AND THAT MIGHT

6    BE INTERESTING TO THE SHARKS UNTIL THEY HEARD THAT THE

7    REVENUE FORECAST WAS A LOSS OF $2.4 MILLION.  LADIES AND

8    GENTLEMEN, IF THAT HAPPENED, I GUARANTEE YOU, EVERY ONE

9    OF THOSE SHARKS WOULD SAY, I'M OUT.  NOBODY WANTS TO PAY

10   $70 MILLION TO LOSE $2.4 MILLION.

11            NOW, AT A BETTER VALUATION, BOTH BROADVIEW

12   AND THE INTERSIL BOARD OF DIRECTORS AUTHORIZED THAT DEAL

13   AND RECOMMENDED IT BETWEEN 42 AND 45, WHICH WERE ALL

14   REASONABLE OFFERS.

15            AND THEN, YOU'VE HEARD TAOS LAWYERS FALSELY

16   IMPLY THAT INTERSIL USED THE INADVERTENTLY AND

17   MISTAKENLY RETAINED DOCUMENTS.  YOU HEARD THEM SAY THAT

18   INTERSIL KEPT THE INFORMATION AND THEN WENT ON TO

19   QUICKLY CREATE A COMPETING PRODUCT BASED ON THE THEFT OF

20   TAOS'S TRADE SECRETS.  NOW, WHAT ACTUALLY HAPPENED WAS

21   INTERSIL'S LEGAL RETENTION WAS A GOOD FAITH MISTAKE.

22   THEY WERE RELYING ON THE DIFFERENT CONFIDENTIAL -- A

23   DIFFERENT NDA THAT DIDN'T ACTUALLY APPLY TO THE TAOS

24   DOCUMENTS, BUT THAT NDA HAD AN EXPRESS TERM THAT SAID,

25   EACH PARTY MAY RETAIN ONE ARCHIVAL COPY IN ITS LEGAL

1    DEPARTMENT TO BE USED ONLY IN RESOLVING A DISPUTE

2    CONCERNING THIS AGREEMENT OR FOR REGULATORY COMPLIANCE

3    PURPOSES.

4              SO IN OTHER WORDS, IF THERE WAS A DISPUTE

5    AS TO WHAT WAS DONE WITH THE INFORMATION OR WHAT WAS

6    EXCHANGED, THEN THE LEGAL DEPARTMENT WOULD HAVE A COPY,

7    AND SO THAT'S WHY TOM TOKOS AND DOUG BALOG HAD COPIES.

8    IT WAS A MISTAKE.  BUT YOU KNOW WHAT?  IT WAS A MISTAKE

9    THAT APPARENTLY TAOS DIDN'T PERCEIVE EITHER, BECAUSE

10   WHEN MR. BALOG SENT HIS CERTIFICATE OF DESTRUCTION, IT

11   REVEALS THE MISTAKE RIGHT THERE.  IT SAYS, WE CERTIFY

12   OUR DESTRUCTION UNDER THE NONDISCLOSURE AGREEMENT, NDA,

13   BETWEEN INTERSIL CORPORATION AND BROADVIEW

14   INTERNATIONAL, DATED JULY 1, 2004.

15             WELL, THEY'RE REFERRING TO THE WRONG NDA,

16   THE ONE THAT ALLOWED A RETENTION BY THE LEGAL

17   DEPARTMENT.  NOW, WE'RE SHOWING YOU THIS TO INDICATE

18   THAT IT WAS A MISTAKE, BUT IT WAS A MISTAKE THAT

19   INTERSIL NEVER TRIED TO HIDE, AND IF LANEY HAD BEEN SO

20   CONCERNED, WHY DIDN'T HE SAY SOMETHING?  WHY DIDN'T HE

21   SAY, WAIT A MINUTE, WHAT NONDISCLOSURE AGREEMENT BETWEEN

22   INTERSIL CORPORATION AND BROADVIEW?  THEY WANT TO ALLEGE

23   THAT TOM TOKOS DID THIS INTENTIONALLY BECAUSE HE

24   RECEIVED AN E-MAIL THAT REFERRED TO A NONDISCLOSURE

25   AGREEMENT.  HERE, THERE'S A CERTIFICATE THAT ACTUALLY

1  HAS THE FULL LEGAL DESCRIPTION OF IT, AND WHAT DOES

2  LANEY SAY?  HE NEVER COMPLAINED.  HE SAID, "THANK YOU

3  FOR YOUR ATTENTION TO THIS MATTER.  YOUR SCANNED

4  ORIGINAL CERTIFICATE OF DESTRUCTION HAS BEEN RECEIVED

5  AND COVERS OUR CONCERNS."

6            AND IT SHOULD BECAUSE THE EVIDENCE IS

7  UNDISPUTED THAT DESPITE THE FACT THAT INTERSIL DELIVERED

8  REAMS OF INFORMATION TO TAOS IN THAT LAWSUIT, WE

9  DELIVERED 28 GIGABYTES OF DATA, 26,000 DOCUMENTS,

10 121,000 PAGES THAT WERE BATES NUMBERED OF DOCUMENTATION.

11 AND DESPITE ALL OF THAT, THEIR EXPERT HAD TO CONCEDE

12 THAT THERE WAS NO EVIDENCE AT ALL OF DISSEMINATION AFTER

13 THE PARTIES CERTIFIED DESTRUCTION.

14            SO, MR. MCALEXANDER ADMITS, THERE WAS NO

15 EVIDENCE OF POST-PURGING DISSEMINATION.  HOW ABOUT THE

16 RETAINED DOCUMENTS BY THE LEGAL DEPARTMENT?  HE WAS

17 ASKED -- NEVER DISSEMINATED.  GOT NO EVIDENCE OF THAT.

18 RETAINED DOCUMENTS BY VERN KELLEY IN HUMAN RESOURCES?

19 WERE THOSE EVER DISSEMINATED?  NEVER DISSEMINATED.  AND

20 E-MAILS LEAVE TRAILS.  YOU CAN'T CIRCULATE E-MAILS

21 WITHOUT LEAVING SOME EVIDENCE OF THAT, AND THERE WAS

22 NONE.

23            HOW ABOUT THE RETAINED DOCUMENTS BY DENNIS

24 FOSTER?  NEVER DISSEMINATED.  RETAINED DOCUMENTS IN

25 DUNCAN WEAVER'S E-MAIL MAILBOX?  WELL, THOSE WERE NEVER

1  ACCESSED BECAUSE DUNCAN WEAVER, COINCIDENTALLY, LEFT THE

2  DAY THAT THE PURGE E-MAILS WENT OUT.  BUT WE FOUND ALL

3  THOSE AND PRODUCED THEM IN THIS LAWSUIT, AND AS A RESULT

4  OF THAT, THE JUDGE SAID, TECHNICALLY, YOU VIOLATED THE

5  NDA.  YOU DIDN'T RETURN EVERY DOCUMENT, AND SO WE'RE

6  GOING TO FIND YOU LIABLE FOR FAILING TO RETURN

7  DOCUMENTS, AND WE'RE GOING ALLOW THE JURY TO ASSESS ONLY

8  NOMINAL DAMAGES RELATED TO THE RETURN OF DOCUMENTS.

9          NOMINAL DAMAGES.  IT'S USUALLY $1 OR A FEW

10  DOLLARS, NOMINAL DAMAGES ONLY FOR THE RETENTION OF

11  DOCUMENTS.  AND YET, THEY WAG THEIR FINGER AT TOM TOKOS

12  AND THEY ACCUSE HIM OF LYING BECAUSE HE SAID THAT THEY

13  HAD NOT -- THEY HAD DESTROYED DOCUMENTS AND THEY DID NOT

14  WITHHOLD ANY DOCUMENTS.  THE COURT'S ALREADY FOUND THAT

15  THE WITHHOLDING OF DOCUMENTS DID NOT CAUSE ANY ACTUAL

16  DAMAGE TO TAOS, AND THAT'S VERY IMPORTANT.  VERY

17  IMPORTANT.

18          SO -- AND THE ISSUE OF USE, TOO, WE

19  BELIEVE, IS ANSWERED BY THIS.  SO YOU'LL BE ASKED, DID

20  INTERSIL USE ANY OF THE TAOS DOCUMENTS THAT IT

21  INADVERTENTLY RETAINED?  THERE'S NO EVIDENCE OF THAT USE

22  ANY TIME AFTER THE DUE DILIGENCE PERIOD ENDED.

23          NOW, LET'S TALK ABOUT THE TRADE SECRETS

24  CLAIM.  TRADE SECRETS CANNOT BE PUBLICLY KNOWN, AND

25  YOU'LL BE INSTRUCTED ON THE LAW, BUT IN ESSENCE, TO BE A

1  TRADE SECRET, THE INFORMATION MUST BE SECRET.

2  INFORMATION THAT IS PUBLIC CANNOT BE A TRADE SECRET.

3  MERE POSSESSION OF TRADE SECRET INFORMATION IS NOT IN

4  AND OF ITSELF IMPROPER.  THIS IS A CRITICAL POINT.  TAOS

5  MUST PROVE THAT INTERSIL WRONGFULLY USED TRADE SECRET

6  INFORMATION.  IN FACT, THE NDA ITSELF EXCLUDES CERTAIN

7  INFORMATION FROM PROTECTION AT ALL.

8           THE TERM, "CONFIDENTIAL INFORMATION," SHALL

9  NOT INCLUDE ANY INFORMATION WHICH IS GENERALLY AVAILABLE

10  TO THE PUBLIC AS OF THE DATE OF THIS AGREEMENT, BECOMES

11  GENERALLY TO THE PUBLIC AFTER THE DATE OF THIS

12  AGREEMENT, ASSUMING THAT IT DOESN'T BECOME THAT WAY AS A

13  RESULT OF INTERSIL'S FAULT.  THEY CAN'T PUT IT ON THE

14  INTERNET AND SAY IT'S PUBLIC.  AND THEY DIDN'T.  OR WAS

15  KNOWN BY THE RECIPIENT PRIOR TO THE DATE OF THIS LETTER

16  AND SUCH KNOWLEDGE WAS DOCUMENTED IN THE RECIPIENT'S

17  WRITTEN RECORDS PRIOR TO SUCH DATE.

18           WHAT IS SO CRITICAL ABOUT THIS IS THAT ALL

19  OF THE INFORMATION THAT INTERSIL IS -- SUPPOSEDLY

20  MISAPPROPRIATED CAME THROUGH THIS NDA.  ALL OF IT IS

21  COVERED BY THESE EXCLUSIONS, SO IF THE INFORMATION MEETS

22  ANY ONE OF THESE EXCLUSIONS, IT CANNOT BE CONFIDENTIAL

23  INFORMATION UNDER THE PARTIES' AGREEMENT.  THIS IS THE

24  AGREEMENT THAT THE PARTIES REACHED, AND WE'RE ASKING YOU

25  TO HOLD BOTH SIDES TO THAT AGREEMENT.

1           SO, DR. PHIL HOBBS TALKED ABOUT THE TRADE

2    SECRETS CLAIM.  HE SAID, ALL OF THE TECHNICAL TRADE

3    SECRETS CLAIMED BY TAOS, WHETHER ALONE OR IN

4    COMBINATION, WERE KNOWN TO INTERSIL OR WERE IN THE

5    PUBLIC DOMAIN.  CERTAIN TECHNICAL INFORMATION CLAIMED AS

6    A TRADE SECRET, WELL, THAT WAS ACTUALLY IN PATENTS OR

7    PATENT APPLICATIONS.  AGAIN, YOU REMEMBER THE

8    DEFINITION.  IF IT'S PUBLIC, IT CANNOT BE CONFIDENTIAL

9    INFORMATION UNDER THE AGREEMENT.

10          THE BALANCE OF THE INFORMATION, HE SAYS,

11   ARE CONCEPTS WELL KNOWN IN THE INDUSTRY, SOMETIMES FOR

12   SEVERAL DECADES.  AND HE WENT ON TO SAY THAT THE ALLEGED

13   TRADE SECRETS WERE EVEN ALREADY USED BY INTERSIL IN THE

14   EL7903 AND IN THE PDIC DEVELOPMENT BEFORE IT EVER MET

15   WITH TAOS.  THIS IS SO CRITICAL.  BECAUSE REMEMBER, IF

16   INTERSIL CAN SHOW, BY ITS OWN DOCUMENTS, THAT IT ALREADY

17   HAD CERTAIN INFORMATION, IT CANNOT QUALIFY AS

18   CONFIDENTIAL INFORMATION UNDER THE AGREEMENT.

19          SO, DR. HOBBS WENT ON TO SAY, THE MANNER IN

20   WHICH INTERSIL CONDUCTED ITS BUILD VERSUS BUY ANALYSIS

21   IS CONSISTENT WITH THE STANDARD IN THE INDUSTRY, AND IT

22   WAS DONE IN THE SAME WAY IN WHICH IBM CONDUCTS ITS BUILD

23   VERSUS BUY ANALYSIS.  SO, PLAINTIFFS ARE TRYING TO READ

24   A WHOLE BUNCH INTO THIS PERMITTED USE AGREEMENT.

25   NOWHERE IN THAT AGREEMENT DOES IT EVER SAY ANYTHING

1    ABOUT A BUILD VERSUS BUY ANALYSIS BEING IMPROPER, NONE

2    AT ALL.  IN FACT, DR. HOBBS IS THE ONLY WITNESS WHO CAME

3    TO YOU AS AN EXPERT AND TESTIFIED THAT THIS IS INDUSTRY

4    STANDARD.  THIS IS ALWAYS DONE IN A PERMITTED USE, IN AN

5    ACQUISITION SITUATION.  AND YOU KNOW, TAOS DID IT TOO.

6                    INTERSIL'S DEVELOPMENT TIME FOR THE 29001

7    WAS CONSISTENT WITH A NONUSE OF TAOS TRADE SECRETS, AND

8    THAT INFORMATION FROM INTERSIL'S REVERSE ENGINEERING IN

9    2006 IS NOT A TRADE SECRET.  THERE IS, AS HE SAID,

10   COPYING, AND THERE IS COPYING, AND WE BELIEVE, AS HE

11   ELABORATED, YOU CAN COPY SOMETHING ILLEGALLY.  WE ALL

12   KNOW THAT.  BUT IF YOU DO SOMETHING LIKE REVERSE

13   ENGINEERING, THAT'S PERFECTLY LEGAL, AND YOU HEARD THE

14   COURT IN READING ITS CHARGE TO YOU ACTUALLY SAY THAT

15   REVERSE ENGINEERING, AS THE COURT NOTED, "THE CONCEPT OF

16   IMPROPER MEANS DOES NOT INCLUDE REVERSE ENGINEERING OF

17   PROPERLY ACQUIRED DEVICES."

18                   SO, IN JANUARY OF 2006, THIS BECOMES

19   CRITICAL, BECAUSE THAT'S ACTUALLY THE FIRST TIME THAT

20   INTERSIL LEARNED THE DETAILS OF TAOS'S DIODES.  AND HE

21   GOES ON TO SAY THAT INTERSIL'S ALS DEVICES AFTER THE

22   29004 USE FILTERS FOR IR REJECTION, AN APPROACH NOT USED

23   BY TAOS.

24                   TRADE SECRETS CANNOT BE KNOWN TO THE OTHER

25   PARTY.  IF THEY ARE, THEY'RE NOT TRADE SECRETS.  SO,

1    LET'S SEE WHAT INTERSIL KNEW BEFORE IT EVER MET WITH

2    TAOS.  IN ITS NEW PRODUCT PROPOSAL FOR THE EL7903 -- AND

3    BY THE WAY, YOU CAN SEE THIS PRODUCT PROPOSAL ISN'T

4    DATED IN AUGUST, ISN'T DATED IN JUNE.  IT'S DATED IN

5    FEBRUARY OF '04, SO THIS IS WHERE THE TIME LINE FOR

6    DEVELOPMENT AT LEAST MUST START.  AND IT LISTS THE PART,

7    AND IT SAYS IT'S GOING ON AN ALS WITH I-SQUARED C

8    INTERFACE.

9              IN FACT, THE INTERNAL DOCUMENT SHOWS THAT

10   INTERSIL BELIEVED THAT IT WOULD BE THE FIRST COMPANY TO

11   HAVE THIS ALS WITH AN I-SQUARED C INTERFACE BECAUSE IT

12   HAD NO IDEA THAT TAOS HAD INDEPENDENTLY DEVELOPED

13   ANYTHING AS OF THIS TIME.  THIS WAS WELL BEFORE THE

14   MEETING.

15             THE SAME PRODUCT PROPOSAL SHOWS THAT IT'S

16   ALSO GOING TO FEATURE AN ANALOG TO DIGITAL CONVERTER,

17   RIGHT HERE, FEATURES A 12-BIT ADC AND AN I2C OR

18   I-SQUARED C INTERFACE.  PLASTIC PACKAGING.  INTERSIL

19   ALWAYS PLANNED TO USE A PLASTIC PACKAGE FOR ITS AMBIENT

20   LIGHT SENSOR.  IN FACT, AS YOU HEARD PHIL BENZEL

21   TESTIFY, IT RAN INTO A LOT OF DIFFICULTIES IN TRYING TO

22   MAKE THIS WORK, BUT IT -- IT OVERCAME THOSE DIFFICULTIES

23   AND WAS SUCCESSFUL IN GETTING A PLASTIC PACKAGE FOR ITS

24   AMBIENT LIGHT SENSOR.

25             SO, THEY CANNOT CLAIM THAT INTERSIL CHANGED

1    ITS STRATEGY FOR ITS AMBIENT LIGHT SENSOR BASED UPON A

2    MEETING WITH TAOS, BECAUSE THAT STRATEGY WAS IN

3    EXISTENCE AND ALREADY LAID OUT IN FEBRUARY OF '04 LONG

4    BEFORE THEY KNEW ANYTHING ABOUT TAOS'S PACKAGING

5    STRATEGY, AND REMEMBER, THEY NEVER GOT THE COST

6    INFORMATION FOR THOSE NEW GLASS PACKAGED PARTS, NEVER.

7                   THE DUAL-DIODE.  WE'VE HEARD SO MUCH ABOUT

8    THE DUAL-DIODE.  THE DUAL-DIODE IS CLEARLY COVERED BY

9    THE ASWELL PATENT, ACCORDING TO PLAINTIFFS.  IT

10   DISCLOSES TWO DIODES.  NOW, THAT'S NOT THE INVENTION, BY

11   THE WAY.  THE INVENTION IS NOT A LIGHT DIODE AND A DARK

12   DIODE.  IT'S SO MUCH NARROWER THAN THAT.  BUT THAT

13   PATENT CERTAINLY DISCLOSES A LIGHT DIODE THAT'S EXPOSED

14   TO INCIDENT LIGHT AND A SHIELDED DIODE THAT IS NOT

15   EXPOSED TO INCIDENT LIGHT AND ONLY RECEIVES INFRARED

16   LIGHT.  THAT'S ALL DISCLOSED IN THE PUBLIC IN A PATENT

17   THAT CANNOT BE A TRADE SECRET.  AND THAT'S A FUNDAMENTAL

18   DISTINCTION THAT TAOS BLURS THROUGHOUT THE CASE.

19                   LET'S TALK ABOUT AN ARRAY.  SO, PRIOR TO

20   THE TIME THAT INTERSIL MET WITH TAOS, IT HAD ACTUALLY

21   FILED FOR A PATENT, AND IT FILED FOR THAT PATENT IN

22   FEBRUARY OF 2003, AND NOW THIS DID NOT ACTUALLY MATURE

23   INTO AN ACTUAL PATENT, BUT IT'S AN -- IT'S AN INTERSIL

24   DOCUMENT, AND IT'S EVEN PUBLIC, AND THE INFORMATION THAT

25   WAS DISCLOSED ON THAT DOCUMENT SHOWED AN ARRAY, AND THIS

1   ISN'T LIMITED TO A PDIC.  THIS ISN'T THAT HONEYCOMB THAT

2   YOU SAW MR. ALIBHAI TALKING ABOUT.  THIS IS AN ACTUAL

3   ARRAY, 1:1 ARRAY, OF LIGHT AND DARK DIODES RIGHT THERE.

4   INTERSIL KNEW ALL OF THAT BEFORE THE MEETING.

5                    THE 1:1 RATIO YOU'VE HEARD SO MUCH ABOUT,

6   WELL, THERE IT IS IN THE SAME RUBIN PATENT APPLICATION

7   PUBLICATION, YOU HAVE A 1:1 RATIO, NOT ONLY IN AREA BUT

8   IN NUMBER AS WELL.  THAT'S ALL KNOWN TO INTERSIL.  THESE

9   ARE THE TECHNICAL TRADE SECRETS THAT THEY HAVE CONTENDED

10  INTERSIL MISAPPROPRIATED.  EVERY SINGLE ONE OF THESE WAS

11  KNOWN TO INTERSIL PRIOR TO THE TIME THAT THEY MET WITH

12  TAOS.  BECAUSE OF THAT, IT FALLS WITHIN AT LEAST THAT

13  THIRD CATEGORY.  MANY OF THESE ARE PUBLIC.  SEVERAL OF

14  THESE ARE ALSO KNOWN TO INTERSIL.  AND IT'S DOCUMENTED

15  THAT INTERSIL KNEW THEM FROM ITS OWN INTERNAL RECORDS.

16  CANNOT BE CONFIDENTIAL INFORMATION UNDER THE NDA.

17                   SO, AN INTERLEAVED PHOTODIODE ARRAY WITH A

18  1:1 RATIO WAS WELL KNOWN TO INTERSIL.  AGAIN, THIS WAS

19  THE RUBIN APPLICATION.  AND BRIAN NORTH TESTIFIED ABOUT

20  THIS.  HE SAID, THIS IS ONE OF THE FIRST THINGS HE READ

21  WHEN HE JOINED INTERSIL BECAUSE THE PRODUCT THAT HE WAS

22  SUPPOSED TO BE DEVELOPING AND THAT HE SET OUT TO DEVELOP

23  WAS BASED ON THIS PATENT.  SO, HE WAS WELL FAMILIAR WITH

24  IT.  HE SAID, THIS PATENT DIRECTLY APPLIES TO THE WORK

25  HE WAS DOING, INCLUDING THE PDIC DEVELOPMENT.

1        IN FACT, BRIAN NORTH SAID, AND HE TESTIFIED

2   THAT, AS AN OPTICAL ENGINEER, THE ARRAY WAS AN OBVIOUS

3   CHOICE BECAUSE IT WAS, QUOTE, THE SAME CONCEPT AS THE

4   PDIC WE'D BEEN USING.  AND AGAIN, HE'S LOOKING AT THIS

5   FROM THE PERSPECTIVE OF A TRAINED OPTICAL ENGINEER OR,

6   AS YOU HEARD, A PERSON OF ORDINARY SKILL IN THE ART,

7   BECAUSE UNLIKE TAOS'S EXPERT, HE ACTUALLY QUALIFIES AS A

8   PERSON OF ORDINARY SKILL IN THE ART.

9        WHY HAVE AN ARRAY?  WELL, THE EL7903, THE

10  NEW PRODUCT THAT WAS COMING OUT, WAS A MUCH LARGER DIE

11  THAN THE 7900, AND THAT ALLOWED ROOM FOR AN ARRAY, AS HE

12  TESTIFIED TO RIGHT HERE AT TRIAL.

13       TAOS DIDN'T TEACH BRIAN NORTH OR INTERSIL

14  ABOUT AN ARRAY.  BECAUSE THE ONLY OTHER PRODUCT THAT

15  BRIAN NORTH WAS WORKING ON AT THAT TIME HAD AN ARRAY OF

16  PHOTODIODES WITH A 1:1 RATIO.  HE WAS WORKING ON A LIGHT

17  SENSOR DEVELOPMENT AND A PDIC DEVELOPMENT.  HE OBVIOUSLY

18  KNEW ABOUT THE 1:1 ARRAY OF PHOTODIODES FROM HIS PDIC

19  DEVELOPMENT, AND HE TESTIFIED TO THAT FACT.

20       AND HERE'S THE HONEYCOMB ARRAY THAT WAS

21  PARTICULAR IN THE PDIC DEVELOPMENT.  AND AGAIN, THIS

22  SHOWS A 1:1 RATIO IN NUMBER.

23       NOW, THE IDEA OF THE CHECKERBOARD, THAT WAS

24  PUBLICLY KNOWN.  THIS COMES FROM A MUCH EARLIER PATENT,

25  AND YOU HEARD MULTIPLE WITNESSES TESTIFY, A CHECKERBOARD

1  WAS WELL KNOWN.  INTERSIL DOMINATED THIS CHECKERBOARD

2  ARRAY.  THIS IS NOT THE TAOS ARRAY AT ALL.  IN FACT, THE

3  CHECKERBOARD ARRAY IS STRIKINGLY DIFFERENT FROM THE TAOS

4  ARRAY.  THERE'S THE CHECKERBOARD.  IT'S ACTUALLY ON A

5  SMALLER DIE THAN THE TAOS PRODUCT.  IT'S MUCH LARGER.

6  ONE REASON IT'S MORE EXPENSIVE IS BECAUSE IT USES MORE

7  SILICON SPACE, WHICH IS MORE EXPENSIVE.

8              THERE IS THE ONLY PICTURE -- THE ONLY

9  DEPICTION THAT ANY OF YOU HAVE OF THE TAOS ARRAY OR THAT

10  INTERSIL HAD OF THE TAOS ARRAY UNTIL IT REVERSE

11  ENGINEERED IT IN JANUARY OF 2006.  I ASKED YOU, YOU

12  KNOW, TAOS, ACCORDING TO BRIAN NORTH, DIDN'T DISCLOSE AN

13  ARRAY TO INTERSIL.  WAS AN ARRAY DISCLOSED AT THE

14  MEETING?  THERE WERE NO ARRAYS MENTIONED.  WHAT ABOUT

15  THIS MEETING SLIDE?  THE RESOLUTION IS TOO POOR TO TELL

16  THE STRUCTURE OF THE PHOTODIODE.  AND THAT'S TRUE.  YOU

17  SIMPLY CANNOT TELL ANYTHING FROM THAT PICTURE.

18              LET ME TALK ABOUT THE CONVENIENT

19  WHITEBOARD.  SO, WE DEPOSED MR. LANEY THREE TIMES, THREE

20  DIFFERENT DAYS IN THIS CASE.  WE DEPOSED MR. ASWELL, THE

21  INVENTOR.  ANOTHER INVENTOR, MR. DIERSCHKE, WE ALSO

22  DEPOSED.  AND AT NO TIME DID ANY OF THOSE INDIVIDUALS

23  EVER DISCLOSE THAT THEY CONVEYED INFORMATION TO US ON A

24  WHITEBOARD.  BRIAN NORTH WAS ASKED, WERE THERE DRAWINGS

25  ON A WHITEBOARD?  I DON'T THINK THERE WAS A

1   WHITEBOARD -- I THINK THERE WAS A WHITEBOARD, HE SAYS,

2   BUT I DON'T REMEMBER ANYBODY DRAWING ON IT.

3               NEVER BEFORE HAS THIS BEEN DISCLOSED IN

4   THIS LITIGATION UNTIL WE CAME HERE TODAY AND WE HEARD

5   ABOUT A 1:1 -- AN ARRAY, A 1:1 RATIO SUPPOSEDLY DRAWN ON

6   A WHITEBOARD.  THAT LEVEL OF DETAIL WAS NEVER PROVIDED

7   TO US, EITHER AT THE MEETING OR IN THE YEARS OF

8   DISCOVERY LEADING UP TO THIS CASE.  IF THIS WAS THEIR

9   CROWN JEWEL, WHY DIDN'T THEY TELL US ABOUT IT?  WHY

10  DIDN'T THEY TELL US ABOUT IT?

11              AND BY THE WAY, WHERE'S MR. ASWELL?  UNLIKE

12  THE INTERSIL WITNESSES WHO NO LONGER WORK FOR THE

13  COMPANY, CECIL ASWELL IS STILL EMPLOYED BY TAOS, AND

14  YET, THEY DIDN'T BRING HIM TO TRIAL.  HE COULD HAVE

15  TESTIFIED AND BEEN CROSS-EXAMINED ABOUT THIS ALLEGED

16  DISCLOSURE ON THIS WHITEBOARD.  IT'S JUST ALL TOO

17  CONVENIENT THAT THE SUPPOSED TRADE SECRET INFORMATION

18  THAT THEY SAY WAS DISCLOSED TO INTERSIL WAS ONLY ON A

19  WHITEBOARD.

20              INTERSIL'S CHECKERBOARD PHOTODIODE ARRAY,

21  WELL, WHAT DO WE HAVE TO COMPARE THAT TO?  HAVE YOU EVER

22  SEEN A DETAILED CLOSE-UP OF THE TAOS ARRAY?  THINK BACK

23  OVER THESE MANY DAYS OF TRIAL.  DID THEY EVER SHOW YOU

24  WHAT THEIR ARRAY LOOKED LIKE?  DID THEY EVER SHOW YOU A

25  CLOSE-UP PICTURE LIKE THIS OF THEIR ARRAY?  I CAN TELL

1   YOU, IT'S NOT A CHECKERBOARD.  THE REASON THEY HAVEN'T

2   SHOWN YOU THEIR ARRAY OR A CLOSE-UP PICTURE IS IT'S

3   NOTHING LIKE INTERSIL'S DESIGN.  THEY ACTUALLY STOOD UP

4   HERE AND ACCUSED INTERSIL OF STEALING, OF THEFT OF THEIR

5   DESIGN, AND THEY DON'T HAVE THE COURAGE TO SHOW YOU FOR

6   YOURSELVES AND LET YOU COMPARE.  WE DON'T HAVE A SINGLE

7   DEPICTION OF THE TAOS ARRAY.  THE ONLY THING WE HAVE IS

8   THAT ONE FUZZY SCREEN CAP FROM A POWERPOINT PRESENTATION

9   THAT EVERYBODY AGREES DOESN'T SHOW ANY OF THE DETAILS OF

10  THE ARRAY.

11          NOW, PHIL BENZEL TESTIFIED ABOUT WHEN THEY

12  FIRST LEARNED ABOUT THE ARRAY, AND PHIL IS VERY

13  IMPORTANT, BECAUSE HE WASN'T THERE AT INTERSIL DURING

14  THE DUE DILIGENCE, BUT HE CAME ON LATER.  HE TESTIFIED

15  VERY CLEARLY THAT THERE WAS NO USE AT ANY TIME, NO

16  DISCUSSION OF DUE DILIGENCE INFORMATION BY THE ENGINEERS

17  IN THE OPTICAL DEPARTMENT ON HIS WATCH.  IT JUST DIDN'T

18  HAPPEN.

19          HE SAID, INTERSIL RECEIVED THE REQUEST TO

20  ADD THE ANALOG TO DIGITAL CONVERTER AND THE I-SQUARED C

21  CONTROL FROM SAMSUNG, AND WE SAW EVIDENCE THAT THAT

22  HAPPENED IN 2004 BEFORE INTERSIL EVER MET WITH TAOS.

23  SO, THE IDEAS CAME FROM INTERSIL 'S CUSTOMERS.

24          BOTH OF THESE CONCEPTS, THE ANALOG TO

25  DIGITAL CONVERTER AND I-SQUARED C WERE WELL KNOWN TO

1  INTERSIL AND WERE COMMONLY USED.  IN FACT, THEY GO BACK

2  DECADES.

3              INTERSIL DIDN'T COPY THE COMPETITOR.  YOU

4  SAW THAT E-MAIL.  WELL, PHIL BENZEL TOOK YOU THROUGH IT,

5  AND HE SAID, LOOK, WE WERE ASKING, SHOULD WE MAKE OURS

6  PIN COMPATIBLE SO THAT IT WILL BE EASIER FOR THE

7  CUSTOMER TO SUBSTITUTE OUR CHIP FOR THEIRS?  AND AT THE

8  END OF THE DAY, INTERSIL DECIDED THAT ITS CHIP WAS NOT

9  GOING TO BE PIN COMPATIBLE WITH THAT OF TAOS, AND ON THE

10 ISSUE OF THE BITS, INTERSIL USED A 2-BIT INTERRUPT

11 BECAUSE THEY HAD A SMALLER DIE.  THEY DIDN'T HAVE THE

12 ROOM FOR ALL THE CIRCUITRY THAT WOULD BE ASSOCIATED WITH

13 A LARGER 4-BIT INTERRUPT.  SO, TAOS ALWAYS HAD A 4-BIT.

14 INTERSIL ALWAYS HAD A 2-BIT INTERRUPT.

15             INTERSIL ENGINEERS NEVER USED ANY TAOS DUE

16 DILIGENCE INFORMATION UNDER HIS WATCH, WHICH BEGAN IN

17 AUGUST OF 2004.  INTERSIL'S CYCLE TIME ON THE ISL29001

18 AND 29003 WAS NOT ACCELERATED.  IN FACT, MR. BENZEL SAID

19 HE THOUGHT IT WAS VERY SLOW.

20             HE ACTUALLY TESTIFIED ABOUT THIS.  WHAT

21 WOULD YOUR REACTION BE TO SOMEONE WHO CLAIMED THAT AN

22 ENGINEERING GROUP LIKE THE INTERSIL ENGINEERS IN

23 2004/2005 COULD NOT HAVE LEGITIMATELY COMPLETED AN

24 AMBIENT LIGHT SENSOR WITH AN ARRAY OF DARK AND LIGHT

25 DIODES IN 53 WEEKS OR LESS?  HE SAID, I WOULD BASICALLY

1   SAY THAT THEY'RE NOT GOING TO BE ABLE TO COMPETE IN THE

2   MARKETPLACE.  SO, IF SOMEONE SUGGESTED THAT YOU COULDN'T

3   COMPLETE A CHIP THIS QUICKLY WITHOUT USING STOLEN TRADE

4   SECRET INFORMATION, WHAT WOULD YOU SAY?  I'D SAY THAT'S

5   LUDICROUS.  AND IF YOU KNOW PHIL BENZEL, THAT'S ABOUT AS

6   STRONG AS HIS LANGUAGE EVER GETS.  IT HAPPENS ALL THE

7   TIME.  I'VE SEEN CYCLE TIMES AS LOW AS FOUR TO FIVE

8   MONTHS OR FIVE TO 25 WEEKS AT THE MINIMUM FOR DERIVATIVE

9   PRODUCTS.

10              SO, IN OTHER WORDS, PHIL IS SAYING THAT,

11  LOOK, FOR A NEW PRODUCT, YOU'RE GOING TO HAVE A LONGER

12  CYCLE TIME.  FOR A DERIVATIVE PRODUCT, THE TIME CAN BE

13  LESS.  IN HIS EXPERIENCE, AS LITTLE AS 5 TO 25 WEEKS.

14              SO, LET'S LOOK AT THE ACTUAL TIME TO

15  MARKET, BECAUSE THERE IS A DISCREPANCY ON THIS, BUT

16  THERE'S NOT A DISCREPANCY AS TO THE FACTS.  SO, INTERSIL

17  FIRST BEGAN DEVELOPING ITS FIRST ALS ON JULY, 2003.  THE

18  7900 DESIGN EVALUATION OCCURRED IN AUGUST OF '03.  NOW,

19  THIS IS AN ANALOG PART, BUT IT'S AN AMBIENT LIGHT

20  SENSOR.  SAMSUNG REQUESTED NEW FEATURES SUCH AS THE

21  I-SQUARED C AND THE ADC TO BE ADDED TO THE 7900.  THOSE

22  WOULD MAKE IT A DIGITAL PART.  THAT'S WHY YOU HAVE AN

23  ANALOG TO DIGITAL CONVERTER.  THAT MAKES IT INTO A

24  DIGITAL PRODUCT.

25              SO THE 79003 DESIGN WAS PROPOSED IN

1   FEBRUARY 11, '04.  THAT'S THE DOCUMENT WE'VE ALL SEEN

2   THAT SCOPED IT OUT.  SO, IN FEBRUARY OF '04, THAT'S WHEN

3   THE DESIGN OF THE 29001 BEGAN.  YOU RECALL THAT ITS NAME

4   CHANGED AS A RESULT OF THE ACQUISITION FROM THE 7903 TO

5   THE 29001.

6            SO, THE 7900 DESIGN, IN THE MEANTIME, WAS

7   TESTED IN MARCH.  THEN IN APRIL, THEY HAD A RE-TAPE-OUT

8   OF THE 7900 DESIGN, AND YOU HEARD MR. BENZEL SAY, THAT'S

9   WHEN YOU SEND EVERYTHING OFF TO THE FAB TO ACTUALLY MAKE

10  IT IN SILICON.  SO, THE 7903 DESIGN EVALUATION WAS DONE

11  IN JUNE OF '04.  COINCIDENTALLY, IT WAS RIGHT BEFORE THE

12  NDA WAS SIGNED.  AND THE FIRST ORDER FOR THE 7900 DIDN'T

13  COME UNTIL MAY OF 2005.  SO THIS IS THE FIRST

14  GENERATION, THE ANALOG CHIP, THAT INTERSIL GETS ITS

15  FIRST ORDER FOR THAT IN MAY OF 2005, AND THE DATA SHEET

16  FOR THE 29001, WHICH BEGAN LIFE AS THE 7903, WAS

17  RELEASED ON DECEMBER 21, '05.

18           LADIES AND GENTLEMEN, THIS IS YOUR

19  DEVELOPMENT TIME, NOT THE MISLEADING FIGURES THAT TAOS

20  HAS TOLD YOU.  IT TOOK 22 MONTHS, 89 WEEKS, FROM THE

21  FIRST DESIGN PROPOSAL TO THE DATA SHEET.  THEY WANT TO

22  PRETEND THAT INTERSIL HAD TO START OVER FROM SCRATCH

23  WHEN IT ADDED AN ARRAY IN SEPTEMBER.  THAT'S JUST SIMPLY

24  NOT TRUE.  IT ADDED AN ARRAY.  YOU HEARD PHIL BENZEL

25  TESTIFY ABOUT THAT.  HE SAID, THAT'S ONE OF THE SIMPLEST

1    THINGS TO DO.  THAT WHEN HE CHANGED THE ARRAY ON THE

2    29003 FROM CHECKERBOARD TO A MODIFIED CHECKERBOARD, IT

3    TOOK HIM A MATTER OF WEEKS TO MAKE THAT CHANGE.  THAT'S

4    A VERY STRAIGHTFORWARD CHANGE.

5              SO, TAOS HAS MISCHARACTERIZED INTERSIL'S

6    TIME TO MARKET.  FOR INTERSIL TO, QUOTE, TURN OUT A NEW

7    CHIP IN SIX, SEVEN MONTHS IS QUITE AN INCREDIBLE FEAT,

8    SAID MR. MCALEXANDER.  BUT HE NEVER TOOK YOU THROUGH THE

9    ACTUAL DATES.  AND IN FACT, 22 MONTHS FROM ITS

10   COMMENCEMENT, INTERSIL CAME OUT WITH A DATA SHEET FOR

11   THE 29001.  29 MONTHS FROM DEVELOPMENT OF THE ANALOG

12   7900 IS WHEN IT CAME OUT.  THE 29003 WAS 31 MONTHS FROM

13   THE EL7903, IN OTHER WORDS, FROM THE BEGINNING OF THAT

14   DEVELOPMENT.  SO, THE SECOND GENERATION CAME OUT

15   38 MONTHS FROM THE ORIGINAL ANALOG DESIGN.

16             TAOS, WHEN THEY WERE TALKING ABOUT THEIR

17   DESIGN TIMES, THEY USED THE FILING OF THEIR PATENT AS

18   ONE OF THE INITIAL TIMES FOR THEIR DESIGN.  WE NEVER SAW

19   THE ACTUAL DESIGN TIME OF THE TAOS CHIPS FOR COMPARISON,

20   BUT REALLY, IT DOESN'T MATTER, BECAUSE INTERSIL IS USING

21   ITS OWN INFORMATION, ITS OWN KNOWLEDGE THAT IS PROVEN BY

22   ITS OWN DOCUMENTS THAT IT HAD IN ITS POSSESSION BEFORE

23   IT EVER MET WITH TAOS.

24             SO DR. RICHARD TURNER TALKED A LITTLE BIT

25   ABOUT THIS, AND HE SAID, HE KNOWS THE MARKET, DEALS WITH

1    THE MARKET EVERY DAY, AND THE MARKET FOR ALS DEVICES IS

2    NOT A TWO-PARTY MARKET.  IT IS VERY COMPETITIVE.

3    DEVELOPMENT OF NEW GENERATION ALS DEVICES TAKES SIX TO

4    12 MONTHS.  HE EXPLAINED WHY.  PHONE COMPANIES, OTHER

5    COMPANIES ARE ELECTRONICS, TABLETS, ET CETERA.  THEY

6    COME OUT WITH A NEW PRODUCT ABOUT EVERY YEAR TO YEAR AND

7    A HALF.  IF YOU DON'T COME OUT WITH A NEW UPDATED LIGHT

8    SENSOR ON THAT SAME SCHEDULE, YOU'RE GOING TO FALL

9    BEHIND.  SO, ONCE YOUR ON THE TREADMILL, YOU HAVE TO

10   KEEP GOING AND OUTPUTTING NEW PRODUCTS.

11           IN A DYNAMIC MARKET, PRODUCTS AND PRODUCT

12   PRICES AND COSTS ARE CONSTANTLY CHANGING.  OLD

13   INFORMATION GETS STALE VERY QUICKLY.  TAOS'S FINANCIAL

14   AND COST INFORMATION FROM 2004 WOULD HAVE HAD ABSOLUTELY

15   NO VALUE TO INTERSIL IN 2007.

16           NOW, BACK UP FOR A MOMENT HERE WITH ME,

17   LADIES AND GENTLEMEN.  REMEMBER, THERE'S NO EVIDENCE

18   THAT ANY FINANCIAL INFORMATION WAS EVER DISCLOSED,

19   DISSEMINATED, DONE ANYTHING IN THE COMPANY AFTER THE

20   PURGE OF THAT INFORMATION IN 2004, ABSOLUTELY NO

21   EVIDENCE.  THEY TRY TO GET YOU TO DRAW THE LINES,

22   CONNECT THE DOTS WHEN THERE'S NO EVIDENCE OF IT.

23           REMEMBER, THE REASON MR. ALIBHAI GETS TO

24   STAND UP AND GO FIRST, THE REASON HE GETS TO GO LAST IS

25   BECAUSE THEY BEAR THE BURDEN OF PROOF.  THEY HAVE TO

1  COME FORWARD WITH EVIDENCE, AND THEY HAVE TURNED OVER

2  EVERY SCRAP OF PAPER, EVERY SCRAP OF DATA AT INTERSIL.

3  YOU'VE SEEN ALL OF THE SCHEMATICS, ALL OF THE

4  SPREADSHEETS, ALL OF THE SOFTWARE ROUTINES FOR EACH OF

5  THESE CHIPS.  YOU'VE SEEN THE GDS FILES.  THEY HAVE ALL

6  OF THE INFORMATION ON OUR DEVELOPMENT.  NOTHING SHOWS

7  ANY USE OF ANY SPREADSHEETS OR COST INFORMATION THAT WAS

8  DISCLOSED IN THE DUE DILIGENCE.  THAT WAS USED AT THE

9  TIME ONLY FOR THE DUE DILIGENCE, ONLY TO INVESTIGATE

10 COST SYNERGIES, AND EVEN AT THAT TIME, WE DIDN'T HAVE

11 THE CHIPSCALE PRODUCT PRICING THAT SUPPOSEDLY WE HAD --

12 WE MADE AN EFFORT TO UNDERCUT.

13               SO, HISTORIC PRICING AND COSTS ARE TRULY

14 USELESS.  IN 1987, I BOUGHT THAT PHONE ON THE LEFT.  I

15 PAID OVER $1200.  I WAS A BRAND-NEW LAWYER, JUST OUT OF

16 LAW SCHOOL, AND MAN, I NEEDED ONE OF THOSE FANCY CELL

17 PHONES.  IT WAS HUGE.  IT WAS THIS BIG, VERY HEAVY, AND

18 DIDN'T HAVE MUCH COVERAGE, ALWAYS DROPPING CALLS, BUT I

19 WAS REALLY PROUD TO HAVE ONE.

20               FAST-FORWARD TO TWO YEARS AGO, I BOUGHT

21 THIS GALAXY S4 FOR $420.  THERE'S A WORLD OF DIFFERENCE

22 IN THE FEATURES, AND HISTORIC PRICING AND COSTS ARE

23 USELESS BECAUSE TECHNOLOGY ADVANCES SO QUICKLY AND

24 PRODUCT MARGINS WILL BRING COSTS DOWN, VOLUMES BRING

25 COSTS DOWN.  AND IN FACT, YOU CAN SEE THIS.  THEIR OWN

1  ECONOMIC EXPERT CONFIRMED THAT TAOS'S 2004 COSTS WOULD

2  BE USELESS TO INTERSIL IN THE FUTURE.  SO, FROM 2005 TO

3  2011, THERE'S A PRETTY DRAMATIC CHANGE IN COSTS WITH THE

4  256 SERIES PRODUCTS; IS THAT CORRECT?  HE ADMITS, THAT'S

5  TRUE.  YOU CAN EVEN EXPLAIN AWAY SOME OF IT.  AND HE

6  ACKNOWLEDGES THAT IT GOES DOWN 39 CENTS, 28 TO 20 CENTS,

7  BUT YES, AS YOU PRODUCE MORE, YOU USUALLY HAVE ECONOMIES

8  OF SCALE.  YOU GET THE ABILITY TO NEGOTIATE PRICES

9  BETTER ON INPUTS AND A LOT OF TIMES, AS YOU INCREASE

10 PRODUCTION, YOUR COSTS GO DOWN.

11         SO, WHATEVER VALUE THESE -- THE FINANCIAL

12 INFORMATION MIGHT HAVE HAD TO INTERSIL IN 2004, THEY

13 DIDN'T USE IT, BY THE WAY, TO DO ANYTHING BUT FIGURE OUT

14 THE SYNERGIES BETWEEN THE COMPANIES.  BUT EVEN IF YOU

15 SUPPOSE THAT THEY WOULD HAVE USED IT AFTER THAT, IT

16 WOULD HAVE BEEN WORTHLESS TO INTERSIL TO KNOW WHAT

17 HISTORIC PRICES WERE.  THAT WOULDN'T TELL YOU HOW YOU

18 COMPETE.

19         IN FACT, HERE'S THE ACTUAL HISTORIC PRICING

20 FROM DR. UGONE'S INFORMATION.  AND WE PUT THAT ON A

21 GRAPH.  AND HERE'S WHAT HAPPENED TO THE ALS -- TO TAOS'S

22 COSTS OF THEIR GOODS SOLD FOR THEIR AMBIENT LIGHT

23 SENSORS OVER THIS TIME AS TAKEN DIRECTLY FROM

24 DR. UGONE'S REPORT.  IT DROPPED DRAMATICALLY.  KNOWING

25 WHAT THESE COSTS WERE HERE IN 2004 DOESN'T TELL YOU

DAILY COPY                             209

1    ANYTHING ABOUT WHAT THEY ARE YEARS LATER.  JUST LIKE MY

2    CELL PHONE FROM 1987, I COULDN'T PREDICT THE PRICE OF MY

3    CELL PHONE THAT I BOUGHT TWO YEARS AGO BY KNOWING THAT.

4             ONE THING THAT TAOS AND INTERSIL BOTH AGREE

5    ON IS THAT REVERSE ENGINEERING IS PERMISSIBLE.  KIRK

6    LANEY SAID, ABSOLUTELY NOTHING IMPROPER OR ILLEGAL IN

7    ANY WAY ABOUT THAT.  TOM TOKOS, THERE WERE NO

8    PROHIBITIONS TO DOING THAT.  JOE MCALEXANDER, NO,

9    NOTHING WRONG WITH THAT AT ALL.  CECIL ASWELL, I BELIEVE

10   THAT REVERSE ENGINEERING IS PERMITTED.  EUGENE

11   DIERSCHKE, THAT'S PROBABLY A LEGITIMATE THING TO DO.

12            AND IN FACT, TAOS ADMITS THAT IT REVERSE

13   ENGINEERED INTERSIL'S PRODUCTS.  LADIES AND GENTLEMEN,

14   THE JUDGE HAS INSTRUCTED, AND YOU KNOW FROM ALL THE

15   WITNESSES' TESTIMONY, REVERSE ENGINEERING IS COMMONLY

16   DONE AND IS PERFECTLY LEGAL.  WHAT TAOS DOESN'T DO IS

17   THEY NEVER TAKE THAT INTO ACCOUNT.  THEY ACTUALLY CLAIM

18   THAT IT WAS SOME KIND OF A WHITEWASH OR A SHAM, THAT

19   INTERSIL WOULD REVERSE ENGINEER THE TAOS PRODUCT.  BUT

20   THAT JUST DOESN'T SQUARE WITH THE FACTS.

21            I INVITE YOU TO TAKE A CLOSE LOOK AT THIS

22   JANUARY, 2006, MEMO.  BECAUSE THERE'S A SENTENCE IN IT

23   THAT ACTUALLY SAYS, "NOW THAT WE KNOW HOW TAOS DOES

24   IT -- "NOW THAT WE KNOW HOW TAOS DOES IT."  SO THE

25   INTERSIL ENGINEERS ACTUALLY NOTICED SEVERAL DIFFERENCES

1   AND EXPRESSED GENUINE SURPRISE AT SOME OF THE THINGS

2   THEY FOUND OUT BY REVERSE ENGINEERING THE TAOS PART.

3                FIRST OF ALL, THEY SAID, THE TWO MOST

4   NOTICEABLE DIFFERENCES BETWEEN THE TAOS SENSORS AND OUR

5   SENSOR ARE, ONE, TAOS SENSORS ARE LONG, THIN STRIPS OF

6   PIN DIODES, WHEREAS OURS IS A MATRIX OF SQUARE PIN

7   DIODES.

8                TWO, TAOS DOESN'T USE ANY FILTER COLORS ON

9   THEIR SENSORS, WHEREAS WE USE THE GREEN FILTER.  AND

10  THAT, BY THE WAY, WAS A DIFFERENCE IN THE CANCELLATION

11  TECHNIQUES.  THE WAY THAT INTERSIL HAD EMPLOYED A

12  CANCELLATION TECHNIQUE TO GET A HUMAN EYE RESPONSE, THEY

13  USED A COLOR FILTER, AND IF YOU LOOK CLOSELY AT BRIAN

14  NORTH'S E-MAIL WHERE HE SAYS, THEY DO IT DIFFERENTLY

15  THAN WHAT WE DO, HE'S NOT TALKING ABOUT THE DIODES.  HE

16  GOES ON TO STAY -- IN FACT, LET'S SKIP TO THAT.  LET'S

17  GO TO THE SLIDE FROM THE DEFENDANT'S 805.  LET'S GO

18  RIGHT TO THAT.

19                SO, MR. ALIBHAI SHOWED YOU THIS SLIGHT A

20  LITTLE BIT AGO, AND WHAT IT ACTUALLY SAYS HERE -- IT'S

21  SO HARD TO SEE, I APOLOGIZE -- BUT THIS SAYS HERE, WE

22  ARE IMPLEMENTING THE FUNCTION IN A DIFFERENT WAY.  AND

23  HE UNDERLINED AND HIGHLIGHTED THAT.  LET'S SEE WHAT HE

24  LEFT OUT.  HE LEFT OUT THE PART THAT SAYS, "THE TAOS

25  APPROACH HAS THE FOLLOWING ADVANTAGE.  CAN USE NONSENSOR

1   CMOS PROCESS, NO COLOR FILTER NECESSARY."  SO, INTERSIL

2   HAD IMPLEMENTED A HUMAN EYE RESPONSE USING A GREEN COLOR

3   FILTER.  TAOS WAS ABLE TO USE A DIFFERENT CMOS PROCESS

4   BECAUSE IT DIDN'T USE A GREEN COLOR FILTER ON ITS

5   PRODUCT.  THAT'S ONE OF THE THINGS THAT THEY THOUGHT WAS

6   PRETTY NEAT.  THAT WAS THE THING THAT BRIAN NORTH GOES

7   ON TO EXPLAIN IS DIFFERENT.

8              HE DOESN'T SAY THAT THEY HAVE A DUAL-DIODE

9   APPROACH THAT WE DON'T HAVE.  THAT'S WHAT THEY WANT YOU

10  TO READ INTO THIS.  THEY DON'T WANT YOU TO READ THE REST

11  OF THE E-MAIL WHERE HE NOTES THAT THE DIFFERENCE IS THE

12  ABSENCE OF A GREEN COLOR FILTER.

13             LET'S GO BACK TO THE REVERSE ENGINEERING

14  SLIDE.  SO THEN THE TEAM DISCUSSED THEIR CENTRAL

15  ARCHITECTURE AND WHETHER CHANGES SHOULD BE MADE TO

16  BETTER ATTAIN THE IR, AND THEY GO INTO DETAIL BELOW.

17  THEY SAY NOW THAT WE KNOW HOW TAOS DOES IT, DO WE

18  INCORPORATE LONG STRIP SENSORS LIKE TAOS, OR DO WE

19  MODIFY OUR MATRIX SENSOR APPROACH?  THEY REALIZED THAT

20  THERE WAS SOMETHING ABOUT THE SPACING OF THE DIODES THAT

21  ACTUALLY WAS ALLOWING TAOS TO GET A BETTER IR RESPONSE.

22             THIS IS IN JANUARY OF '06.  REMEMBER THAT

23  THEY HAD ALREADY SUBMITTED INFORMATION, AND THEY HAD

24  ALREADY SEEN THAT THEIR PRODUCT WAS NOT DOING WELL, THE

25  29001, AND THEY WERE REDESIGNING THAT INTO THE 29003.

1           SO, WHAT DID THEY DO?  AS PHIL BENZEL

2  TESTIFIED, HE SAID, "INTERSIL DID NOT KNOW THE STRUCTURE

3  OF THE TAOS PHOTODIODE ARRAY UNTIL AFTER IT REVERSE

4  ENGINEERED THE TAOS PART IN 2006."  LADIES AND

5  GENTLEMEN, WHY WOULD THEY BE REVERSE ENGINEERING THE

6  TAOS PART IN JANUARY OF 2006 IF THEY ALREADY KNEW THIS

7  BACK IN '04?  JUST DOESN'T MAKE SENSE.  WOULDN'T EVER

8  HAPPEN.

9           THEY LEARNED ABOUT THIS LONG, NARROW STRIPS

10  USED BY TAOS AND THAT TAOS DID NOT USE COLORED FILTERS.

11  THEY DIDN'T EVEN KNOW THAT TAOS DIDN'T USE COLORED

12  FILTERS.  THEY COULD NOT INCORPORATE THE TAOS LONG

13  NARROW STRIPS OF PHOTODIODES WITHOUT A COMPLETE

14  REDESIGN, AND THAT'S BECAUSE THE ARRAY THAT TAOS USES IS

15  ACTUALLY LONGER THAN THE DIE THAT INTERSIL USES.  YOU

16  COULDN'T PUT IT ON THERE.

17           BUT THEY DECIDED THAT THEY WOULD MAKE THEIR

18  PATTERN AND THEIR CHECKERBOARD THINNER TO HELP CANCEL

19  IR.  HE ALSO NOTED THAT IT WOULD GET RID OF ANOTHER

20  PROBLEM.  SO THEY WERE HAVING PROBLEMS WITH THE -- THAT

21  TAOS WOULD NEVER HAVE.  TAOS USED GLASS.  INTERSIL USED

22  A PLASTIC EPOXY AT THE TOP OF THEIR CHIP, SO THEY GOT

23  BUBBLES IN THE PLASTIC, AND THOSE BUBBLES SOMETIMES

24  WOULD PREVENT THE LIGHT FROM COMING INTO THE DIODE.  SO

25  BY MAKING MORE SENSORS, BY INCREASING THE NUMBER OF

1  SENSORS, THEY WERE ABLE TO AVERAGE OUT THE ERRORS AND

2  ALLEVIATE THE PROBLEMS ASSOCIATED WITH BUBBLES.  SO

3  THOSE WERE TWO REASONS THEY CHANGED IT.

4            AND HE SAID HE REVIEWED THE PATENT, BUT HE

5  COULDN'T DISCLOSE THAT IN MARCH 2010.  YOU KNOW WHY?

6  BECAUSE DAVID FOGG HAD DONE HIS WORK, AND THAT WAS STILL

7  PRIVILEGED.  UNDER THE RULES THAT THE COURT ADOPTED,

8  THEY SET A DEADLINE FOR INTERSIL TO DISCLOSE WHETHER OR

9  NOT IT WAS GOING TO CLAIM PRIVILEGE ON DAVID FOGG, AND

10  WE FOLLOWED THAT DEADLINE.  SO, AT THIS TIME, HE WAS NOT

11  FREE TO DISCLOSE THAT, AND HE DIDN'T.  HE WASN'T LYING.

12  HE NEVER LIED.  HE WAS FOLLOWING HIS COUNSEL'S

13  INSTRUCTIONS.

14            IN FACT, YOU SAW MR. BENZEL ON THE STAND.

15  HE ACTUALLY STARTED TO TELL MORE ABOUT WHAT HE HAD

16  DISCUSSED WITH HIS LAWYERS, AND THE JUDGE -- JUDGE

17  SCHELL STOPPED HIM AND SAID, OH, DON'T TELL US WHAT YOUR

18  LAWYERS SAID.  HE UNDERSTOOD THAT IN 2010, AND THAT'S

19  WHY NO DISCLOSURE WAS MADE AT THAT TIME.

20            BUT DR. PHIL HOBBS ANALYZES THIS.  HE SAYS,

21  REVERSE ENGINEERING A CHIP COSTS TENS OF THOUSANDS OF

22  DOLLARS, WHICH IS A WASTE OF MONEY IF YOU ALREADY KNOW

23  THE ANSWER.  WASTE OF MONEY.  IF INTERSIL WAS TRYING TO

24  COVER ITS TRACKS, WHY WOULD INTERSIL WAIT 16 MONTHS

25  BEFORE DOING THE REVERSE ENGINEERING?  THIS PRODUCT HAD

DAILY COPY                          214

1    BEEN OUT ON THE MARKET A WHILE BEFORE INTERSIL PURCHASED

2    IT AND REVERSE ENGINEERED IT.

3              THE CONTEMPORANEOUS DOCUMENTS SHOW GENUINE

4    SURPRISE BY INTERSIL'S ENGINEERS, AND THEY DO.  GENUINE

5    SURPRISE.  REMEMBER, THIS IS BEFORE THEY RECEIVED ANY

6    E-MAIL FROM MR. LANEY COMPLAINING ABOUT THE COMMON USE

7    OR HOW SUPPOSEDLY THE INTERSIL PRODUCT MIRRORED THEIR

8    FEATURES.  THIS IS BEFORE THAT.  THEY'RE NOT TRYING TO

9    COVER THEIR TRACKS.  THEY'RE LEARNING ABOUT IT FOR THE

10   FIRST TIME.  AND WHAT DID THEY DO?  THEY CHANGED THEIR

11   CHECKERBOARD PATTERN BASED ON THE LAWFUL INFORMATION

12   THEY OBTAINED IN REVERSE ENGINEERING.  THEY MADE A

13   CHANGE.  YOU DON'T WANT TO HEAR TAOS TALK ABOUT THIS

14   BECAUSE IT WAS DONE DIRECTLY IN RESPONSE TO THE REVERSE

15   ENGINEERING.

16             LADIES AND GENTLEMEN, THEY CANNOT OBTAIN

17   DAMAGES FOR USE OF INFORMATION FROM LAWFUL REVERSE

18   ENGINEERING.  THIS WAS DONE IN JANUARY, 2006, AND THE

19   CHANGE THAT WAS MADE, IT WENT FROM THE CHECKERBOARD

20   PATTERN, AND THEY TOOK EACH LITTLE SQUARE AND DIVIDED IT

21   UP INTO FOURS, AND THEY GOT THIS MODIFIED CHECKERBOARD

22   PATTERN, AND THAT WAS THE CHANGE THAT WAS MADE TO THE

23   ARRAY.

24             AGAIN, AN ARRAY IS A SIMPLE THING TO ADD.

25   SIMPLE THING TO CHANGE HERE.  AND YOU SAW MR. BENZEL

1    TESTIFY TO THIS FACT.

2              NOW, THEY DIDN'T STOP THERE.  THEY WERE

3    TRYING TO GET THE BEST INFRARED CANCELLATION.  THEY HAD

4    BEEN EXPERIMENTING ALL ALONG WITH MANY TECHNIQUES.  YOU

5    HEARD MR. BENZEL SAY, WE TRIED IR REJECTING GLASS.  SO

6    THEY ACTUALLY TRIED TO GLUE A PIECE OF GLASS THAT WAS

7    COVERED WITH AN INFRARED REJECTION FILM ON TO THEIR

8    PLASTIC PARTS.  MISERABLE FAILURE, DIDN'T WORK WELL.

9    THEY COULDN'T MAKE THAT WORK.

10             THEY TRIED DIFFERENT COLOR FILTER

11   COMBINATIONS, AND YOU SAW THIS.  MR. BENZEL TOOK YOU

12   THROUGH THE INTERSIL EXPERIMENTS WITH COLOR FILTERS.

13   SO, HERE IS THE DEVICE THAT TAOS WANTS TO TELL YOU

14   MIMICKED AND COPIED THE TAOS IR REJECTION.  WELL,

15   MR. BENZEL POINTED OUT THAT THIS IN THE WAY THAT

16   INTERSIL IMPLEMENTED IT DIDN'T REJECT ANY IR.  THIS HAD

17   HORRIBLE IR REJECTION, JUST LIKE THE ANALOG PART, JUST

18   LIKE THE ANALOG PART.

19             LADIES AND GENTLEMEN, IF INTERSIL STOLE THE

20   IR REJECTION TECHNIQUE FROM TAOS, THEN WHY DID THIS PART

21   NOT REJECT IR?  THIS IS THE ACTUAL GRAPH THAT SHOWS WHAT

22   HAPPENED IN THIS CASE.  VIRTUALLY NO IR REJECTION.  AND

23   THEY -- THEY TRIED ANOTHER EXPERIMENT.  THE SECOND TIME,

24   THEY COVERED IT, DIODE 2, WITH A RED FILTER.  THIS,

25   BECAUSE OF THE RED FILTER, YOU KNOW, IT -- IT DID WIPE

1  OUT A LOT OF THE INFRARED, BUT UNFORTUNATELY, IT ALSO

2  TOOK OUT A LOT OF THE RED LIGHT, SO IT INTERFERED WITH

3  THE HUMAN EYE RESPONSE AS WELL.  SO, THIS SOLUTION

4  DIDN'T WORK EITHER.

5          BUT INTERSIL EXPERIMENTED WITH COLOR

6  FILTERS.  INTERESTINGLY, ONLY AFTER THIS LAWSUIT WAS

7  FILED AND INTERSIL WAS BASICALLY DRIVEN FROM THE MARKET,

8  GUESS WHO STARTED USING COLOR FILTERS?  IN FACT, ONE OF

9  THE MOST IMPORTANT EXPERIMENTS THAT INTERSIL DID IS THEY

10 DEVELOPED A TECHNIQUE FOR STACKING FILTERS.  VERY

11 DIFFICULT WHEN YOU'RE USING THESE PROCESSES TO PUT ONE

12 PLASTIC FILTER ON TOP OF ANOTHER IN A VERY, VERY SMALL

13 MICROSCOPIC DIODE.  BUT THEY FIGURED OUT THAT IF THEY

14 STACKED THE RED FILTER ON THE GREEN FILTER THAT YOU

15 WOULD GET A DARK BROWN TO BLACK FILTER AND YOU COULD USE

16 THAT INSTEAD OF THE SHIELDED DIODE, AND IF YOU DID THAT,

17 YOU GOT TREMENDOUS IR REJECTION, TREMENDOUS, BECAUSE

18 THIS WOULD FILTER OUT ALL THE INFRARED.

19          IN FACT, INTERSIL ALSO, AS YOU KNOW,

20 DEVELOPED ITS OWN PLASTIC PACKAGE, AND IT TOOK A WHILE

21 TO PROTOTYPE THAT.  YOU SAW THE SCHEDULE TO DO THAT, BUT

22 IT WAS ACTUALLY DONE IN PROTOTYPE BEFORE THEY EVER MET

23 WITH TAOS AND THIS WAS AN OPTICAL DFN PACKAGE, SO

24 INTERSIL DEVELOPED ITS OWN OPTICAL PACKAGE, MADE IT COST

25 EFFECTIVE.  IN CONTRAST, THEY USED A GLASS PACKAGE,

1   LARGER CHIP, WAS IN CHIPSCALE PACKAGE, AND BECAUSE THE

2   HIGHER SILICON COST AND IT'S A MORE EXPENSIVE PACKAGE,

3   THEIRS JUST COSTS MORE.  IT JUST DOES.  AND SO AS A

4   RESULT THERE WAS A DIFFERENCE IN PRICE.  THAT WASN'T

5   INTERSIL MISUSING TAOS INFORMATION.  THAT WAS JUST A

6   FUNDAMENTAL DIFFERENCE IN THE COST OF MANUFACTURING WITH

7   GLASS VERSUS PLASTIC.

8               CECIL ASWELL WAS ASKED ABOUT THIS.  HE

9   SAID -- AND THIS IS THE SAME CECIL ASWELL THAT DIDN'T

10  COME TO TRIAL, DID NOT PROVIDE TRADE SECRET INFORMATION

11  ABOUT PACKAGING.  THAT'S WHAT HE TESTIFIED TO.  IN THE

12  DUE DILIGENCE PERIOD, NO TRADE SECRET INFORMATION ABOUT

13  PACKAGING.

14              HE SAYS, THERE ARE NUMEROUS DIFFERENCES

15  BETWEEN INTERSIL'S AND TAOS'S SENSORS.  AND

16  INTERESTINGLY, HE SAID APPLE REQUESTED A PROXIMITY

17  SENSING CAPABILITY IN 2008, WHICH TAOS DIDN'T HAVE.

18  HE'S ALSO THE LEAD NAMED INVENTOR ON THE PATENT.  HE

19  DIDN'T EVEN BOTHER TO COME TO TRIAL.  WHY NOT?  BECAUSE

20  HIS TESTIMONY WOULD NOT HAVE BEEN HELPFUL ON ANY OF THE

21  ISSUES.

22              SO, MR. LANEY ADMITS THAT WHEN APPLE

23  REQUESTED PROXIMITY SENSING CAPABILITY IN 2008, TAOS

24  DIDN'T HAVE A COMBINATION PRODUCT.  IN FACT, ONE OF THE

25  REASONS THAT APPLE CHOSE INTERSIL WAS THE PRICE, A

1    DIFFERENCE OF 35 CENTS VERSUS 59 CENTS FOR THE TAOS

2    PART.  BUT ALSO, DUE TO FUTURE INTEGRATION WITH THE

3    TRANSMIT SIZE OF THE PROXIMITY SENSOR, AND IN FACT, TAOS

4    REALIZED AT THAT TIME THAT IT HAD FALLEN BEHIND

5    INTERSIL, INTERSIL CAME OUT WITH A SINGLE OUTPUT DIGITAL

6    SENSOR, CHEAP AS THE 2903.  THEY HAVE IT ALL.

7              AND TODD BISHOP, INTERNAL TAOS ENGINEER,

8    ACTUALLY SUMMED IT UP PRETTY NICELY.  AND THEY WENT ON

9    TO SAY THAT BASED ON THIS, IT SEEMS TO ME THAT WE ARE

10   ABOUT OUT OF THE WIDEBAND ALS BUSINESS.  THEY WERE VERY

11   CONCERNED.  AND IN FACT, INTERSIL DID COME OUT ON

12   NOVEMBER 12TH, 2008, WITH ITS COMBINATION AMBIENT LIGHT

13   SENSOR AND PROXIMITY SENSOR.

14             NOW, REMEMBER, APPLE DIDN'T ULTIMATELY

15   DECIDE TO GO WITH THIS LATER, BUT THIS IS WHAT THEY WERE

16   EXPRESSING AT THE TIME THAT THEY WANTED.  THEY TOLD BOTH

17   TAOS AND INTERSIL THEY WERE INTERESTED IN THE

18   COMBINATION PROXIMITY AND ALS.

19             SO, WHAT HAPPENED?  THIS COMES OUT.  IT'S

20   CIRCULATED WITHIN TAOS.  TWO WEEKS LATER, THIS LAWSUIT

21   IS FILED.  LADIES AND GENTLEMEN, THIS SHOWS SOME OF THE

22   PROBLEMS HERE WITH THE MISUSE THAT HAS GONE ON.  THIS

23   SHOWS THE UNCLEAN HANDS THAT TAOS HAS IN BRINGING THIS

24   PATENT SUIT.  IN FACT, THE ONLY EVIDENCE OF ACTUAL

25   MISUSE OF INFORMATION PROVIDED UNDER THE NDA THAT EXISTS

1    IN THIS CASE IS THAT TAOS MISUSED IT.  THEY SAID THEY

2    TALKED WITH INTERSIL UNDER THE NDA, AND THEY TOLD US WHO

3    THEY WERE USING FOR PACKAGING, AND ONE OF THE VENDORS

4    WAS CHIPPAC, SO INFORMATION THAT INTERSIL GAVE TO TAOS

5    UNDER THE NDA, AT SOME POINT, THEY HAD CHECKED UP ON

6    THAT.

7                THIS IS WELL AFTER THE TIME OF THE DUE

8    DILIGENCE.  THEY STILL HAD THE INFORMATION, AND THEY

9    WERE USING IT IN VIOLATION OF THE NONDISCLOSURE

10   AGREEMENT.  THIS IS ALSO A MATERIAL BREACH, AND YOU

11   HEARD THE JUDGE'S INSTRUCTIONS.  FOR ANY BREACHES THAT

12   ARE ALLEGED TO HAVE OCCURRED AFTER THIS POINT IN TIME --

13   AND WE'RE NOT SURE EXACTLY WHEN THIS BREACH OCCURRED --

14   BUT THE E-MAIL IS DATED JANUARY 6, 2006, INTERESTINGLY,

15   ABOUT THE SAME TIME THAT INTERSIL WAS REVERSE

16   ENGINEERING THE TAOS PART.

17                SO, AFTER JANUARY, '06, YOU CAN CHOOSE TO

18   DISREGARD ANY POTENTIAL DAMAGES EITHER FOR BREACH OF

19   TRADE SECRETS THAT WOULD HAVE BEEN DISCLOSED BY THE

20   REVERSE ENGINEERING, OR FOR BREACH OF CONTRACT BECAUSE

21   OF THE PRIOR MATERIAL BREACH.

22                SO, FOR TORTIOUS INTERFERENCE, THERE'S NO

23   CAUSATION, NO TESTIMONY FROM APPLE THAT APPLE WOULD HAVE

24   PAID THAT 59 CENT PRICE.  IN FACT, TAOS HAD A PLASTIC

25   PART.  WHAT DID LANEY DO?  HE BLAMED APPLE.  HE DIDN'T

1   BLAME INTERSIL.  HE BLAMED APPLE FOR NOT TELLING HIM

2   THAT THEY WANTED A PLASTIC PACKAGED PART.  THE REASON HE

3   DIDN'T OFFER THIS TO APPLE WAS BECAUSE THEY HAD HIGHER

4   MARGINS THAT THEY WERE GETTING FROM NOKIA.  THEY DIDN'T

5   WANT TO LOSE ALL THE -- THE GRAVY MONEY THAT THEY WERE

6   GETTING FROM NOKIA, WHICH WOULD HAVE HAPPENED IF THEY

7   HAD SOLD A PLASTIC PACKAGED PART TO APPLE.

8              AND APPLE HAD A PREFERENCE TO GET TAOS OUT.

9   NOW, THERE IS EVIDENCE THAT APPLE DROPPED INTERSIL

10  BECAUSE OF THE LAWSUIT.  DAVID CRAIG SAID, NOKIA AND

11  APPLE BOTH BEAT THE TAR OUT OF TAOS ON PRICES.  SO,

12  THERE'S NO EVIDENCE THAT THEY WOULD HAVE GOTTEN THEIR 59

13  CENT PRICE HAD INTERSIL NOT BEEN IN THE PICTURE.

14             TAOS HAD CAPACITY PROBLEMS IN 2008.  NOW,

15  KIRK LANEY DENIES THAT, BUT DAVID CRAIG HAS SINCE PASSED

16  AWAY, UNFORTUNATELY.  I THINK HE'D BE ASHAMED OF THE

17  FACT THAT EVEN THOUGH HE WAS IN CHARGE OF FINANCING THAT

18  KIRK LANEY HAS COME TO COURT AND COMPLETELY CONTRADICTED

19  WHAT HE PREVIOUSLY SAID UNDER OATH.

20             NOW, TRADE SECRETS ARE DIFFERENT THAN

21  PATENTS.  TRADE SECRETS ARE PROTECTED BECAUSE THEY ARE

22  SECRET.  PATENTED INVENTIONS ARE PROTECTED BECAUSE THEY

23  ARE PUBLIC.  JOE MCALEXANDER NOTED THAT HE DIDN'T

24  DETERMINE THE DEFAULT MODE OF ANY OF INTERSIL'S ALS'S.

25  HE ADMITTED THAT MODE3 IS ONLY CONFIGURED BY AN OFF CHIP

1  COMMAND.  WHY IS THIS CRITICAL?  BECAUSE INFRINGEMENT

2  MUST BE MONOLITHIC, ACCORDING TO THE COURT'S

3  INSTRUCTIONS.  YOU'LL SEE THAT.  THAT MEANS IT ALL HAS

4  TO OCCUR ON THE SAME SUBSTRATE.  PART OF THE

5  INFRINGEMENT CANNOT COME FROM OFF THE CHIP, BUT THAT'S

6  EXACTLY WHAT HAPPENS.

7             HE ALSO DOESN'T SHOW, EVER, HOW SUBTRACTION

8  OF VALUES YIELDS AN INDICATION OF SPECTRAL CONTENT.

9  REMEMBER, THE PATENT ISN'T ONLY ON SENSING AMBIENT

10  LIGHT.  THE PATENT REQUIRES THAT YOU GET AN INDICATION

11  OF SPECTRAL CONTENT FROM A COMPARISON.  IN OTHER WORDS,

12  YOU LEARN SOMETHING ABOUT THE WAVELENGTH OF A LIGHT.

13             HE ACTUALLY ATTEMPTS TO DEFINE INFRINGEMENT

14  BY READING ABOUT THE DATA SHEETS, WHICH TAOS ADMITS ARE

15  JUST MARKETING MATERIAL.  HE DOESN'T READ IT ON THE

16  ACTUAL PRODUCTS.  SO, WHAT WENT WRONG HERE IN HIS

17  ANALYSIS?  FIRST OF ALL, HE IS NOT QUALIFIED.  HE LACKS

18  OPTICAL EXPERIENCE.  A PERSON OF ORDINARY SKILL IN THIS

19  DISCIPLINE, ACCORDING TO MR. LANEY HIMSELF, WOULD HAVE

20  FIVE YEARS OR MORE OF EXPERIENCE IN THE FIELD OF OPTICAL

21  LIGHT SENSING.

22             WELL, BRUCE BUCKMAN CERTAINLY HAS THAT.  HE

23  SAID THAT INTERSIL SENSORS CANNOT DETERMINE AN

24  INDICATION OF SPECTRAL CONTENT BECAUSE IT DOESN'T

25  PROVIDE WAVELENGTH INFORMATION.  MCALEXANDER'S TESTIMONY

1   ABOUT SIMPLE SUBTRACTION ACTUALLY CONFLICTS WITH WHAT

2   THE INVENTORS SAID.

3           MR. MCALEXANDER NEVER EXPLAINED HOW

4   SUBTRACTION YIELDS AN INDICATION OF SPECTRAL CONTENT.

5   HE SAID ONLY, WELL, IT'S ARITHMETIC.  BUT IT MUST

6   DETERMINE INFORMATION ABOUT THE SPECTRAL CONTENT, I.E.,

7   THE WAVELENGTHS.  SUBTRACTION ONLY PROVIDES AN

8   APPROXIMATION OF THE AMOUNT OF LIGHT.  DR. BUCKMAN

9   DEMONSTRATED THAT BY SHOWING THAT TWO SOURCES OF LIGHT

10  DO HAVE THE SAME RESULT EVEN THOUGH THEY HAVE DIFFERENT

11  SPECTRAL CONTENT IN THE MERE SUBTRACTION.  THIS DOESN'T

12  INFRINGE.

13          INVENTOR CECIL ASWELL SAID, AND HOW EXACTLY

14  WOULD YOU DETERMINE WAVELENGTH USING A SUBTRACTION

15  METHOD?  YOU DO NOT DETERMINE WAVELENGTH USING THE

16  SUBTRACTION METHOD.  HE ADMITS THAT INTERSIL'S PRODUCTS

17  DON'T INFRINGE BECAUSE THEY DON'T DETERMINE WAVELENGTH

18  OF SUBTRACTION.

19          GENE -- EUGENE DIERSCHKE WAS ASKED, WHAT

20  WOULD BE DIFFERENT IF YOU JUST SUBTRACTED THOSE VALUES

21  INSTEAD OF MEASURED A RATIO?  HE GOES ON TO SAY,

22  THEREFORE, YOU CAN'T DO A DIRECT SUBTRACTION BECAUSE OF

23  THE FACT THAT IT'S THE SECOND N-WELL.  IT DOES NOT

24  EXACTLY REPRODUCE THE IR THAT'S DETECTED BY THE FIRST

25  WELL, EXACTLY WHAT DR. BUCKMAN SAID.

1           MR. MCALEXANDER SAYS ONLY THAT, WELL, IT'S

2    AN ARITHMETIC PROCESS.  ONE'S AS GOOD AS ANOTHER.

3           PHIL BENZEL NOTED THAT INTERSIL'S MODE3

4    DOESN'T OPERATE UNLESS IT'S RECONFIGURED FROM A COMMAND

5    FROM AN OFF CHIP CONTROLLER.  NONE OF INTERSIL'S

6    CUSTOMERS EVER USED MODE3 IN ANY OF THEIR PRODUCTS.

7    THIS IS WHY INTERSIL WAS CONFIDENT THAT IT WAS NOT

8    INFRINGING THE TAOS PATENT, BECAUSE NO CUSTOMER EVER

9    USED MODE3 EVER.  INTERSIL NEVER TESTED ANY OF ITS CHIPS

10   IN MODE3.  IN FACT, THE TEST MODE, WHICH MR. MCALEXANDER

11   DIDN'T EVEN REVIEW, ACTUALLY DISCONNECTS THE CURRENT

12   FROM THE PHOTODIODES WHEN IT'S GOING INTO TEST.  SO,

13   MODE3, ACCORDING TO SPECIFICATIONS DONE IN -- BEFORE --

14   THIS IS BEFORE THE CHIP WAS EVER BUILT, SAY THAT MODE3

15   IS ONLY ENABLED VIA THE MICROCONTROLLER.

16           NOW, THIS IS IMPORTANT.  MR. ALIBHAI DIDN'T

17   TAKE YOU THROUGH THE COURT'S CLAIM CONSTRUCTION.  YOU

18   REMEMBER THERE'S SOMETHING CALLED A MEANS-PLUS-FUNCTION

19   CLAIM, AND THE COURT HAS ALREADY DEFINED THAT THE

20   STRUCTURE OF THAT CLAIM IS PROCESSING AND CONTROL UNIT

21   46 OF FIGURE 3 AND ITS EQUIVALENTS.  THEY NEVER TOOK YOU

22   THROUGH THIS ANALYSIS.  THE REASON IS THAT THIS

23   PROCESSING AND CONTROL UNIT HAS A CONTROL FUNCTION RIGHT

24   THERE, AND THAT CONTROL FUNCTION MUST BE ON THE CHIP.

25   SO THERE MUST BE A COMMAND ON THE CHIP THAT CONTROLS THE

1    ANALOG-TO-DIGITAL CONVERTER AND THE MUX.

2              AND MCALEXANDER AGREED THAT THAT IS OFF THE

3    CHIP.  HE ADMITTED THAT IN MODE3, IT CANNOT OPERATE

4    UNLESS IT RECEIVES A SIGNAL, A COMMAND FROM AN OFF CHIP

5    MASTER.  SO, THERE HAS TO BE A SEPARATE MICROCONTROLLER

6    TO SEND THE SIGNAL.  THIS CHIP CANNOT INFRINGE.  IT'S

7    IMPOSSIBLE FOR IT TO INFRINGE BECAUSE ALL THE FEATURES

8    THAT ARE REQUIRED FOR INFRINGEMENT ARE NOT ON THE CHIP.

9    AND THIS ISN'T BY ACCIDENT; THIS IS HOW IT'S DESIGNED,

10   BUT NOBODY CARES BECAUSE NOBODY USES THIS MODE.  NO ONE.

11             LUX EQUATIONS, THOSE ARE WRITTEN.  THOSE

12   ARE DEVELOPED.  HE ADMITTED THE DETERMINING STEP IS

13   SOMEBODY WRITING DOWN INFORMATION.  IT'S NOT BEING

14   PERFORMED BY A CHIP.  IT'S BEING PERFORMED BY A

15   CALCULATOR AND A COMPUTER AND AN ENGINEER.  THAT'S NOT

16   INFRINGEMENT, CERTAINLY NOT MONOLITHIC.

17             TESTING, NEVER USED MODE3, UNDISPUTED.  AND

18   MOST OF THE TESTING WASN'T EVEN DONE IN THE UNITED

19   STATES.

20             SO, TAOS'S DAMAGES.  I HATE TO TALK ABOUT

21   THIS, BUT I HAVE A FEW MINUTES LEFT.  AND IF WE GET TO

22   DAMAGES -- IF YOU GET TO START FILLING IN THOSE BLANKS

23   EXCEPT FOR THE NOMINAL ONES, IT MEANS THAT AT SOME

24   POINT, I WILL HAVE FAILED IN MY MISSION TO CONVINCE TO

25   YOU THAT INTERSIL NEVER STOLE ANY TAOS TRADE SECRETS.

1    THEY NEVER MISAPPROPRIATED INFORMATION.  THEY DON'T

2    INFRINGE THE PATENT.  BUT IF YOU GET TO THESE, YOU AT

3    LEAST SHOULD DO IT PROPERLY.  AND YOU DON'T HAVE THAT

4    GUIDANCE.

5              REMEMBER, THE HYPOTHETICAL NEGOTIATION FOR

6    ROYALTY, IT BEGINS IN 2006, BUT THEY WANT YOU TO USE A

7    PROFIT DECREASE THAT DIDN'T HAPPEN UNTIL 2009.  IT'S

8    IMPROPER.  NO ECONOMIC SENSE AT ALL.

9              FOR THE TRADE SECRET CONTRACT DAMAGES, THEY

10   FAILED TO ACCOUNT FOR NUMEROUS FACTORS.  THE TRADE

11   SECRETS WERE DISCLOSED IN 2007, BUT THEY HAVE LESS

12   COMMERCIAL VALUE IN 2006, '7, '8, '9, '10.  DO THEY HAVE

13   THE SAME COMMERCIAL VALUE LAST YEAR AS 10 YEARS BEFORE

14   WHEN THEY WERE DISCLOSED?  OF COURSE NOT.  BUT THEY MAKE

15   NO ACCOUNT FOR THIS, NONE WHATSOEVER.

16             INTERSIL REVERSE ENGINEERED TAOS'S CHIPS IN

17   2006, EARLY 2006.  THEY CANNOT HAVE MISAPPROPRIATED

18   ANYTHING THAT WAS DISCLOSED IN THE CHIP.

19             THE NDA EXPIRED BY ITS TERMS IN JUNE OF

20   2007.  THE COURT'S INSTRUCTED YOU FOR ANY BREACHES THAT

21   OCCUR AFTER THAT POINT, THERE ARE NO DAMAGES, BUT THEY

22   DON'T REDUCE THAT FROM THEIR CALCULATION.  THIS IS

23   CRITICAL.  LOST PROFITS.  TAOS COULDN'T OR WOULDN'T MAKE

24   THE SALE BECAUSE THEY REFUSED TO GIVE THEIR PLASTIC

25   PACKAGING TO APPLE.  NOW, GUESS WHAT THE IPHONE 3GS

1   USED?  IT USED A PLASTIC PACKAGED CHIP.

2              ONLY AFTER TAOS GOT THE WAKE-UP CALL --

3   THEY WERE SUPPOSEDLY BLINDSIDED, ALTHOUGH WE SAW LOTS OF

4   EVIDENCE THAT WASN'T TRUE, BUT AT THAT POINT, THEY

5   OFFERED A PLASTIC PACKAGE CHIP TO APPLE, AND THAT'S WHAT

6   APPLE PURCHASED.  THEY WANT TO MAKE YOU BELIEVE THAT

7   THEY PURCHASED THE SAME THING FOR THE IPHONE 3 THAT THEY

8   HAD PURCHASED FOR THE IPHONE 1.  IT'S JUST NOT TRUE.

9   APPLE PURCHASED A PLASTIC PACKAGED CHIP.  THEY PAID LESS

10  FOR IT, MUCH LESS, AND THEY CAN'T GET LOST PROFITS ON A

11  CHIP THAT APPLE WOULDN'T HAVE BOUGHT FOR THE IPHONE 2.

12  THEY WOULD HAVE INSISTED ON A PLASTIC PACKAGED CHIP.

13             APPLE WANTED TAOS OUT IN 2007/2008.

14  THERE'S NO DISPUTE ABOUT THAT.  TAOS REFUSED TO LOWER

15  ITS PRICES FOR APPLE BECAUSE IT WAS MAKING THE SAME

16  PROFIT ON NOKIA ON THE SAME PART.  TAOS LACKED CAPACITY

17  FOR PRODUCTION AT THAT TIME.  AND THIS REQUIRES NET

18  PROFITS.  UGONE, DR. UGONE DIDN'T APPLY NET PROFITS.  HE

19  USED GROSS.

20             TAOS'S ROYALTY DAMAGES WERE OVERSTATED.

21  THEY FAILED TO APPORTION.  REMEMBER MR. RATLIFF'S PIE

22  CHART?  THEY DIDN'T APPORTION FOR PREEXISTING

23  TECHNOLOGY.  WHAT ABOUT THE PACKAGING TECHNOLOGY THAT

24  WAS DIFFERENT?  THEY DIDN'T APPORTION FOR THAT.

25  INTERSIL'S R&D, THE DIFFERENCE BETWEEN THE PATENT VALUE

1   AND THE TRADE SECRETS, 50/50.  THAT'S WHAT MR. RATLIFF

2   SUGGESTED.  THEY WANT YOU TO APPLY 100/100 AND GIVE THEM

3   200 PERCENT.  THEY WANT A ROYALTY BOTH FOR THE TRADE

4   SECRET VALUE AND THE PATENT VALUE.

5            THEY ASK FOR A 10 CENT PROFIT.  WELL, FIRST

6   OF ALL, 18 COMPETITORS ARE CHARGING LOWER PRICES AND

7   USING PLASTIC PACKAGES.  INTERSIL WAS ONLY A 5 TO

8   15 PERCENT MARKET PARTICIPANT.  THEY IGNORE THEIR OWN

9   LICENSE WITH AVAGO WHICH HAS A 3.5 CENT ROYALTY.  THEY

10  IGNORE THEIR OWN INTERNAL COMMUNICATIONS ABOUT 5 CENT

11  ROYALTY AND THE FACT THAT 500,000 FOR ALL THEIR PATENTS

12  AND LICENSES WAS A RECENT VALUATION.

13           THEY'RE ASKING FOR 27 PERCENT OF THE ACTUAL

14  SALES PRICE.  REMEMBER, THESE ONLY GO UP TO 35 CENTS.

15  THEY'RE ASKING FOR 10 CENTS OF THAT TO BE PAID TO THEM

16  FOR A ROYALTY, FOR USING A -- A PATENT THAT ONLY

17  OPERATES IN A MODE THAT NO CUSTOMER USES.  THAT DEFIES

18  LOGIC.  THAT IS GROSSLY OVERSTATING.

19           THE COURT:  MR. BRAGALONE, YOU HAVE

20  TWO MINUTES.

21           MR. BRAGALONE:  THANK YOU, YOUR HONOR.

22           SO, TAOS WAS FIXATED ON MAINTAINING THESE

23  PRICES, AS WE'VE SEEN, BECAUSE IT WOULD HAVE HURT THEIR

24  MARGINS WITH NOKIA, BECAUSE THEY USED THE SAME CONTRACT

25  MANUFACTURER AS APPLE AND THEY WOULD HAVE FOUND OUT.

1              SO, THE TRADE SECRET DAMAGES WOULD BE --

2    AGAIN, THEY DON'T APPORTION ANYTHING, THEY DON'T SHOW

3    WHAT TRADE SECRETS WERE USED AND THEY FAIL TO LIMIT

4    THEIR DAMAGES BASED ON REVERSE ENGINEERING OR EXPIRATION

5    OF THE NDA.  THEY USE GROSS PROFITS AND NOT INCREMENTAL

6    ONES.

7              SO, WHAT ARE THE DAMAGES?  15,000 FOR

8    PATENT DAMAGES IF YOU FIND LIABILITY.  NONPATENT

9    DAMAGES, 3.7 MILLION.  BUT THIS IS IMPORTANT.  ACCORDING

10   TO EXHIBIT 300A, FIRST OF ALL, KIRK LANEY INSISTED ON

11   THE THREE-YEAR TERM, AND HE HAS CALCULATED IF YOU CUT

12   OFF THE DAMAGES, AS YOU SHOULD WHEN THE NDA EXPIRES, THE

13   DISGORGEMENT DAMAGES ARE 115,000.  THE ROYALTY DAMAGES

14   ARE 53,000.  THAT'S IN EXHIBIT 300A.

15             THE PATENT IS INVALID.  WE'VE GONE OVER THE

16   QUICK REFERENCE IN THE '981 REFERENCE.  I'LL INVITE YOU

17   TO READ THOSE, BUT THEY ACTUALLY DO USE INCIDENT LIGHT,

18   THE SAME TERM AS THE PATENT.

19             BOTH TAOS AND INTERSIL WANT TO BEAT THE

20   COMPETITION.  YOU'VE SEEN E-MAILS FROM INTERSIL ABOUT

21   PUTTING A NAIL IN THE COFFIN, BUT WHAT ABOUT THIS E-MAIL

22   FROM KIRK LANEY OF TAOS?  HE SAYS HE WANTS TO BRAINSTORM

23   AND RALLY AROUND A COMPREHENSIVE PLAN TO CRUSH INTERSIL,

24   ROHM, AND CAPELLA.  BOTH PARTIES WANT TO COMPETE AND

25   WANT TO COMPETE AGGRESSIVELY.  THERE'S NOTHING IMPROPER

1  ABOUT THAT.  HE SAYS HE WANTS TO CRUSH INTERSIL, WE WANT

2  TO DRIVE A NAIL IN THEIR COFFIN.  IT'S COMPETITIVE

3  JARGON.

4          BUT TAOS POISONED THE MARKET WITH THEIR

5  LITIGATION THREATS.  YOU RECALL THIS.  TWO YEARS BEFORE

6  THEY EVER FILED SUIT, THEY WERE ACCUSING INTERSIL OF

7  INFRINGEMENT.

8          AND FINALLY, THEY ULTIMATELY PUBLICIZED THE

9  LAWSUIT AS YOU RECALL FROM MY OPENING, WHICH CAUSED

10 INTERSIL'S SALES TO PLUMMET AFTER THAT INFORMATION WAS

11 DISCLOSED.

12         YOUR HONOR, I HAVE 30 SECONDS.  TAOS

13 BROUGHT -- BOUGHT AUSTRIA MICROSYSTEMS, WAS BOUGHT BY

14 THEM, AND YOU HEARD MR. MAHESWARAN SAY, WHY IS THIS SUIT

15 EVEN BEING BROUGHT?  BECAUSE INTERSIL DIDN'T BUY TAOS.

16 AS A RESULT, TAOS GOT EQUITY FINANCING, AND THEY WERE

17 ABLE, YEARS LATER, TO CASH OUT HANDSOMELY.  THEY

18 RECEIVED, JUST SHAREHOLDERS ALONE, $300 MILLION, HALF IN

19 STOCK AND HALF IN CASH DUE TO THIS ACQUISITION.  THEY'RE

20 NOT THE SMALL GUY ON THE BLOCK ANYMORE.

21         WE ASK, FINALLY, LADIES AND GENTLEMEN, THAT

22 YOU NOT ADD FURTHER INJURY TO THE INSULT, THAT YOU NOT

23 GIVE THEM A FURTHER WINDFALL IN THIS CASE AND THAT YOU

24 RETURN A VERDICT OF NO INFRINGEMENT, NO TRADE SECRET

25 MISAPPROPRIATION, AND NO LIABILITY ON BREACH OF CONTRACT

1  OR TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACT.

2  THANK YOU VERY MUCH FOR YOUR TIME AND ATTENTION.  I HAVE

3  TO SIT DOWN NOW, AND I HAVE TO LISTEN, AND I WILL BE

4  GRIMACING AS TAOS GETS THE LAST WORD.  I DON'T HAVE

5  ANOTHER OPPORTUNITY TO SPEAK TO YOU, BUT I WANT TO THANK

6  YOU SO MUCH FOR YOUR TIME AND ATTENTION THROUGHOUT THIS

7  TRIAL.

8              THE COURT:  THANK YOU, MR. BRAGALONE.

9              MR. ALIBHAI, I'LL ADD 2 MINUTES TO YOUR

10 TIME, SO YOU HAVE 26 MINUTES.

11             LADIES AND GENTLEMEN, IF YOU WANT TO KEEP

12 GOING FOR 26 MINUTES OR DO YOU WANT TO TAKE A BREAK?  WE

13 CAN TAKE A BREAK IF YOU WANT.  KEEP GOING?  OKAY.

14             MR. ALIBHAI:  YOUR HONOR?

15             THE COURT:  MR. ALIBHAI.

16             MR. ALIBHAI:  I'M GOING TO START WITH THE

17 CLAIMS THAT WE'RE TALKING ABOUT AND -- TALK ABOUT THE

18 CLAIMS.  I'M GOING TO START WITH PATENT INFRINGEMENT

19 BECAUSE HE JUST RUSHED THROUGH THAT AT THE VERY END

20 THERE.

21             JOE MCALEXANDER LOOKED AT THE TAOS AND

22 INTERSIL PRODUCTS, TOOK AN APPLE IPHONE 3G APART, AND

23 LOOKED AT THAT PRODUCT THAT WAS IN THERE, WHICH WAS THE

24 INTERSIL 29003, TESTED THAT PRODUCT, SHOWED YOU PICTURES

25 OF THAT PRODUCT, SHOWED YOU CROSS-SECTIONS OF THAT

1  PRODUCT, SHOWED YOU HOW THAT PRODUCT WORKED IN THAT

2  DEVICE, AND SHOWED YOU HOW IT INFRINGED AND WENT THROUGH

3  STEP BY STEP THE INFRINGEMENT OF EACH OF THE ASSERTED

4  CLAIMS.

5          AND THE ONLY THING THAT THEY CAN SAY

6  APPEARED IS, WELL, WE'RE NOT AWARE OF CUSTOMERS USING

7  MODE3.  THE MORE IMPORTANT QUESTION IS, AS MR. BENZEL

8  TESTIFIED TO, WHY DOES EVERY SINGLE ONE OF THESE ACCUSED

9  PRODUCTS HAVE, YOU KNOW, A 3?  WHY DO THEY SELL 88

10  MILLION ACCUSED PRODUCTS, THE 29001, '02, '03, '04, WITH

11  A MODE3?  WHY DO THEY ADVERTISE THAT WHEN YOU DO D1

12  MINUS D2 YOU GET IR CANCELLATION AND YOU GET A HUMAN EYE

13  RESPONSE?

14          IT INFRINGES THE PATENT.  IT INFRINGES ALL

15  SIX CLAIMS OF THE PATENT.  AND WITH RESPECT TO THAT

16  INFRINGEMENT, IT WAS DONE TO TRY TO GET SALES.  REMEMBER

17  THAT MR. NORTH WAS ASSIGNED TO THE PDIC PROGRAM, AND

18  THAT'S WHAT MR. MAHESWARAN SAID HE WANTED TO BUY TAOS

19  FOR, WAS PDIC'S.  WHAT HAPPENS AFTER THEY MEET US AND

20  BEFORE MR. NORTH LEAVES?  DO THEY EVER FINISH A PDIC?

21  NO.  DO THEY START SELLING AMBIENT LIGHT SENSORS?  172

22  MILLION OF THEM.  88 MILLION THAT INFRINGE THE PATENT.

23          SO WE KNOW THEY SET OUT ON A COURSE OF

24  ACTION AFTER MEETING US AND DECIDED NOT WILLING TO PAY

25  WHAT TAOS IS WORTH, WE'LL JUST GO AHEAD AND MAKE THE

1   PRODUCTS THEY SELL.  SO, LET'S TALK ABOUT SOME OF THE

2   POINTS THAT ARE IMPORTANT TO, AGAIN, LOOKING AT THESE

3   FOUR CAUSES OF ACTION.  THEY SPENT 20, 25 MINUTES

4   TALKING ABOUT THESE OFFERS THAT SAY, DRAFT.  A SECOND

5   ONE THAT THERE'S NOT EVEN A DOCUMENT SHOWING THAT IT WAS

6   SENT TO TAOS.

7                ALL RIGHT.  LET'S SAY THEY DID OFFER

8   $45 MILLION.  FOR WHAT?  AN INVALID PATENT AND PUBLICLY

9   AVAILABLE INFORMATION?  THAT'S WHAT YOU'RE SUPPOSED TO

10  BELIEVE?  ALL YOU HAVE TO DO, HIS HONOR SAID, IS USE

11  YOUR COMMON SENSE.  COMMON SENSE.  INTERSIL WORTH A

12  HUNDRED -- $950 MILLION, IT'S GOING TO SPEND $45 MILLION

13  FOR WHAT?  SOMETHING IT ALREADY HAD?  PUBLICLY AVAILABLE

14  INFORMATION?  PATENTS THAT ARE INVALID?  HIGH LEVEL

15  TECHNICAL INFORMATION?  THAT DOESN'T MAKE SENSE.

16               LET'S LOOK AT ID 987.  THEY WANT YOU TO

17  DETERMINE THAT THEY HAD THIS TECHNOLOGY, AND IF THAT'S

18  TRUE, ASK THESE FOUR QUESTIONS.  NUMBER ONE,

19  MR. MAHESWARAN SAID, YOU DON'T BUY PRODUCTS YOU ALREADY

20  DON'T HAVE -- YOU DON'T BUY PRODUCTS YOU ALREADY HAVE.

21  HE SAID, THEY WERE BUYING TAOS FOR TECHNOLOGY, KNOW-HOW,

22  AND THEIR PRODUCTS.

23               NUMBER TWO, THEY GO TO THE BOARD OF

24  DIRECTORS.  HE SAID, THERE ARE BILLIONAIRES SITTING ON

25  OUR BOARD.  THAT'S WHAT MR. MAHESWARAN SAID.  HE WENT TO

```
 1  THOSE PEOPLE AND SAID, WE WANT TO SPEND 35 TO
 2  $45 MILLION OF OUR MONEY.  FOR WHAT?  FOR TECHNOLOGY
 3  THAT THEY THOUGHT WAS VALUABLE.  THERE IS NOT A SINGLE
 4  DOCUMENT, AND YOU WILL HAVE THE RIGHT AND THE
 5  OPPORTUNITY TO REVIEW ALL 300 OF PLAINTIFF'S EXHIBITS
 6  AND ALL 500 OF DEFENDANT'S EXHIBITS, AND IF YOU WANT TO
 7  HAVE SOME FUN, LOOK THROUGH THOSE 500 EXHIBITS AND LOOK
 8  FOR ONE DOCUMENT ABOUT DESIGNING AN AMBIENT LIGHT SENSOR
 9  THAT REFERENCES THIS RUBIN PATENT APPLICATION THAT NEVER
10  BECAME A PATENT.
11              ONE, DON'T YOU THINK YOU WOULD HAVE SEEN IT
12  TODAY IF IT WAS IN THAT BOX OF 500?  DON'T YOU THINK
13  MR. BRAGALONE WOULD HAVE SHOWN YOU THAT DOCUMENT OF ALL
14  THE DOCUMENTS IN THE WORLD?  TO STAND UP HERE TODAY IN
15  2015 AND GO, WELL, THERE'S THIS PATENT CALLED KUIJK AND
16  THERE'S THIS PATENT APPLICATION CALLED RUBIN, AND
17  THERE'S STUFF OUT THERE ABOUT I-SQUARED C, SHOW ME.
18  SHOW ME ANYWHERE WHERE SOMEONE CAME UP WITH THE WORLD'S
19  FIRST DIGITAL AMBIENT LIGHT SENSOR THAT USED A
20  DUAL-DIODE APPROACH.  I'LL SHOW YOU.  YOU DON'T HAVE TO
21  GET REAL FAR IN PLAINTIFF'S EXHIBITS.  PLAINTIFF'S
22  EXHIBIT 1 -- IN FACT, YOU'LL RECEIVE A COPY OF IT --
23  THAT'S THE WORLD 'S FIRST DIGITAL DUAL-DIODE AMBIENT
24  LIGHT SENSOR.  IT'S PATENTED BY DR. DIERSCHKE AND BY
25  TAOS.
```

1            THEN WHAT HAPPENS?  THESE GUYS THAT HAVE A

2   HUNDRED-PLUS YEARS IN OPTOELECTRONICS, AND THEY WANT YOU

3   TO MAGICALLY BELIEVE THAT RANDOMLY, SOMEHOW, ONE NIGHT,

4   BETWEEN JUNE WHEN HE DOES DUE DILIGENCE AND AUGUST 30TH,

5   BRIAN NORTH WAKES UP AND HAS THE IDEA TO DO ALL THE

6   THINGS HE HAD NEVER DONE BEFORE.

7            CAN I USE THE BOARD AGAIN, YOUR HONOR?

8            THE COURT:  YES.

9            MR. ALIBHAI:  THANK YOU.  I ASKED HIM -- I

10  WENT THROUGH IT WITH HIM.  I SAID, AUGUST 31, 2004, YOU

11  SIT THERE AT A DESIGN REVIEW AND YOU PUT IN ALL THESE

12  FEATURES.  AND PRIOR TO TAOS, DID YOU HAVE ANY OF THOSE

13  FEATURES?  LOOK AT THE DESIGN REVIEW DOCUMENTS OF

14  INTERSIL'S.  THEY DIDN'T USE AN INTERLEAVED PHOTODIODE

15  ARRAY IN AN AMBIENT LIGHT SENSOR.  THEY DIDN'T USE

16  MULTIPLE CELLS.  THEY HAD THIS ONE BIG DIODE.  DO YOU

17  KNOW WHAT THE SECOND ONE'S CALLED?  DUMMY DIODE.

18            THEY DIDN'T HAVE A 1:1 RATIO IN AREA.  THEY

19  DIDN'T HAVE EXPOSED AND SHIELDED DUAL-DIODE APPROACH.

20  AND IT CERTAINLY DIDN'T DO IR REJECTION.  WHEN THEIR

21  EXPERT COMES HERE AND TELLS YOU IT DOESN'T DO IR

22  REJECTION AND DR. LIN, WHO'S INVOLVED IN DESIGN, SAYS IT

23  DOESN'T DO IR REJECTION, WE KNOW IT DOESN'T DO IR

24  REJECTION.

25            THEY DIDN'T HAVE IT BEFORE THEY MET US.

1   THAT'S THE ISSUE YOU HAVE TO DECIDE.  DID THEY HAVE IT?

2   BECAUSE MR. TOKOS WROTE TO KIRK LANEY AND SAID, WE

3   DEVELOPED THIS BEFORE WE MET YOU.  IT IS YOUR JOB AS THE

4   FINDERS OF FACT TO SEE IF THAT STATEMENT WAS TRUE.  IF

5   THAT STATEMENT IS NOT TRUE, IF YOU FIND THAT THEY DID

6   NOT HAVE AN AMBIENT LIGHT SENSOR THAT HAD THESE

7   FEATURES, THEN YOU KNOW THAT THEY MISAPPROPRIATED TAOS'S

8   TRADE SECRETS AND THEY USED TAOS'S CONFIDENTIAL

9   INFORMATION TO DEVELOP THEIR LINE OF AMBIENT LIGHT

10  SENSORS.

11           LET'S LOOK AT ID 607, PLEASE.  THIS SAYS

12  THAT YOU CAN USE THE INFORMATION FOR ONE REASON, FOR THE

13  PURPOSE OF EVALUATING THE BUSINESS AND FINANCIAL

14  CONDITION OF TAOS.  IT DOES NOT SAY YOU CAN USE IT TO

15  DEVELOP A COMPETING LINE OF AMBIENT LIGHT SENSORS.  IT

16  DOES NOT SAY THAT YOU CAN USE OUR FINANCIALS TO SELL TO

17  OUR CUSTOMER AND COMPETE WITH US.  IT DOES NOT SAY, YOU

18  CAN USE TECHNICAL INFORMATION ABOUT OUR PRODUCT THAT WE

19  DISCLOSE TO YOU BECAUSE WE TRUST THAT YOU'RE GOING TO

20  KEEP IT IN CONFIDENCE AND COME UP WITH YOUR OWN PRODUCTS

21  THAT USE THOSE SAME FEATURES.  IT DOESN'T SAY THAT.  AND

22  YOU CAN READ THIS DOCUMENT, PLAINTIFF'S EXHIBIT 62, AND

23  THAT'S THE DEFINITION OF PERMITTED USE.  IT DOESN'T SAY

24  YOU CAN DO ANY OF THE THINGS THAT THEY DID.

25           AND YOU WANT TO SEE EVIDENCE OF THEM USING

1    OUR INFORMATION?  IT IS RARE THAT SOMEBODY STEALS

2    SOMETHING AND THEN ADMITS TO IT.

3                    CAN YOU PUT UP ID 900 PLEASE?

4                    MR. MAHESWARAN WALKED INTO THIS COURT, SAT

5    RIGHT THERE, SWORE UNDER OATH THAT HE WAS PROVIDED

6    INFORMATION THAT WAS CONFIDENTIAL.  WHEN THEY STAND UP

7    HERE AND TELL YOU NOTHING WAS CONFIDENTIAL, NOTHING WAS

8    A TRADE SECRET, MR. MAHESWARAN TESTIFIED, UNDER OATH,

9    CONFIDENTIAL INFORMATION.  "AND THE USE OF THAT

10   INFORMATION WAS FOR PURPOSE OF CONSIDERING AN

11   ACQUISITION OF TAOS, CORRECT?"  "THAT'S CORRECT."

12   WHAT'S HE SAY NEXT?  "AND YOU TESTIFIED TO TODAY WAS

13   THAT INTERSIL DID A MAKE VERSUS BUY ANALYSIS USING THAT

14   INFORMATION; ISN'T THAT CORRECT?"

15                   "THAT'S CORRECT.  UH-HUH."

16                   HE ADMITTED THAT THEY BREACHED THIS

17   CONTRACT, THAT THEY USED THE CONFIDENTIAL INFORMATION

18   FOR THEIR PURPOSES, TO DO THEIR BUILD VERSUS BUY OR MAKE

19   VERSUS BUILD ANALYSIS.  THAT IS NOT A PERMITTED USE

20   UNDER THAT AGREEMENT, AND THAT IS HARD EVIDENCE.  FOR

21   SOMEONE TO STAND UP HERE UNDER OATH AND SAY, YEP, WE

22   DIDN'T LIVE UP TO OUR WORD, WE SAID WE'D USE IT FOR THAT

23   PURPOSE, AND WE USED IT FOR A DIFFERENT ONE.

24                   NOW, LET'S TALK ABOUT THE FINANCIAL TRADE

25   SECRETS.

1          ID 894, PLEASE.

2          AND WE TALK ABOUT TAOS'S PRODUCTS, THIS

3   UNRELEASED PRODUCT THAT WE DISCUSSED WITH THEM.  WE

4   SHOWED THEM CONFIDENTIAL INFORMATION ABOUT THAT.  AND IF

5   WE LOOK AT ID 668, PLEASE.  WHAT I TOLD YOU HAD HAPPENED

6   IS EXACTLY WHAT HAPPENED.  I TOLD YOU THAT THERE'S A

7   MONSTER SPREADSHEET THAT'S 300 PAGES LONG AND THAT

8   THEY'RE GOING TO STAND UP HERE AND THEY'RE GOING TO SHOW

9   YOU THE BLANK SPREADSHEET THAT HAD BLANK TABS.  ISN'T

10  THAT WHAT HAPPENED?  DID THEY SHOW YOU THE MONSTER

11  SPREADSHEET?

12          BACK TO KINDERGARTEN.  CAN YOU MATCH THINGS

13  UP JUST TO SHOW THAT THE THINGS ARE BEING USED?  IF YOU

14  TAKE THEIR E-MAIL, WHICH IS JULY 6TH, THIS IS AFTER THE

15  COUNTEROFFER'S BEEN MADE, AFTER THEY SAY, WHOA, 70

16  MILLION?  PUT IT ON HOLD.  LET'S LOOK AT IT OURSELVES.

17  AND JULY 4TH, WHILE FIREWORKS ARE GOING OFF AND EVERYONE

18  ELSE IS WATCHING FIREWORKS, MR. LAHRI'S SAYING, OH,

19  LET'S LOOK AT WHAT HAPPENED WITH TAOS.  LET'S LOOK AT

20  WHAT INFORMATION THEY HAVE.  THIS IS A RESPONSE TO HIS

21  E-MAIL ON JULY 4TH, AND ON JULY 6TH, THEY ARE COPYING

22  INFORMATION FROM OUR MONSTER SPREADSHEET ABOUT OUR

23  PRODUCTS AND SHOWING THEM AND DISCUSSING THEM TO DISCUSS

24  WHAT THE MARGINS WERE.  WHY?  BECAUSE THEY WANT TO KNOW

25  IF IT'S PROFITABLE FOR THEM TO GET INTO THIS BUSINESS.

1  THEY'RE NOT IN THIS BUSINESS.  THEY'RE DECIDING WHETHER

2  TO GET INTO THIS BUSINESS LOOKING AT OUR FINANCIAL DATA.

3              THAT'S NOT HOW YOU MAKE THAT DECISION.  YOU

4  DON'T GET CONFIDENTIAL INFORMATION OF TAOS TO MAKE A

5  DECISION TO GET INTO THE BUSINESS, BUT THAT'S EXACTLY

6  WHAT THEY DID.  AND MR. MCCABE SHOWED YOU HOW THOSE

7  COLUMNS LINE UP WITH THE INFORMATION IN THE E-MAIL.  WHY

8  IS THAT INFORMATION IN THAT E-MAIL AT ALL?  IT SHOULDN'T

9  HAVE BEEN DISCUSSED.

10             NOW LET'S TALK ABOUT THE TECHNICAL TRADE

11 SECRETS.

12             CAN WE LOOK AT PLAINTIFF'S EXHIBIT 65,

13 PLEASE?  MAYBE WE CAN ZOOM IN ON THE TOP PART A LITTLE

14 FIRST.

15             THIS IS THE E-MAIL FROM MR. NORTH

16 RESPONDING TO COMMENTS FROM THE MEETING WE TALKED ABOUT.

17 AND HE SAYS, WE'VE IMPLEMENTED THE FUNCTION IN A

18 DIFFERENT WAY.  CAN WE LOOK AT A DIFFERENT PART OF IT?

19             "THEIR PORTFOLIO IS EXACTLY THE SAME GROUP

20 OF PRODUCTS THAT I WOULD SUGGEST WE BUILD.  THEY HAVE A

21 SIGNIFICANT JUMP START.  IT WOULD TAKE ABOUT A MAN-YEAR

22 OF DESIGN TO REPLICATE ALL OF THE MORE INTERESTING

23 ITEMS."  AND HE TESTIFIED THAT THE MORE INTERESTING

24 ITEMS WERE THE AMBIENT LIGHT SENSORS.  IT WOULD TAKE A

25 MAN-YEAR OF DESIGN TO REPLICATE THEM.  HOW LONG DID IT

1    TAKE BRIAN NORTH?  THE TIME LINE DOESN'T LIE.  YOU CAN

2    LOOK AT THAT TIME LINE THAT I SHOWED YOU EARLIER.  I

3    BELIEVE THAT'S -- IS IT 803-01, PLEASE?

4              IT IS AUGUST 31ST.  HE'S WRITING THAT

5    E-MAIL IN JUNE.  HE'S SAYING IT WOULD TAKE A MAN-YEAR.

6    BY AUGUST, HE'S REDESIGNED THE PRODUCT, AND HE'S GOT OUR

7    DESIGN MAP.  HE'S USING ALL THE FEATURES THAT WE'VE

8    TAUGHT HIM ABOUT OUR PRODUCT.  NOW, MAYBE THE

9    CHECKERBOARD LOOKS DIFFERENT THAN THE RECTANGULAR

10   STRIPS, BUT IT'S GOT ALL THOSE FEATURES.  IT'S GOT THE

11   INTERLEAVING, IT'S GOT THE 1:1 RATIO, IT'S GOT THE

12   ALTERNATING LIGHT AND DARK DIODES.  IT USES THE

13   DUAL-DIODE APPROACH.  IT USES MANY CELLS.  IT HAS ALL

14   THE SAME FEATURES.

15             HE DID THAT IN A COUPLE OF WEEKS, NOT A

16   MAN-YEAR, AND YOU DON'T HAVE TO TAKE MY WORD FOR IT.

17   THEY SAID THEY WENT TO APPLE AND THAT THEY WOULD HAVE

18   THOSE PRODUCTS TO THEM IN A MONTH.  SO, THAT'S A

19   FIVE-MONTH -- IT DIDN'T TAKE THEM A YEAR.  BUT THEY

20   REPLICATED IT, AND THEY SAID THAT WE SHOULD REPLICATE

21   IT.

22             AND WITH RESPECT TO THIS IDEA THAT SOMEHOW

23   HIS KNOWLEDGE AND PDIC'S TOLD HIM THIS, ONCE AGAIN, AS

24   MR. MCCABE ASKED YOU, HE HAD THAT KNOWLEDGE SINCE 2003.

25   HE SAID HE READ THAT PATENT APPLICATION WHEN HE FIRST

1  JOINED.  NOTICE THAT HE WAS VERY CAREFUL WITH HIS WORDS,

2  AND YOU CAN ASK -- READ HIS TESTIMONY.  HE DID NOT SAY,

3  I RELIED ON IT.  I USED IT.  I COPIED IT FROM THE RUBIN

4  PATENT APPLICATION.  HE SAID, I READ IT.  I KNEW ABOUT

5  IT.  HE KNEW ABOUT IT SINCE 2003, BUT IT'S ONLY AFTER

6  TAOS TEACHES HIM THAT HE DECIDES TO IMPLEMENT THAT IN

7  THE AMBIENT LIGHT SENSORS.

8              MR. LANEY TESTIFIED THAT THIS INFORMATION

9  WAS A TRADE SECRET AND THAT THIS INFORMATION WAS

10 DISCLOSED TO INTERSIL.  "DID YOU CONSIDER WHAT HE WAS

11 DESCRIBING TO BE THE METHOD BY WHICH YOU WOULD MAXIMIZE

12 YOUR INFRARED CANCELLATION TECHNIQUE?"  "YES."  "DID YOU

13 CONSIDER THE DESCRIPTION THAT PROVIDED THE STRATEGY TO

14 MOVE FROM THE FIRST GENERATION TO THE SECOND GENERATION

15 AMBIENT LIGHT SENSOR?"  "YES."

16             HE TALKS ABOUT HOW DURING THOSE MEETINGS

17 THEY DISCLOSED INFORMATION, AND HE EVEN TALKS ABOUT HOW

18 THIS WAS DISCLOSED IN DEPTH.  AND HE WAS ASKED, WHO DID

19 THAT?  MR. ASWELL.  AND HOW DID HE PHYSICALLY DO THAT?

20 HE'S -- HE'S VERY GOOD IN FRONT OF A WHITEBOARD.

21             FOR THEM TO COME HERE TODAY AND STAND UP

22 AND CLAIM THAT DR. DIERSCHKE IS SOMEHOW LYING ABOUT

23 SEEING A PICTURE DRAWN ON A WHITEBOARD, HE STOOD RIGHT

24 HERE IN FRONT OF YOU AND DREW ON THE BACK OF A

25 WHITEBOARD, AND HE TESTIFIED, UNDER OATH, THAT'S THE

1  SAME DRAWING THAT WAS DONE BEFORE.  MR. ASWELL

2  TESTIFIED -- MR. LANEY TESTIFIED THAT HE ALSO SAW THAT

3  HAPPEN, WAS AT THAT MEETING, AND DISCLOSED THAT THEY

4  WERE CHANGING TO IMPROVE THE IR CANCELLATION TECHNIQUE

5  IN THEIR PRODUCTS.

6              DR. TURNER TESTIFIED THAT THIS IS

7  INFORMATION THAT WOULD BE CONSIDERED A TRADE SECRET.

8  "IF YOU CONSIDERED INTERSIL A COMPETITOR, WOULD YOU HAVE

9  DISCLOSED THAT INFORMATION TO THEM?"  "NO, I WOULD NOT."

10 THIS IS MR. LANEY.  "DID YOU CONSIDER THAT CHANGE IN THE

11 PHOTODIODE STRUCTURE TO BE ONE OF TAOS'S TRADE SECRETS?"

12 "WE DID, YES."

13             IT'S NOT A RELEASED PRODUCT.  OF COURSE

14 IT'S A TRADE SECRET.  SO THERE'S EVIDENCE THAT THEY USED

15 OUR CONFIDENTIAL INFORMATION.  MR. MAHESWARAN ADMITTED

16 TO THAT RIGHT HERE.  THERE SHOULD BE NO DOUBT THAT THEY

17 RECEIVED CONFIDENTIAL INFORMATION AND THAT THEY USED IT

18 IMPROPERLY IN VIOLATION OF THE PERMITTED USE, THAT THEY

19 USED OUR FINANCIAL INFORMATION AND THAT THEY USED OUR

20 TECHNICAL INFORMATION TO GIVE THEMSELVES A HEAD START.

21             NOW, THEY TALK ABOUT THIS REVERSE

22 ENGINEERING.  IT'S ON THIS TIME LINE.  WE KNEW THEY'D

23 TALK ABOUT IT.  JANUARY 26, 2006, WHAT'S ALREADY

24 HAPPENED BY THEN?  NUMBER ONE, THEY'VE ALREADY GONE TO

25 APPLE WITH THE 29001 PART.  NUMBER TWO, THEY'VE ALREADY

1    RELEASED THE 29001 DATA SHEET.  NUMBER THREE, THEY'VE

2    ALREADY RELEASED THE 29003 DATA SHEET.  AND HOW'D THEY

3    KNOW TO GO REVERSE ENGINEER OUR PRODUCT?  WHY DIDN'T

4    THEY GO REVERSE ENGINEER ONE OF THESE CAPELLA PRODUCTS

5    THAT WE READ ABOUT IT?  WHY'D THEY PICK THE 2560 TO

6    REVERSE ENGINEER?  BECAUSE THEY KNEW.

7                 AND IF THEY CLAIM, OH, WELL, WHY ARE PEOPLE

8    TALKING ABOUT IT NOW?  BRIAN NORTH'S LEFT THE COMPANY IN

9    2005.  THE ONLY GUY WHO WAS INVOLVED IN THE DUE

10   DILIGENCE FROM AN ENGINEERING STANDPOINT WAS BRIAN

11   NORTH.  HE LEAVES IN 2005, CHANGES THE STRUCTURE AND

12   LEAVES.

13                THEN IN 2006, DR. LIN AND MR. BENZEL ARE

14   SITTING AROUND AND GOING, OH, WHAT SHOULD WE DO ABOUT

15   THIS NOW?  WELL, LET'S REVERSE ENGINEER ONE OF THE

16   PRODUCTS WE'VE BEEN TRYING TO COPY ALL THIS TIME ANYWAY.

17   THE PRODUCT THEY CHOSE IS TELLING.  THE PRODUCT THEY

18   CHOSE IS EVIDENCE THAT THEY USED CONFIDENTIAL

19   INFORMATION THAT THEY'D ACQUIRED WHO THEY'D BEEN

20   COMPETING WITH AND PICKED THAT PRODUCT SO THEY COULD

21   WALK IN HERE AND GO, OH, WELL, WE REVERSE ENGINEERED IT.

22   YOU'D ALREADY RELEASED YOUR PRODUCTS.  YOU'D ALREADY

23   DONE THE BAD ACTS.  YOU'D ALREADY LIED, CHEATED, AND

24   STOLEN BEFORE YOU WENT AND REVERSE ENGINEERED.

25                NOW, WITH RESPECT TO THE DAMAGES THAT HAVE

1  BEEN CAUSED, THEY LAUNCHED AN ENTIRE LINE OF AMBIENT

2  LIGHT SENSORS.  29001, '2, '3, AND '4 ARE ALL RELEASED

3  BEFORE ANY REVERSE ENGINEERING, AND ALL FROM THIS CHANGE

4  IN DESIGN IN 2004 AND 2005.  AND THEN, THEY CONTINUE TO

5  LAUNCH PRODUCTS, THE '6, '8, THE '10, '12, THE '13, ALL

6  USING A DUAL-DIODE APPROACH WHERE ONE DIODE IS SUBJECT

7  TO VISIBLE LIGHT AND INFRARED, AND THE SECOND ONE IS

8  SENSITIVE MOSTLY TO INFRARED.

9            THEIR ENTIRE PROGRAM WAS BASED UPON OUR

10  TRADE SECRETS AND OUR TECHNOLOGY.  THAT'S UP FOR YOU TO

11  DECIDE.  HOW DID THEY GET THOSE 172 MILLION UNITS THERE

12  SHOULD BE A ROYALTY OWED?  BUT WHEN YOU THINK ABOUT THE

13  ROYALTY, I THINK IT'S PRETTY CLEAR THAT WHEN MR. RATLIFF

14  TESTIFIES TO 1.7 CENTS, THAT THAT'S A LITTLE LOW.  THAT

15  TAOS, IF THEY WERE SITTING DOWN WITH INTERSIL, AND THEY

16  TURNED DOWN 30 MILLION, AND THEY TURNED DOWN 42 OR 45

17  MILLION WOULD SAY, YOU KNOW WHAT, YOU'RE 50 TIMES BIGGER

18  THAN US, WE'RE LOSING MONEY, WE'LL TAKE A PENNY AND A

19  HALF AND YOU GUYS GO SELL THIS STUFF.  THAT MAKES NO

20  SENSE.

21            TAOS, FIRST OF ALL, WOULDN'T HAVE WANTED

22  THE LICENSE.  IT ALREADY SAID NO WHEN RICK FURTNEY

23  SUGGESTED IT, BUT EVEN IF IT WERE FORCED -- BECAUSE

24  THERE'S THIS FORCED HYPOTHETICAL NEGOTIATION -- IT WOULD

25  HAVE ASKED FOR EVERY PENNY OF PROFIT IT COULD HAVE ASKED

1   FOR.  THEY MADE $49 MILLION SELLING THOSE AMBIENT LIGHT

2   SENSORS.  THAT $49 MILLION WAS MADE BY USING SOMEBODY

3   ELSE'S INFORMATION, BASED ON COPYING SOMEBODY ELSE'S

4   HARD WORK.  A HUNDRED YEARS OF HARD WORK IN

5   OPTOELECTRONICS.  AND THEY WANT TO SAY, YOU KNOW WHAT?

6   WE'LL KEEP 49, GIVE THEM 3, WE'LL HAVE 46 LEFT OVER,

7   IT'S ALL GOOD.  WILL THAT MAKE THINGS RIGHT?  DID WE

8   REALLY SIT THROUGH A FOUR-WEEK TRIAL SO THAT THEY COULD

9   KEEP $46 MILLION IN PROFIT AND PAY TAOS 3 MILLION AND

10  SAY, IT'S ALL RIGHT, WE ALMOST PUT YOU OUT OF BUSINESS?

11          WHAT YOU HEARD TODAY WERE A LOT OF EXCUSES,

12  AND YOU'VE HEARD EXCUSES FOR FOUR, AND I TRIED TO JOT

13  DOWN SOME OF THE THINGS THAT I HEARD, BUT IT'S UP TO YOU

14  TO DECIDE WHAT TYPES OF THINGS THEY SAID THAT DON'T MAKE

15  A LOT OF SENSE.  TAOS GAVE INTERSIL TOO MUCH

16  INFORMATION.  HOW ELSE ARE YOU SUPPOSED TO DO DUE

17  DILIGENCE?  YOU WANT TO SELL ME YOUR CAR?  CAN'T DRIVE

18  IT, CAN'T LOOK UNDER THE HOOD.  JUST BUY IT.  OF COURSE

19  NOT.  DUE DILIGENCE MEANS EXCHANGING INFORMATION.

20  THERE'S AN AGREEMENT.

21          IS TAOS TO BE BLAMED FOR RELYING ON A

22  CONFIDENTIALITY AGREEMENT THAT INTERSIL SIGNED?  KIRK

23  LANEY WAS GREEDY.  KIRK LANEY VALUED THE COMPANY THE WAY

24  THAT IT WAS SUPPOSED TO BE VALUED.  WHO WAS RIGHT?  WAS

25  THE COMPANY WORTH 30 MILLION OR WAS IT WORTH CLOSER TO

1    70?  BECAUSE A FEW YEARS LATER, IT SOLD FOR 300 MILLION.

2    WHO HAD THE VALUATION OF THE COMPANY RIGHT?  WHO WAS

3    RIGHT THAT THESE AMBIENT LIGHT SENSORS WOULD TAKE OFF,

4    THAT EVERYONE WOULD BE CARRYING AN APPLE IPHONE OR A

5    SAMSUNG GALAXY PHONE THAT HAD AN AMBIENT LIGHT SENSOR IN

6    IT?

7              THEY SAID THAT BREACHING THE AGREEMENT WAS

8    A MISTAKE?  YOU ARE INSTRUCTED AS A MATTER OF LAW THE

9    DEFENDANT RETAINED CONFIDENTIAL INFORMATION IN BREACH OF

10   THE AGREEMENT.  AND YOU ARE LATER INSTRUCTED ON PAGE 9,

11   A MATERIAL BREACH OF ONE ASPECT OF THE CONTRACT

12   GENERALLY CONSTITUTES THE MATERIAL BREACH OF THE WHOLE

13   CONTRACT.  AND WHAT ARE THEY GOING TO SAY?  THAT IN

14   2006, THEY FOUND ONE E-MAIL WHERE THEY INTERNALLY WERE

15   DISCUSSING THAT INTERSIL USED CHIPWORKS AS A PACKAGING

16   COMPANY?  IN 2006, INTERNALLY TALKED ABOUT THAT?  THAT'S

17   A MISUSE OF THE INFORMATION?  WELL, IT DOESN'T EVEN

18   MATTER.  THEY BREACHED THIS AGREEMENT IN 2004 WHEN THEY

19   DIDN'T RETURN THOSE DOCUMENTS AND SAID THEY WERE GOING

20   TO RETURN THEM.

21              AND THEY SAY, OH, WE RELIED ON THE

22   BROADVIEW AGREEMENT.  YOU HEARD MR. TOKOS'S TESTIMONY.

23   THE BROADVIEW AGREEMENT SAID, THE LEGAL TEAM COULD KEEP

24   THE DOCUMENTS.  IT WASN'T THE LEGAL TEAM THAT KEPT THESE

25   DOCUMENTS.  WE'VE HEARD ABOUT AT LEAST THREE OTHER

1    INDIVIDUALS THAT KEPT THESE DOCUMENTS.  EVEN IF THAT'S

2    THE AGREEMENT THEY WENT ON, THEY BREACHED THAT AGREEMENT

3    TOO.

4              NO CONFIDENTIAL INFORMATION WAS PROVIDED.

5    MR. MAHESWARAN CONTRADICTS THAT.

6              NO TRADE SECRETS WERE GIVEN.  PRODUCT

7    DETAILS ABOUT UNRELEASED PRODUCT ARE TECHNICAL TRADE

8    SECRETS.

9              THE COURT:  MR. ALIBHAI, YOU HAVE

10   TWO MINUTES.

11             MR. ALIBHAI:  THANK YOU, YOUR HONOR.  THIS

12   ALL COMES DOWN TO ONE THING.  THEY HAD BOARD

13   AUTHORIZATION TO OFFER 35 TO $45 MILLION.  THEY OFFER

14   $30 MILLION.  AND REMEMBER, EVEN THIS $30 MILLION OFFER

15   IS 10 NOW, 5 NEXT YEAR, AND MAYBE 15 IF YOU MEET SOME

16   TARGETS.  MR. LANEY SAYS, WE'RE WORTH $70 MILLION.  THEY

17   GOT THAT COUNTEROFFER IN THE FIRST WEEK OF JULY AND

18   SAID, FORGET IT.  THEY SAID, LET'S DO WHAT BRIAN NORTH

19   SAID WE COULD DO.  LET'S TAKE THE MORE INTERESTING

20   PRODUCTS, LET'S REPLICATE THEM, LET'S COMPETE WITH THEM.

21             BUT THEY DIDN'T JUST WANT TO COMPETE.  THEY

22   WANTED TO PUT US OUT OF BUSINESS, AND THEY WANTED TO BE

23   THE LAST NAIL IN OUR COFFIN.  THEY ALMOST DID IT.  AND

24   I'M NOT GOING TO TAKE IT -- ANY APOLOGIES FOR TAOS,

25   BECAUSE THEY SUCCEEDED, BECAUSE THEY THRIVED, BECAUSE

1    THEY CONTINUED TO WORK HARD AFTER ALMOST LOSING THEIR

2    BUSINESS.  THEY SHOULD BE CONGRATULATED FOR THAT GRIT

3    THAT THEY SHOWED IN '04 AND '05 WHEN THEY HAD TOUGH

4    TIMES, AND THEY DID WELL, BUT THAT DOESN'T MEAN THAT

5    BECAUSE THEY DID WELL, THEY'RE ALLOWED TO LIE, CHEAT, OR

6    STEAL.  TODAY'S THE DAY TAOS GETS JUSTICE AND INTERSIL

7    HAS TO ANSWER FOR THE WRONGS IT DID.

8                    GOOD LUCK IN YOUR DELIBERATIONS.

9                    THE COURT:  ALL RIGHT.  THANK YOU,

10   MR. ALIBHAI.

11                   LADIES AND GENTLEMEN, IT'S 4:37 P.M.  YOU

12   CAN TAKE WITH YOU, OF COURSE, YOUR COURT'S -- YOUR COPY

13   OF THE COURT'S JURY INSTRUCTIONS TO THE JURY ROOM AND

14   REFER TO THOSE.  MS. SANFORD WILL GATHER UP THE EXHIBITS

15   THAT HAVE BEEN ADMITTED INTO EVIDENCE, AND SHE'LL BRING

16   THOSE TO YOU FOR YOU TO REFER TO DURING YOUR

17   DELIBERATIONS.

18                   IT'S 4:37.  IT IS, AS YOU CAN HEAR, RAINING

19   OUTSIDE.  IT IS RIGHT AROUND 34 DEGREES OUTSIDE, SO I

20   THINK THE STREETS ARE OKAY RIGHT NOW.  AS FAR AS HOW

21   LATE YOU MAY WANT TO STAY, I DON'T KNOW.  YOU MAY WANT

22   TO VISIT AMONG YOURSELVES AND DECIDE WHAT YOU'D LIKE TO

23   DO THIS EVENING.

24                   WE WILL -- WOULD NORMALLY STAY AS LATE AS

25   YOU WANT TO STAY, WHETHER THAT'S 8 O'CLOCK, 9 O'CLOCK,

```
 1   10 O'CLOCK.  TONIGHT, I'M NOT SURE THAT IT'S WISE TO
 2   STAY THAT LATE, GIVEN THAT THE TEMPERATURES ARE DROPPING
 3   AND IT'S RAINING.  TOMORROW MORNING, IT'S PREDICTED TO
 4   BE AROUND 26 DEGREES, SO IT'S -- I DON'T KNOW WHAT THE
 5   ROADS WILL BE LIKE IN THE MORNING.  I'M GOING TO SUGGEST
 6   THAT WE PROBABLY HAVE A LATE START TOMORROW WHEN YOU
 7   COME BACK FOR JURY DELIBERATIONS.
 8             BUT FOR RIGHT NOW, I'LL JUST ASK YOU TO GO
 9   TO THE JURY ROOM AND BEGIN YOUR DELIBERATIONS.  AT -- AT
10   THE POINT AT WHICH YOU WANT TO GO HOME AND COME BACK
11   TOMORROW, PLEASE TELL MR. WESTBERG SO HE CAN LET ME KNOW
12   ABOUT THAT.  I THINK WE'LL PROBABLY, IN ANY EVENT,
13   RECESS, PROBABLY -- WELL, I'LL WATCH THE TEMPERATURES,
14   BUT MAYBE AROUND 7:00, SOMETHING LIKE -- 7:00 TO 8:00.
15   I DON'T WANT TO STAY TOO LATE AND THEN THERE'S A PROBLEM
16   GETTING HOME.
17             OKAY.  THANK YOU, FOLKS.
18             COURT SECURITY OFFICER:  ALL RISE.
19             (JURY NOT PRESENT)
20             THE COURT:  ALL RIGHT.  WE'LL BE IN RECESS
21   UNTIL THE JURY RETURNS WITH A NOTE OR A MESSAGE.  THANK
22   YOU.
23             (BREAK TAKEN FROM 4:41 P.M. TO 4:42 P.M.)
24             THE COURT:  MR. ALIBHAI AND MR. BRAGALONE,
25   DO YOU AGREE TO THE EXHIBITS THAT MS. LYON IS PLACING
```

1    OVER HERE WITH THE COURT SECURITY OFFICER TO DELIVER TO

2    THE JURY?

3                    MR. ALIBHAI:  YES, YOUR HONOR.

4                    MR. KIMBLE:  YES, YOUR HONOR.

5                    THE COURT:  ALL RIGHT.  MR. KIMBLE, AND

6    MR. ALIBHAI AGREE SO THAT'S FINE.  MS. SANFORD, GO AHEAD

7    AND DELIVER THE EXHIBITS TO THE JURY.

8                    DEPUTY COURT CLERK:  YES, SIR.

9                    (BREAK TAKEN FROM 4:43 P.M. TO 5:03 P.M.)

10                   (JURY NOT PRESENT)

11                   COURT SECURITY OFFICER:  ALL RISE.

12                   THE COURT:  THANK YOU.  PLEASE TAKE YOUR

13   SEATS.  THE COURT HAS RECEIVED A NOTE FROM THE JURY AT

14   4:52 P.M. JUST ANNOUNCING THAT TODD MILLER, JUROR NUMBER

15   7, IS THE PRESIDING JUROR.  OKAY.

16                   ALSO, THE COURT SECURITY OFFICER INFORMS ME

17   THAT THE JURY WOULD LIKE TO COME INTO THE COURTROOM.

18                   COURT SECURITY OFFICER:  JUST TO LET YOU

19   KNOW WHAT THEIR DECISIONS ARE.

20                   THE COURT:  WELL, CAN YOU ASK THEM TO WRITE

21   A NOTE TO ME?

22                   COURT SECURITY OFFICER:  I CAN DO THAT.

23                   THE COURT:  OKAY.  NOTE NUMBER 2 FROM THE

24   JURY RECEIVED JUST NOW, 05:05 P.M., READS, "WE WOULD

25   LIKE TO LEAVE AROUND 6:00 P.M. BEFORE WEATHER GETS BAD.

1   WE WOULD LIKE TO START AT 9:00 A.M. UNLESS SCHOOLS ARE

2   CLOSED.  THEN, WE WOULD DELAY UNTIL 11:00 A.M."

3                  ALL RIGHT, LET'S SEE.  I WILL WRITE THEM

4   BACK AND TELL THEM THAT THAT'S FINE AND THAT THEY

5   SHOULD -- THAT I WILL BRING THEM INTO THE COURTROOM AT

6   6:00 P.M. BEFORE THEY LEAVE

7                  COURT SECURITY OFFICER:  OKAY.

8                  THE COURT:  OKAY.  MY RESPONSE IS, "MEMBERS

9   OF THE JURY, THE COURT AGREES WITH YOUR PROPOSED

10  SCHEDULE.  THE COURT SECURITY OFFICER WILL BRING YOU

11  BACK INTO THE COURTROOM AT 6:00 P.M. TONIGHT."

12                 IS THAT AGREEABLE, MR. ALIBHAI?

13                 MR. ALIBHAI:  YES, YOUR HONOR.

14                 THE COURT:  ALL RIGHT.  THANK YOU.

15                 MR. BRAGALONE, IS THAT AGREEABLE?

16                 MR. BRAGALONE:  OF COURSE, YOUR HONOR.

17                 THE COURT:  OKAY.  THANK YOU.

18                 COURT SECURITY OFFICER:  THANK YOU, JUDGE.

19                 THE COURT:  OKAY.  WE'LL RECESS FOR ANOTHER

20  50 MINUTES.

21                 (BREAK TAKEN FROM 5:10 P.M. TO 6:04 P.M.)

22                 THE COURT:  KEEP YOUR SEATS.  OKAY.  IT IS

23  A LITTLE AFTER 6:00.  THE JURY HAD SAID THAT IT -- OR

24  THAT THEY WOULD LIKE TO GO HOME AT 6:00, SO I'M GOING TO

25  BRING THEM IN, TELL THEM THAT THEY CANNOT DELIBERATE

1    OVERNIGHT, THEY HAVE TO WAIT UNTIL THEY RETURN TOMORROW.

2    THEIR NOTE SAID THAT THEY WOULD RETURN AT 9:00 UNLESS

3    THE SCHOOLS ARE CLOSED.  I'M GOING TO CLARIFY WITH THEM,

4    THEY'RE TALKING ABOUT THE PLANO SCHOOL SYSTEM, AND WE

5    CAN ALL WATCH THE TELEVISION TONIGHT AND SEE IF PLANO

6    CLOSES THEIR SCHOOLS.

7               WHETHER THEY'LL DO THAT TONIGHT OR EARLY IN

8    THE MORNING, I DON'T KNOW, BUT WE CAN ALL WATCH THE NEWS

9    AND SEE.  IF PLANO CLOSES THE SCHOOLS, THEN WE'LL RESUME

10   AT 11:00 TOMORROW.  HOPEFULLY IT'LL WARM UP, START TO

11   WARM UP.

12              OKAY, MR. WESTBERG, BRING THEM IN.

13              COURT SECURITY OFFICER:  ALL RISE.

14              (JURY PRESENT)

15              THE COURT:  ALL RIGHT, TAKE YOUR SEATS,

16   PLEASE.  ALL RIGHT, LADIES AND GENTLEMEN, IT'S A LITTLE

17   BIT AFTER 6:00, 5 AFTER 6:00.  YOU HAD SAID THAT YOU

18   WOULD LIKE TO GO HOME AT 6 O'CLOCK, SO WE'LL RECESS FOR

19   TODAY.  I JUST NEED TO REMIND YOU, YOU CAN'T DELIBERATE

20   OVERNIGHT.  YOU CAN'T BE ON THE PHONE WITH EACH OTHER.

21   YOU CAN ONLY DELIBERATE WHEN ALL NINE OF YOU ARE

22   TOGETHER IN THE JURY ROOM, AND KEEP IN MIND, YOU CAN'T

23   TALK ABOUT THIS CASE TO FRIENDS OR FAMILY OR NEIGHBORS

24   UNTIL AFTER YOU'VE REACHED A VERDICT AND RETURNED A

25   VERDICT.  THEN YOU CAN TALK TO ANYBODY YOU WANT TO,

1    OKAY?

2                OKAY.  ALL RIGHT.  YOU HAD SAID THAT YOU

3    WOULD -- YOU'LL COME BACK AT 9 A.M. UNLESS THE SCHOOLS

4    ARE CLOSED.  I ASSUME WE'RE TALKING ABOUT THE PLANO

5    INDEPENDENT SCHOOL DISTRICT, SO WE'LL ALL WATCH THE

6    NEWS.  IF PLANO CANCELS CLASSES FOR TOMORROW, THEN WE'LL

7    KNOW THAT YOU WON'T BE BACK UNTIL 11 A.M.  IF FOR SOME

8    REASON THE ROADS ARE STILL BAD INTO THE MORNING --

9    HOPEFULLY IT'LL START TO WARM UP TOMORROW -- THEN, YOU

10   KNOW, JUST GET HERE WHENEVER IT'S SAFE FOR YOU TO GET

11   HERE.  IF YOU'RE NOT GOING TO BE HERE BY 11:00, MAYBE

12   YOU COULD CALL -- LET'S SEE.

13                DO THEY HAVE YOUR NUMBER?

14                DEPUTY COURT CLERK:  YES, SIR.

15                THE COURT:  OKAY.  YOU HAVE MS. SANFORD'S

16   NUMBER.  CALL MS. SANFORD AND JUST LET HER KNOW.

17   OTHERWISE, WE'LL EITHER SEE YOU AT 9:00 A.M. OR

18   11:00 A.M. TOMORROW.  OKAY, THANK YOU.

19                COURT SECURITY OFFICER:  ALL RISE.

20                (JURY NOT PRESENT)

21                THE COURT:  OKAY.  WE'LL RECESS UNTIL

22   EITHER 9 A.M. OR 11:00 A.M. DEPENDING ON WHAT HAPPENS

23   WITH THE PLANO SCHOOLS.  THANK YOU.  YOU'RE EXCUSED.

24                (PROCEEDINGS ADJOURNED AT 6:07 P.M.)

25

1

2    COURT REPORTER'S CERTIFICATION

3         I HEREBY CERTIFY THAT ON THIS DATE, MARCH 4,

4    2015, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

5    RECORD OF PROCEEDINGS.

6

7

8                        /S_____
                         BRYNNA K. MCGEE, CSR-RPR-CRR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25