# United States District Court

**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| AMS SENSORS USA INC. f/k/a | § | |
| TEXAS ADVANCED OPTOELECTRONIC | § | |
| SOLUTIONS, INC. | § | Civil Action No.  4:08-cv-00451 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| RENESAS ELECTRONICS AMERICA | § | |
| INC. f/k/a INTERSIL CORPORATION | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Renesas Electronics America, Inc.'s Motion to Exclude Trial Testimony of Plaintiff's Technical Expert Joseph McAlexander (Dkt. #712).  Having considered the Motion and the relevant briefing, the Court finds the Motion should be **GRANTED in part** and **DENIED in part**.

## BACKGROUND

### I.       The First Trial

The parties develop and sell ambient light sensors, which are used in electronic devices to adjust screen brightness in response to incident light.

In the summer of 2004, the parties confidentially shared technical and financial information during negotiations for a potential acquisition.[1]  In August 2004, the parties went their separate ways.  Soon after, Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas" f/k/a "Intersil") released new sensors with the technical design Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS" f/k/a "TAOS") disclosed in the confidential negotiations.  In January 2005, Plaintiff won a contract from Apple for the first-

---

[1] For simplicity's sake, the Court refers to the parties as "Plaintiff" and "Defendant."  When quoting briefing or prior rulings, the Court does not alter the quotations.  As such, some quotations may refer to the parties by their current names or former names, and sometimes a mix of both.

generation iPhone.  In February 2005, Plaintiff released its product that contained the confidential technology.  In January 2006, Defendant reverse-engineered that product.  In March 2008, Defendant won a contract from Apple for the second-generation iPhone.

On November 25, 2008, Plaintiff sued for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).  The trade secret claim asserted one technical trade secret and two financial trade secrets.

After a trial in early 2015, a jury returned a verdict for Plaintiff and awarded damages on all four claims.  The Court ruled on the parties' post-trial motions and entered final judgment.  Both parties appealed.

## II.        The Federal Circuit Mandate

The Federal Circuit wrote a lengthy opinion, affirming in part, reversing in part, vacating in part, and remanding the case (Dkt. #614).  Among its rulings, the Federal Circuit affirmed liability for trade secret misrepresentation, but only on the theory of a technical trade secret.  It identified the single "asserted trade secret" ("ATS") as "a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)."    *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1313 (Fed. Cir. 2018) (hereinafter "*TAOS*") (emphasis original).  Liability for the two financial trade secrets was vacated.

The misappropriation damages were overturned for two independent reasons: (1) Plaintiff's expert "did not explain which of the trade secrets contributed to what amount of profit to be disgorged" and (2) the ATS "was accessible to Intersil by proper means long before the time of many of the sales included in TAOS's request for monetary relief."  *Id.* at 1317.  The Federal Circuit further explained the second reason:

Such accessibility existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560. . .

. . . Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products. . . .

. . . That limited head-start period, which 'depend[s] upon the facts of each case,' ends TAOS's entitlement to monetary relief.

Here, the jury awarded disgorgement of profits in the exact amount TAOS's expert proposed, based on sales from April 2006 through March 2014. . . . TAOS's evidence supporting its claim to monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period, and that omission cannot be deemed harmless.

*Id.* at 1317-18.  The Federal Circuit concluded:  "On remand, any determination of sales-based monetary relief for trade secret misappropriation requires evidence and a determination of the time at which the trade secret became properly accessible to Intersil and the duration of any head-start period."  *Id.* at 1318.

The Federal Circuit discussed additional errors with Plaintiff's disgorgement award.  In trade secret cases, plaintiffs sometimes use the defendants' gains as evidence of the plaintiffs' losses, or of the reasonable royalty.  But here, Plaintiff sought disgorgement of Defendant's profits without "any evidence or arguments that such profits soundly measured . . . TAOS's losses or a reasonable royalty."  *Id.* at 1320.  Defendant's profits were therefore not "a case-specific proxy for, TAOS's losses or a reasonable royalty."  *Id.*  There was "no evidence" that Defendant's profits from misappropriating Plaintiff's trade secret correlated with Plaintiff's losses.  *Id.* at 1321.  "For example, . . . TAOS has not identified evidence showing that it would have won the [Apple] contract had Intersil not used TAOS's photodiode array structure."  *Id.*

3

### III.        On Remand

On remand, the parties dispute damages.  On August 9, 2019, Judge Schell[2] transferred this case to the undersigned (Dkt. #662).

On November 25, 2019, Plaintiff moved for Entry of Final Judgment (Dkt. #672).  The Court denied the motion on March 27, 2020 (Dkt. #682).  Relevantly, the Court concluded Plaintiff's tortious interference claim was eliminated on appeal (Dkt. #682 at p. 22).  The Federal Circuit found no causation between Defendant's trade secret misappropriation and its subsequent iPhone contract (Dkt. #682 at p. 22, n.11).  This Court was unequivocal:

> In light of the Federal Circuit's discussion . . ., there is no evidence to support any link between these underlying acts and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008.
> . . .
> Renesas's other two arguments can be boiled down to once concept: Renesas did not win the Apple iPhone 3G contract using any misappropriated information or by using TAOS's patent subject matter; rather, as the Federal Circuit summarized the evidence at trial, Renesas won the contract "primarily" due to Renesas's "significantly lower bid price, made possible by using the (lower cost) plastic packaging." . . . The Court must agree.
> . . .
> Although the Federal Circuit's discussion was not directed at TAOS's tortious interference claim, the Court struggles to see how it is not the law of the case. [citations omitted].  And as the law of the case, the Court may not reexamine the Federal Circuit's determination that Apple's decision to award Renesas the iPhone 3G was driven by Renesas's use of low-price plastic packaging.

(Dkt. #682, pp. 22, 24-25).  The Court noted the Federal Circuit determined "that TAOS's only misappropriated trade secret was properly accessible to Renesas no later than January 2006."  (Dkt. #682 at p. 26).  This "precludes TAOS from claiming that any misappropriated information interfered with any reasonably probable Apple business—Renesas did not even start contracting with Apple until after TAOS's [ATS] lost trade-secret status." (Dkt. #682 at pp. 26-27).

---

[2] United States Senior District Judge Richard Schell assumed senior status on March 10, 2015.

Plaintiff moved for reconsideration (Dkt. #686).   The Court denied the motion and reiterated it was bound by the law of the case as determined by the Federal Circuit (Dkt. #696).

## IV.        The Present Motion

As trial approaches, the parties filed various expert motions.  These motions focus on how to interpret and apply the Federal Circuit's opinion.  On December 1, 2020, Defendant moved to Exclude Trial Testimony of Plaintiff's Technical Expert Joseph McAlexander ("Mr. McAlexander") (Dkt. #712).   On December 15, 2020, Plaintiff responded (Dkt. #717).   On December 22, 2020, Defendant replied (Dkt. #719).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue.  FED. R. EVID. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury.  509 U.S. 579, 590-93 (1993).  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kuhmo Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).  "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

The party offering the expert's testimony has the burden to prove by a preponderance of the evidence that:  (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable. *Daubert*, 509 U.S. at 590-91.  A proffered expert witness is

qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education." FED. R. EVID. 702.

In deciding reliability, the Court considers numerous factors.  *See Daubert*, 509 U.S. at 594.  In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony:  (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community.  *Id.* at 593-94; *Pipitone*, 288 F.3d at 244.  When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 594.

The *Daubert* factors are not "a definitive checklist or test."  *Daubert*, 509 U.S. at 593.  As the Court has emphasized, the *Daubert* framework is "a flexible one."  *Id.* at 594.  The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 151.  Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court.  *St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000).

Rule 403 dictates that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  FED. R. EVID. 403.  Furthermore, the Fifth Circuit has consistently held that an expert may not render conclusions of law.  *See Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996); *see also Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009) ("an expert may never

render conclusions of law."); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("allowing an expert to give his opinion on legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").

## ANALYSIS

Defendant asks this Court to exclude testimony from Plaintiff's technical expert, Mr. McAlexander.  Fundamentally, the parties have different interpretations of the Federal Circuit's decision.  As this Court has repeated, it is bound by the Federal Circuit's opinion as it is the law of the case.  *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974). Accordingly, the Court carefully reviewed the lengthy trial and appellate records, its two recent orders, and the parties' briefing.  It now addresses each of the eight disputes.

### I.    Mr. McAlexander's Opinions Regarding Apple

On remand, the central dispute is how Defendant benefitted from Plaintiff's intellectual property.  A hotly contested issue is Defendant's contractual relationship with Apple.

Defendant asks this Court to exclude Plaintiff's technical expert, Mr. McAlexander, from testifying about his opinions regarding Apple.  Mr. McAlexander opines "there is a linkage" between Defendant's trade secret misappropriation and Apple's decision to purchase Defendant's product (Dkt. #712, Exhibit 2 at 161:4-8).  Defendant argues this contradicts the Federal Circuit's finding of no evidentiary linkage (Dkt. #712 at p. 3).

Plaintiff disagrees with this characterization and argues there is no such finding.  Plaintiff argues Mr. McAlexander opines about whether Plaintiff would have profited without the misappropriation—not whether Defendant profited from the misappropriation (Dkt. #717 at p. 5).

Plaintiff's argument ignores the Federal Circuit's unambiguous finding.  The Federal Circuit found "no evidence" that Defendant's profits from misappropriation correlated with

Plaintiff's loss.  *TAOS*, 895 F.3d at 1321.  On remand, this Court applied the finding and reiterated "there is no evidence to support any link between these underlying acts [of misappropriation and infringement] and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008."  (Dkt. #682 at p. 22).

Contradicting these rulings, Mr. McAlexander opines "there is a linkage" between misappropriation of the ATS and Apple's decision to purchase Defendant's product (Dkt. #712, Exhibit 2 at 161:4-8).  Specifically, he opines that Defendant "would not have won any design-in or contract to supply the ISL29003 for Apple's iPhone 3G products had it not misappropriated TAOS's Trade Secret."  (Dkt. #712, Exhibit 3 at ¶ 181).  These opinions cannot be squared with the Federal Circuit's factual finding and this Court's application of that finding.  Because these opinions cannot be squared, Mr. McAlexander is excluded from testifying to any linkage between Defendant's misappropriation and the Apple iPhone 3G contract.

Plaintiff tries to thread the needle by arguing that Mr. McAlexander's testimony goes to Defendant's profits earned from using the ATS—not Plaintiff's profits lost from Defendant's misappropriation.  While the Court appreciates the nuance, the Federal Circuit's factual finding precludes this argument.  The Court is bound by what the Federal Circuit "decided by necessary implication as well as those decided explicitly."  *Terrell*, 494 F.2d at 19.  As the Court held in its Order denying Plaintiff's Motion for Final Judgment (Dkt. #682) and its Order denying Plaintiff's Motion for Reconsideration (Dkt. #696): there is no evidence to support any link between these underlying acts and the iPhone 3G contract.  There is no leeway in this finding.

Still, Plaintiff asserts it can recover Defendant's profits.  It relies on a Fifth Circuit case that discussed trade secret damages.  *Univ. Computing Co. v. Lykes-Youngstown Corp.*, 504 F.2d 518 (5th Cir. 1974).  There, the Fifth Circuit noted two main approaches to damages: (1) measuring

plaintiff's loss or (2) measuring the value to the defendant.  *Id.* at 535-356.  Plaintiff argues Mr. McAlexander is testifying as to the second approach—the value to the defendant.[3]  The crux of Plaintiff's argument is that Defendant benefitted from the ATS and that benefit enabled them to profit with an Apple contract.

Again, this argument ignores the Federal Circuit's mandate.  The Federal Circuit held that Plaintiff did not establish causation between Plaintiff's loss and Defendant's gain.  As a specific example, the Federal Circuit found there was no evidence that Plaintiff would have won the Apple contract but for the misappropriation.  From here, this Court found no connection between the underlying acts of misappropriation and infringement and the Apple contract.[4]

Plaintiff's argument invokes the related issues surrounding the so-called "derivative" products that are "derived" from the ATS but do not actually practice the ATS.  The parties separately contest the admissibility of derivative products, which the Court addresses below. While trade secret law permits, to some extent, damages on derivative products, the Court cannot evade the Federal Circuit's factual findings about Defendant's iPhone 3G contract.

The Court excludes Mr. McAlexander's testimony to the extent he contradicts prior Court rulings.  For example, he may not opine to a "linkage" between Defendant's misappropriation and the iPhone 3G contract.  The Court declines to grant Defendant's broad request of excluding any

---

[3] Mr. McAlexander characterizes this Court's rulings as bearing on "Apple's decision to buy a product" whereas he is opining on "Intersil's ability to provide a product." (Dkt. #712, Exhibit 2 at 164:9-17).  Similarly, Mr. McAlexander opines that "Intersil was able to learn from the trade secret, put it into place, and produce what Apple would then consider to be a viable product for purchase." (Dkt. #712, Exhibit 2 at 166:6-167:3).  Both of these arguments suggest there is "a linkage" between Defendant's misappropriation and the Apple iPhone 3G contract.

[4] Plaintiff asserts "this Court never suggested that the Intersil products sold to Apple did not use TAOS's trade secret or that Intersil could keep the profits from such sales." (Dkt. #717 at p. 2).  This is incorrect.  The Court held that "AMS's photodiode array structure had already lost its trade secret status by the time Renesas was entering into talks with Apple. . . When Renesas won the contract, the photodiode technology *was not* a trade secret." (Dkt. #696 at p. 8-9) (emphasis original).  Consequently, Defendant's products sold to Apple for the iPhone 3G did not use the ATS. These products may have contained the same technology, but by this late date, it was properly accessible and so could not "use TAOS's trade secret."

testimony regarding Apple.  As Plaintiff notes, the Federal Circuit did not make a similar factual finding regarding Defendant's sales to Apple for the iPod (Dkt. #717 at p. 6 n.4).  The parties may move in limine and object to evidence at trial.

## II. Mr. McAlexander's Opinions Regarding A 17-Month Head-Start Duration and Pre-2004 Head-Starts

A crucial issue for misappropriation damages is determining the head-start duration.  The Federal Circuit described the head-start duration as, "the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the [ATS], to recreate that structure in its own products." *TAOS*, 895 F.3d at 1317.  In other words, the head-start is the time "which would have been required for one having no background in the . . . business to launch such an enterprise." *Id.* (quoting *Equip. Co. v. C. H. Galloway & Sci. Cages, Inc*., 485 S.W.2d 953, 956 (Tex. Civ. App.—Waco 1972, no writ)).  When the Federal Circuit considered this, it held Plaintiff's damages expert used sales "from April 2006 through March 2014" which "did not limit the covered sales to a head-start period" and "that omission cannot be deemed harmless."  *Id.* at 1318.

On remand, the parties have differing opinions on the head-start duration, including how to define it.  Is it the time necessary to merely incorporate the trade secret into an existing product, as Defendant argues? Or is it longer, requiring the time "to develop an identical product with identical clientele," as Plaintiff argues? (Dkt. #717, p. 8 (citing *Halliburton Energy Services, Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 259 (Tex. App.—Dallas 2014, no pet.))).

Defendant asks this Court to exclude Mr. McAlexander's testimony on a 17-month head-start because it includes the design time to "create a new product," and not merely incorporate the trade secret (Dkt. #712 at pp. 5-6).  Specifically, the 17 months includes the time to digitize an analog device by incorporating multiple, non-secret features, in addition to adding the trade secret.

These are more steps than necessary to incorporate the ATS.  Because of this, Defendant argues Mr. McAlexander's testimony should be excluded.

Plaintiff disagrees.  It asserts that under Texas law, the head-start period must "correct more than just the lead time gained through misappropriation."  *Halliburton*, 444 S.W.3d at 259. The "additional reasonable period of time . . .  to eliminate any commercial advantage" extends throughout the time "required to develop an identical product with identical clientele."  *Id.* Plaintiff asserts this is therefore a factual question for the jury.

The Court turns to the Federal Circuit's opinion, which defines the head-start duration as the time "to recreate" the ATS in Defendant's products.  *TAOS*, 895 F.3d. at 1317.  The Federal Circuit did not assign additional requirements of clientele building, as Plaintiff proposes.  Nor does the Federal Circuit's language of "recreate" the trade secret require developing an identical product.  The Federal Circuit's focus is only on incorporating the trade secret into "[Defendant's] own products."  *Id.*  The opinion relied on Texas law, which defines the head-start as the time for someone having "no background" to "launch such an enterprise."  *Research Equip. Co., Inc. v. C. H. Galloway & Sci. Cages, Inc.*, 485 S.W.2d 953, 956 (Tex. Civ. App.—Waco 1972, no writ). This language suggests "recreating" is more than physically reproducing the trade secret in a product because it discusses having an inexperienced person "launching" a similar venture.

On matters of state law, both the Federal Circuit and this Court are bound by Texas Supreme Court precedent.  The Texas Supreme Court defined the head-start duration as "a marketing advantage or head start as compared to the patentee or any manufacturer or processor licensed by him after the issuance of the patent."  *Hyde Corp. v. Huffines*, 158 Tex. 566, 581, 314 S.W.2d 763, 773 (1958).  This "marketing advantage" creates an unfair head-start; he who misappropriates "may not and often does not stand on the basis of economic equality with

competing manufacturers or the public at large at the date of the public disclosure of the [trade secret]."  *Id.* at 588.  "For this reason relief . . . should not be arbitrarily denied because the trade secrets . . .  have been made public."  *Id.* at 588-89.  It "depend[s] upon the facts of each particular case" whether relief should be granted beyond the publication date.  *Id.* at 589.

Taken together, the head-start duration is for the factfinder to determine when that "marketing advantage or head start" was neutralized.  The Texas Supreme Court has not required a more extensive showing, such as requiring "the time to develop an identical product with identical clientele," as Plaintiff argues (Dkt. #717, p. 8).  Instead, the Court's language focuses on a fact-specific inquiry to determine when the defendant "stand[s] on the basis of economic equality with competing manufacturers or the public at large."  *See id.* at 588.  The Court's reference to "competing manufacturers or the public at large" undercuts Plaintiff's argument that the head-start is the time for a true novice to launch a comparable company.

Texas precedence comports with the Federal Circuit's opinion, which recognized that the "limited head-start period . . . depend[s] upon the facts of each particular case."  *TAOS*, 895 F.3d at 1318 (citing *Hyde*, 158 Tex. at 589).  The factfinder must determine the time necessary for Defendant to "recreate" the ATS in its own product.  This may include additional time beyond strictly implementing the ATS, to account for the unfair "marketing advantage" gained from misappropriation.  Plaintiff argues it would take many months to do so; Defendant argues it would be a snap.  Neither argument is wrong as a matter of law.  As such, the motion is denied on this basis.

## III.   Mr. McAlexander's Opinions on Proper Accessibility

The Federal Circuit remanded for determination of the time that the trade secret became properly accessible.  *Id.* at 1318.  Once the ATS was properly accessible, it was no longer a

protected secret.  *Id.*  Defendant asks this Court to exclude Mr. McAlexander's testimony because he purportedly uses the wrong legal standard for whether a trade secret is properly accessible.

Mr. McAlexander explains proper accessibility as: "the public sale of a product incorporating trade secrets will not terminate secrecy unless it is a simple device widely circulated, the construction of which is ascertainable at a glance." (Dkt. #712, Exhibit 2 at 93:9-14).  He relies heavily on this purported standard of "ascertainable at a glance." (*See* Dkt. #712, Exhibit 2 at 93:15-19).  Mr. McAlexander emphasizes that "[j]ust because it was accessible does not mean it was ascertainable" (Dkt. #712, Exhibit 2 at 102:19-20).  He appears to rely on this to define "proper accessibility" as "ascertainable at a glance."

This is not the correct legal standard.  The Court finds the Texas Uniform Trade Secrets Act to be instructive, even if the Act does not govern the case.[5]  The Act defines "proper means" of access as "discovery by independent development, reverse engineering unless prohibited, or any other means that is not improper means."  TEX. CIV. PRAC. & REM. CODE ANN. § 134A.002(4).  Improper means include theft, bribery, misrepresentation, breach, espionage, and the like.  *Id.* § 134A.002(2).  This is much different than "ascertainable at a glance," which implies that something is only accessible if it is obvious.  The Act's definition includes independent development and reverse-engineering, both of which require some amount of effort to learn the trade secret.

The Federal Circuit's use of "properly accessible" comports with the Act, but not with Mr. McAlexander.  The Federal Circuit found the ATS "was accessible to Intersil by proper means long before the time of many of the sales included in TAOS's request for monetary relief.  Such

---

[5] The Texas Uniform Trade Secrets Act, which governs claims accruing on or after September 1, 2013, does not apply here.  *See Sw. Energy Prod. Co. v. Berry–Helfand*, 491 S.W.3d 699, 711 n.7 (Tex. 2016) (citing Tex. Civ. Prac. & Rem. Code § 134A.001–.008).

accessibility existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560." *TAOS*, 895 F.3d at 1317.  In support, the Federal Circuit relies on a Fifth Circuit case applying Texas law. *Id.* at 1317 (citing *E.I. duPont deNemours & Co. v. Christopher*, 431 F.2d 1012, 1015 (5th Cir. 1970)).  That case confirms a trade secret is properly accessible "if he discovers [the trade secret] by his own independent research" or "discovers the process by reverse engineering applied to the finished product."  *E.I. duPont deNemours*, 431 F.2d at 1015.  This language mirrors the Act's concise definition.   Neither of these sources reference "ascertainable at a glance."

Plaintiff relies on *K & G Oil* for Mr. McAlexander's use of "ascertainable at a glance," but the case is inapposite.  *K & G Oil Tool & Serv. Co. v. G & G Fishing Tool Serv.*, 158 Tex. 594, 314 S.W.2d 782 (1958), on reh'g sub nom. K & G Oil Tool & Serv. Co., Inc. v. G & G Fishing Tool Serv., A-6577, 1958 WL 91271 (Tex. June 4, 1958).  There, the Texas Supreme Court considered trade secret misappropriation of a magnetic fishing tool.  The Texas Supreme Court discussed the product's novelty and stated it "is no simple device, the construction of which was ascertainable at a glance."  *Id.* at 606.  It distinguished the complex device from a simpler fishing tool, which was previously found not to be entitled to secrecy protection.  *Id.*  After further analysis, the Texas Supreme Court concluded the device was entitled to secrecy protection.  *Id.*

This did not create a new standard of "ascertainable at a glance."  The Texas Supreme Court commented that the magnetic fishing tool was sufficiently complex such that it may have secrecy protection.  *See id.*  If it were a simple device, "the construction of which was ascertainable at a glance," then it would not be entitled to any secrecy protection as a matter of law.  *See id.*  But, because it was not ascertainable at a glance, the Texas Supreme Court had to engage in further analysis to determine if it qualified for protection.  *See id.*  For example, if the complex device had

been reverse-engineered, it would be properly accessible.  This case does not create a per se rule that something must be "ascertainable at a glance" to be accessible.  It would be a misleading to testify otherwise.

Neither Texas law nor the mandate support Mr. McAlexander's characterization of proper accessibility as "ascertainable at a glance."  Mr. McAlexander must apply the correct statement of the law, as defined by the Federal Circuit's use of "properly accessible."  To the extent he does not, his opinions are excluded.

## IV.  Mr. McAlexander's Opinions that Draw a Distinction Between Confidential Information Separate from the ATS

On remand, the parties dispute damages for trade secret misappropriation and breach of the Confidentiality Agreement through misuse of confidential information.  The parties disagree on the scope of these claims.  Defendant argues the ATS and the confidential information are the same.  Plaintiff argues the confidential information is separate from the ATS and they are not coextensive.

The Court returns to the law of the case.  The crux of Defendant's argument is that Plaintiff inappropriately argues theories that did not survive appellate review.  The Federal Circuit affirmed trade secret liability for the ATS, but not for Plaintiff's two theories of financial trade secrets.[6] *TAOS*, 895 F.3d at 1312.  The Federal Circuit noted there was "overwhelming evidence that Intersil learned of TAOS's design during the due diligence and changed its design soon after the negotiations fell through."  *Id.* at 1316.  The breach of contract claim was not on appeal.

On remand, this Court upheld liability for breach of the Confidentiality Agreement but did not enter final judgment on the damages (Dkt. #687 at p. 18).  Defendant's breach was supported under the theory "that Renesas used TAOS's confidential information to revamp Renesas's designs

---

[6] The two financial theories were the "build v. buy" theory and the "packaging roadmap" theory.

15

for its ambient light sensor and develop a new line of light sensors to compete with TAOS" (Dkt. #687 at pp. 20-21).   The damages were unsupported because they were based in some part on a theory of liability that was vacated on appeal (Dkt. #687 at p. 22).   Consequently, the parties dispute damages for trade secret misappropriation and for breach of the Confidentiality Agreement through inappropriate use of confidential information.

Mr. McAlexander's report makes references to these separate issues.   For example, Mr. McAlexander's report states he was retained "to provide opinions related to . . . the competitive advantage Intersil gained from TAOS' technical trade secret and confidential information that were misappropriated by Renesas." (Dkt. #712 at p. 9).   He also states that "by early January 2006, Intersil already had misappropriated TAOS' Trade Secret . . . and also had begun using, in August 2004, TAOS' Confidential information in violation of the Confidentiality Agreement." (Dkt. #712 at p. 9).

These statements are in line with the mandate because they recognize that Defendant is liable for both trade secret misappropriation and separately for breach of contract.   Mr. McAlexander does not conflate the two issues, nor does he opine that the confidential information is necessarily a trade secret.   The breach of contract and trade secret claims are not coextensive. *See Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013) (looking to the "broad contractual definition of 'confidential information" for the breach of contract claim and separately at "the legal definition of a trade secret" for misappropriation).   This Court already recognized there was "overwhelming evidence" to support the jury's finding that Defendant "used TAOS's confidential information to revamp Renesas's designs for its ambient light sensor and develop a new line of light sensors to compete with TAOS." (Dkt. #682 at pp. 19-20).   This is distinct from the Federal Circuit's definition of the ATS.  *See TAOS*, 895 F.3d at 1313.

16

And Mr. McAlexander's opinion on Defendant's "know how" to implement and maximize the benefits of the ATS is supported by the trial record (Dkt. #712, Exhibit 2 at 65:24-66:9).  As such, there is no basis to exclude these opinions.

## V.   Mr. McAlexander's Opinions Limiting the ATS to an Ambient Light Sensor or to Plaintiff's Implementation of the ATS

The parties dispute the scope of the ATS.  Defendant argues Mr. McAlexander goes beyond the scope of the Federal Circuit's definition.  The Federal Circuit specified, "[t]he asserted trade secret is a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)."  *Id.* at 1313 (emphasis original).

Mr. McAlexander's report defines the ATS twice, as shown in the below table.

| The Trade Secret in ¶ 73 | The Trade Secret in ¶ 76 |
|---|---|
| TAOS' 'dual-diode' approach with an array of interleaved Diode1 (exposed) and Diode2 (shielded) photodiodes in a 1:1 ratio (i.e. TAOS' Trade Secret) | TAOS' 'dual-diode' approach using an array of interleaved Diode1 (exposed) and Diode2 (shielded) photodiodes in a 1:1 ratio with Diode2 *covered by metal* (i.e. TAOS' Trade Secret).<br><br>(emphasis added) |

His second reference in ¶ 76 specifies that the Diode2 is "covered by metal."  He testified that his second definition is how Plaintiff implemented the trade secret (Dkt. #712, Exhibit 2 at 32:13-19). Mr. McAlexander acknowledged that the Federal Circuit's definition does not include this limitation (Dkt. #712, Exhibit 2 at 32:13-15).  The Federal Circuit's definition controls.  If Mr. McAlexander defines the ATS, he must use the Federal Circuit's definition.  That definition does not contain the limitation "covered by metal."

Separately, Mr. McAlexander testified the ATS "is limited to an ambient light sensor." (Dkt. #712, Exhibit 2 at 131:12-13).  The Federal Circuit's definition does not contain this

limitation either.   As such, Mr. McAlexander is precluded from inserting it into the ATS's definition.

Plaintiff argues the ATS "has always been defined in the context of an ambient light sensor (ALS) device." (Dkt. #717 at p. 13).  In support, Plaintiff cites prior filings that reference ambient light sensors (*See* Dkt. #1 at ¶ 2 (identifying TAOS's introduction of the "first digital ambient light sensor"); Dkt. #505 (referring to "ambient light sensor" nearly 50 times)).  This does not address the mandate.  The Federal Circuit made a factual finding of the ATS.  The Court is bound by that finding.  *See Terrell*, 494 F.2d at 19.  The Federal Circuit's definition leaves no room for interpretation; Mr. McAlexander is precluded from modifying it.

## VI.    Mr. McAlexander's Opinions Regarding Defendant's Derivative Products

The parties disagree if damages can include products derived from the ATS, but that do not practice the ATS.  Specifically, Mr. McAlexander identifies a group of products that "were developed based on or derived from" the ATS (Dkt. #712, Exhibit 3 at ¶ 20).  Mr. McAlexander acknowledges these products do not practice the ATS and refers to them as derivative products.[7] Still, Mr. McAlexander opines these derivative products are "based upon knowledge of that trade secret." (Dkt. #712, Exhibit 2 at 234:4-15).   Plaintiff's damages expert relies on Mr. McAlexander's statements to include these derivative products in Plaintiff's damages base.

Defendant argues for a strict interpretation of how a trade secret is "used." (*See* Dkt. #712 at pp. 15-16).  It points to the Federal Circuit's opinion, which states that misappropriation occurs when one "discloses or uses" a trade secret."  *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1312 (Fed. Cir. 2018) ("One who discloses or uses another's trade

---

[7] When asked whether these derivative products "fall outside of the ATS," Mr. McAlexander responded that: "They're not in the primary products that actually practice and implement the Federal Circuit's definition for a trade secret.  But they're derived based upon knowledge of that trade secret." (Dkt. #712, Exhibit 2 at 234:4-15).

secrets, without a privilege to do so, is liable to the other if . . .") (quoting *Hyde*, 314 S.W.2d at 769; Restatement of Torts § 757).  Defendant reasons that only products that "actually practice and implement" the ATS can be part of the damages (Dkt. #712 at p. 16).

Defendant construes "use" of a trade secret too narrowly.  The Fifth Circuit adopted the Third Restatement of Unfair Competition's broader definition of "use":

> As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a "use[.]" . . . Thus, marketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret . . . all constitute "use."

*Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 877 (5th Cir. 2013) (quoting RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40(c) (1995)).  This is a broad definition that encompasses derivative products.

The Third Restatement continues, asserting that "use of any substantial portion of the secret is sufficient to subject the actor to liability.  Similarly, the actor need not use the trade secret in its original form."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 (1995).  Defendant is liable "for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret."  *Id.*  If the trade secret's contribution "is so slight that [Defendant's] product or process can be said to derive from other sources of information or from independent creation," then the trade secret has not been "used."  *Id.*

Mr. McAlexander's testimony comports with this definition.  He opines the derivative products were "derived based upon knowledge of that trade secret."  (Dkt. #712, Exhibit 2 at 234:14-15).  "[I]t's derivative based upon the . . . knowledge that Intersil had of the trade secret and . . . the design basically was revamped and involved basically a new set and new theory as to how to develop their products.  Some products that were based on that new approach would be

derivatives of that." (Dkt. #712, Exhibit 2 at 239:7-17).  The crux of Mr. McAlexander's opinion

is that Defendant used the ATS to "assist or accelerate research or development."  *See Wellogix*,

716 F.3d at 877.  This is permissible for damages.  Defendant may argue that the products are not

derivative at all or derive "so slight[ly]" from the ATS that trade secret is not used at all.  *See*

RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 40 (1995).

## VII.    Mr. McAlexander's Opinions Regarding Any Proportionate Value of the ATS

Defendant asks this Court to preclude Mr. McAlexander from testifying as to "any

proportionate value of the ATS" (Dkt. #712 at p. 13).  The entirety of the briefing on this issue is

below:

> One of the bases for reversal of the damages award in the prior trial was the failure to
> apportion the value of the ATS relative to the other two secrets that the CAFC found
> invalid. [citation].  Mr. McAlexander testified that he "did not recall addressing the
> proportionate value" [citation] of the trade secret in his Report.  Because he did not address
> that issue in his Report, as required by Fed. R. Civ. P. 26(a)(2)(b)(i), he has no basis to
> testify about it at trial.

(Dkt. #712 at p. 13-14).  Plaintiff does not respond, and Defendant does not revisit this argument

in its reply.  This is insufficient briefing for the Court to understand the dispute.  The Court can

only repeat the truism that experts are bound by the opinions expressed in their reports.  FED. R.

CIV. P. 26(a)(2).  And just because Mr. McAlexander "did not recall" whether something was in

his report does not mean it was not in his report.

## VIII.    Mr. McAlexander's Testimony as to Any Legal Issues or What the Jury Found

Defendant asks this Court to preclude Mr. McAlexander from testifying "about legal

issues, court rulings, and jury findings or verdicts" (Dkt. #712 at p. 14).

The Court declines to grant a general, blanket exclusion.  Experts may testify to their

understanding of the relevant law, provided they do not opine about the meaning of a law. *See*

*Gibson Brands, Inc. v. Armadillio Distribution Enterprises, Inc*., 4:19-CV-00358, 2021 WL

229463, at *3 (E.D. Tex. Jan. 22, 2021).  And at trial, the jury will be routinely reminded that the Court provides the applicable law.  Defendant may raise specific, targeted objections at the Pre-Trial Conference or at trial.

With that said, the Court addresses Defendant's targeted objection to Mr. McAlexander's testimony.  In his report, Mr. McAlexander describes the jury verdict as finding that specific products misappropriated the ATS:

> 138. As already confirmed by a jury and the courts . . . the Intersil Primary ALSs (ISL29001, ISL29002, ISL29003, ISL29004, ISL29010, ISL29012, and ISL29013) each incorporate and use TAOS' specific photodiode array structure . . .

(Dkt. #712 at p. 14).  But the verdict did not contain a product list.[8]  Nor did the Federal Circuit's opinion.  It would be misleading to testify otherwise.  Mr. McAlexander is therefore precluded from testifying that specific products were found to use the ATS.

## CONCLUSION

It is therefore **ORDERED** that Renesas Electronics America, Inc.'s Motion to Exclude Trial Testimony of Plaintiff's Technical Expert Joseph McAlexander (Dkt. #712) is hereby **GRANTED in part** and **DENIED in part**.

**SIGNED this 26th day of February, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE

---

[8] On the verdict, the jury found that the ISL29001, ISL29002, ISL29003, and ISL29004 infringed asserted patent claims.  This is not the same thing as a product list that uses the ATS (Dkt. #511 at p. 5).