# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| AMS SENSORS USA INC. f/k/a § | |
| TEXAS ADVANCED OPTOELECTRONIC § | |
| SOLUTIONS, INC. § | Civil Action No.  4:08-cv-00451 |
| § | Judge Mazzant |
| v. § | |
| § | |
| RENESAS ELECTRONICS AMERICA § | |
| INC. f/k/a INTERSIL CORPORATION § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is TAOS's Motion to Strike Expert Opinions of Woodward Yang, Ph.D., and Thomas W. Britven (Dkt. #714).  Having considered the Motion and relevant briefing, the Court finds the Motion should be **GRANTED in part** and **DENIED in part**.

### BACKGROUND

**I.      The First Trial**

The parties develop and sell ambient light sensors, which are used in electronic devices to adjust screen brightness in response to incident light.

In the summer of 2004, the parties confidentially shared technical and financial information during negotiations for a potential acquisition.[1]  In August 2004, the parties went their separate ways.  Soon after, Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation ("Renesas" f/k/a "Intersil") released new sensors with the technical design Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS" f/k/a "TAOS") disclosed in the confidential negotiations.  In January 2005, Plaintiff won a contract from Apple for the first-generation iPhone.  In February 2005, Plaintiff released its product that contained the confidential

---

[1] For simplicity's sake, the Court refers to the parties as "Plaintiff" and "Defendant."  When quoting briefing or prior rulings, the Court does not alter the quotations.  As such, some quotations may refer to the parties by their current names or former names, and sometimes a mix of both.

technology.  In January 2006, Defendant reverse-engineered that product.  In March 2008, Defendant won a contract from Apple for the second-generation iPhone.

On November 25, 2008, Plaintiff sued for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1). The trade secret claim asserted one technical trade secret and two financial trade secrets.

After a trial in early 2015, a jury returned a verdict for Plaintiff and awarded damages on all four claims.  The Court ruled on the parties' post-trial motions and entered final judgment. Both parties appealed.

## II. The Federal Circuit Mandate

The Federal Circuit wrote a lengthy opinion, affirming in part, reversing in part, vacating in part, and remanding the case (Dkt. #614).  Among its rulings, the Federal Circuit affirmed liability for trade misrepresentation, but only on the technical trade secret.  It identified the single "asserted trade secret" ("ATS") as "a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)." *Tex. Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1313 (Fed. Cir. 2018) (hereinafter "*TAOS*") (emphasis original).  Liability for the two financial trade secrets was vacated.

The misappropriation damages were overturned for two independent reasons: (1) Plaintiff's expert "did not explain which of the trade secrets contributed to what amount of profit to be disgorged" and (2) the ATS "was accessible to Intersil by proper means long before the time of many of the sales included in TAOS's request for monetary relief." *Id.* at 1317.  The Federal Circuit further explained the second reason:

> Such accessibility existed no later than January 2006, when Intersil successfully reverse-engineered the TSL2560, and perhaps as early as February 2005, when TAOS 'released' the TSL2560. . .
>
> . . . Secrecy protection terminated at the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the photodiode structure, to recreate that structure in its own products. . . .
>
> . . . That limited head-start period, which 'depend[s] upon the facts of each case,' ends TAOS's entitlement to monetary relief.
>
> Here, the jury awarded disgorgement of profits in the exact amount TAOS's expert proposed, based on sales from April 2006 through March 2014. . . . TAOS's evidence supporting its claim to monetary relief for trade secret misappropriation did not limit the covered sales to a head-start period, and that omission cannot be deemed harmless.

*Id.* at 1317-18. The Federal Circuit concluded: "On remand, any determination of sales-based monetary relief for trade secret misappropriation requires evidence and a determination of the time at which the trade secret became properly accessible to Intersil and the duration of any head-start period." *Id.* at 1318.

The Federal Circuit discussed additional errors with Plaintiff's disgorgement award. In trade secret cases, plaintiffs sometimes use the defendants' gains as evidence of the plaintiffs' losses, or of the reasonable royalty. But here, Plaintiff sought disgorgement of Defendant's profits without "any evidence or arguments that such profits soundly measured . . . TAOS's losses or a reasonable royalty." *Id.* at 1320. Defendant's profits were therefore not "a case-specific proxy for, TAOS's losses or a reasonable royalty." *Id.* There was "no evidence" that Defendant's profits from misappropriating the ATS correlated with Plaintiff's losses. *Id.* at 1321. "For example, . . . TAOS has not identified evidence showing that it would have won the [Apple] contract had Intersil not used TAOS's photodiode array structure." *Id.*

3

### III. On Remand

On remand, the parties dispute damages. On August 9, 2019, Judge Schell[2] transferred this case to the undersigned (Dkt. #662).

On November 25, 2019, Plaintiff moved for Entry of Final Judgment (Dkt. #672). The Court denied the motion on March 27, 2020 (Dkt. #682). Relevantly, the Court concluded Plaintiff's tortious interference claim was eliminated on appeal (Dkt. #682 at p. 22). The Federal Circuit found there was no causation between Defendant's trade secret misappropriation and its subsequent iPhone contract (Dkt. #682 at p. 22, n.11). This Court was unequivocal:

> In light of the Federal Circuit's discussion . . ., there is no evidence to support any link between these underlying acts and Apple's decision to purchase Renesas's ambient light sensors for the iPhone 3G in 2008.
> . . .
> Renesas's other two arguments can be boiled down to once concept: Renesas did not win the Apple iPhone 3G contract using any misappropriated information or by using TAOS's patent subject matter; rather, as the Federal Circuit summarized the evidence at trial, Renesas won the contract "primarily" due to Renesas's "significantly lower bid price, made possible by using the (lower cost) plastic packaging." . . . The Court must agree.
> . . .
> Although the Federal Circuit's discussion was not directed at TAOS's tortious interference claim, the Court struggles to see how it is not the law of the case. [citations omitted]. And as the law of the case, the Court may not reexamine the Federal Circuit's determination that Apple's decision to award Renesas the iPhone 3G was driven by Renesas's use of low-price plastic packaging.

(Dkt. #682, pp. 22, 24-25). Plaintiff moved for reconsideration (Dkt. #686). The Court denied the motion and reiterated it was bound by the Federal Circuit's opinion (Dkt. #696).

### IV. The Present Motion

As trial approaches, the parties filed various expert motions. These motions focus on how to interpret and apply the Federal Circuit's opinion. On December 1, 2020, Plaintiff moved to Strike Expert Opinions of Woodward Yang, Ph.D. ("Dr. Yang") and Thomas W. Britven ("Mr.

---

[2] United States Senior District Judge Richard Schell assumed senior status on March 10, 2015.

Britven") (Dkt. #714).  On December 15, 2020, Defendant responded (Dkt. #715).  On December 22, 2020, Plaintiff replied (Dkt. #721).

## LEGAL STANDARD

Federal Rule of Evidence 702 provides for the admission of expert testimony that assists the trier of fact to understand the evidence or to determine a fact in issue.  FED. R. EVID. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court instructed courts to function as gatekeepers, and determine whether expert testimony should be presented to the jury.  509 U.S. 579, 590-93 (1993).  Courts act as gatekeepers of expert testimony "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kuhmo Tire Co. Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).  "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony."  *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002) (citing *Kuhmo*, 526 U.S. at 147).

The party offering the expert's testimony has the burden to prove by a preponderance of the evidence that:  (1) the expert is qualified; (2) the testimony is relevant to an issue in the case; and (3) the testimony is reliable.  *Daubert*, 509 U.S. at 590-91.  A proffered expert witness is qualified to testify by virtue of his or her "knowledge, skill, experience, training, or education."  FED. R. EVID. 702.

In deciding reliability, the Court considers numerous factors.  *See Daubert*, 509 U.S. at 594.  In *Daubert*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony:  (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4)

whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94; *Pipitone*, 288 F.3d at 244. When evaluating *Daubert* challenges, courts focus "on [the experts'] principles and methodology, not on the conclusions that [the experts] generate." *Daubert*, 509 U.S. at 594.

The *Daubert* factors are not "a definitive checklist or test." *Daubert*, 509 U.S. at 593. As the Court has emphasized, the *Daubert* framework is "a flexible one." *Id.* at 594. The test for determining reliability can adapt to the particular circumstances underlying the testimony at issue. *Kuhmo*, 526 U.S. at 151. Accordingly, the decision to allow or exclude experts from testifying under *Daubert* is committed to the sound discretion of the district court. *St. Martin v. Mobil Exploration & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000).

Rule 403 dictates that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." FED. R. EVID. 403. Furthermore, the Fifth Circuit has consistently held that an expert may not render conclusions of law. *See Snap-Drape, Inc. v. C.I.R.*, 98 F.3d 194, 198 (5th Cir. 1996); *see also Goodman v. Harris Cnty.*, 571 F.3d 388, 399 (5th Cir. 2009) ("an expert may never render conclusions of law."); *Owen v. Kerr-McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983) ("allowing an expert to give his opinion on legal conclusions to be drawn from the evidence both invades the court's province and is irrelevant.").

## ANALYSIS

Plaintiff asks this Court to exclude testimony from Defendant's technical expert, Dr. Yang, and damages expert, Mr. Britven. Fundamentally, the parties have different interpretations of the Federal Circuit's decision. This Court is bound by the Federal Circuit's opinion as it is the law of

the case. *See Terrell v. Household Goods Carriers' Bureau*, 494 F.2d 16, 19 (5th Cir. 1974). The Court carefully reviewed the lengthy record, its recent orders, and the parties' briefing. It now addresses each of the three disputed opinions.

## I. Testimony Asserting the ATS was Properly Accessible Before the Time of Misappropriation

Plaintiff asks this Court to exclude testimony asserting the ATS was properly accessible before the time of misappropriation. On appeal, the Federal Circuit affirmed Defendant's liability for trade secret misappropriation and vacated damages. *TAOS*, 895 F.3d at 1317-18. The Federal Circuit remanded the case for "determination of the time at which the trade secret became properly accessible to Intersil and the duration of any head-start period." *Id.* at 1318.

On remand, Defendant's experts assert that the ATS was properly accessible before August 2004, the time of misappropriation. For example, Dr. Yang testified that "the asserted trade secret as defined by the CAFC was properly known to Intersil before the June 2004 meeting" (Dkt. #714, Exhibit 4 at 88:8-12). Even though the Federal Circuit affirmed liability, Dr. Yang asserted "the question that we're trying to answer" is "whether it's a legitimate trade secret or not." (Dkt. #714, Exhibit 4 at 88:24-89:2).

This is incorrect. The Federal Circuit affirmed Defendant's liability for misappropriating the ATS. *TAOS*, 895 F.3d at 1317. Inherent in that ruling, the Federal Circuit determined the ATS was a so-called "legitimate" trade secret. *Id.* at 1313 (defining the ATS). The jury determined each element of trade secret misappropriation was established by a preponderance of the evidence (Dkt. #511 (Verdict)). One of those elements is whether "[t]he trade secret was acquired through a breach of a confidential relationship or discovered by improper means." (Dkt. #506 at p. 10 (Jury Instructions)). When the Federal Circuit affirmed liability, it affirmed the jury's factual findings. These include finding Defendant acquired or discovered the ATS improperly. Defendant cannot argue otherwise.

Defendant's experts are therefore precluded from testifying that the ATS was properly accessible before the time of misappropriation. This is because for a trade secret to be misappropriated, it must have been secret (*See* Dkt. #511 at p. 10 (Jury Instructions)). When a trade secret is properly accessible, it is no longer a secret. *TAOS*, 895 F.3d at 1317. Thus, if the jury found the ATS was misappropriated, the jury determined the ATS was secret at the time of misappropriation. Dr. Yang's opinion that the trade secret was properly accessible before the time of misappropriation contradicts this finding.

## II. Testimony Asserting that Defendant Did Not Use the ATS

The parties dispute which accused products used the ATS. Plaintiff asks the Court to preclude testimony asserting that Defendant never used the ATS (Dkt. #714 at p. 11). For example, Dr. Yang opines that "Intersil never used the ATS in their [Ambient Light Sensor] Products as Intersil ALS designs were based on a specialized CMOS sensor process with color filters." (Dkt. #714, Exhibit 2 at p. 51). Dr. Yang seems to include the EL7903/ISL29001 as an Ambient Light Sensor product (*See* Dkt. #714, Exhibit 2 at p. 11).

Plaintiff argues the Federal Circuit identified products that used the ATS and thus Defendant cannot argue those products never used the ATS. For example, the Federal Circuit stated, "the trade secret misappropriation award was based on sales of [ISL29001, ISL29002, ISL29003, and ISL29004] and more than a dozen others." *TAOS*, 895 F.3d at 1328. The Federal Circuit made several additional findings on how the EL7903/ISL29001 used the trade secret.

Defendant argues the jury's verdict was simply that Defendant misappropriated the Plaintiff's trade secrets (Dkt. #715 at p. 7). The verdict did not contain a product list, nor did the Federal Circuit's opinion. It is therefore an open question which products used the ATS.

For the most part, Defendant is correct. While the Federal Circuit affirmed liability for the ATS, it did not list the products that used the ATS. This is true even though damages were "based

8

on sales of [ISL29001, ISL29002, ISL29003, and ISL29004,] and more than a dozen others." *TAOS*, 895 F.3d at 1328. This passage refers to the overall misappropriation award, which was vacated because Plaintiff did not explain which profits were attributable to the ATS. *Id.* at 1317, 1328. Damages were based on all three theories of trade secrets, but only the ATS was affirmed on appeal. Because it was impossible to determine what portion of the damages was attributable to the ATS, the Federal Circuit vacated the award. Similarly, it is unclear if each of the accused products practice the ATS, rather than one of the other theories of trade secrets that were vacated on appeal. Because it is unclear whether each accused product used the ATS, the Defendant is not bound by them on remand. Defendant may properly contest whether these products use the ATS.

However, Defendant is bound by the Federal Circuit's findings on the EL7903/ISL29001. The Federal Circuit initially noted that Plaintiff presented its ATS at trial as "allegedly used by Intersil in modifying its products (the EL7903/ISL29001)." *Id.* at 1312. After a thorough discussion, the Federal Circuit found "overwhelming evidence that Intersil learned of TAOS's design during the due diligence and changed its design soon after the negotiation fell through" based on "Intersil's lead engineer on the EL7903/ISL29001." *Id.* at 1316. He "confirmed that, before the EL7903, he had never designed a structure with interleaved shielded and exposed diodes," as well as "documents show[ing] that Intersil changed the structure of the EL7903 to incorporate the 1:1 interleaved diode array structure after the end of the due diligence meetings in August 2004." *Id.*

These findings demonstrate that Defendant's EL7903/ISL29001 used the ATS. The Federal Circuit separately defined the ATS as "a structure that includes *both* a 1:1 ratio of shielded to unshielded wells *and* interleaving of the wells in that ratio, *i.e.*, repetition of the 1:1 ratio in an alternating pattern (requiring more than one set of wells)." *Id.* at 1313 (emphasis original). When

discussing the EL7903/ISL29001, the Federal Circuit repeated this language, indicating that the product used the ATS. For example, the EL7903/ISL29001 contained "interleaved shielded and exposed diodes" and "incorporate[d] the 1:1 interleaved diode array structure." *Id.* at 1316. The Federal Circuit contextualized these features as being incorporated "after the negotiation fell through" and "after the end of the due diligence meetings in August 2004." *Id.* This references the time of misappropriation. The Federal Circuit therefore found that Defendant's EL7903/ISL29001 used the ATS.

While the parties may dispute which products used the ATS, Defendant may not contradict the Federal Circuit's finding on the EL7903/ISL29001. Dr. Yang is therefore precluded from opining that "Intersil never used the ATS in their [Ambient Light Sensor] Products" to the extent he includes the EL7903/ISL29001 as an Ambient Light Sensor product (Dkt. #714, Exhibit 2 at p. 51).

### III. Testimony Asserting the Head-Start Terminates With Mere Implementation of the ATS

A crucial issue for misappropriation damages is determining the head-start duration. The Federal Circuit described the head-start duration as, "the end of the period of time it would have taken Intersil, after Intersil's permissible discovery of the [ATS], to recreate that structure in its own products." *TAOS*, 895 F.3d at 1317. In other words, the head-start is the time "which would have been required for one having no background in the . . . business to launch such an enterprise." *Id.* (quoting *Equip. Co. v. C. H. Galloway & Sci. Cages, Inc*., 485 S.W.2d 953, 956 (Tex. Civ. App.—Waco 1972, no writ)). When the Federal Circuit considered this, it held Plaintiff's damages expert used sales "from April 2006 through March 2014" which "did not limit the covered sales to a head-start period" and "that omission cannot be deemed harmless." *Id.* at 1318.

On remand, the parties have differing opinions on the head-start duration, including how to define it. Is it the time necessary to merely incorporate the trade secret into an existing product,

as Defendant argues? Or is it longer, requiring the time "to develop an identical product with identical clientele," as Plaintiff argues? (Dkt. #717, p. 8 (citing *Halliburton Energy Services, Inc. v. Axis Techs., LLC*, 444 S.W.3d 251, 259 (Tex. App.—Dallas 2014, no pet.))).

The Court resolved this dispute in Defendant's Motion to Exclude Trial Testimony of Plaintiff's Technical Expert Joseph McAlexander (Dkt. #737). There, the parties asked the Court to define the head-start duration as a matter of law. In that Order, the Court held that this is a question for the jury:

> The factfinder must determine the time necessary for Defendant to "recreate" the ATS in its own product. This may include additional time beyond strictly implementing the ATS, to account for the unfair "marketing advantage" gained from misappropriation. Plaintiff argues it would take many months to do so; Defendant argues it would be a snap. Neither argument is wrong as a matter of law; this is a factual question for the jury. As such, the motion is denied on this basis.

(Dkt. #738 at p. 12). Now, Plaintiff moves to exclude Defendant's expert's testimony on the head-start duration for these same reasons. The Court's prior ruling resolves this dispute. As addressed previously, neither party's argument is wrong as a matter of law. The jury must determine when the head-start duration concluded. Accordingly, the Court denies the Motion on this basis.

## CONCLUSION

It is therefore **ORDERED** that TAOS's Motion to Strike Expert Opinions of Woodward Yang, Ph.D., and Thomas W. Britven (Dkt. #714) is hereby **GRANTED in part** and **DENIED in part**.

**SIGNED this 4th day of March, 2021.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE