# United States District Court
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| AMS SENSORS USA INC. f/k/a § <br> TEXAS ADVANCED OPTOELECTRONIC § <br> SOLUTIONS, INC. § <br> § <br> v. § <br> § <br> § <br> RENESAS ELECTRONICS AMERICA § <br> INC. f/k/a INTERSIL CORPORATION § | Civil Action No.  4:08-cv-00451 <br> Judge Mazzant |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Fed. R. Civ. P. 50(b) and 59(a) Motions (Dkt. #875).  Having considered the motions and relevant pleadings, the Court finds they should be **DENIED.**

### BACKGROUND

On June 3, 2004, the parties entered into a letter "Confidentiality Agreement" to explore a possible business relationship.  Pursuant to the terms of the Confidentiality Agreement, the parties exchanged confidential information.  However, the parties were ultimately unable to agree on the terms of a business relationship and discussions regarding Defendant Renesas Electronics America Inc. f/k/a Intersil Corporation's ("Renesas") acquisition of Plaintiff AMS Sensors USA Inc. f/k/a Texas Advanced Optoelectronic Solutions, Inc. ("AMS") ended.  AMS subsequently discovered that Renesas used AMS's confidential information to create a competing line of digital ambient light sensors ("ALS").  As such, on November 25, 2008, AMS filed suit against Renesas alleging claims for patent infringement, breach of contract, trade secret misappropriation, and tortious interference with prospective business relations (Dkt. #1).

The case proceeded to a jury trial on February 9, 2015.  At the conclusion of the trial on March 6, 2015, the jury found that (1) Renesas breached the Confidentiality Agreement with AMS,

(2) Renesas misappropriated AMS's trade secrets, (3) Renesas' misappropriation of AMS's trade secrets resulted from Renesas' fraud, malice, or gross negligence, (4) Renesas did not prove that AMS must have known or must have been reasonably able to discover that Renesas used AMS's proprietary information to create competing products before November 25, 2005, (5) AMS proved that Renesas fraudulently concealed the facts upon which AMS's misappropriation of trade secrets claim was based, (6) Renesas intentionally interfered with AMS's prospective business relations with Apple, (7) Renesas' tortious interference was the result of fraud, malice, or gross negligence, (8) Renesas willfully infringed the '981 patent, (9) Renesas did not prove that any of the claims of the '981 patent were invalid due to obviousness, for failing to satisfy the written description requirement, or for failing to contain a sufficiently full and clear description of how to make and use the full scope of the claimed invention, (10) Renesas did not prove that its conduct was excused because of laches, and (11) Renesas did not prove that AMS had unclean hands (Dkt. #511).

The jury awarded AMS the following:

(a) $1.00 in nominal damages for Renesas' retention of AMS's confidential information under the Confidentiality Agreement;
(b) $12,000,000.00 as a reasonable royalty for Renesas' breach of the Confidentiality Agreement;
(c) $48,783,007.00 as disgorgement of Renesas' profits for the misappropriation of AMS's trade secrets;
(d) $10,000,000.00 in exemplary damages for Renesas' trade secret misappropriation;
(e) $8,000,000.00 in lost profit damages arising from Renesas' intentional interference with AMS's prospective relations with Apple;
(f) $10,000,000.00 in exemplary damages for Renesas' tortious interference; and
(g) $73,653.51 as a reasonable royalty for Renesas' infringement of the '981 patent.

(Dkt. #511). Final judgment was entered on June 9, 2016 (Dkt. #596). Renesas appealed.

On appeal, The Federal Circuit affirmed in part, reversed in part, and vacated in part the final judgment and remanded the case. *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304 (Fed. Cir. 2018) (hereinafter "*TAOS*"). The Federal Circuit

affirmed liability for trade secret misappropriation, but only on the technical trade secret. Liability for the two financial trade secrets was vacated. The misappropriation damages were overturned. *Id.* at 1317. Finally, the Federal Circuit found that the patent infringement award was duplicative of the trade secret misappropriation award. *Id.* at 1328.

On April 5, 2021, AMS and Renesas appeared before the Court for a jury trial on damages. On April 16, 2021, the jury returned a verdict (Dkt. #824). The jury provided an advisory opinion on the issue of disgorgement for trade secret misappropriation. On August 24, 2021, AMS filed its amended election of remedies (Dkt. #854). AMS asked the Court to award:

> (a) Disgorgement of profits from sales of the ISL29003 to Apple for use in the iPod Touch and to non-Apple customers through March 2008 in the amount of $8,546,000.00;
> (b) Exemplary damages for trade secret misappropriation in the amount of $17,092,000.00;
> (c) Royalty on all sales of Derivative Products in the amount of $6,637,693.00; and
> (d) Royalty on residual sales of Primary Products (excluding ISL29003) in the amount of $613,014.00

(Dkt. #854).

On December 14, 2021, the Court entered its Findings of Fact and Conclusions of Law (Dkt. #855). The Court agreed with the jury's advisory findings that the ISL29003 used AMS's trade secret, such trade secret became properly accessible in January of 2006, and that there was a 26-month head start period (Dkt. #855). The Court also found AMS was entitled to recover disgorgement of Renesas' profits in the amount of $8,546,000 (Dkt. #855 at p. 43). The Court entered Final Judgment on March 7, 2022 (Dkt. #870).

On March 31, 2022, Renesas filed the current motion (Dkt. #875). AMS responded on April 28, 2022 (Dkt. #891). Renesas replied on May 19, 2022 (Dkt. #903). AMS filed its sur-reply on June 9, 2022 (Dkt. #914).

**LEGAL STANDARD**

### I.  Judgment as a Matter of Law

Upon a party's renewed motion for judgment as a matter of law following a jury verdict, the Court should ask whether "the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004); FED. R. CIV. P. 50(a). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). "A JMOL may only be granted when, 'viewing the evidence in the light most favorable to the verdict, the evidence points so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at any contrary conclusion.'" *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1261 (Fed. Cir. 2013) (quoting *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838 (5th Cir. 2004)).

Under Fifth Circuit law, a court should be "especially deferential" to a jury's verdict and must not reverse the jury's findings unless substantial evidence does not support the findings. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petrol., Inc.*, 211 F.3d 887, 891 (5th Cir. 2000). A motion for judgment as a matter of law must be denied "unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion." *Baisden*, 693 F.3d at 498 (citation omitted). However, "[t]here must be more than a mere scintilla of evidence in the record to prevent

4

judgment as a matter of law in favor of the movant." *Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 606 (5th Cir. 2007).

In evaluating a motion for judgment as a matter of law, a court must "draw all reasonable inferences in the light most favorable to the verdict and cannot substitute other inferences that [the court] might regard as more reasonable." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 451 (5th Cir. 2013) (en banc). However, "[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses.'" *Id.* at 151 (citation omitted).

## II. Motion for New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a new trial can be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). However, "[u]nless justice requires otherwise, no error in admitting or excluding evidence – or any other error by the court or a party – is grounds for granting a new trial . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61.

To be entitled to a new trial, the movant must show that the verdict was against the great weight of the evidence, not merely against the preponderance of the evidence. *Taylor v. Seton*

*Healthcare*, No. A-10-CV-650 AWA, WL 2396880, at *2 (W.D. Tex. June 22, 2012) (citing *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838–39 (5th Cir. 2004); *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir. 1982)). A jury verdict is entitled to great deference. *Dresser-Rand Co.*, 671 F.2d at 839. "Weighing the conflicting evidence and the inferences to be drawn from that evidence, and determining the relative credibility of the witnesses, are the province of the jury, and its decision must be accepted if the record contains any competent and substantial evidence tending fairly to support the verdict." *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275, 1297 (5th Cir. 1988).

## ANALYSIS[1]

Renesas moves for judgment as a matter of law, or in the alternative, for new trial. AMS opposes the motion, arguing in large part that Renesas merely attempts to renew arguments on issues the Court has already heard and resolved.

### I.  Renesas' Motion for Judgment as a Matter of Law

Renesas challenges the sufficiency of the evidence on the breach of the Confidentiality Agreement claim. Specifically, Renesas challenges the sufficiency of the evidence at trial regarding causation of damages, scope and use of AMS's confidential information, and the reasonable royalty rate the jury used to calculate damages. AMS responds that substantial evidence supports the jury's verdict.

Renesas also asserts the jury should not have been allowed to award punitive damages, no breach of contract issues should have been tried due to AMS's alleged waiver of its right to elect a breach of contract remedy, and the Court should enter judgment in favor of Renesas on the patent infringement claim. AMS contends Renesas has already raised these arguments and the Court has

---

[1] Citations to testimony from the second trial are in the form of "2Tr. [page]:[line(s)] ([witness's last name])."

6

rejected them many times over. The Court will address each of the arguments in turn.

### A. Proximate Cause

Renesas argues it is entitled to judgment as a matter of law on the breach of contract claim because any breach was not a proximate cause of AMS's "loss of sales for the 1st and 2nd Generation iPods" (Dkt. #875 at p. 2). Renesas asserts the evidence demonstrated price, rather than any alleged misuse of confidential information, was the substantial factor for Apple's decision to award the contracts for the purchase of ALS chips for the 1st and 2nd generation iPods to Renesas, as opposed to AMS.

However, the Final Judgment does not include any contract damages arising from sales to Apple for iPods (Dkt. #87). Instead, the Final Judgment awards reasonable royalty damages for Renesas's breach of contract related to sales of the Derivative Products and sales of the Primary Products, excluding the ISL29003 (Dkt. #870 at p. 2). The ISL29003 was the product Renesas supplied for the iPod. Thus, no damages were awarded for loss of sales for the 1st and 2nd Generation iPods. Renesas' proximate cause argument, therefore, does not address the Final Judgment and cannot serve as a basis for judgment as a matter of law.

Further, Renensas' argument regarding the lost contracts "would be relevant in a lost profits case." *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). However, the reasonable royalty theory of damages "compensates the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Id.* (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009)). Consequently, Renesas' focus on damages proximately caused by lost sales is misplaced.

### B. Scope of Confidential Information

Renesas argues AMS did not demonstrate misuse of confidential information beyond the trade secret itself. AMS responds that Renesas once again equates "confidential information," as defined in the Confidentiality Agreement, with the trade secret itself. The Court has already rejected this false equation: "[t]his Court already recognized there was 'overwhelming evidence' to support the [first] jury's finding that Defendant 'used [AMS's] confidential information[,]'" and that "[t]his is distinct from the Federal Circuit's definition of the [trade secret]" (Dkt. #737 at pp. 16–17 (citing Dkt. #682 at pp. 19–20)); *see also TAOS*, 895 F.3d at 1310 (noting that "[AMS] disclosed," among other things, "the technical aspects of the not-yet-released TSL2560 *with* the 1:1 interleaved diode array structure").

Not only has the Court already ruled on these arguments, but evidence from the second trial established the existence of other confidential information in addition to the trade secret. Testimony from Joseph McAlexander, a registered professional engineer and expert for AMS, was that, "[AMS] went through in increasingly detailed fashion the different ways in which the circuits operated, how it was structured, not just the fact that it's a 1:1 ratio of wells unshielded to shielded," but "the specifics of the know-how, how it's done and why they did it the way they did it." 2Tr. 1003:18–1004:3 (McAlexander). Kirk Laney, the CEO and one of the founders of AMS, testified that his Vice President of engineering, Cecil Aswell, conducted a phone call with the technical team at Renesas—after the parties entered the Confidentiality Agreement—wherein Aswell provided a tutorial on "silicon characteristics that would apply to the diode performance" including "diffusion depths" and "epi versus non-epi silicon." 2Tr. 344:9–348:1 (Laney). AMS's Vice President testified to the "know-how" Renesas needed to actually implement the trade secret. 2Tr. 943:20–23 (Strippoli). Thus, the Court finds there was sufficient evidence for the jury to find that Renesas conveyed confidential information distinct from the trade secret itself.

8

Further, there was sufficient evidence from which the jury could conclude Renesas misused such confidential information. *See* 2Tr. 1063:7–21 (McAlexander) (discussing emails showing Renesas' employees "going back and directly comparing [AMS's confidential product information] to their own product") (citing PX65 and PX67); 1077:15–1078:10 (contemporaneous design review showed Renesas was "already looking at how to implement that within changes to their own design") (citing PX111); 597:21–598:2 (Laney) ("[T]he thing that gave [Renesas] the leapfrog was comprehending and adapting the 1:1 interleaved structure. Confidential information pointed them in the direction, and the trade secret ultimately took the product over the goal line to compete in the market."). The Court is thus satisfied that "reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Am. Home Assurance*, 378 F.3d at 487. Accordingly, Renesas' argument on this point is to no avail.

### C. Use of Confidential Information

Renesas argues the Derivative Products and one of the Primary Products do not incorporate the trade secret, and any product which does not contain the trade secret cannot be the basis for breach. However, "incorporation" of the trade secret is too narrow an interpretation of "use," as this Court has already ruled (Dkt. #737 at p. 19). At the second trial, the Court instructed the jury that such "use" "is not limited to products that directly practice and implement the trade secret" but rather "any exploitation of the trade secret that is likely to result in Plaintiff's injury or Defendant's enrichment" including "relying on the trade secret to assist or accelerate research or development" (Dkt. #822 at p. 8). In the Court's Findings of Fact and Conclusions of Law, the Court adopted the same standard and found "'overwhelming evidence' that Defendant 'used [AMS's] confidential information'—including the trade secret—'to revamp [its] designs for its ambient light sensor and develop a new line of light sensors to compete with [AMS]'" (Dkt. #855

9

at p. 36 (citing Dkt. #682 at pp. 19–20)). The Court has thus already impliedly ruled that substantial evidence supports the jury's finding of breach based on Renesas' development of the Primary and Derivative Products. Renesas has not shown why that ruling should change.

### D. Reasonable Royalty Rate

The jury's award was based on a reasonable royalty rate of $0.075 per unit. Renesas argues this rate cannot stand due to AMS's election, and should not exceed $0.025 per unit. Renesas also contends the reasonable royalty rate "cannot extend materially beyond February 2005, or alternatively, beyond the term of the NDA" (Dkt. #875 at p. 11). AMS counters that Renesas waived these arguments by failing to raise them in its pre-verdict Rule 50(a) motion, and, in any event, the reasonable royalty rate and term are supported by substantial evidence. The Court will address each argument regarding the royalty damages in turn.

#### 1. The ISL29003

Renesas argues AMS elected, and the Court awarded, reasonable royalty damages for breach of contract related to the Derivative Products—none of which included the ISL29003—and royalty damages on residual sales of Primary Products, excluding the ISL29003 (Dkt. #875). Renesas contends that "[i]f the ISL29003 is removed from the calculus, the jury verdict would have been much lower" (Dkt. #875 at p. 15). Thus, because the ISL29003 is "no longer part of the damages base," Renesas requests a reduction of the reasonable royalty rate and/or a new trial to determine the appropriate rate. AMS responds the ISL29003 was never removed from the "breach damages base" (Dkt. #891 at p. 9).

As the Court explained in its order on AMS's election of remedies, the jury awarded damages for both the trade secret misappropriation claims (Dkt. #853 at pp. 8–9). Under the misappropriation claim, the jury awarded disgorged profits for certain ISL29003 sales, along with

exemplary damages. Under the breach claim, the jury awarded royalties on Derivative Products and on Primary Products—but the ISL29003 is one of the Primary Products. Thus, the jury included damages for the sales of the ISL29003 in both its misappropriation and breach awards.

In its election, for the misappropriation claim, AMS asked for the entire disgorgement award—which covered ISL29003 sales to both Apple for use in the iPod Touch, and to all other customers from January 30, 2006, through March 2008—and the maximum exemplary damages allowed by law. For the breach claim, AMS asked for royalties on all sales of Derivate and Primary Products, except for those ISL29003 sales that were already included in the misappropriation award. However, this request meant AMS could still obtain royalties on other ISL29003 sales, such as those made after March 2008 to non-apple customers. Identifying a double recovery issue, the Court found AMS "cannot splice sales of the ISL29003 into two different remedies. Plaintiff cannot recover twice for one wrong: the development and sale of the ISL29003" (Dkt. #853 at p. 15). The Court thus directed AMS to file an amended election of remedies.

At trial, the jury awarded $6,701,743 as reasonable royalty damages for the Primary Products (Dkt. #824 at p. 6). In its amended election, AMS requested $613,014 for royalty on sales of Primary Products, excluding the ISL29003 (Dkt. #854). Generally, when "the election of remedies theory applies . . . the issue of whether" the unelected award "was proper is moot." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 341 (5th Cir. 2008). Although AMS elected—and recovered—damages under both the misappropriation and breach claims, by removing the ISL29003 from the royalty on Primary Products, the Court views the jury's verdict on reasonable royalty damages related to the ISL29003 as analogous to an unelected remedy. Thus, the propriety of the award is moot. *Id.* This is especially true as AMS's election on the reasonable royalty damages for the Primary Products represents not even a tenth of the jury's

verdict on such damages.  Renesas' request, therefore, for a reduction of the reasonable royalty rate has been satisfied, albeit in a circuitous manner.  Accordingly, the Court need not disturb the jury's verdict.

### 2. Term

Renesas argues the substantial evidence does not support the ten-year term for the hypothetical negotiation that the jury adopted because: (1) AMS's product was capable of being reverse engineered in February 2005; and (2) the Confidentiality Agreement expired on June 3, 2007.

This is not the first time the Court has heard Renesas' arguments regarding reverse-engineering.  The Court already noted the lack of evidence that Renesas or any third party accessed the trade secret upon the release of the TSL2560 (Dkt. #855 at p. 5 (citing 2 Tr. 1889:11–13, 1890:2–15 (Yang), 2144:23–2145:1 (Britven)).  Moreover, there was testimony at trial that reverse-engineering a product is not dispositive to the royalty analysis because "the key is getting a product to the market" and "just because you have the teardown doesn't mean you can implement it into a competitive product."  2Tr. 1573:7–22 (Ugone).  Renesas' reverse-engineering argument, therefore, is not persuasive.

Further, Renesas' argument that the term should be shortened because Renesas was no longer in breach after the confidentiality period ended is not persuasive.  The Federal Circuit has considered—and rejected—a similar argument before.  *See SiOnyx LLC v. Hamamatsu Photonics K.K.*, 981 F.3d 1339, 1350–51 (Fed. Cir. 2020).  In *SiOnyx*, the defendant argued the plaintiff was not entitled to damages for its breach of contract or unjust enrichment claims after the confidentiality period of the parties' NDA expired.  *Id.* at 1350.  The lower court denied the motion, reasoning that the jury's verdict could "'incorporate a finding that [the defendant]

continued to reap the benefit of their earlier breach by selling products that it had designed using [the plaintiff's] confidential information.'" *Id.* at 1351 (quoting *SiOnyx, LLC v. Hamamatsu Photonics K.K.*, No. 1:15-cv-13488-FDS, 2019 WL 11307358, at *3 (D. Mass. July 25, 2019)). The Federal Circuit agreed with such reasoning and declined to alter the jury's award of damages. *Id.* Similarly, here, the evidence showed Renesas continued to benefit from developing its products using confidential information during the Confidentiality Agreement's term. By August 2007, Renesas was sampling the ISL29003 to Apple for the iPhone 3G platform. 2Tr. 1404:6–1405:3 (McAlexander). Then, "by March 2008, Apple selected [Renesas'] product" for use in the iPhone 3G. *TAOS*, 895 F.3d at 1310. Between 2006 and 2014, Renesas sold more than eighty million units of the ISL29003, generating nearly $30 million in revenue. PX435-B; 2Tr. 1468:14–16 (Ugone). Thus, there was evidence from which the jury could arrive at its conclusion and the Court is not persuaded to modify the royalty term.

### 3. Rate

Renesas argues the jury's award—which the Court adopted in its Findings of Fact and Conclusions of Law (Dkt. #855)—was based on an incorrect royalty rate. Renesas argues the royalty rate for breach cannot exceed $0.025/unit because "the only confidential information demonstrated to be misused was the [trade secret]" and the rate does not apportion in light of the Federal Circuit's holding that "previously asserted business and financial information was not misused by [Renesas]" (Dkt. #875 at p. 12). AMS argues the jury's reasonable rate is supported by substantial evidence.

At the first trial, AMS asserted Renesas misappropriated three trade secrets: (1) AMS's detailed financial information, which Renesas allegedly used to make its "Build vs. Buy" decision; (2) the "packaging roadmap" specification of glass packaging; and (3) the 1:1 interleaved

photodiode array structure. *TAOS*, 895 F.3d at 1312. It is true that the Federal Circuit held misappropriation liability could only rest on one of the three grounds that AMS presented to the jury—the interleaved photodiode array structure. *Id.* at 1317. However, in the second trial, the Court followed the mandate and only instructed the jury on the remaining viable trade secret. The Court's instructions repeatedly referred to one, or "the," trade secret (Dkt. #822). For example, in the instructions regarding disgorgement for trade secret misappropriation, the Court stated: "Plaintiff seeks the disgorgement of Defendant's profits from the ISL29003 product. The parties dispute whether Defendant's ISL29003 product used the trade secret" (Dkt. #822 at p. 9). Further, the Court's instruction on proper accessibility was as follows:

> The prior proceedings determined that the trade secret was properly accessible no later than January 2006, when Defendant successfully reverse-engineered Plaintiff's TSL2560 product, and perhaps as early as February 2005, when Plaintiff "released" the TSL2560. The trade secret was not properly accessible when Defendant misappropriated it, back in August 2004

(Dkt. #822 at pp. 10–11). This instruction restates the Federal Circuit's decision regarding Renesas' ability to reverse-engineer the photodiode array structure. *TAOS*, 895 F.3d at 1317. The Court's instructions reflect that the only trade secret the jury received instructions on was the interleaved photodiode array structure. As a result, the Court can reasonably infer the jury's award was based on misuse of the trade secret, not the financial information or packaging roadmap.

Moreover, district courts have frequently looked to *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y. 1970) for guidance on reasonable royalty damages assessment. *See also Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555, 1567, 1577 (Fed. Cir. 1995) (approving of the *Georgia-Pacific* analysis for determining reasonable royalty damages). *Georgia-Pacific* sets forth fifteen factors to be considered in a reasonable royalty analysis. *Id.* at 1120. The central premise underlying the *Georgia-Pacific* analysis is that of a

14

fictional hypothetical negotiation occurring at the time infringement began, between a willing licensor and willing licensee for the technology-at-issue. *See id.* Here, the jury was instructed on such factors (Dkt. #822 at pp. 14–15). Because the jury was instructed on only one trade secret, along with the *Georgia-Pacific* factors, the Court can reasonably infer the jury's award properly apportioned the value of the confidential information.

Moreover, the jury's royalty rate was supported by substantial evidence. Renesas previously conceded the verdict in the first trial was based predominately "on the asserted secrecy of 'the diode structure[.]'" *TAOS*, 895 F.3d at 1316. The testimony of AMS's founders and inventors of the 1:1 interleaved photodiode structure supported its high value and importance. *See e.g.*, 2Tr. 436:6–10 (Laney) (noting that structure was "the entire value proposition" for the TSL2560 product family); *id*. at 772:7–21 (Dierschke) (noting that "photodiode itself was the most important change because . . . customers wanted it for an ambient light sensor. So, unless you had a good . . . photodiode – then the rest of it is not that meaningful"); *id*. at 907:7–9 (Strippoli) ("The essence of . . . our ALS was the photodiode structure. It was the steak on the steak dinner."). AMS's damages expert, Dr. Ugone, presented sales data showing significant demand for AMS's and Renesas' products that incorporated the trade secret structure relative to those that did not. For example, Dr. Ugone's analysis concluded that Renesas sold less than one million units of the EL7900—the only ALS product Renesas developed before misappropriation. 2Tr. 1471:12–16 (Ugone). After misappropriation, by contrast, Renesas' sales of the ISL29003 alone rose to more than eighty-one million units. PX435-B at 1; 2Tr. 1468:14–16, 1471:16–18 (Ugone). "Where there is substantial evidence for a reasonable jury finding, it is not [the Court's] function to second guess or reevaluate the weight given to that evidence." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015). Looking at the evidence, there is no basis for the Court to

substitute its judgment for that of the jury. Thus, the Court will not disturb the jury's finding on the royalty rate.[2]

### E. Punitive Damages

Renesas argues the jury impermissibly awarded punitive damages. Renesas argues the jury's knowledge of the prior liability finding "prejudiced the jury against Renesas" (Dkt. #875 at p. 13). While it is true that the description of a prior verdict before a jury "creates the possibility that the jury will defer to the earlier result," *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1351 (3d Cir. 1975), that is only a problem where the earlier verdict is not relevant or has no bearing on the subsequent jury's verdict. In the second trial, the jury was *required* to defer to the earlier finding on liability. On appeal, the Federal Circuit vacated the award of exemplary damages, but not the liability finding. *TAOS*, 895 F.3d at 1318. Thus, the second jury was only tasked with determining the amount of exemplary damages, not liability. There is no evidence in the record the jury had any knowledge about the prior amount of the award and was thereby prejudiced against Renesas. The Court will not disturb the jury's finding in the second trial merely because the Court informed the jury of its more limited role as a result of the prior verdict.

Renesas also argues "the jury as a matter of law should not have even had the ability to award punitive damages" because the jury was not involved in the liability finding for trade secret misappropriation (Dkt. #875 at pp. 13–14). However, this is the not first time the Court has heard, addressed, and rejected this argument. The Court finds no reason to reverse course now.

### F. Election of Breach Remedy

Renesas contends no breach of contract issues ever should have been tried. More specifically, Renesas asserts the Court erred in its prior ruling that AMS's original election of the

---

[2] The Court need not reach AMS's argument regarding waiver as it finds the substantial evidence supports the jury's verdict on the royalty rate and term.

trade secret misappropriation remedy was not binding, thus allowing AMS to re-elect its remedy on remand. The Court has already conducted a detailed analysis of this argument and rejected it (Dkt. #682). Renesas fails to raise any new law or argument which would alter the Court's prior disposition.

### G. Patent Claim

On remand, AMS elected not to pursue damages for any patent infringement claim. Renesas now argues it is entitled to judgment on that claim. However, AMS aptly points out that the Federal Circuit affirmed the Court's prior final judgment of willful infringement against Renesas. *TAOS*, 895 F.3d at 1308, 1332. Further, in its Order on the Final Judgment, the Court explicitly stated AMS was the sole prevailing party on the patent claim (Dkt. #869 at p. 18). There has been no subsequent law or ruling that persuades the Court to change its position. Thus, Renesas is not entitled to judgment on the patent claim.

## II. Renesas' Motion for New Trial

Because Renesas asserts the same grounds for its right to a new trial and its motion for judgment as a matter of law, for the same reasons the Court denies the judgment as a matter of law, it also denies the motion for new trial. The verdict is not against the weight of the evidence, nor were the damages awarded excessive, the trial was not unfair, and prejudicial error was not committed during the course of trial. *Transworld Drilling Co.*, 773 F.2d at 613. Thus, the Court denies the motion for new trial.

## CONCLUSION

It is therefore **ORDERED** Defendant's Fed. R. Civ. P. 50(b) and 50(a) Motions (Dkt. #875) are **DENIED**.

**IT IS SO ORDERED.**

**SIGNED this 25th day of July, 2022.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE